,IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | The Honorable Liam O'Grady |
| Plaintiff, ) | |
| ) | Case No. 1:12-cr-00003-LO |
| v. ) | |
| ) | |
| KIM DOTCOM, *et al*. ) | |
| ) | |
| Defendants. ) | |

## BRIEF OF INTERESTED PARTY KYLE GOODWIN IN SUPPORT OF EMERGENCY MOTION FOR PROTECTIVE ORDER BY NON-PARTY CARPATHIA HOSTING, INC. AND FOR ADDITIONAL RELIEF

**I.    INTRODUCTION**

It is one thing to take legal action against an alleged copyright infringer. It is quite another to do so at the expense of entirely innocent third parties, with no attempt to prevent or even mitigate the collateral damage.

That is what has happened here. When the government shut down Megaupload, it was one of the 100 most popular websites in the world, with reportedly 150 million registered users. One of those users, Kyle Goodwin, had recently started a business reporting on local high school sporting events across Ohio. In addition to backing up his files on a hard drive, Mr. Goodwin joined many others like him in placing his files on Megaupload's servers, paying for a premium account, and taking advantage of the remote backup cloud-based system for storage and remote access to an unlimited number of files.

When Mr. Goodwin's hard drive crashed, he expected to be able to restore his files by drawing them from Megaupload's servers. However, before he could do so, on January 19, 2012, federal agents shut down Megaupload with no prior notice to Mr. Goodwin (or any other customer), seized its domain names, froze its funds, and executed search warrants on the leased

1

servers that housed its customers' (including Mr. Goodwin's) property. As a result, since January 19, 2012, Mr. Goodwin has not been able to access the files he needs to conduct his business—*i.e.*, his lawful property—despite the fact that those files are sitting on Carpathia's servers.

It is unclear which party has control of Mr. Goodwin's property. According to Carpathia, while the servers are in its possession, it cannot access those servers' contents. According to the government, it has released control over the servers and the data on them. According to Megaupload, without access to its funds (that are indisputably currently under the government's control), it cannot afford to turn the servers back on and allow customers like Mr. Goodwin to retrieve their files.

What is clear is that Mr. Goodwin, the rightful owner of the data he stored on Megaupload, has been denied access to his property. It is also clear that this Court has equitable power to fashion a remedy to make Mr. Goodwin—an innocent third party—whole again. And finally it is clear that any such remedy will set an important precedent, because it is unlikely that this will be the last time an innocent third party will have his or her files or other property seized as part of a federal copyright case. Indeed, the federal government has reportedly seized more than 500 websites so far under its Operation in our Sites campaign.[1] Therefore, Mr. Goodwin files this brief in support of Carpathia's Motion for Protective Order and requests that the Court

---

[1] *See 2011 U.S. Intellectual Property Enforcement Coordinator Annual Report on Intellectual Property Enforcement*, available at
http://www.whitehouse.gov/sites/default/files/omb/IPEC/ipec_annual_report_mar2012.pdf
("Operation In Our Sites is the first coordinated and sustained law enforcement effort to target websites that distribute counterfeit and pirated goods and has . . . result[ed] in the seizure of 270 domain names of infringing Websites.").

2

implement a procedure to expedite the return of his rightful property, as well as the property of others similarly situated, stored on Megaupload's servers.

## II. BACKGROUND

### A. OhioSportsNet and Megaupload

In July 2011, Mr. Goodwin formed his business, OhioSportsNet, to cover local high school sporting events. Declaration of Kyle Goodwin ("Goodwin Decl."), attached as Ex. A, at ¶ 1. As part of that business, Mr. Goodwin and his producers travel all over the state and film various high school sports games. *Id.* at ¶ 2. OhioSportsNet broadcast some of those games later; others were streamed in real time via the OhioSportsNet website. *Id.*

In order for Mr. Goodwin and his producers to share tape of the games—to prepare that tape for streaming and to create related promotional and news packages—they must exchange the large video files electronically. *Id.* at ¶ 3. For example, in November 2011, OhioSportsNet was the only outfit to cover, via video, the state high school soccer finals. *Id.* at ¶ 4. During the early rounds of those playoffs, multiple games occurred on the same night, which meant OhioSportsNet had to dispatch three or four people to film each game. *Id.* The logistics behind sharing these and other recordings in short order were challenging, to say the least, and required a technical means for exchanging large files over the Internet. *Id.* at ¶ 5. Megaupload's cloud storage service seemed to offer an ideal solution. Mr. Goodwin therefore registered a premium account there, allowing him to upload and store files of unlimited size. *Id.* Mr. Goodwin paid 79.99 euros for his two-year premium Megaupload membership. *Id.* As it happens, the footage from those soccer games is among the many files to which Mr. Goodwin lost access to when the government shut down Megaupload without warning. *Id.* at ¶ 6.

Over the past six months, OhioSportsNet has started to realize some commercial success. *Id.* at ¶ 7. For example, its coverage of the state high school soccer finals garnered more than

5,000 unique viewers. *Id.* In total to date, more than 40,000 unique visitors have come to OhioSportsNet's website and its videos have received more than 55,000 hits on YouTube. *Id.*

### B.   OhioSportsNet's Backup Policies and Megaupload's Crash

Mr. Goodwin backed up all the raw footage of the sporting events, player and coach interviews, and promotional packages on a personal hard drive. *Id.* at ¶ 8. Mr. Goodwin believed that between his own hard drive backups and Megaupload's cloud storage service, he was protecting the files he needed to continue to grow his business. However, as luck would have it, in mid-January, his hard drive crashed. *Id.* Upon learning that the files on his hard drive could not be recovered, Mr. Goodwin logged into Megaupload to pull his files off the server and save backup copies to replace those he had lost. To his surprise, he could not get past the welcome screen. *Id.* Initially, he was not concerned, figuring there were some technical problems that would be ironed out and he would have access to his files. Of course, unbeknownst to Mr. Goodwin, federal agents had shut down Megaupload's service and seized the servers that housed Mr. Goodwin's files. It was only after he called his producers that he learned the fate of Megaupload and his files. *Id.*

That fate has been widely discussed in court filings and in the media; indeed, it made international news. On January 19, this Court unsealed an indictment dated January 5. Indictment, Dkt. No. 1. With much fanfare, the government, with representatives of foreign law enforcement agencies, raided the homes of defendants and seized bank accounts, jewelry, cars, and other valuable goods.[2] The government also seized 18 domain names, including www.megaupload.com. Dkt. No. 1 at 71. In addition to the seizures, the government executed a search warrant for the more than 1,000 servers owned by Carpathia Hosting, which Megaupload

---

[2] *See generally* Bryan Gruley, *et al.*, *Kim Dotcom, Pirate King*, BLOOMBERGBUSINESSWEEK (Feb. 15, 2012), http://www.businessweek.com/articles/2012-02-16/kim-dotcom-pirate-king.

4

had leased and on which it stored Mr. Goodwin's—and its other customers'—data. Carpathia Hosting, Inc.'s Memorandum of Law in Support of its Motion for Protective Order ("Carpathia Mot."), Dkt. No. 39 at 2; January 27 Letter from Jay V. Prabhu ("Prabhu Letter"), Dkt. No. 32. During the execution of that warrant, Mr. Goodwin's data was indisputably in the government's control. *Id.* Mr. Prabhu's January 27 letters signaled the government's belief that, as of that day, it no longer exercised control over the data.

On January 27, the government filed the Prabhu Letter with this Court, stating that it had completed its execution of the search warrants and that it no longer had any need for Carpathia's servers. Prahbu Letter, Dkt. No. 32. More troubling, the government also said that it understood that "the hosting companies may begin deleting the contents of the servers beginning as early as February 2, 2012." *Id.* To date, Carpathia has not deleted that data. Carpathia Mot., Dkt. No. 39 at 1-2. In the meantime, no one—including Mr. Goodwin—has accessed the data on Carpathia's servers.

On March 20, Carpathia filed a motion with this Court, asking for emergency relief. *See generally,* Carpathia Mot., Dkt. No. 39. In its Motion, Carpathia explained that in order to continue storing the servers that Megaupload had leased (and for which Megaupload cannot currently pay), Carpathia—another third party—must pay more than $9,000 a day. *Id*. at 6. Moreover, due to its own leasing concerns, Carpathia must now move the servers, at an approximated cost of $65,000 with an ongoing leasing cost of $37,00 per month. *Id.* As a result, Carpathia requested this Court grant it emergency relief, either requiring parties to the case or the government to take control of the servers or otherwise allowing it to delete the servers' contents so they could be repurposed. *Id.* at 10. Mr. Goodwin files this brief to ensure that his voice—

5

and the voices of other innocent third parties who would be directly affected by any such relief—be heard.

### C. Losses to OhioSportsNet

Despite the fact that Mr. Goodwin's files exist, presumably on Carpathia's servers, Mr. Goodwin has not been able to access them. Goodwin Decl., Ex. A, at ¶ 9. Their loss threatens multiple aspects of OhioSportsNet's business. For example, at least four parents have agreed to pay Mr. Goodwin to put together highlight reels of their children's sports season to send to colleges for recruitment purposes; he has been unable to do that. *Id.* at ¶ 10. Mr. Goodwin, on behalf of OhioSportsNet, also made a full-length documentary of the Strongsville girls soccer team's full season. *Id.* at ¶ 11. He has a DVD copy of his finished product but not the raw footage, which he had hoped to further polish and use for marketing in the future. *Id*. The loss of his files has made that impossible.[3]

In addition to raw footage of sporting events and player and coach interviews, OhioSportsNet has lost the original files of all of its promotional videos and other news packages, leaving Mr. Goodwin and his producers unable to extract the video to make more packages and promote their site as they try to secure crucial additional funding for the growing business. *Id.* at ¶ 12.

In short, the January seizure has cause significant and enduring harm to Mr. Goodwin and doubtless many others who lack the resources to seek relief from this Court.

---

[3] Mr. Goodwin has tried without success to copy the DVD into a workable file on his computer, but the file size has proven to be too large for his current editing program. Goodwin Decl., Ex. A at ¶ 11.

### III. LEGAL ARGUMENT

#### A. The Government's Seizure of Megaupload's Servers Wrongfully Deprived Innocent Third Parties Of Access to Their Property

The laws surrounding both criminal forfeiture and seizure proceedings recognize the potential dangerous overbreadth of those doctrines and therefore contain important safeguards for innocent third parties. For example, criminal forfeiture procedure, such as that available under the Racketeer Influenced and Corrupt Organizations (RICO) Act, authorizes *only* forfeiture of "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity … ." 18 U.S.C. § 1963(a)(3); *see also U.S. v. McHahn,* 101 F.3d 1027, 1042 (4th Cir. 1996) ("the RICO forfeiture statute further reveals Congress' intent to forfeit under § 853 all tainted revenues").

Unfortunately, it is all too easy for an innocent third-party's property to be swept up in a larger forfeiture. For this very reason, courts have long counseled against irresponsible use of the procedure. The Supreme Court has observed: "Forfeitures are not favored; they should be enforced only when within both letter and spirit of the law." *U.S. v. One 1936 Model Ford V-8 De Luxe Coach,* 307 U.S. 219, 226 (1939) (citation omitted); *see also U.S. v. Reckmeyer*, 628 F. Supp. 616, 619 (E.D. Va. 1986) ("The general policy opposed to forfeitures is based on their tendency to inordinately [*sic*] punish both the guilty and the innocent."). Criminal forfeitures are meant to be solely punitive in nature, and "prudential arguments concerning the burdens of restraint are clearly permitted by the statute, which recognizes the due process concerns that are triggered by judicial orders aimed at third parties." *U.S. v. Siegal,* 974 F. Supp. 55, 58 (D. Mass. 1997) (citing *U.S. v. Real Prop. in Waterboro*, 64 F.3d 752, 756 (1st Cir. 1995); *see also U.S. v. Lizza Indus., Inc.,* 775 F.2d 492, 498 (2d Cir. 1985) ("Forfeiture under RICO is a punitive, not a

restitutive measure"); *U.S. v. Cauble*, 706 F.2d 1322, 1349 (5th Cir. 1983) ("The RICO forfeiture is *in personam:* a punishment imposed on a guilty defendant.").

The law also provides important third-party safeguards. For example, innocent owners of seized property may move to recover that property in what is commonly called an "innocent owner defense." *See, e.g.,* 18 U.S.C. § 983(d); 18 U.S.C. § 1963. In *U.S. v. Wu,* 814 F. Supp. 491, 494-95 (E.D. Va. 1993), for example, this Court noted: "[o]ne such purpose [of the law] is the avoidance of overinclusiveness; the statutes sanction neither forfeiture nor, presumably, restraints on the alienability, of property with respect to which a third party can establish, by a preponderance of the evidence, a right, title or interest exclusive of or superior to the criminal defendant's right, title, or interest."

This recovery mechanism helps achieve the law's "prime statutory purpose, [which is] to punish the defendant . . . without unfairly punishing innocent third persons." *Reckmeyer,* 628 F. Supp. at 622. In order to protect those innocent third parties, the statutory framework only requires that a third party prove that it owned the forfeited property. *Chaim v. U.S.,* 692 F. Supp. 2d 461, 470-71 (D.N.J. 2010) ("Ownership by the innocent third party is all that must be shown. This is because the purpose of criminal forfeiture statutes is to punish the *criminal defendant* for criminal conduct.") (emphasis in original).

The law surrounding criminal seizures likewise includes a mechanism for third parties to get their data back: Rule 41(g) of the Federal Rules of Criminal Procedure, which provides that any "person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." Fed R. Crim. P. 41(g). The Advisory Committee Notes make clear that a third party's right to his property is paramount, especially when the government no longer needs access to that property. *See supra* advisory committee notes; 1989

Amendments: ("The Fourth Amendment protects people from unreasonable seizures as well as unreasonable searches . . . If the United States has a need for the property in an investigation or prosecution, its retention of the property is generally reasonable. But, if the United States' legitimate interests can be satisfied even if the property is returned, continued retention of the property would become unreasonable."); *see also U.S. v. Comprehensive Drug Testing, Inc.,* 621 F.3d 1162, 1173 (9th Cir. 2010) ("Rule 41(g) is concerned with those whose property or privacy interests are impaired by the seizure.").

Of course, Mr. Goodwin's data was not forfeited, or potentially even seized, in the traditional sense. Yet the government cannot just execute its search warrant and wipe its hands of any responsibility for the property incidental to that warrant, especially when the government's actions have the direct effect of impermissibly denying innocent third parties of their property. Indeed, a "deprivation [of one's property] need not be [a complete deprival] to constitute a seizure subject to constitutional protections. Rather, the Fourth Amendment also governs temporary or partial seizures." *Presley v. City Of Charlottesville*, 464 F.3d 480, 487 (4th Cir. 2006). In *Presley,* the Fourth Circuit further made clear that an individual's Fourth Amendment protection against unreasonable search and seizure is implicated when there "is some meaningful interference with an individual's possessory interests in that property." *Id.* at 487, *citing U.S. v. Jacobsen,* 466 U.S. 109, 113 (1984). The government, in executing its search warrants on Carpathia's servers and otherwise seizing Megaupload's property (and freezing its funds), has impermissibly meaningfully interfered with Mr. Goodwin's possessory interests in his own property.

Therefore, the same due process and fairness principles that apply in forfeiture law and in the Fourth Amendment should also apply here. The seizure warrant issued in this case, and the

subsequent seizure of Megaupload's servers and funds plainly deprived Mr. Goodwin (and many others) of their property. The seizure in this case was accomplished on an *ex parte* basis, with no notice or opportunity to be heard, and the government appears to have failed to consider, much less address, the obvious issues of innocent third parties who lost access to their property. This is impermissible. The Supreme Court has criticized (and invalidated) an *ex parte* seizure procedure that "affords little or no protection to the innocent owner" where the "Government is not required to offer any evidence on the question of innocent ownership or other potential defenses a claimant might have." *U.S. v. James Daniel Good Real Property,* 510 U.S. 43, 55 (1993). *See also Comprehensive Drug Testing,* 579 F.3d at 1178 (Kozinski, C.J., concurring) (the government should implement procedures "that would allow retention of data obtained only because [it] was required to segregate seizable from non-seizable data.").

Mr. Goodwin's files rightfully belong to him. He also holds copyright in them as the author. 17 U.S.C. § 102. Presumably, the government agrees; it has not alleged that they were used in furtherance of any alleged criminal act nor has it implicated[4] Mr. Goodwin or any other third party in this or any other action.[5] Moreover, the government has not met its burden (nor could it) of demonstrating "that the property to be restrained will be subject to criminal forfeiture." *U.S. v. Riley,* 78 F.3d 367, 369 (8th Cir. 1996).

Moreover, the seizure of Mr. Goodwin's data is particularly troubling because it implicates his First Amendment rights in his expressive work. By seizing the entire Megaupload

---

[4] Some courts have even questioned whether preconviction restraining orders "may affect property not fairly encompassed within the forfeiture allegations of the indictment, particularly given the forfeiture pleading requirements of Fed. R. Crim. P. 7(c)(2)." *U.S. v. Riley,* 78 F.3d 367, 369 at n.2 (8th Cir. 1996).

[5] MPAA has publicly stated that "it has no plans to use the data to sue individual file sharers." *See* David Kravets, *MPAA Wants Megaupload User Data Retained for Lawsuits — Updated* (Mar. 21, 2012 1:40 PM), http://www.wired.com/threatlevel/2012/03/mpaa-megaupload-user-litigatio/.

site, the government cut off access to the speech of Mr. Goodwin and millions of other Megaupload customers. The Supreme Court has made clear that seizures that amount to little more than prior restraints should be discouraged. *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46, 50-51 (1989). In *Fort Wayne,* the Court found a pretrial seizure order of a bookstore unconstitutional, stating that "mere probable cause to believe a legal violation has transpired is not adequate to remove books or films from circulation." *Id*. at 66. As in *Fort Wayne*, in seizing Megaupload, the government here has seized an entire business devoted to publishing, Megaupload, and effectively suppressed all of the expressive content hosted on it, including Mr. Goodwin's expressive works, without proving that any of that content was in fact illegal. *See id*. at 67 ("literally thousands of books and films were carried away and taken out of circulation by the pretrial order. . . . Yet it remained to be proved whether the seizure was actually warranted . . . .").

While in this Motion Mr. Goodwin does not challenge the underlying seizure, and merely requests access to his First-Amendment protected speech, it is questionable whether that seizure was permissible under *Fort Wayne's* increased standard for the seizure of expressive material. *Id.* at 63 ("Thus, while the general rule under the Fourth Amendment is that any and all contraband, instrumentalities, and evidence of crimes may be seized on probable cause (and even without a warrant in various circumstances), it is otherwise when materials presumptively protected by the First Amendment are involved.") (citation omitted).

But Mr. Goodwin is, of course, significantly harmed in other ways. Without access to his premium account with Megaupload, Mr. Goodwin has lost access to the files that form the basis for his business. Until he can access those files, he cannot make additional promotional and highlight reels, nor can he provide footage of the games to the student athletes or schools that

participated in them. Thus, the shutdown of Megaupload continues to damage Mr. Goodwin's growing business.

Again, Mr. Goodwin expresses no opinion as to the legitimacy of the government's case against Megaupload, but there can be no doubt that *he* has done nothing to merit punishment. It is past time for him, and others similarly situated, to be made whole. The government itself created the problem of an overbroad seizure by utilizing a method that predictably encompasses innocent property. It certainly has other options, and it should be encouraged (if not required) to use those options, or at the least to take measures after the fact to minimize the improper consequences that predictably take place.

> B. **The Court Should Not Allow the Government to Disclaim Responsibility For The Collateral Damages It Has Caused**
>
> > 1. **Mr. Goodwin Cannot Be Made Whole Without His Government's Assistance**

The government has claimed it no longer is in possession of the data belonging to Mr. Goodwin, OhioSportsNet, or others similarly situated. *See* Prabhu Letter, Dkt. No. 32 ("The Mega Servers are not in the actual or constructive custody or control of the United States, but remain at the premises controlled by, and currently under the control of, Carpathia and Cogent."). However, Carpathia "does not own and *cannot access the data.*" Carptahia Mot., Dkt. No. 39 at 2 (emphasis added). Presumably, Megaupload's employees have the technical know-how required to access that data. But since Megaupload's funds have been seized, and the government has apparently refused to release funds to allow Megaupload to give Mr. Goodwin access, Megauplouad apparently has no ability to turn the servers back on or devise another avenue for its customers to access their legal data. *See, e.g.,* February 19 email from Ira Rothken to Bob Wiechering, Dkt. No. 39-2. The government is the only party with the ability to unfreeze the funds required for Megaupload to arrange for the return of data to Mr. Goodwin and others or

12

take the lead in implementing an alternative scheme to make sure that happens. Carpathia Mot. at 3.

Thus, while some things are still unclear, it seems likely that restoring the data to lawful owners such as Mr. Goodwin will require the cooperation of the government, Carpathia, and Megaupload itself. A useful comparison may be found in RICO cases: where assets associated with a defendant are frozen pursuant to a protective order, the courts have routinely allowed third parties with an interest in the assets to seek access before trial. *See Roberts v. U.S.*, 141 F.3d 1468 (11th Cir. 1998) (third parties whose property has been restrained during the pendency of a criminal case may move for modification of the restraining order); *U.S. v. Real Prop. in Waterboro*, 64 F.3d 752, 756 (1st Cir. 1995) (acknowledging that third parties may participate in a restraining order proceeding); *U.S. v. Paris-Lopez*, 111 F. Supp. 2d 100 (D.P.R. 2000) (holding that a third party with a valid claim to restrained property should not have to wait for the outcome of a potentially distant criminal proceeding to obtain access to its property).

### 2. The Government Cannot Rely on Megaupload's Terms of Service to Avoid Responsibility For Its Own Actions

Based on public statements, it appears that the government may seek to sidestep its obligations by asserting that despite its direct role in depriving users of their property, the government is protected by Megaupload's terms of service. A Department of Justice spokesperson was quoted as saying, "Megaupload.com expressly informed users through its Frequently Asked Questions ('FAQs') and its Terms of Service that users have no proprietary interest in any of the files on Megaupload's servers, they assume the full risk of complete loss or unavailability of their data, and that Megaupload can terminate site operations without prior

notice."[6] The government makes this assertion even though Mr. Goodwin never transferred title in his property to the government and, until January 19, had full access to his data and the full ability to control whether it remained on Megaupload's site.

The Court should not allow the government to avoid its responsibilities to innocent third parties based on their purported arrangements with Megaupload. First, the government was not a party to any agreement between Megaupload and its customers and, therefore cannot rely upon it to disclaim responsibility. In *Truax v. Raich,* 239 U.S. 33, 37 (1915), the Supreme Court declared unconstitutional a law requiring businesses to fire non-citizens and rejected, *inter alia*, the claim that law was permissible because employees were employed at will and could be discharged by the employer at any time. The Court said:

> It is said that the bill does not show an employment for a term, and that under an employment at will the complainant could be discharged at any time for any reason or for no reason, the motive of the employer being immaterial. The conclusion, however, that is sought to be drawn is too broad. The fact that the employment is at the will of the parties, respectively, does not make it one at the will of others.

Indeed, the central question is whether the property owner has a right of possession as against that party who has deprived her of her property; his or her agreements with others are immaterial:

> It is only necessary that at the time of the dispossession, the plaintiff have the right to retain the possession of the chattel as against the actor. It is immaterial that he has no right to its possession as against some third person. Therefore, a defendant in an action . . . may not plead as a defense the title or right of some third person unless he acts upon the authority of such third person . . . .

*See also* RESTATEMENT (SECOND) OF TORTS § 222 cmt. e, (1965). The same is true here. The fact that Megaupload has no obligation to restore users' data does not mean that *the government*

---

[6] Andrew Couts, *DoJ to Megaupload users who lost files: You should have known better*, DIGITAL TRENDS (Jan. 23, 2012), http://www.digitaltrends.com/web/doj-to-megaupload-users-who-lost-files-you-should-have-known-better/.

can block access to it. The government does not and cannot stand in Megaupload's shoes with respect to its customers.

Second, the circumstances here show precisely why the government cannot claim the protection of Megaupload's contract. Any risk that Mr. Goodwin assumed when he stored his files on Megaupload was with regard to Megaupload and in exchange for the crucial services Megaupload provided, based on his expectations regarding Megaupload's likely activities. It would be unjust to allow the government to effectively make itself a third party beneficiary of a contract, especially based on circumstances neither the contract, nor Mr. Goodwin, could have reasonably contemplated.

### 3. The Presence of Infringing Files Does Not Justify Forfeiture of Noninfringing Materials.

Finally, perhaps in an attempt to avoid responsibility for its seizure, the government has alleged that some data on the servers consists of infringing copies of copyrighted works. However, the potential presence of others' infringing files does not diminish the Court's responsibility to safeguard customers' lawful and noninfringing files and provide for their return. *Cf. United States v. Douglas*, 55 F.3d 584 (11th Cir. 1995) (if the government wrongfully forfeits a third party's property, it is liable for damages). Neither Mr. Goodwin, nor any other Megaupload user, has been charged in this case. There is no legal basis to effectively forfeit their property even if there is an allegation against Megaupload for secondary infringement – or the network that may rest on primary infringement there.

### C. The Court Can and Should Establish a Means to Allow Megaupload Users Like Mr. Goodwin To Retrieve Their Noninfringing Files.

Using its equitable authority, the Court can and should establish a mechanism for the return of property to innocent third parties like Mr. Goodwin. Courts have equitable power to hear and provide relief to innocent third parties whose property has been seized, a power that

15

may be exercised before adjudication of the underlying case. *See U.S. v. Mageean*, 649 F. Supp. 820, 822 (D. Nev. 1986) *aff'd*, 822 F.2d 62 (9th Cir. 1987) (holding that the court "may have an adjunct power to stay the disposition of forfeited property pending its adjudication of third party claims even though the statute gives no express authority for such actions."). Likewise, in RICO cases, Congress has given the Attorney General "expansive" equitable authority "to refashion forfeitures to protect innocent third parties." *U.S. v. BCCI Holdings (Luxembourg), S.A.*, 46 F.3d 1185, 1190 (D.C. Cir. 1995), citing 18 U.S.C. § 1963(g)(1).

A recent settlement between the United States and an Internet gambling site provides one model for effective relief. In *U.S. v. Pokerstars, et al.*, Case No. 11-2564 (S.D.N.Y.), the government seized the Internet domain name of Full Tilt Poker pursuant to an indictment for money laundering and unlawful Internet gambling. Recognizing that the seizure prevented Full Tilt's customers from retrieving funds they legally had on account with the gambling site, the U.S. Attorney agreed to allow Full Tilt to operate its website in the United States for the sole purpose of allowing customers to withdraw funds. *See* Ex. B ¶¶ 6, 8. The agreement also called for independent monitoring, at Full Tilt's expense, to ensure that the site would not be used for gambling in the United States. *Id.* ¶ 5.

In this case, the Court could create a similar mechanism for customers of Megaupload, allowing them to retrieve their legal data. For example, each customer could be permitted to access their data for a period of time, based on a reasonable showing that the customer is the legal owner of that data, such as presentation of the customer's username and password. *Accord*, *U.S. v. Regan,* 858 F.2d 115, 121 (2nd Cir. 1998) ("orders directed at third parties are strong medicine and should not be used where measures that are adequate and less burdensome on third parties are available").

However, as the Court is doubtless aware, an additional mechanism may be needed. Unlike Full Tilt, Megaupload is not currently doing business and cannot, without court approval, pay fees to Carpathia either to maintain or to host the data for retrieval by customers, or likely pay for the bandwidth to do so. Therefore, unless Megaupload and government can come to a voluntary agreement to unfreeze some portion of Megaupload's assets, the Court should create an equity receivership, directed and authorized to 1) receive and evaluate claims from Megaupload customers for access; 2) provide customers access to their data; and 3) expend funds and otherwise direct the activities of Megaupload as necessary to carry out these functions.

Such an arrangement would be consistent with the legislative and judicial policy behind equity receiverships in analogous contexts. Receiverships are an equitable remedy. See Fed. R. Civ. P. 66. Though created for various purposes, their overall goal is "marshaling and untangling a company's assets." *U.S. v. Acorn Tech. Fund, L.P.*, 429 F.3d 438, 443 (3d Cir. 2005). The Court retains absolute discretion in determining whether or not to appoint a receiver. *Hutchinson v. Fid. Inv. Ass'n,* 106 F.2d 431, 436 (4th Cir. 1939) ("It should not be forgotten that the appointment of a receiver is not a matter of right, but one resting in the sound discretion of the court."), *citing Pennsylvania v. Williams,* 294 U.S. 176, 182 (1935).

This power "derives from [the court's] inherent equitable powers under the common law. *First United Bank & Trust*, 2011 WL 1563108 (N.D.W.Va. Mar. 31, 2011), *citing Liberte Capital Group, LLC v. Capwill,* 462 F.3d 543, 551 (6th Cir.2006). "The receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary." *Capwill,* 462 F.3d at 551, *citing* 13 Moore's Federal Practice ¶¶ 66.02–03 (3d ed.1999).

In cases like these, a receiver may be necessary to ensure that all aggrieved parties, including third parties like Mr. Goodwin and Carpathia Hosting, have their interests taken into account during the disposition of the seized property.

## IV.   CONCLUSION

Mr. Goodwin joins Carpathia Hosting, another third party caught in the government's seizure of Megaupload's property and freezing of its funds, in asking this Court to fashion a remedy that makes the innocent third parties whole.  Specifically, Mr. Goodwin requests this Court ensure the rightful return of his property, and that of others similarly situated.

Dated:  March 30, 2012                                  Respectfully submitted,
                                                                        _____/s/_____

                                                                        John S. Davis
                                                                        WILLIAMS MULLEN
                                                                        200 So. 10th St.
                                                                        Richmond, VA  23218
                                                                        Telephone:  (804) 420-6296
                                                                        Facsimile:  (804) 420-6507
                                                                        Email:  jsdavis@williamsmullen.com

                                                                        Julie P. Samuels
                                                                        Corynne McSherry
                                                                        ELECTRONIC FRONTIER FOUNDATION
                                                                        454 Shotwell Street
                                                                        San Francisco, CA 94110
                                                                        Telephone: (415) 436-9333
                                                                        Facsimile: (415) 436-9993
                                                                        Email: julie@eff.org

                                                                        Abraham D. Sofaer
                                                                        The Hoover Institution
                                                                        Stanford University
                                                                        434 Galvez Mall
                                                                        Stanford, CA 94305-6010
                                                                        Telephone: (650) 723-1754
                                                                        Email: asofaer@stanford.edu

                                                                        Attorneys for Interested Party Kyle Goodwin

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2012, the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users, as well as by first class U.S. mail, postage prepaid, upon the following:

Jay V. Prabhu  
Chief, Cybercrime Unit  
Assistant United States Attorney  
Eastern District of Virginia  
2100 Jamieson Avenue  
Alexandria, VA  22314  

Ed McNicholas  
Sidley Austin LLP  
1501 K Street, NW  
Washington, DC  20005  
*Counsel to Megaupload Limited*  

Ira Rothken  
Rothken Law Firm  
3 Hamilton Landing, Suite 280  
Novato, CA  94949  
*Counsel to Megaupload Limited*  

Stephen Fabrizio  
Jenner & Block  
1099 New York Avenue, NW  
Suite 900  
Washington, DC  20001  
*Counsel to Motion Picture Association of America*  

Dated:  March 30, 2012 _____/s/_____

John S. Davis