IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | The Honorable Liam O'Grady |
| Plaintiff, ) | |
| ) | Case No. 1:12-cr-00003-LO |
| v. ) | |
| ) | |
| KIM DOTCOM, *et al*. ) | |
| ) | |
| Defendants. ) | |

**BRIEF OF KYLE GOODWIN IN SUPPORT OF HIS MOTION FOR THE RETURN OF PROPERTY PURSUANT TO 18 U.S.C. § 1963 AND/OR FEDERAL RULE OF CRIMINAL PROCEDURE 41(g)**

**I.     Introduction**

Movant Kyle Goodwin did not want to bring this motion. However, it has now been more than four months since he was deprived of access to his property—an important part of his growing small business in Ohio—as a perfectly foreseeable result of the government's seizure of the Megaupload servers. Moreover, it is now apparent that the government is not only unwilling to assist with the recovery of Mr. Goodwin's property, it is actively *resisting* Mr. Goodwin's efforts. Indeed, if the government gets its way, Mr. Goodwin will likely be deprived of his property for many years, if not permanently.

That must not be allowed. Mr. Goodwin—who all parties agree is completely innocent in this matter—has already been deprived of access to his property for months, an especially significant deprivation for someone whose business turns, in part, on giving parents timely access to video of their children's sports activities. The prospect of waiting years for the return of his property, which is apparently what the government contemplates, is indefensible. Having attempted to negotiate a voluntary solution protecting the interests of property owners, and

1

having concluded that the government is unwilling to even contemplate such a solution, Mr. Goodwin brings this motion.

To be clear, however, there is more at stake here than Mr. Goodwin's data. The government also seized the property of an unknown but significant number of other people along with Mr. Goodwin's property. If the Court does not act, all of those people also face years of deprivation, if not permanent loss. What is worse, the government's procedure and legal posture in this case appears to reflect a broader disregard for the effects its increasing use of domain and other digital seizure mechanisms can have on the innocent users of cloud computing services. Given that the use of cloud computing services is already widespread and poised to grow exponentially in the next few years, this Court should establish procedures to ensure that such innocent users do not become regular collateral damage.

In no area of commercial or personal activity is the government allowed to seize property without taking reasonable measures to avoid unnecessary harm and loss of commercial value. That should be no less true when the property is information. Thus, if the government is going to get into the business of seizing Internet properties used to host a wide range of content—infringing and not—it must implement procedures and standards for protecting the property and due process rights of innocents such as Mr. Goodwin who use those services for legitimate purposes. Since the government seems uninterested in developing those processes and standards itself, this case should serve as a starting point for the judiciary to do so.

## II.     Background

### A.     Procedural History

On January 19, this Court unsealed an indictment dated January 5. Indictment, Dkt. No. 1. The government seized 18 domain names and executed a search warrant and effectively seized the more than 1,000 servers owned by Carpathia Hosting, which Megaupload had leased

and on which it most likely stored its customers' data.[1]  Dkt. No. 39 at 5; January 27 Letter from Jay V. Prabhu ("Prabhu Letter"), Dkt. No. 32.  During the execution of that warrant, Mr. Goodwin's data was indisputably in the government's control.  *Id.*

On January 27, the government filed the Prabhu Letter with this Court, stating that it had completed its execution of the search warrants, that it no longer had any right to access Carpathia's servers, and that it no longer exercised control over the data.  Dkt. No. 32.

On March 20, after discussions between the parties failed to produce a plan for handling the data or giving innocent customers access to their property, Carpathia sought emergency relief from this Court.  Dkt. No. 38.  Mr. Goodwin filed a brief in support, asking the Court to fashion a remedy to make him and other innocent third parties whole.  Kyle Goodwin's Brief In Support of Emergency Motion for Protective Order by Carpathia Hosting, Inc. ("Goodwin March 30 Brief"), Dkt. No. 51 at 15.

On April 13, 2012, at the hearing on Carpathia's motion, the Court instructed all parties, including Mr. Goodwin, to negotiate in good faith to two ends: first, to ensure the preservation of the seized material for use both in the defense of the Megaupload defendants in this criminal matter and in any related civil litigation; and second, to devise a plan to allow innocent users of Megaupload to retrieve their property. Dkt. No. 86.[2]

---

[1] The government, along with foreign law enforcement, also raided the homes of defendants, none of whom resides in the United States, and seized bank accounts, jewelry, cars, and other valuable goods. Dkt. No. 1 at 66-71.

[2] Mr. Goodwin maintains that by using a technical technique called "mirroring" or something similar, access to his information can be allowed while still preserving the corpus and metadata of the data on Megaupload's server in a form that can be used for Megaupload's defense or in civil litigation.  There is no need to hold Mr. Goodwin's data hostage simply because a criminal indictment has been unsealed.  Indeed, because of the digital nature of the property, protecting the evidentiary value of the data is even easier than would be the case had the government seized a hotel or physical storage facility with innocent customer property in it.  It merely requires that the information be copied so that it may be both preserved and accessed. Mr. Goodwin remains

Two weeks later, on April 26, the parties met with Magistrate Judge Anderson in an attempt to reach an agreement providing for preservation of, and access to, the servers. Dkt. No. 89. While no agreement has been reached, it appears that some progress has been made towards the first goal, with the government having agreed to free up some of the seized assets to allow for the continuing preservation of the material.

Yet no progress has been made on the second, and arguably more pressing, goal of allowing innocent users to retrieve their property. Following the Court's instruction, Goodwin attempted in good faith to negotiate with the other parties. In fact, Mr. Goodwin agreed to allow preservation arrangements to be a first step, with access delayed, despite the continuing harm his business would suffer as a result. But the government simply ignored Mr. Goodwin's suggestions and submitted a proposal with no provision for access whatsoever. In fact, the proposal the government put forth would create a new procedural hurdle for Mr. Goodwin by requiring a further judicial ruling before any such access could occur.

**B. Mr. Goodwin's Lost Property**

As detailed more fully in his March 30 brief, Mr. Goodwin owns a business, OhioSportsNet, which covers local high school sporting events. Goodwin March 30 Brief at 3; Declaration of Kyle Goodwin ("Goodwin Decl."), Dkt. No. 51-1, at ¶ 1. As part of that business, Mr. Goodwin and his producers travel all over the state and film various high school sports games. *Id*. at ¶ 2.

In order to efficiently and effectively run his business, Mr. Goodwin and his producers used Megaupload's service to store and share large files, particularly video (both raw and edited)

---

ready to discuss those specific steps, which will need to be tailored to meet the specific requirements of the seized data, at any time.

of the sports that they covered. *Id.* at ¶¶ 4-6. To facilitate his business, Mr. Goodwin paid Megaupload for a premium subscription. *Id.* at ¶ 5.

Mr. Goodwin backed up all the raw footage of the sporting events, player and coach interviews, and promotional packages on a personal hard drive. *Id.* at ¶ 8. Mr. Goodwin believed that between his own hard drive backups and Megaupload's cloud storage service, he was protecting the files he needed to continue to grow his business. However, as luck would have it, in mid-January, his hard drive crashed. *Id.* Days, if not hours, later, the government shut down Megaupload's service, and when Mr. Goodwin went to pull his files from Megaupload, he found them unavailable. *Id.*

Despite the fact that Mr. Goodwin's files exist, presumably on Carpathia's servers, Mr. Goodwin has not been able to access them. *Id.* at ¶ 9. Their loss threatens multiple aspects of OhioSportsNet's business. For example, at least four parents have agreed to pay Mr. Goodwin to put together highlight reels of their children's sports season to send to colleges for recruitment purposes; he has been unable to do that. *Id.* at ¶ 10. Mr. Goodwin, on behalf of OhioSportsNet, also made a full-length documentary of the Strongsville girls soccer team's full season. *Id.* at ¶ 11. He has a DVD copy of his finished product but not the raw footage, which he had hoped to further polish and use for marketing in the future. *Id*. The loss of his files has made that impossible.[3]

In addition to raw footage of sporting events and player and coach interviews, OhioSportsNet has lost the original files of all of its promotional videos and other news packages, leaving Mr. Goodwin and his producers unable to extract the video to make more

---

[3] Mr. Goodwin has tried without success to copy the DVD into a workable file on his computer, but the file size has proven to be too large for his editing program. Goodwin Decl. at ¶ 11.

5

packages and promote their site as they try to secure crucial additional funding for the growing business. *Id.* at ¶ 12.

In short, the January seizure has caused significant and enduring harm to Mr. Goodwin and doubtless many others who lack the resources to seek relief from this Court.

**III.     Argument**

      **A.     This Court May Exercise Its Equitable Jurisdiction to Return to Mr. Goodwin his Lawful Property.**

Both the Federal Rules of Criminal Procedure and the Racketeer and Influenced and Corrupt Organizations Act ("RICO") provide the Court with the tools to exercise its equitable jurisdiction in cases like these, where a forfeiture or seizure improperly harms innocent third parties' rights. In "[r]ecognizing the harsh consequences *in personam* forfeiture can work on innocent persons, Congress … [has] expressed its intent that these heavy economic sanctions not be imposed on innocent third parties." *U.S. v. Reckmeyer,* 628 F.Supp. 616, 620 (E.D. Va. 1986)*; see also Libretti v. U.S.,* 516 U.S. 29, 41 (1995) (holding forfeiture is a form of punishment directed only at a criminal defendant). Specifically, RICO provides that "[a]ny person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States" under the law may "petition the court for a hearing to adjudicate the validity of his alleged interest in the property." 18 U.S.C. § 1963(l)(2); *see also* 21 U.S.C. § 853 (using identical language for property subject to criminal forfeiture).[4] Where, as here, no final order of forfeiture has been entered, the court may still choose to exercise its equitable

---

[4] The Comprehensive Drug Abuse Prevention and Control Act likewise provides district courts with tools to return forfeited property to innocent third parties. "'This statute [21 U.S.C. § 853] is, in nearly all respects, identical to the RICO criminal forfeiture statute [18 U.S.C. § 1963]....'" *U.S. v. Wu,* 814 F. Supp. 491, 493 (E.D. Va. 1993) (citing S.Rep. No. 225, 98th Cong., 2d Sess. 209 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3392).

jurisdiction.[5] *U.S. v. Wu,* 814 F. Supp. 491, 494-95 (E.D. Va. 1993); *U.S. v. Siegal,* 974 F. Supp. 55, 58 (D. Mass. 1997). Rule 41(g) likewise provides that a "person aggrieved by an unlawful search and seizure of property or by the deprivation of property may move for the property's return." Fed. R. Crim. P. 41(g).

Not only do the statutory framework and case law surrounding forfeiture demonstrate the need to protect third-party property rights, so does the Constitution. "The Court does not believe that Congress intended that the criminal forfeiture statute would be applied in such a manner as would cause such great hardship to innocent persons in violation of their constitutional rights." *Reckmeyer,* 628 F. Supp. at 621; *see also Wu,* 814 F. Supp. at 494-95. In *Wu*, for instance, this court found that a statute allowing forfeiture should be read to effectuate the purpose of "avoidance of overinclusiveness; the statutes sanction neither forfeiture nor, presumably, restraints on the alienability, of property with respect to which a third party can establish, by a preponderance of the evidence, a right, title or interest exclusive of or superior to the criminal defendant's right, title, or interest." 814 F. Supp. at 494-95 (citing 18 U.S.C. § 1963(l)(6); 21 U.S.C. § 853(n)(6)).

Consequently, courts have allowed third parties to raise issues involving their property post-indictment and pre-conviction under 18 U.S.C. § 1963, 21 U.S.C. § 853, and Fed. R. Crim. P. 41(g). In *Siegal*, for example, which involved a third-party motion for return of funds seized in joint accounts under 18 U.S.C. § 1963(d)(1)(A), the court noted that "prudential arguments concerning the burdens of restraint are clearly permitted by the statute, which recognizes the due

---

[5] Section 1963(l) governs property that was subject to a RICO forfeiture. Admittedly, Mr. Goodwin's lost property does not fit that definition. Yet the relevant portions of that law, and the cases commenting on it, show congressional intent to make parties who lost rightful property at the hand of government actions whole again, especially where, as here, those government actions were committed pursuant to a RICO action. *See, e.g., Reckmeyer,* 628 F. Supp. at 621.

process concerns that are triggered by judicial orders aimed at third parties." 974 F. Supp. at 58. In those circumstances, under RICO, a third party need only show, by a preponderance of the evidence, "a right, title, or interest exclusive of or superior to the criminal defendant's right, title, or interest." *Wu,* 814 F. Supp. at 495-96. Mr. Goodwin has already made such a showing, Goodwin Decl., and, indeed, no party thus far has objected. The inquiry may end there.

However, because this case is currently post-indictment and pre-conviction, it may be helpful to look also to Rule 41(g), which offers another vehicle under which Mr. Goodwin may assert necessary standing to access his property. Under this Rule, in considering whether to exercise jurisdiction in post-indictment, pre-conviction instances, courts should consider four factors: "(1) whether the Government displayed a callous disregard for the constitutional rights of the movant; (2) whether the movant has an individual interest in and need for the property he wants returned; (3) whether the movant would be irreparably injured by denying return of the property; and (4) whether the movant has an adequate remedy at law for the redress of his grievances." *Chaim v. U.S.,* 692 F. Supp.2d 461, 469 (D.N.J. 2010) (citing caselaw from seven different federal circuits).

Each of those factors favors Mr. Goodwin, as well as similarly situated innocent third parties. First, the government's actions showed a clear disregard for those parties' rights. The government knew Megaupload operated a data storage business, and thus held the property of a large number of third parties. The government knew its search and seizure of Megaupload's assets would deprive third parties of the ability to access and retrieve their property. In seizing domain names and executing the search warrant at Carpathia, the government took constructive possession of third parties' data, then abandoned the data under circumstances in which it was both inaccessible and potentially subject to destruction.

It is equally obvious that the seizure and continued denial of access violates Mr. Goodwin's constitutional rights. Under the Fourth and Fifth Amendments, the government was obligated to execute the searches and seizures in a manner that reasonably protected the rights of third parties to access and retrieval. Reasonable protection would consist in either (1) notice and opportunity to retrieve; or (2) the government's securing and preserving the data (either directly or via arrangements with data storage businesses) and provision of means for prompt retrieval by third parties. By failing to take those necessary steps, and then refusing to work with Mr. Goodwin to effectuate the return of his property, the government deprived him of his right to that property under both the Fourth and Fifth Amendments.

Mr. Goodwin has already clearly demonstrated his interest in and need for the files he lost when the government shut down Megaupload. Goodwin March 30 Brief; Goodwin Decl. Moreover, denial of the return of that property irreparably harms Mr. Goodwin and his growing business. As time passes, Mr. Goodwin's inability to access the footage that is the basis for his business means that he loses marketing and sales opportunities in the ongoing business. Goodwin Decl. at ¶ 12.

The harm is more acute since the parties themselves agree that the underlying criminal litigation could take *years*. Courts have found six months to be an unacceptable length of time for innocent third parties to be left in limbo when it comes to their rightful property:

> Here, because of the complexity of this case involving twelve defendants and thousands of pages of documents, by agreement of all defendants, the case will not be tried until October 1997. That means that the third parties cannot raise a statutory challenge to the restraint on property which they claim derived from 'clean sources' for another six months. I conclude that the due process clause requires me to afford these third parties a timely pretrial opportunity to challenge the restraining order as 'clearly improper' on the ground the property was not available for forfeiture.

9

*Siegal,* 974 F. Supp. at 58 (concerning the seizure of funds from joint bank accounts). Mr. Goodwin has already been deprived of his property for five months.

Finally, without this Court's intervention, Mr. Goodwin is left without any adequate remedy at law. Each of the parties that could potentially allow Mr. Goodwin access to his property—the government, Megaupload, and Carpathia—now claims that it does not control that property. To some extent, that may be true. However, it is irrelevant. Carpathia has made clear that it does not care what happens with the data on the servers; so long as it is justly compensated, it presumably will not object to innocent third parties gaining access. Megaupload has likewise not raised objections to third-party access, but lacks funds to operate the servers for the benefit of those third parties. Only the government can release the necessary assets to facilitate that access, but it has refused. This Court should thus exercise its equitable jurisdiction under Fed. R. Crim. P. 41(g) and order Mr. Goodwin's property returned.

Of course, although the government now disclaims any responsibility to restore Mr. Goodwin's property (even while blocking the release of funds necessary to accomplish it), it was the government's own actions that left Mr. Goodwin and others in this situation. It is therefore the government's responsibility to make those parties whole again, *whether or not it has physical control of the data.* Indeed, a "motion for return of property does not become moot merely because the government no longer retains the seized property." *U.S. v. Chambers,* 192 F.3d 374, 375 (3d Cir. 1999). Moreover, "the government can not defeat a properly filed motion for return of property merely by stating that it has destroyed the property or given the property to third parties." *Id.* at 377. In fact, if this Court finds that the property is truly unavailable, and that the government's actions, or lack thereof, were improper, Mr. Goodwin and others like him should be entitled to appropriate remedies. *Id.* at 378.

Mr. Goodwin, an innocent party accused of no wrongdoing, has proven that property that was his was lost on January 19. He has likewise shown that he will suffer irreparable injury until that property is returned. Thus, whether under 18 U.S.C. § 1963, Fed. R. Crim. P. 41(g), or any other equitable theory of law, this Court should exercise its equitable jurisdiction and grant Mr. Goodwin and others like him the relief to which they are entitled. Specifically, the Court should implement a procedure, or appoint a technology expert to do the same, that guarantees innocent third parties access to their rightful property.

**B.     Allowing the Government to Ignore Third-Party Rights in Seizure Cases Sets A Dangerous Precedent.**

The practice of seizing domain names, along with myriad third-party property, on sites accused of copyright infringement has become, for better or worse, commonplace.[6] Yet accomplishing these seizures by permanently disabling third parties' access to their legal content without notice or potential for recourse runs afoul not only of the Fourth and Fifth Amendments, *see infra* p. 9, but the First as well, since much of what is seized is protected expression. Goodwin March 30 Brief at 10-11. Moreover, allowing such seizures without regard to injuries to the property rights of third parties will create a dangerous practical, if not legal, precedent that will affect an increasing number of Americans as we move our information, data, and other content to the cloud. As the Ninth Circuit has stated:

> [T]here are very important benefits to storing data electronically. Being able to back up the data and avoid the loss by fire, flood or earthquake is one of them. Ease of access from remote locations while traveling is another. The ability to

---

[6] . *See*, *e.g.*, David Kravets, *Uncle Sam: If It Ends in.Com, It's .Seizable*, Wired (March 6, 2012), http://www.wired.com/threatlevel/2012/03/feds-seize-foreign-sites/ (estimating that Operation in Our Sites has resulted in 750 domain name seizures and noting that "seizures are becoming commonplace under the Obama administration"); Letter from Ron Wyden, U.S. Senator, to Eric Holder, U.S. Attorney General, and John Morton, Director, Immigration and Customs Enforcement (Feb. 2, 2011) (available at http://www.wyden.senate.gov/library?PageNum_rs=5) (calling the surge in domain name seizures "a major shift in the way the U.S. government combats copyright infringement").

> swiftly share the data among professionals, such as sending MRIs for examination by a cancer specialist half-way around the world, can mean the difference between death and a full recovery. Electronic storage and transmission of data is no longer a peculiarity or a luxury of the very rich; it's a way of life. Government intrusions into large private databases thus have the potential to expose exceedingly sensitive information about countless individuals not implicated in any criminal activity, who might not even know that the information about them has been seized and thus can do nothing to protect their privacy.

*U.S. v. Comprehensive Drug Testing, Inc.*, 621 F.3d 1162, 1177 (9th Cir. 2010) (*en banc*) ("*CDT*").

In *CDT*, facing competing interests of law enforcement and innocent third parties' privacy rights, the Ninth Circuit upheld the quashing of subpoenas and search warrants where the government failed to protect the Fourth Amendment privacy rights of those innocent third parties whose information was caught up in a larger dragnet. *Id.* In so doing, the *en banc* panel recognized "the reality that over-seizing is an inherent part of the electronic search process" and proceeded "on the assumption that, when it comes to the seizure of electronic records, this will be far more common than in the days of paper records." *Id.* Yet, the widespread shift from the analog to the digital world did not give the government in that case carte blanche to violate the privacy of untold individuals.

The same should hold when the risk is to property rights in the data itself, rather than the privacy rights of those whose information is contained in the records. As in *CDT*, this Court must assist Mr. Goodwin in regaining his property since the government has refused to do so and it should set out clear standards and procedures for the government to follow in the future.

## IV. Conclusion

Mr. Goodwin respectfully requests that this Court exercise its equitable jurisdiction and grant the relief originally requested in his March 30 brief, namely, that an independent third party be appointed to assess the technological and financial requirements for provision of access

to innocent third parties and that the independent third party, or another, be given the ability to work with all parties to accomplish that task, or that the Court fashion another remedy as appropriate to make Mr. Goodwin and innocent third parties like him whole.

Additionally, this Court is empowered to, and should, prescribe procedures and standards for the government in future domain or electronic data seizures. Not unlike the process for obtaining computer search warrants, those procedures should require the government to investigate the third-party property that may be seized before any seizure, narrowly tailor seizures to reach as small an amount of third-party property as possible, and promptly (and without any cost to the innocents impacted) either return the property or set up a process by which those third parties may obtain the property.

Dated: May 25, 2012  Respectfully submitted,

        /s/ John S. Davis
John S. Davis
WILLIAMS MULLEN
200 So. 10th St.
Richmond, VA 23218
Telephone: (804) 420-6296
Facsimile: (804) 420-6507
Email: jsdavis@williamsmullen.com

Julie P. Samuels
Corynne McSherry
ELECTRONIC FRONTIER FOUNDATION
454 Shotwell Street
San Francisco, CA 94110
Telephone: (415) 436-9333
Facsimile: (415) 436-9993
Email: julie@eff.org

Abraham D. Sofaer
THE HOOVER INSTITUTION
Stanford University
434 Galvez Mall
Stanford, CA 94305-6010
Telephone: (650) 723-1754

Email: asofaer@stanford.edu

*Attorneys for Interested Party Kyle Goodwin*

## CERTIFICATE OF SERVICE

I hereby certify that on May 25, 2012, the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users, as well as by first class U.S. mail, postage prepaid, upon the following:

Jay V. Prabhu
Chief, Cybercrime Unit
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314

Ed McNicholas
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005

*Counsel to Megaupload Limited*

Ira Rothken
Rothken Law Firm
3 Hamilton Landing, Suite 280
Novato, CA 94949

*Counsel to Megaupload Limited*

Stephen Fabrizio
Jenner & Block
1099 New York Avenue, NW
Suite 900
Washington, DC 20001

*Counsel to Motion Picture Association of America*

I declare under penalty of perjury that the foregoing is true and correct.


Dated: May 25, 2012                             /s/ John S. Davis
                                                John S. Davis