IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | The Honorable Liam O'Grady |
| | ) | |
| KIM DOTCOM, et al., | ) | |
| | ) | Criminal No. 1:12-CR-3 |
| Defendants | ) | |
| | ) | |

**[PROPOSED] MOTION TO CHALLENGE THE SCOPE OF PRETRIAL RESTRAINT
OF ASSETS OF DEFENDANTS MEGAUPLOAD LIMITED, KIM DOTCOM,
MATHIAS ORTMANN, BRAM VAN DER KOLK & FINN BATATO
AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

The Government's case against Megaupload Limited ("Megaupload"), a cloud storage provider, and the other charged Defendants rests on a host of novel theories of criminal liability for copyright infringement. These theories extend U.S. copyright laws well beyond their intended reach, their territorial scope and the limits of the Constitution. As explained herein, the core of the Government's case is that the Defendants should be held criminally responsible for the alleged misconduct of third-party cloud storage users even though such alleged mass secondary copyright infringement is not made criminal by any federal statute and is no crime at all; other allegations turn a blind eye to the laws that actually are on the books that provide a safe harbor for "caching" and for businesses such as this who made efforts to remove infringing material in response to take-down notices; still others are based on conduct that indisputably occurred outside of the United States such that it may not be proscribed by U.S. copyright law; and the remainder depend almost in their entirety on pure assumption unadorned by even a modicum of supporting proof. The Government's charges are less a considered application of

1

the law to the evidence, and more an experiment in stretching U.S. criminal law well past the breaking point.

In instructing the Government to provide discovery supporting its charges, the New Zealand court presiding over the individual Defendants' extradition proceedings pinpointed a central flaw of the Government's case: "[T]he United States is attempting to utilise concepts from the civil copyright context as a basis for the application of criminal copyright liability which necessitates a consideration of principles such as dual use of technology or . . . significant non-infringing uses." *See* Decision of His Honor Judge David J. Harvey on Application for Disclosure, ¶ 244 (May 29, 2012) (Exhibit 4).[1] The Government thus far has been indifferent to innocent uses, however, making casualties of the blameless and the (allegedly) culpable alike.

As suspect as these charges are, Defendants' assets have been frozen pursuant to them, leaving them with no funds with which to defend themselves in a hugely complex case involving petabytes of potential evidence, an untold number of witnesses and a business that spanned the globe. Defendants Megaupload, Kim Dotcom, Mathias Ortmann, Bram Van der Kolk and Finn Batato respectfully submit that they are entitled to the release of currently frozen funds for their defense, consistent with their constitutional entitlements as elucidated by the Fourth Circuit in *United States v. Farmer*, 274 F.3d 800 (4th Cir. 2001), because the Government lacked probable cause to seize a majority (at least) of these funds.[2]

---

[1] All citations of "Exhibit __" are exhibits attached to the concurrently filed Motion of Quinn Emanuel Urquhart & Sullivan LLP, the Rothken Law Firm, and Craig C. Reilly, Esq. for Leave to Enter Limited and Special Appearances on Behalf of Megaupload Limited, Kim Dotcom, Mathias Ortmann, Bram Van der Kolk & Finn Batato and to Exceed Page Limit.

[2] Megaupload this same day is separately moving for dismissal and corresponding release of its assets because it cannot be served. Grant of the motion to dismiss would moot the request with respect to Megaupload's assets, as distinct from those of the individual Defendants who are party to the instant motion. If, on the other hand, the Court were to decline to dismiss Megaupload from the case, then Megaupload would request that the Court consider release of

Defendants ran a popular business that was well established within the mainstream. By all accounts, Megaupload operated for some seven years as a successful business whereby millions upon millions of users around the world could, via the Internet and the Megaupload website, upload and download content of the users' own choosing and initiative. The resulting content ran the gamut from (to take just a few examples) family photos, to artistic designs, to business archives, to academic coursework, to legitimately purchased files of movies, videos and music, to allegedly infringing files of such movies, videos and music.

Yet the Government has branded Megaupload, its personnel and its tens of millions of customers as a vast criminal enterprise dedicated to the singular purpose of infringing U.S. copyright laws. Only thus can the Government attempt to justify the extraordinary measures it has taken to shut down and destroy Megaupload and to place the liberty and property of seven individuals in jeopardy. The Government is treating Defendants no differently than it would treat a drug-trafficking ring or even a terrorist organization, notwithstanding that the crime charged here is of an entirely different nature. Its approach would be disproportionate by any fair measure even if all of its allegations were taken on faith. *See, e.g.*, *Kim Dotcom wins bail in fight against U.S. extradition*, http://newsandinsight.thomsonreuters.com/Legal/News/2012/02_-_February/Kim_Dotcom_wins_bail_in_fight_against_U_S__extradition/ (Feb. 22, 2012) (describing the execution of search warrants of Mr. Dotcom's home as a "military-style raid") (last visited May 25, 2012); *Guns, body armor, and raids: The piracy fight gets dangerous* (Feb. 6, 2012), http://news.cnet.com/8301-31001_3-57372113-261/guns-body-armor-and-raids-the-piracy-fight-gets-dangerous/?tag=mncol;3n (reporting that over 70 officers, some wearing body

---

relevant assets pursuant to *Farmer* in the alternative, even as Megaupload respectfully reserves and preserves its grounds for dismissal.

armor and brandishing automatic weapons, stormed Mr. Dotcom's home where his then-pregnant wife and small children lived) (last visited May 25, 2012).

The Government's extreme tactics have wiped out Megaupload without the benefit of even the most basic guarantees of due process such as service of a summons.[3]  As the Defendants have previously explained, *see* Rebuttal in Support of Motion for Leave to Enter Limited Appearance (Dkt. 79) at 1-5, the Government has also deprived Megaupload of its right to counsel by freezing all of its worldwide assets, then refusing to agree to unfreeze one penny to fund defense efforts, and most recently attempting (with spurious claims of conflict of interest) to force the disqualification of any law firm with the requisite experience and wherewithal to mount an effective defense, *see* Government's Opposition to Motion for Leave to Enter Limited Appearance (Dkt. 76).  The Government, in short, has destroyed Megaupload without bothering even to serve the company and is now bent on preserving its advantage by disabling any effort to challenge the lawfulness of its actions.  Only if there exists probable cause to conclude that Megaupload's entire business was, from root to branch, criminal in nature might the Government's adventurous approach be sustained.  Yet any such premise falls apart upon sober examination of facts and law.

Defendants seek now only the unfreezing of certain assets as necessary to fund their defense.  To grant this motion, the Court need not resolve any factual dispute or decide any ultimate merits question.  Instead, it need decide only that the Superseding Indictment fails on its face to establish probable cause that the criminal charges reach every aspect of the Defendants' business and assets.  Thus, we assume *arguendo* for present purposes that the Government may have probable cause for believing *some* criminal violation (however attenuated and vulnerable to

---

[3]   *See* Defendant Megaupload Limited's concurrently filed Motion to Dismiss for Lack of Personal Jurisdiction.

challenge at trial) occurred; it suffices to note simply that its probable cause is not, in any event, remotely coextensive with the vast sweep of Defendants' business and assets at issue.

As demonstrated below, even affording the Government and its allegations every plausible benefit of the doubt,[4] its criminal theories still fall far short of the mark:

A. The theory of *secondary* copyright infringement, while forming the gravamen of the Government's case against Defendants, can never translate to *criminal* liability, as expressly circumscribed by statute;

B. The Government cannot identify specific facts establishing, *e.g.*, that Defendants had requisite *scienter*, except as to a limited number of discrete instances of alleged infringement, and, to the contrary, has acknowledged aspects of their business whose legitimacy remains beyond question;

C. Defendants are protected by obvious, on-point defenses insomuch as Megaupload's service had substantial, non-infringing uses and fell within safe harbors of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512;

D. The bulk of the alleged infringing acts occurred entirely *outside* of the United States such that they are, correspondingly, *outside* the reach of the Copyright Act; and

E. The Government's peremptory sweep threatens to trample upon the First Amendment to the United States Constitution.

To be clear, this is not a motion to dismiss the Superseding Indictment on these grounds; that motion will come in due course, as and if necessary. Defendants now ask only that this Court closely examine the charges against them to determine whether the law and undisputed facts permit the wholesale seizure of their assets. Defendants respectfully submit that, upon such examination, it will be manifest that most of the assets seized do not belong within the

---

[4]   Lest there be any doubt, Defendants intend to vigorously contest the Government's factual allegations.  Even so, for the limited purposes of this submission, and to obviate any burdens and delays that would be associated with adjudicating evidentiary disputes at this time, Defendants are generally accepting *arguendo* the Government's account of the facts, while respectfully reserving rights to challenge that account in many of its particulars at a later juncture.

Government's dragnet. Accordingly, those assets should be released as necessary to enable Defendants to pay for their chosen counsel. *See Farmer*, 274 F.3d at 805.[5]

## BACKGROUND

Founded in 2005 by Kim Dotcom, Megaupload provided cloud-storage services. "The term 'cloud computing' is based on the industry usage of a cloud as a metaphor for the ethereal internet . . . . An external cloud platform is storage or software access that is essentially rented from (or outsourced to) a remote public cloud service provider . . . . This software-as-a-service allows individuals and businesses to collaborate on documents, spreadsheets, and more, even when the collaborators are in remote locations." *In re United States' Application for a Search Warrant to Seize and Search Elec. Devices*, 770 F. Supp. 2d 1138, 1144 n.5 (W.D. Wash. 2011) (quoting David A. Couillard, *Defogging the Cloud: Applying Fourth Amendment Principles to Evolving Privacy Expectations in Cloud Computing*, 93 Minn. L. Rev. 2205, 2216 (2009)) (internal quotations and citations omitted). Cloud computing offers a variety of benefits, including broad network access, resource pooling, rapid elasticity, on-demand self-service, and measured service. Peter Mell & Timothy Grance, *The NIST Definition of Cloud Computing: Recommendations of the National Institute of Standards and Technology* at 2, NIST Special Publication 800-145 (Sept. 2011). Megaupload's primary business, Megaupload.com, was a commercial website that offered a popular Internet-based storage platform for customers, who ranged from large businesses to individuals. Its storage platform allowed users to store files in the Internet "cloud" and to use, as needed, online storage space and bandwidth. Prior to being

---

[5] Regardless whether assets are released pursuant to *Farmer* or outright dismissal (as currently sought with respect to Megaupload), Defendants and their counsel are committed to addressing preservation of servers for the benefit of the larger issues and interests in this case, particularly as concerns innocent users who have lost access to their own content. As such, prompt resolution of these issues would prove timely and constructive for all concerned.

shut down by the Government, Megaupload's cloud-storage service allowed tens of millions of users throughout the world to store, retrieve, and share hundreds of millions of files. At the time the Government shut it down, the content stored across Megaupload.com's servers spanned a veritable ocean of accumulated human learning, knowledge, information, personal narrative, artistry and entertainment—as comprehensive review of its many hundreds of servers around the world would attest.

Any Internet user who used the Megaupload.com website could upload a computer file. *See* Superseding Indictment ¶ 6 (Feb. 16, 2012) (Dkt. 34). Similar to many businesses and cloud-storage providers that rely on efficient data storage, Megaupload was designed to store a single useable copy of each unique file uploaded to its servers. Whenever a file was uploaded to the site, an automated system used a mathematical algorithm to calculate a unique identifier, called an "MD5 hash," for the file. *See id.* ¶ 23. If, after the MD5 hash was calculated, it was determined that multiple users had uploaded the identical file, Megaupload would retain only one instance of the file, and generate a unique link for each individual user, called a Uniform Resource Locator ("URL"). *See id.* One user might choose to keep his unique link private; another user might wish to share his link with a close friend or family member by way of an e-mail; and another user might make it more widely available by embedding it in a webpage. Notably, Megaupload simply stored users' files on its servers at the request of users.

Since its founding, Megaupload was a successful participant in the expanding cloud-storage industry. At one point in its history, Megaupload.com was estimated to be the 13th most frequently visited website on the entire Internet. *Id.* ¶ 3. The site had more than one billion visitors during its existence, at least 66.6-million registered users, and an average of 50-million daily visits. *Id.* It accounted for, on average, approximately four percent of the total traffic

across the Internet.  *Id.*  In order to host the massive amount of unique data uploaded by its users,[6] Megaupload leased many hundreds of computer servers all over the world, most of them outside the United States.  *See id.* ¶ 39 (alleging that Megaupload leased "[m]ore than 1,000 computer servers" in North America);[7] *id.* ¶ 40 (alleging that Megaupload leased "approximately thirty-six computer servers in Washington, D.C. and France"); *id.* ¶ 41 (alleging that Megaupload leased "[m]ore than 630 computer servers in the Netherlands" and, in 2011, purchased "an additional sixty servers" hosted in the Netherlands).

Megaupload's income was derived primarily from two sources:  premium subscriptions and online advertising.  *Id.* ¶ 4.  Premium subscriptions could be purchased online for as little as a few dollars per day or as much as $260 for a lifetime.  *Id.*  In exchange for payment of the subscription fee, premium users enjoyed better and faster access to the website's content.  *See id.* ¶ 10.  Premium users were also entitled to longer-term file storage on the Megaupload cloud system.  *See id.* ¶ 7.  Subscription fees collected during the company's existence were estimated to exceed $150 million, whereas receipts from online advertising on Megaupload.com and affiliated sites were estimated to total a mere fraction of that, somewhere above $25 million.  *See id.* ¶ 4.

As with any cloud-storage service, or, for that matter, online service of any kind, Megaupload was susceptible to misuse by some customers.  Any service that enables users to

---

[6]   For example, the servers that Megaupload leased from Carpathia Hosting, Inc. contain more than 25 petabytes (25 million gigabytes) of information, which equals approximately half of all the entire written works of mankind, from the beginning of recorded history, in all languages.  *See* Memorandum of Law in Support of Emergency Motion for Protective Order by Non-Party Carpathia Hosting, Inc. at 8 n.12 (Dkt. 39).

[7]   By the Government's count, approximately 300 servers were located in Canada.  *See In the Matter of the Attorney General of Canada on behalf of the United States and Equinix, Inc.*, Affidavit of Daniel Raymond (redacted) ¶ 24 (Jan. 18, 2012) (Exhibit 5) ("Raymond Affidavit").

upload and share digital files across the Internet might be used to infringe underlying copyrights. To address this, Megaupload instituted several measures to comply with the safe-harbor provisions of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512(c), and to prevent misuse of the service.

To begin with, Megaupload required each user to accept its terms of use prior to uploading any file to the site. These terms included a prohibition against uploading any digital material or files for which the user did not own the copyright or was not authorized to have and maintain the files. Additionally, Megaupload cooperated with copyright owners by adhering to the "notice and takedown" procedures described in DMCA section 512(c)(3). *See* 17 U.S.C. § 512(c)(3). By October 15, 2009, Megaupload had also designated an agent to receive notices from copyright owners, as described in 17 U.S.C. § 512(c)(2). *See* Superseding Indictment at 10, ¶ 21 n.1. Accordingly, upon receipt from a copyright owner of a signed, written notification credibly identifying the presence of an allegedly infringing work, Megaupload as a matter of course would act expeditiously to remove or disable access to the infringing URL.[8] And it systematically did so countless times. Megaupload also adopted measures that went beyond compliance with DMCA's safe-harbor provisions. For example, Megaupload negotiated with numerous major copyright holders or their agents—including the Recording Industry Association of America, Disney, Warner Brothers, NBC, and Microsoft—to allow them access to remove directly, without the oversight or involvement of Megaupload, an active link to material they

---

[8] The Government alleges that Defendants would, in discrete instances, discount auto-generated takedown notices that requested takedowns *en masse*. *See, e.g.*, Superseding Indictment ¶¶ 24, 66, 73(nnn), 73(ooo), 73(zzz), 73(hhhh). Even so, we perceive no dispute, and no room for dispute, as to whether Defendants otherwise had a well documented, well implemented takedown policy.

believed infringed their copyrights. *See id.* ¶ 22. This enhanced access enabled such parties to protect their copyrights without need for formal take-down notices under the DMCA.

Notwithstanding Defendants' efforts to prevent infringement and to comply with the DMCA's safe-harbor provisions, on January 5, 2012 the Government indicted Megaupload, its founder, Kim Dotcom, and six others in what the Government calls one of "the largest criminal copyright cases ever brought by the United States." *See* Press Release, U.S. Department of Justice, *Justice Department Charges Leaders of Megaupload with Widespread Online Copyright Infringement* (Jan. 19, 2012) (available at http://www.justice.gov/opa/pr/2012/January/12-crm-074.html). The Government thereafter superseded the Indictment on February 16, 2012. *See* Superseding Indictment (Feb. 16, 2012) (Dkt. 34). The Superseding Indictment alleges that Megaupload, Mr. Dotcom, and the six other Defendants "were members of the 'Mega Conspiracy,' a worldwide criminal organization whose members engaged in criminal copyright infringement and money laundering on a massive scale with estimated harm to copyright holders well in excess of $500,000,000 and reported income in excess of $175,000,000." *Id.* ¶ 1.

Further, the Superseding Indictment seeks criminal forfeiture of "at least" $175 million. *Id.* ¶ 114. This represents the total revenues generated by Megaupload during its entire corporate existence. *Id.* ¶ 72. Thus, the premise of the Government's forfeiture request is that Megaupload never earned a single penny that was not criminal under U.S. law—whether, say, from a non-infringing use of its service, or from use that occurred wholly outside the United States and beyond reach of U.S. law, or even from an infringing use within the United States as to which Defendants nonetheless qualify for a statutory safe harbor or lacked requisite criminal intent.

Upon securing the initial Indictment, the United States petitioned this Court *ex parte* for a restraining order authorizing the pretrial seizure of all of Defendants' assets. This Court granted

the United States' request on January 10, 2012 and entered a restraining order authorizing pretrial seizure of all assets owned by Defendants.  Beginning on January 18, 2012, pursuant to this Court's restraining order, the United States and foreign governments around the world cooperated to restrain the assets, including over $67 million in liquid assets, belonging to Megaupload and the other Defendants.  The seized assets included bank accounts, personal property, and real property owned by Megaupload and the other Defendants in multiple jurisdictions, including but not limited to New Zealand and Hong Kong.  All of those assets remain seized—with the exception of a New Zealand court's limited release for Defendants' living expenses including, for example, funds Mr. Dotcom may use to cover his and his family's monthly living expenses, but not any legal expenses, *see* Exhibit B to Government's Opposition to Motion for Leave to Enter Limited Appearance at 4 ¶¶ 6.1.1, 6.1.2, 6.2 (Dkt. 76-2)—as the foreign courts now look to this Court for further proceedings and further word.

## ARGUMENT

The Fifth Amendment's due process guarantee requires a hearing if "'all of a defendant's substantial assets have been restrained and the defendant seeks to utilize restrained assets to fund his legal defense.'"  *Farmer*, 274 F.3d at 803 (citing *United States v. Harvey*, 814 F.2d 905, 913, 928-29 (4th Cir. 1987)); *see also United States v. Ziadah*, 230 F. Supp. 2d 702, 704 (E.D. Va. 2002) (explaining that, pursuant to *Farmer*, a defendant rendered indigent by the pretrial restraint of assets deserves an opportunity "'to prove by a preponderance of the evidence that the government seized untainted assets without probable cause and that he needs those assets to hire counsel.'") (quoting *Farmer*, 274 F.3d at 805).  A defendant's right to counsel likewise entails "a qualified Sixth Amendment right to use wholly legitimate funds to hire the attorney of his choice."  *Farmer*, 274 F.3d at 804.  There must, in sum, be "opportunity for [these Defendants]

11

to prove by a preponderance of the evidence that the government seized untainted assets without probable cause and that [t]he[y] need[] those same assets to hire counsel." *Id.* at 805.

In this case, *Farmer* relief can be granted on the law and without resort to a factual hearing. This is so because, as set out below, the Superseding Indictment by its own terms does not and cannot reach even the bulk of Megaupload's business, much less *all* of its business. We are content for present purposes to rely upon the Government's allegations in its Superseding Indictment, supplemented only by what are, or should be, undisputed facts. Established law simply does not support the Government's theory of-across-the-board liability under the alleged facts.

In these circumstances, this Court should exercise its "broad discretion" when it comes to "supervis[ing] pretrial proceedings" to rule that there is good warrant under *Farmer* and the U.S. Constitution for releasing funds as necessary to fund the defense. *See id.* at 805-06. Once that is established, Defendants will petition for specific release pursuant to a proposed order.

## I.  DEFENDANTS ARE WITHOUT FUNDS TO HIRE ATTORNEYS OF THEIR CHOICE.

By the Government's design, all available assets for the defense have been seized and frozen, as the Government well knows. The limited allotments Mr. Dotcom is receiving (by order of a New Zealand court) are reserved for his living expenses and those of his family and cannot be used to cover legal expenses, as is already a matter of record before this Court. *See* Exhibit B to Government's Opposition to Motion for Leave to Enter Limited Appearance at 4 ¶¶ 6.1.1, 6.1.2, 6.2 (Dkt. 76-2). All of the legal work performed to date by the undersigned has gone without recompense. The Government has effectively acknowledged the Defendants' inability to pay for attorneys in proposing release of frozen funds for the narrow purpose of preserving servers. For present purposes, therefore, there should be no dispute that Defendants

are in fact unable to fund their defense absent the requested relief.  In an abundance of caution, however, confirmatory testimony and orders from New Zealand are attached hereto.[9]

## II.   THE SCOPE OF THE PRETRIAL SEIZURES VASTLY EXCEEDS ANY POTENTIALLY FORFEITABLE AMOUNT.

Given Defendants' inability to fund their defense, their seized assets should be released under *Farmer* unless the Government has probable cause that all of the assets are destined for criminal forfeiture.  But the Government does not have probable cause for any such thing.

### A.   The Government's Case Rests Upon A Theory of *Secondary* Copyright Infringement That Cannot Give Rise To *Criminal* Liability.

A false legal premise enfeebles the Government's case at the threshold.  The Superseding Indictment is predicated upon judicially-created doctrines of secondary liability for copyright

---

[9]    *See* Reserved Judgment of Judge N R Dawson Granting Opposed Second Bail Application of Kim Dotcom in *Kim Dotcom v. United States*, at ¶ 35 (Feb. 22, 2012) (Acknowledging that "all known assets have been seized and are unavailable for Mr. Dotcom's use or disposal.") (Exhibit 6); Affidavit of Kim Dotcom in Support of Application for Bail (Jan. 23, 2012) at ¶ 25a ("Indeed I have no financial ability to conduct any business at all as all of my bank accounts have been identified by the US government and have been frozen due to the effect of the restraining order issued by the Courts both here in New Zealand and in the US.") ("Dotcom Aff.") (Exhibit 7); Reserve Decision of D J McNaughton on Opposed Bail Application of Matthias Ortmann in *Matthias Ortmann v. United States* (Feb, 9, 2012), ¶¶ 39 & 41 (granting Mr. Ortmann bail upon finding, *inter alia*, that "all his assets [are]frozen" and "there are no other accounts and no hidden funds" with which he could abscond to Germany) (Exhibit 8); Reserved Judgment of Judge D J McNaughton on Opposed Bail Application of Finn Batato in *Finn Batato v. United States* (Jan. 26, 2012) ¶¶ 21-22, 31 (accepting Mr. Batato's representations that he has a "relatively modest income" and that "[a]ll of his accounts are frozen apart from one account at an Austrian bank which contains a minimum sum[]" and granting bail accordingly) (Exhibit 9); Reserved Judgment of Judge D J McNaughton on Opposed Bail Application of Bram Van der Kolk in *Bram Van der Kolk v. United States* (Jan. 26, 2012) ¶¶ 24, 32 (granting bail upon accepting Mr. Van der Kolk's representation that all of his funds with the exception of two bank accounts containing €40,000 in total have been restrained by the US Government and finding that he does not have access to any other funds) (Exhibit 10); *In the Matter of Kim Dotcom, et al. in the High Court of the Hong Kong Special Administrative Region*, Miscellaneous Proceedings No. 116 of 2012, Second Affirmation of Bonnie Lam, at 3 ¶ 3 (confirming that "the United States Department of Justice and the Customs & Excise Department in Hong Kong have already identified all of [Megaupload]'s bank accounts and frozen them[]" such "that there were no funds available to meet the expenses" of the Company) (Exhibit 11).

infringement, which heretofore have been invoked only in the civil context.[10]  In essence, the

Superseding Indictment seeks to transplant to the criminal context the concept of secondary *civil*

liability enunciated by the Supreme Court in *MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913

(2005).[11]  This is an unsustainable and unprecedented expansion of criminal liability for

copyright infringement that does not square with the Copyright Act or with the Supreme Court's

reasoning in *Grokster*, or with the fundamental precept that crimes must be defined by statute.

The Copyright Act creates civil as well as criminal liability for *direct* infringement of

copyright.  17 U.S.C. § 501 *et seq.* (2010).  In the civil context, however, courts have created

doctrines of secondary liability derived "from common law principles" not codified in the

Copyright Act.  *See Grokster*, 545 U.S. at 930 (citation omitted).  Federal crimes, in contrast, are

"solely creatures of statute." *Liparota v. United States*, 471 U.S. 419, 424 (1985) (citing *United

States v. Hudson*, 11 U.S. (7 Cranch) 32 (1812)).  The Government, nonetheless, impermissibly

imports a common-law theory of a liability over to a statutorily-defined crime.

When assessing the reach of a federal criminal statute, the courts are to "pay close heed

to language, legislative history, and purpose in order strictly to determine the scope of the

conduct the enactment forbids." *Dowling v. United States*, 473 U.S. 207, 213 (1985).  Here, the

language, legislative history, and purpose of the Copyright Act uniformly indicate that Congress

---

[10]    Although the Superseding Indictment purports to allege a handful of isolated instances of direct infringement by Defendants themselves (*see, e.g.*, Counts 4-8), these are clearly outside of its gravamen and grossly insufficient to support sweeping pretrial seizure of all available assets.  Notably, these allegations of direct infringement are invalid on their face, as explained *infra*.

[11]  The Indictment is systematically tailored to fit the *Grokster* theory of "inducement" liability.  *See, e.g.*, Superseding Indictment ¶¶ 5, 21, 57, 64, 65, 69, 72, 73(g).  Indeed, the New Zealand court presently presiding over Defendants' extradition proceedings has recently agreed that the United States Government is attempting to transplant civil concepts into the criminal context.  *See* Decision of His Honor Judge David J. Harvey on Application for Disclosure, ¶ 244 (May 29, 2012) ("[T]he United States is attempting to utilise concepts from the civil copyright context as a basis for the application of criminal copyright liability . . . .") (Exhibit 4).

never intended to impose criminal liability for secondary copyright infringement.  Lacking any statutory support for its unprecedented effort to criminalize secondary copyright infringement, the Government has reached beyond the pale of the law.

> **1.    Federal Criminal Liability Is Created by Statute, And No Statute Imposes Criminal Liability for Secondary Copyright Infringement.**

Federal crimes are delimited by statute.  It is for Congress, not for the courts, to say (and to warn) what constitutes a crime.  *Dowling*, 473 U.S. at 213-14 (quoting *United States v. Wilberger*, 5 Wheat. 76 (1820) ("It is the legislature, not the Court, which is to define a crime, and ordain its punishment")).  Courts interpreting penal statutes will exercise restraint and adopt a narrow statutory interpretation unless Congress has definitely indicated that it intended a harsher reading.  *Id.*  Because "[t]he Copyright Act does not expressly render anyone liable for infringement committed by another," *Sony Corp. of Am. v. Universal Studios*, 464 U.S. 417, 434 (1984), reh'g denied, 456 U.S. 1112 (1984), the Act cannot be read to make *secondary* infringement a crime.

The provision that codifies criminal liability for copyright infringement, 17 U.S.C. § 506(a), says nothing about secondary liability.  In particular, Section 506(a) provides:

> **(1) In general.**--Any person who willfully infringes a copyright shall be punished as provided under section 2319 of title 18, if the infringement was committed--
>
> **(A)** for purposes of commercial advantage or private financial gain;
>
> **(B)** by the reproduction or distribution, including by electronic means, during any 180-day period, of 1 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of more than $1,000; or
>
> **(C)** by the distribution of a work being prepared for commercial distribution, by making it available on a computer network accessible to members of the public, if such person knew or should have known that the work was intended for commercial distribution.

This section does, to be sure, create criminal liability for direct, willful infringement in certain specified circumstances.  But it does *not* state that criminal liability can be predicated upon theories of secondary liability; does not equate criminal liability with civil liability; and does not contemplate the importation of common-law doctrines whereby courts have widened civil liability for copyright infringement.[12]

Notably, even in the civil context, Congress has declined to codify secondary liability for copyright infringement.  In 1998, while debating enactment of the DMCA, Congress studied the issue of secondary liability for service providers.  While acknowledging case law addressing service providers' secondary civil liability for copyright infringement and sympathizing with the desire of service providers for statutory clarification, "[r]ather than embarking upon a wholesale clarification of these doctrines, the Committee decided to leave current law in its evolving state and, instead, to create a series of 'safe harbors' for certain common activities of service providers."  S. Rep. No. 105-190, 1998 WL 239623, at *19 (1998).

This decision to create safe harbors rather than codify secondary liability was part of Congress' ongoing effort to "ensur[e] an appropriate balance between the interests of copyright owners and information users []" and to adopt provisions that are "technology neutral[.]"  H.R. Rep. No. 105-551 (II), 1998 WL 414916, at *24 (1998).  Congress envisioned that its statutory safe harbor would afford needed security and certitude in the face of the evolving law by "protect[ing] qualifying service providers from liability for all *monetary relief* for direct, vicarious, and contributory infringement."  S. Rep. No. 105-190, 1998 WL 239623, at *20 (emphasis added).  Thus, Congress not only declined to codify secondary liability, but expressed

---

[12]  To construe Congress' silence in Section 506 as authorizing criminal liability for secondary copyright infringement would (even if not otherwise foreclosed) separately violate the rule of lenity, which "requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them."  *United States v. Santos*, 553 U.S. 507, 514 (2008).

its intention to protect service providers even against "monetary relief" in the civil context; it follows *a fortiori* that Congress did not contemplate that service providers such as these Defendants might be *imprisoned* based on uncodified theories of secondary liability that are still evolving in the civil context, as though those amounted to established federal crimes.

> **2.    Extending the Judicial Doctrine of Secondary Civil Liability for Inducement to Criminal Liability Would Be Contrary to the Supreme Court's Reasoning in *Grokster*.**

Like Congress, the courts have wrestled with the tension between protecting the rights of authors and promoting technological innovation.  As the Supreme Court noted in *Grokster*, "[t]he more artistic protection is favored, the more technological innovation may be discouraged; the administration of copyright law is an exercise in managing the tradeoff."  545 U.S. at 928 (citation omitted).  The Court in *Grokster* therefore took care not to chill innovation in narrowly tailoring a theory of civil "inducement" liability.  Specifically, the Court borrowed from patent law the notion of "inducement" liability for copyright infringement:

> For the same reasons that *Sony* took the staple-article doctrine of patent law as a model for its copyright safe-harbor rule, the inducement rule, too, is a sensible one for copyright.  We adopt it here, holding that one who distributes a device with the object of promoting its use to infringe copyright, as shown by a clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.

*Id.* at 936-37.[13]

At the same time, the Court stressed the need for balance and explained how its rule was narrowly tailored to achieve it, stating:

> We are, of course, mindful of the need to keep from trenching on regular commerce or discouraging the development of technologies with lawful and unlawful potential.  Accordingly, just as *Sony* did not find intentional inducement despite the knowledge of the VCR manufacturer that its device could be used to

---

[13]    Section 271(b) of the Patent Act codifies liability for inducement of patent infringement, while 271(c) codifies contributory liability for distribution of a product not "suitable for substantial non-infringing use."  35 U.S.C. §§ 271(b), 271(c).

> infringe, mere knowledge of infringing potential or of actual infringing uses would not be enough here to subject a distributor to liability.  Nor would ordinary acts incident to product distribution, such as offering customers technical support or product updates, support liability in themselves.

*Id.* at 937 (citation omitted).

The Court's reasoning has particular import for these alleged crimes.  Patent law, from which the *Grokster* Court borrowed the "inducement" rule as "a sensible one for copyright," is *exclusively* civil in nature—there is no such thing as criminal liability for patent infringement. *See Dowling*, 473 U.S. at 227 n.19.

Copyright infringement, moreover, is "primarily an economic offense[,]" *id.* at 222, because a "copyright license is just a type of contract," *In Re Aimster Copyright Litig.*, 334 F.3d 643, 646 (7th Cir. 2003), *cert. denied*, 540 U.S. 1107 (2004); it follows that civil damages should ordinarily suffice to remedy infringement.  Copyright owners could have brought a civil action, just as they later did here[14] and have done in the past,[15] if they were confident they could establish secondary liability with respect to Megaupload's service.  Instead, the Government has stepped in to transmogrify the doctrine of secondary infringement, as fashioned by the courts for civil copyright cases, into a crime and to wield its prosecutorial pretrial powers to snuff out an innovative technology—thereby upsetting the essential balance that Congress and the Supreme Court have taken such care to strike and maintain.  *See Dowling*, 473 U.S. at 228 ("[T]he deliberation with which Congress . . . has addressed the problem of copyright infringement for profit, as well as the precision with which it has chosen to apply criminal penalties in this area, demonstrates anew the wisdom of leaving it to the legislature to define crime and prescribe

---

[14]   Plaintiffs Microhits, Inc. and Valcom, Inc. filed a civil lawsuit in this court against Defendants Megaupload, Kim Dotcom, and Mathias Ortmann on March 21, 2012 in Case No. 12-cv-327.

[15]   *See, e.g.*, *Sony*, 464 U.S. at 417*; A&M Records v. Napster, Inc.*, 239 F.3d 1004 (9th Cir. 2001); *Aimster*, 334 F.3d at 643*; Grokster*, 545 U.S. at 913.

penalties."); *Grokster*, 545 U.S. at 958 (Breyer, J. concurring) ("Judges have no specialized technical ability to answer questions about present or future technological feasibility or commercial viability where technology professionals, engineers, and venture capitalists themselves may radically disagree . . . .").

> **B.   The Indictment Is Facially Defective.**

Further defects in the Government's case jump out from the Superseding Indictment. These are not mere technical defects, but the most telling indicators of the Government's claimed cause and how it falls short.

> **1.   The Criminal Copyright Infringement Counts Do Not Properly Notify Defendants Of The Charges Against Them.**

Counts Four through Eight of the Indictment charge Defendants with direct (as opposed to secondary) criminal copyright infringement. *See* Superseding Indictment ¶¶ 93-97. These counts do not incorporate or re-allege any of the preceding paragraphs or allegations of the complaints. Instead, Count Four merely alleges in a single paragraph that Defendants willfully infringed a copyright by making publicly available a specific motion picture ("Taken") that was slated for commercial distribution, while Counts Five through Eight allege in only the most conclusory fashion that Defendants willfully infringed copyrights by directly reproducing and distributing unspecified content over the Internet. *See id.* Although these paragraphs recite the language of the criminal copyright statute, that is all they do; they are devoid of meaningful factual detail and are therefore deficient as a matter of law.

An indictment is legally sufficient if it: (1) presents the essential elements of the charged offense, (2) notifies the accused of the charges to be defended against, and (3) enables the accused to rely upon a judgment under the indictment as a bar against double jeopardy for any subsequent prosecution for the same offense. *See Russell v. United States*, 369 U.S. 749, 763-64

(1962); *see also* FED. R. CRIM. P. 7(c)(1).  Moreover, the indictment must contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]" FED. R. CRIM. P. 7(c)(1).  Where, as here, an indictment contains multiple counts, each count is viewed as a separate indictment for purposes of determining its sufficiency.  *See Dunn v. United States*, 284 U.S. 390, 393 (1932).  While a count may incorporate factual allegations contained in previous counts, *see* FED. R. CRIM. P. 7(c)(1), any such incorporation must be express.  *See United States v. Huff*, 512 F.2d 66, 69 (5th Cir. 1975) ("[E]ach count of an indictment must be regarded as if it were a separate indictment and must stand on its own content without dependence for its validity on the allegations of any other count not expressly incorporated[.]"); *see also United States v. Redcorn*, 528 F.3d 727, 734–35 (10th Cir. 2008) ("There is no need to look beyond the borders of a particular count to determine what offense is charged; indeed, it is generally improper to do so except where a count incorporates other allegations expressly[.]"); *United States v. Miller*, 774 F.2d 883, 885 (8th Cir.1985) (each count of an indictment "must stand on its own, and cannot depend for its validity on the allegations of any other count not specifically incorporated") (internal quotation marks and citation omitted).  Where a given count provides no factual detail whatsoever, it is legally invalid.

The Eleventh Circuit's recent decision in *United States v. Schmitz*, 634 F.3d 1247 (11th Cir. 2011), is on point.  There, the indictment charged the defendant with four counts of theft concerning a program receiving federal funds, allegedly in violation of 18 U.S.C. § 666(a)(1)(A).  634 F.3d at 1260.  The court noted that, although the theft counts incorporated the first two background paragraphs of the indictment, they failed to incorporate or re-allege any of the allegations of the preceding counts.  *Id.* at 1260-61.  Rather, the counts simply parroted the language of the statute, charging that the defendant "knowingly and willfully did embezzle, steal,

obtain by fraud and without authority convert to her own use, and intentionally misapply" federal funds. *Id.* at 1261. The Eleventh Circuit held the counts to be legally insufficient because they failed to notify the defendant of the relevant charges. *Id.* Specifically, the court stated that, "[e]ven when an indictment tracks the language of the statute, it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged." *Id.* If such a statement is lacking, the indictment is invalid.

The counts of criminal copyright infringement contained in this Superseding Indictment are likewise invalid. Beyond reciting the verbiage of the statute, these counts provide no factual information from which Defendants could prepare a defense. The counts fail to specify such critical information as which copyrights were allegedly infringed; who holds those copyrights; when and where the alleged infringements occurred; who directly committed the alleged infringement; and how the copyrights were allegedly infringed.

Even if the Court were to look beyond Counts Four through Eight themselves, the Government's allegations are nonetheless lacking. The Superseding Indictment indeed *assumes* that infringement occurred each time a copyrighted work was uploaded, downloaded, or shared. But it alleges no facts to support that assumption. For example, the Government alleges that Kim Dotcom uploaded a copyrighted song by rap artist 50 Cent, without alleging anything about where or how Mr. Dotcom obtained that music file. *See* Superseding Indictment ¶ 73(u). The Indictment offers no allegation or evidence that Mr. Dotcom did not purchase the song and upload it legally. The Government later alleges that Finn Batato "distributed an infringing copy of the copyrighted music file 'Louis Armstrong – We have all the time in the world.mp3[,]" but does not allege *why* it was an "infringing copy." *Id.* ¶ 73(nn). The Superseding Indictment is

replete with similar instances where the Government simply assumes that infringement occurred without alleging any of the requisite facts. *See, e.g.*, *id.* ¶ 73(r) (alleging that Bram Van der Kolk sent an e-mail that attached a screenshot of a download page for a copyrighted file, without alleging that he obtained the file illegally); ¶ 73(bbb); ¶ 73(eee); ¶73(fff); ¶73(kkk); ¶ 73(jjjj); ¶ 73(aaaaa); ¶ 73(ccccc); ¶ 73(kkkkk); ¶ 73(rrrrr).

These omissions are not small, they are not subtle, they are not few, and they are not inconsequential. The Government has attempted to make out an all-encompassing case of an alleged criminal copyright conspiracy without bothering to allege concrete specifics of the actual infringement allegedly committed. It has attempted to build one of "the largest criminal copyright cases ever brought by the United States" out of conclusory *ipse dixit*, reciting statutory verbiage and nothing more. Certainly Counts Four through Eight do not reflect facts supplying requisite probable cause.

> **2.     The Government Simply Assumes Scienter, Without Alleging Specific Facts To Support It.**

The Superseding Indictment's defects are all the more glaring in reference to Defendants' allegedly criminal intent, which is, of course, essential to differentiate *criminal* infringement from run-of-the-mill civil infringement.

As to each count of a criminal indictment, the Government must show that a defendant acted with the requisite intent or mental state. *See Salinas v. United States*, 522 U.S. 52, 65 (1997) (to be convicted under the RICO conspiracy statute, 18 U.S.C. § 1962(d), a conspirator must intend to further an endeavor that, if completed, would satisfy all elements of a substantive criminal offense); *United States v. Edwards*, 188 F.3d 230, 234 (4th Cir. 1999) (to prove a criminal conspiracy under federal law, 18 U.S.C. § 371, the Government must establish willing participation by the defendant); *United States v. Green*, 599 F.3d 360, 371 (4th Cir. 2010) (to

obtain a conviction for money laundering conspiracy, 18 U.S.C. § 1956(h), Government must prove that the defendant knew that the money laundering proceeds had been derived from an illegal activity and that the defendant knowingly and voluntarily became part of the conspiracy); 17 U.S.C. § 506(a) (requiring that criminal copyright infringement be committed "willfully"); *United States v. Privette*, 358 Fed. App'x 398, 399 (4th Cir. 2009) ("An element of wire fraud is the intent to defraud.").  Throughout the Superseding Indictment, however, the Government relies on conclusory statements that the Defendants acted with the requisite intent without providing any factual basis to support that assertion.

For example, in Count One, the Indictment generically claims that the Defendants did "*knowingly*, *willfully*, and *intentionally* combine, conspire, confederate, and agree together and with each other and with other persons known and unknown to the Grand Jury, to violate 18 U.S.C. § 1962(c)."  *See* Superseding Indictment ¶ 48  (emphasis added).  Yet the Superseding Indictment fails to allege or identify a single conversation, e-mail, document, record, or piece of evidence of any kind to establish that Defendants entered into any agreement at all—let alone one that was knowingly, willfully, or intentionally setting out to break the law.  Littered across the Superseding Indictment are similar unsupported assumptions of mental state.  *See, e.g.*, *id.* ¶ 2 (alleging that Defendants used Megaupload.com "to willfully reproduce and distribute many millions of infringing copies of copyrighted works"); ¶ 8 ("[T]he Mega Conspiracy has purposefully made their rapid and repeated distribution a primary focus of their infrastructure."); *see also id.* ¶¶ 11, 13, 14, 21, 27, 52, 58, 62, 67, 75, 76, 77, 80, 81, 82, 92, 93, 94, 95, 96, 97, 99, 105.

Furthermore, many of the key facts alleged as evincing criminal intent are no less consistent, ostensibly *more* consistent, with perfectly lawful business purposes.  *See, e.g.*, *id.* ¶ 4

(noting that Megaupload directed its revenue to compensating its owners and employees; to "developing and promoting Megaupload.com and complementary Internet sites and services"; to "an 'Uploader Rewards' Program, which promised premium subscribers transfers of cash and other financial incentives to upload popular works"; and to "the infrastructure supporting their businesses, including the leasing of computers, hosting charges, and Internet bandwidth"); ¶ 9 ("Mega Conspiracy's business strategy for advertising requires maximizing the number of online downloads (i.e., distributions of content)"); ¶ 10 ("In addition to displaying online advertisements, the download pages on Megaupload.com are designed to increase premium subscriptions.  All non-premium users are encouraged to buy a premium subscription to decrease wait and download times . . . .  As a result, non-premium users are repeatedly asked by the Conspiracy to pay for more and faster access to content on Megaupload.com.  Users are also prompted to view videos uploaded to Megaupload.com directly on a proprietary player designed by the Conspiracy and offered through the Megavideo.com website and service."); *see also id.* ¶¶ 8, 11, 13, 17, 18, 19, 23.  The Government may not establish probable cause of criminal intent by assumption, particularly where the evidence of intent is entirely consistent with normal and lawful business practices.

Particularly in the context of this case, where it can be stipulated that Megaupload's business was designed to appeal to its users and facilitate uploading and downloading of files, such allegations say nothing of consequence.  If the Government believes that every such business model is inherently and pervasively criminal because it may enable copyright infringement along with other misuse, then it should say as much, so that everyone is on notice and this Court can take due account.  If, on the other hand, the Government believes that this

business and these Defendants specially set out with intent to perpetrate copyright infringement, it is conspicuously bereft of corresponding facts.

To the extent isolated exceptions may be found in the Superseding Indictment, they only highlight the above-stated rule.  The closest the Superseding Indictment comes to suggesting any knowing *tolerance of* (let alone complicity in) infringement is limited to a handful of discrete allegations that would not begin to implicate the entire business in question, or even, for that matter, a substantial fraction of its assets.[16]  That Defendants may have generally known of a discrete amount of infringement present on the website, as an inevitable side effect of having four percent of the internet's traffic, does not translate to an intent by them to commit infringement, much less to do so business-wide.  It does not differentiate these Defendants from, say, the host provider of a blog or website who leaves undisturbed someone's posting of song lyrics or a magazine clipping.  If a scattering of such instances indeed amounts to criminal conspiracy implicating an entire business, all participants therein, and all assets therefrom, then much of the online world is in big trouble.  The discrete instances alleged by the Government cannot sustain its ultimate allegation that Megaupload's entire business was "a worldwide criminal organization whose members engaged in criminal copyright infringement and money laundering on a massive scale."  *Id.* ¶ 1.  Yet that is the necessary premise underlying the Government's seizure of every available dollar Defendants ever earned.

Notably, assuming *arguendo* that the Government could, notwithstanding all of the contrary law cited *supra* at Section II(A), pursue this criminal prosecution based on alleged liability for secondary copyright infringement, it would at least need to prove that the requisite intent obtains throughout the infringement—*i.e.*, on the part of Defendants as secondary

---

[16]     *See, e.g*., Superseding Indictment ¶ 26; *id.* ¶ 73(y); *id.* ¶ 73(bb); *id.* ¶ 73(cc); *id.* ¶ 73(uu).

infringers, and of the user as primary infringer.  But the Government makes no such attempt. Even if the law did impose criminal liability for secondary infringement, therefore, this failure of proof as to intent would be fatal.[17]

### 3.    Many Of The Seized Assets Are Disconnected From The Allegedly Infringing Activities.

Finally, the Superseding Indictment itself establishes that many of the seized assets are categorically removed from any allegedly infringing activities.  *See In re United States' Application for a Search Warrant to Seize and Search Elec. Devices*, 770 F. Supp. 2d at 1143 (holding that the Government's search and seizure of the "vast amount and nature of data that can be stored on or accessed by personal computers" is a violation of the Fourth Amendment's particularity requirement).  To take an example, the Superseding Indictment alleges that Defendants collected more than $150 million in subscription fees from premium users.  *See* Superseding Indictment ¶ 4.  By the Government's *ipse dixit*, every cent of these fees is subject to forfeiture.  *See id.* ¶ 72.  This is possible, however, only if there is probable cause to believe that every single one of the millions of Megaupload premium users was engaged in criminal copyright infringement and that every dime they paid was in furtherance of their infringement. Of course, any such notion defies belief.  To the contrary, available evidence confirms that

---

[17]    The Government's aiding and abetting charges fail for the same reason.  The Superseding Indictment fails to allege facts showing willful criminal infringement by any of Megaupload's users.  Even if such willfulness were present, the Government has failed to allege that Defendants were aware of the users' criminal intent or of the unlawful nature of their acts. This is plainly insufficient to support aiding and abetting liability.  *See United States v. Winstead*, 708 F.2d 925, 927-28 (4th Cir. 1983) ("To prove the crime of aiding and abetting the government must show that the defendant knowingly associated himself with and participated in the criminal venture. . . .  This requires evidence that the defendant be aware of the principals' criminal intent and the unlawful nature of their acts. Evidence that the defendant merely brought about the arrangement that made the criminal acts of the principals possible does not alone support a conclusion that the defendant was aware of the criminal nature of the acts.") (internal citations omitted).

Megaupload received subscription fees for innocent, non-infringing activities. *See, e.g.*, Declaration of Interested Party Kyle Goodwin in Support of Emergency Motion for Protective Order by Non-Party Carpathia Hosting, Inc. and for Additional Relief ¶ 5 (Dkt. 51-1) (indicating that Mr. Goodwin paid for a premium account for storage and remote access to an unlimited number of files for which he was the rightful owner) ("Goodwin Decl."); *see also* Brief of Kyle Goodwin in Support of his Motion for the Return of Property at 4-5, 8 (Dkt. 91) (explaining that Mr. Goodwin and other similarly situated innocent third parties like him used Megaupload.com for lawful purposes).  On these facts, Megaupload's subscription fees are legitimate and free of taint regardless of whether certain users allegedly infringed, unless the Government can show that the value of the service lies in providing access to infringing material (which the Government has not even attempted to do here).  *See Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004) (subscription fees are not a financial benefit where users were not paying to engage in the infringing activity); S. Rep. No. 105-190, 1998 WL 239623, at *44-45 ("[R]eceiving a one-time set-up fee and flat periodic payments for service from a person engaging in infringing activities would not constitute receiving a 'financial benefit directly attributable to the infringing activity.'").

No less dubious is the connection between advertising revenues and the alleged infringement.  The Superseding Indictment seeks forfeiture of the entirety of the more than $25 million in advertising fees that Megaupload generated over the course of its existence.  *See* Superseding Indictment ¶¶ 4, 72.  The Government's forfeiture theory thus disregards the fact that *every* download on Megaupload.com—including downloads by authorized, non-infringing users—occurred on a page that contained online advertisements, which brought corresponding revenues.  *See id.* ¶ 9.

The Government seeks forfeiture of all of Defendants' revenue because it has assumed all of the revenue is tainted by crime.  But there is no probable cause to support that assumption, which by no means follows from—and is, indeed, at odds with—acknowledged aspects of Megaupload's business that stand well removed from the alleged infringement.  To put matters in perspective, consider the maximum statutory fine that might be imposed upon Megaupload and the individual Defendants were they convicted on all five criminal counts, Counts Four through Eight, concerning the alleged copyright infringement:  The maximum fine per count for a first offense of criminal copyright infringement under 21 U.S.C. § 506(a) would be $250,000 for the individual and $500,000 for the corporation, *see* 18 U.S.C. §§ 2319(b), 3571(b)(3), 3571(c)(3), such that imposing the fine upon these Defendants consecutively across all five counts would result in a combined fine of $7,500,000.00.  Yet tens of millions of dollars, more than ten times the amount of that maximum fine, have been seized from these Defendants as derived from the business.  The math does not compute.

### C.    Defendants Have The Benefit of Obvious Defenses.

Even setting aside the glaring defects in the Government's factual allegations and legal theory of secondary liability, its allegations of criminal copyright infringement could not possibly touch the bulk of Defendants' business, because obvious, established defenses stand as shields.  As explained *infra* at Section II(E)(1), the Megaupload.com website was capable of "substantial non-infringing uses" such that it could not, even in the civil context, give rise to secondary copyright liability.  *Sony*, 464 U.S. at 442.  It therefore follows *a fortiori* that it cannot give rise to criminal liability.

In addition, a statutory safe harbor obtains here, at least in large part.  The DMCA, 17 U.S.C. § 512, expressly furnishes a safe harbor for Internet service providers whose services are

used by others for the transmission or storage of infringing content. *See, e.g.*, *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 25 (2d Cir. 2012); *UMG Recordings, Inc. v. Shelter Capital Partners LLC*, 667 F.3d 1022, 1030 (9th Cir. 2011). Defendants qualify for its protections.

To fall within the safe harbor, a service provider must, *e.g.*, receive notifications of alleged infringement and, upon receipt of a proper takedown notice, act expeditiously to remove or disable access to the infringing material.[18] The prerequisites are satisfied here. Megaupload had a designated agent and processed takedown requests expeditiously (in most instances, within a matter of hours). *See* Dotcom Aff. at ¶ 14 (Exhibit 7).

If anything, Defendants went above and beyond what the law requires to help content owners identify and remove unauthorized material from the site. Megaupload negotiated with numerous major rights holders, including the Recording Industry Association of America, the Motion Picture Association of America, Disney, Warner Brothers, and Universal Pictures, to grant them full access to directly remove any active link to infringing material. Dotcom Aff. ¶ 14; *see also* Affidavit of Bram Van der Kolk in Support of Application for Bail (Jan. 23, 2012) ¶ 12 ("Van der Kolk Aff.") (Exhibit 12). As the program proved its utility, Megaupload expanded it, increasing Warner Brothers' direct takedown quota from 2,500 to 5,000 takedowns per day. *See* Superseding Indictment  ¶ 73. Before it was shuttered, Megaupload was taking down thousands of links each day and had taken down approximately 15-million allegedly infringing links. Van der Kolk Aff. ¶ 11; Dotcom Aff. ¶ 15.

A service provider who satisfies the threshold criteria loses safe-harbor protection only if (a) it had knowledge or awareness of specific instances of infringement; (b) consciously avoided knowledge or awareness of specific instances of infringement; or (c)  (i) had the "right and

---

[18]   Service providers are not required to actively monitor or "affirmatively seek[] facts indicating infringing activity."  17 U.S.C. § 512(m)(1); *see Viacom*, 676 F.3d at 35.

ability to control" the infringement, which is properly understood as exerting substantial influence on the activities of its users, *Viacom*, 676 F.3d at 36-38, *UMG Recordings*, 667 F.3d at 1041-43, <u>and</u> (ii) derived a direct financial benefit from infringing material. *See Ellison v. Robertson*, 357 F.3d 1072, 1078-79 (9th Cir. 2004). Again, even if every allegation in the Superseding Indictment is accepted as true, there is no indication that a disqualifying condition obtains as to anything more than a discrete and tiny fraction of the material hosted by Megaupload. Thus, assuming *arguendo* that the Government may ultimately pierce some gap in Defendants' safe-harbor shield, the point remains for present purposes that Defendants and their business are, at least in the main, protected from liability. That is, they are protected even from *civil* liability. For the Government nonetheless to have alleged criminal scienter and liability is an adventurous stretch. But for the Government to have done so while seizing all of Defendants' assets as destined for criminal forfeiture is altogether unsustainable.

> **D.    The Indictment And Seizure Transgress The Territorial Limitation On The Copyright Act.**

Were the Government's allegations and theories well founded in all other respects, they would still need to be territorially bounded. Megaupload was a non-U.S. company whose activities mostly occurred overseas and whose users were mostly located overseas.[19] The laws of

---

[19]    By the Government's own count, more than half of Megaupload's servers resided outside the United States. *See* Superseding Indictment ¶¶ 39-41 (1,726 servers were spread around the world, 690 of which were in the Netherlands); Raymond Affidavit ¶ 24 (reflecting that more than 300 of the servers were in Canada) (Exhibit 5). Similarly, by the Government's own estimate, users of Megaupload.com at one time accounted for "approximately four percent of the total traffic on the Internet." *Id.* ¶ 3. The Internet is, of course, available to and used by individuals all over the world. In fact, as of December 31, 2011, Internet usage in North America (including Canada) as a proportion of total Internet traffic trailed far behind usage in Asia and Europe. *See* Internet Users in the World Distributed by World Regions 2011, http://www.internetworldstats.com/stats.htm (last visited May 14, 2012) (indicating that, in 2011, Internet usage in Asia accounted for 44.8% of total Internet traffic; usage in Europe 22.1%; and usage in North America just 12%). Consistent with this reality, the Superseding Indictment is replete with indications that infringements it alleges transpired abroad. *See, e.g.*, *id.* ¶ 73(v)

the United States do not apply to overseas locations and operations absent contrary prescription by Congress. *See Morrison v. Nat'l Australia Bank*, 130 S. Ct. 2869, 2877 (2010) ("It is a longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.") (quoting *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) (internal quotations omitted)). Given the specter of international conflicts over intellectual property, this presumption applies even "more robust[ly] . . . to the Copyright Act[.]" *Omega S.A. v. Costco Wholesale Corp.*, 541 F.3d 982, 988 (9th Cir. 2008), *aff'd by an equally divided court*, 131 S. Ct. 565 (2010).[20]

It is an "'undisputed axiom that United States copyright law has no extraterritorial application[.]'" *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1093 (9th Cir. 1994) (*en banc*), *cert. denied*, 513 U.S. 1001 (1994) (quoting 3 David Nimmer & Melville B. Nimmer on Copyrights § 12.04[A][3][b], at 12-86 (1991)); *see Nintendo of Am., Inc. v. Aeropower Co. Ltd.*, 34 F.3d 246, 249 n.5 (4th Cir. 1994) (noting that the Copyright Act is "generally considered to have no extraterritorial application"); *In re Outsidewall Tire Litig.*, No. 1:09cv1217, 2010 WL 2929626, at *8 (E.D. Va. July 21, 2010) (citing with approval the Ninth Circuit's extraterritoriality analysis in *Subafilms*). With respect to this prosecution and, in

---

(alleging that Megaupload paid a user who uploaded, *inter alia*, "Vietnamese content" and an "unknown (Italian serries? [sic]) rar files"); ¶ 73(y) (describing one user's files as "vietnamese DVD rips"); ¶ 73(y) (describing one user's files as "vietnamese DVD rips"); ¶ 73(gg) (referencing "'the sopranos [] in French'"); ¶ 73(nnn) (referencing "infringement reports" from Mexico); ¶ 73(tttt) (referencing complaint of a Taiwanese broadband service provider); ¶ 73(vvvv) (alleging infringement of BBC copyrighted television show); ¶ 73(eeeee) (discussing French complaint about infringement); ¶ 73(ppppp) (referencing complaint of the Vietnamese Entertainment Content Protection Association).

[20] So limited and fixed is the Copyright Act's territorial reach that it presumptively does not apply to conduct that occurs abroad *regardless* whether that conduct produces harmful effects within the United States. *Omega*, 541 F.3d at 988 (citing *Subafilms*, 24 F.3d at 1096-98). In any event, the Indictment alleges no such harm within the United States.

particular, this asset seizure, the Government appears to have taken no account whatsoever of these established bounds.

"For the Copyright Act to apply, 'at least one alleged infringement must be completed entirely within the United States.'"  *Elmo Shropshire v. Canning*, No. 10-CV-01941-LHK, 2011 WL90136, at *3 (N.D. Cal. Jan. 11, 2011) (quoting *Los Angeles News Serv. v. Reuters Television Int'l, Ltd.*, 149 F.3d 987, 990-91 (9th Cir. 1998)); *accord Rundquist v. VAPIANO SE*, 798 F. Supp. 2d 102, 126 (D.D.C. 2011).  Tellingly, the Superseding Indictment fails to allege a specific instance in which an entire act of infringement—particularly an unauthorized uploading or downloading by a user who lacked rights—occurred within the United States.  The closest the Indictment comes is to allege fewer than 50 instances (even giving the Government every benefit of the doubt and crediting verbatim its passing recitation of "thirty nine infringing copies" located in this District, *see* Superseding Indictment ¶ 26) where an ostensibly unauthorized copy of copyrighted material *resided* on a server within the United States.  To be precise, and conservatively assuming that none overlap, the Superseding Indictment alleges a sum total of 44 such instances.[21]

---

[21]  *See, e.g.*, Superseding Indictment ¶ 26 (alleging that "thirty-nine infringing copies of copyrighted motion pictures were present on their leased servers . . . in the Eastern District of Virginia."); ¶ 73(fff) ("On or about October 25, 2008, VAN DER KOLK uploaded an infringing copy of a copyrighted picture entitled "Taken["] . . . . [A]n infringing copy of this copyrighted work was still present as of October 27, 2011, on a server in the Eastern District of Virginia[.]"); ¶ 73(aaaaa) ("On or about April 29, 2011, members of the Conspiracy infringed the copyright of the motion picture 'The Green Hornet' by making it available on publicly accessible Internet-connected servers . . . within the Eastern District of Virginia, and reproduced and distributed the work over the Internet without authorization.  The film, which had been released in U.S. theaters on or about January 14, 2011, was not commercially distributed in the United States until on or about May 3, 2011."); ¶ 73(ccccc) ("On or about May 13, 2011, members of the Conspiracy infringed the copyright of the motion picture 'Thor' by making it available on publicly accessible . . . servers . . . in Ashburn, Virginia . . . .  The film . . . was not commercially distributed in the United States until on or about September 13, 2011."); ¶ 73(jjjjj) ("On or about August 12, 2011, members of the Conspiracy infringed the copyright of the motion picture 'Bad Teacher' by

These 44 instances, which do not specify where the purportedly infringing content was uploaded or accessed, do not establish that so much as a single alleged act of infringement was consummated within the United States.[22]  But we will assume, *arguendo*, that they did establish an instance of U.S.-based infringement.  We will further assume that the Government established that *all* of these 44 alleged instances involved U.S.-based infringement.  We will even put to the side the other failures identified *supra* in the Government's allegations, proof and theories and assume that all of these 44 instances were shown to involve criminal, direct infringement, with requisite intent, for which these Defendants are themselves liable.  As a point of comparison, were the Court to impose the maximum statutory penalty applicable for civil infringement committed "willfully"—$150,000.00 per infringement, *see* 17 U.S.C. § 504(c)(2)—for each of the 44 infringements allegedly traced to the United States, the resulting fine would total $6,600,000.  Such a fine would be severe, but it would constitute a mere *ten percent* of the assets currently seized.

---

making it available on publicly accessible . . . servers . . . in Ashburn, Virginia. . . . .  The film . . . was not commercially distributed in the United States until on or about October 18, 2011.)"; ¶ 73(sssss) ("On or about November 20, 2011, members of the Conspiracy infringed the copyright of the motion picture 'The Twilight Saga: Breaking Dawn – Part 1' by making it available on publicly accessible . . . servers . . . in Ashburn, Virginia . . . .  The film . . . had not been commercially distributed as of January 5, 2012.").

[22]  The mere fact that potentially infringing content resides on a server in the United States does not suffice to establish infringement under the Copyright Act.  *See CoStar Group, Inc. v. LoopNet, Inc.*, 373 F.3d 544, 549-50 (4th Cir. 2004) (holding that direct infringement requires more than "mere ownership of a machine used by others to make illegal copies" and that there "must be actual infringing conduct[.]"); *see also ALS Scan, Inc. v. RemarQ Communities, Inc.*, 239 F.3d 619, 622 (4th Cir. 2001) ("'As to direct infringement, liability is ruled out for passive, automatic acts engaged in through a technological process initiated by another.'") (quoting H.R. Rep. No. 105-551(I), 1998 WL 414916, at *11 (1998)); *Cartoon Network LP, LLLP v. CSC Holdings, Inc.*, 536 F.3d 121, 131-32 (2d Cir. 2008) (direct infringement requires "volitional conduct," not mere ownership of device used by others to infringe).

**E.      The Government's Shuttering of Megaupload Violates Established First Amendment Protections.**

The Government's shuttering of Megaupload without any process whatsoever demands heightened scrutiny given the worrisome implications that the Government's expansive theories have for freedom of speech and expression.  The Defendants maintained a forum that facilitated speech and expression by users around the country (and, indeed, around the world).  Megaupload afforded, as the Supreme Court put it in *Reno v. ACLU*, 521 U.S. 844, 853 (1997), "a vast platform from which to address and hear from a world wide audience of millions."  If this prosecution succeeds, then the chilling effect on newly emerging cloud storage technologies will be profound, and a valuable means of expression will be compromised.

**1.   Megaupload's Services Are Capable of Substantial Non-Infringing Uses.**

In *Sony*, the Supreme Court held that design, sale and supply of a technology that is "merely [] capable of substantial non-infringing uses" cannot be a basis for secondary copyright liability.  464 U.S. at 442.  The Betamax videotape recorder at issue in *Sony* was capable of both infringing and legitimate uses, with the latter "serv[ing] the public interests in increasing access to television programming, an interest that is consistent with the First Amendment policy of providing the fullest possible access to information through public airwaves."  *Id.* at 425 (internal quotation and citation omitted).  Megaupload implicates the same doctrine and concern because, as with the video tape recorder at issue in *Sony*, its services are capable of substantial non-infringing uses.  Also as in *Sony*, Megaupload's technology served the public interest by increasing access to speech—permitting users to upload and store large amounts of data securely and then to access and share that data via the Internet.

Megaupload subscribers clearly used the service to store legitimate, non-infringing music and video files.  Take, for example, Kyle Goodwin, a premium user who used Megaupload to

upload and store video files for his online business reporting on high-school sporting events, which required large video files.  Mr. Goodwin and his producers often exchanged raw sports footage electronically via Megaupload.  *See* Goodwin Decl. at 1-2 (Dkt. 51-1).  Also among Megaupload's innocent users are musicians who held premium accounts and used those to release their own work.  As one such artist has explained, "You sign up for a paid account from services like Megaupload, which pay you if you get a ton of downloads.  For big name artists, that's easy . . . So it's a great business model for artists:  they get paid and their fans get music for free."[23]  Accordingly, there should be no doubt and no dispute that this technology found substantial, non-infringing use.

### 2.     The Government's Unprecedented Theory of Secondary Criminal Copyright Liability Violates Core Protections for Freedom of Speech.

"[I]t is appropriate to construe copyright's internal safeguards to accommodate First Amendment concerns."  *Eldred v. Ashcroft*, 537 U.S. 186, 221 n.24 (2003); *see also* S. Rep. No. 105-190, 1998 WL 239623, at *69 (Statement of Sen. Leahy) (noting that copyright exists to "create incentives for the dissemination to the public of new works and forms of expression"); Mark A. Lemley & Eugene Volokh, *Freedom of Speech and Injunctions In Intellectual Property Cases*, 48 Duke L.J. 147, 167-68 (1998) ("Enjoining or punishing non-infringing speech would thus be an unconstitutional restraint of First Amendment protected expression.").  While copyright rewards owners of works, "[t]he reward to the owner is 'a secondary consideration' that serves the primary public purpose of 'inducing release to the public of the products of the author's or artist's creative genius.'"  *Bond v. Blum*, 317 F.3d 385, 393 (4th Cir. 2003) (brackets omitted) (quoting *Sony*, 464 U.S. at 429).  The foremost concern of copyright law, therefore, is to

---

[23]   *See Busta Rhymes Backs Megaupload, Says Record Labels Are the Real Criminals* (Jan. 20, 2012), http://www.techdirt.com/articles/20120120/15060817494/busta-rhymes-backs-Megaupload-says-record-labels-are-real-criminals.html (last visited May 24, 2012).

enable the public to enjoy copyrighted content of all descriptions.  By indiscriminately shutting down all of the content stored on Megaupload, the Government has overridden copyright's "internal safeguards" and imperiled the First Amendment in at least two respects:  first, its wholesale seizure of the content of Megaupload's service is a prior restraint upon protected speech; second, the seizure is fatally overbroad.

*i.  The Government's Wholesale Seizure Amounts to a Prior Restraint*

The Government's shuttering of Megaupload, purely on its own *ipse dixit*, is a modern-day throwback to the unconstitutional prior restraints on speech that are a notorious enemy of the First Amendment.  In *Fort Wayne Books, Inc. v. Indiana*, 489 U.S. 46 (1989), for instance, the State of Indiana filed a civil action against several owners of adult bookstores alleging RICO violations and, based on an *ex parte* showing of probable cause, seized "the real estate, publications, and other personal property comprising each of the three bookstores operated by the corporate defendants."  *Id.* at 51.  Even assuming that the seized materials were obscene, and thus unprotected, the Court held that "our cases firmly hold that mere probable cause to believe a legal violation has transpired is not adequate to remove books or films from circulation."  *Id.* at 66; *see United States v. Jenkins*, 974 F.2d 32, 35 (5th Cir. 1992) ("It is, of course, well-settled that the government may not seize presumptively protected expressive materials without a prior judicial determination of obscenity").  The bottom line is that the Government cannot order seizure of "literally thousands of books and films [to be] carried away and taken out of circulation by [a] pretrial order" until "the claimed justification for seizing books or other publications is properly established in an adversary proceeding."  *Fort Wayne Books*, 489 U.S. at 67; *see, e.g.*, *Multi-Media Distributing Co., Inc. v. United States*, 836 F. Supp. 606, 614 (N.D. Ind. 1993) (finding that government seizure of "presumptively First Amendment protected

36

materials without a judicial determination of their obscenity" entitled plaintiff to a prompt hearing to determine whether the materials were, in fact, protected).

Here, the Government has effectively accomplished what *Fort Wayne Books* foreclosed. It has shuttered Megaupload, and, with it, a treasure trove of books, films, videos, photos, digital expression of every stripe, without any adversarial proceeding at all.   What is more, if the Government had its way, 1,100-servers worth of that collection would have been wiped, with members of the public (including rightful owners of that material) left the poorer for it.   In this sense, what the Government has done in this case raises further alarms, for it has seized not only allegedly infringing copies, but effectively taken down everything that was on Megaupload.com, taking works out of circulation entirely.   *See Heller v. New York*, 413 U.S. 483, 492 (1973) (explaining that "a single copy of a book or film may be seized and retained for evidentiary purposes based on a finding of probable cause" but it is when a book or film is "taken out of circulation completely" that the seizure rises to the level of a prior restraint).   The parallels between this case and cases in which prior restraints have been denounced as unconstitutional are unsettling and, if nothing else, warrant heightened judicial skepticism and scrutiny.

### ii.   The Government's Wholesale Shuttering of Megaupload Is Unconstitutionally Overbroad

As noted above, Megaupload had substantial non-infringing uses.   Because a significant portion of the business undoubtedly promoted lawful, non-infringing means of expression, the Government's seizure of all of the Defendants' assets and destruction of the business is unconstitutionally overbroad.   This reality is amply demonstrated by the recent filing of interested party Kyle Goodwin, which makes clear that Mr. Goodwin's protected expression— including edited videos of local high school sporting events, promotional videos, news packages, and footage used to produce a full-length documentary of the Strongsville girls soccer team's full

season—has been trampled by the Government's overreach.   *See* Brief of Kyle Goodwin in Support of his Motion for the Return of Property at 5-6, 11 (Dkt. 91) ("Yet accomplishing these seizures by permanently disabling third parties' access to their legal content without notice or potential for recourse runs afoul not only of the Fourth and Fifth Amendments . . . but the First as well, since much of what is seized is protected expression.").   "The Government may not suppress lawful speech as the means to suppress unlawful speech.   Protected speech does not become unprotected merely because it resembles the latter.   The Constitution requires the reverse."   *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002).

While no court has yet considered whether the Government's peremptory seizure, based on allegations of criminal infringement, of property that undisputedly reflects substantial non-infringing content can pass muster under the First Amendment, courts and commentators have repeatedly examined the lesser question whether a *civil* injunction may issue when a work as a whole contains substantial non-infringing content.   And the consistent answer has been that a civil injunction *cannot*.   *See, e.g.*, *Silverstein v. Penguin Putnam, Inc.*, 368 F.3d 77, 84-85 (2d Cir. 2004) (refusing to grant an injunction because "any protectible interest [the plaintiff] may have would be so slight" in comparison to the non-infringing works that an injunction was an abuse of discretion); *Abend v. MCA, Inc.*, 863 F.2d 1465, 1479 (9th Cir. 1988) (refusing to enjoin film because "[a]n injunction would also effectively foreclose defendants from enjoying legitimate profits derived from exploitation of the 'new matter'" contained elsewhere in the work).

This Circuit is in accord.   In *Bouchat v. Baltimore Ravens LP*, the Fourth Circuit concluded that the defendants had infringed the plaintiff's copyright but did not order an injunction.   619 F.3d 301, 316 (4th Cir. 2010).   Instead, the Fourth Circuit remanded the case for

a determination whether an injunction was appropriate under the circumstances. *Id.* at 317. On remand, the district court (Garbis, J.) specifically declined to enter an injunction, reasoning that an injunction would be inappropriate where it would "'encumber a great deal of property unrelated to the infringement.'" *Bouchat v. Baltimore Ravens LP*, 2011 WL 5445947, at *2 (D. Md. Nov. 9, 2011) (quoting *Christopher Phelps & Assocs.*, *LLC v. Galloway*, 492 F.3d 532, 545 (4th Cir. 2007)). The *Bouchat* Court concluded that, although a copyright holder may be injured by infringement, that injury "must be balanced against the public's right to obtain a benefit from the copyright-protected material." *Id.* at *3. The same solicitude for the First Amendment has moved other courts to resist overbroad restraints. *See, e.g.*, *A&M Records, Inc. v. Napster, Inc.*, 239 F.3d 1004, 1027-28 (9th Cir. 2001) (recognizing that it would have had to further adjust the scope of the injunction at issue in light of the effect on the First Amendment, had there not been a finding that all of the users were engaging in infringing conduct); *New Era Pub. Int'l v. Henry Holt & Co.*, 873 F.2d 576, 597 (2d Cir. 1989) (Oakes, J., concurring) (agreeing with denial of an injunction because "a non-injunctive remedy provides the best balance between the copyright interests and the First Amendment").

Here, again, the Government has accomplished through brute force of peremptory seizure the very sort of overbroad shutdown of speech and content that the First Amendment should impede. This is but further confirmation that the Government has gone too far.

## CONCLUSION

For the foregoing reasons, and accepting *arguendo* the Government's purported proof and affording it every plausible benefit of the doubt, the Government would have probable cause to seize, at most, a small fraction of the business and resulting assets at issue.  Conversely, a portion of the total assets currently frozen will suffice to fund defense of this matter.  Thus, no close question need be decided and no fine line need be drawn in order for defense of this matter to be funded from assets that remain free of taint.  Because Defendants Megaupload, Kim Dotcom, Mathias Ortmann, Bram Van der Kolk and Finn Batato have been rendered unable to pay for their chosen counsel, their untainted assets are due to be released to the extent necessary to fund full and fair defense.  The Defendants respectfully submit that this Court should so rule as a matter of law, whereupon Defendants would petition for specific release of assets to their chosen counsel pursuant to a proposed order.

Respectfully submitted,


Ira P. Rothken                          ____/s/ Heather H. Martin_____
ROTHKEN LAW FIRM                        William A. Burck
3 Hamilton Landing                      Derek L. Shaffer
Suite 280                               Heather H. Martin (VSB # 65694)
Novato, CA 94949                        QUINN EMANUEL URQUHART &
(415) 924-4250                          SULLIVAN LLP
(415) 924-2905 (fax)                    1299 Pennsylvania Avenue N.W., Suite 825
ira@techfirm.net                        Washington, D.C. 20004
                                        (202) 538-8000
                                        (202) 538-8100 (fax)
                                        williamburck@quinnemanuel.com
                                        derekshaffer@quinnemanuel.com
                                        heathermartin@quinnemanuel.com


                                        Carey R. Ramos
                                        Robert L. Raskopf
                                        Andrew H. Schapiro
                                        QUINN EMANUEL URQUHART &
                                        SULLIVAN LLP
                                        51 Madison Avenue, 22nd Floor
                                        New York, N.Y.  10010
                                        (212) 849-7000
                                        (212) 849-7100
                                        careyramos@quinnemanuel.com
                                        robertraskopf@quinnemanuel.com
                                        andrewschapiro@quinnemanuel.com

                                        *Counsel for Defendants Megaupload
                                        Limited and Kim Dotcom*

                                        _____/s/ Craig C. Reilly_____
                                        Craig C. Reilly (VSB # 20942)
                                        111 Oronoco Street
                                        Alexandria, VA 22314
                                        (703) 549-5354
                                        (703) 549-2604 (fax)
                                        craig.reilly@ccreillylaw.com

                                        *Counsel for Defendants Mathias Ortmann,
                                        Bram Van der Kolk & Finn Batato*

Dated:  May 30, 2012

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2012, the foregoing [PROPOSED] MOTION TO CHALLENGE THE SCOPE OF PRETRIAL RESTRAINT OF ASSETS OF DEFENDANTS MEGAUPLOAD LIMITED, KIM DOTCOM, MATHIAS ORTMANN, BRAM VAN DER KOLK & FINN BATATO AND MEMORANDUM OF LAW IN SUPPORT THEREOF was filed and served electronically by the Court's CM/ECF system upon all registered users.

Ira P. Rothken
ROTHKEN LAW FIRM
3 Hamilton Landing
Suite 280
Novato, CA 94949
(415) 924-4250
(415) 924-2905 (fax)
ira@techfirm.net

_____*/s/ Heather H. Martin*_____
William A. Burck
Derek L. Shaffer
Heather H. Martin (VSB # 65694)
QUINN EMANUEL URQUHART &
SULLIVAN LLP
1299 Pennsylvania Avenue N.W., Suite 825
Washington, D.C. 20004
(202) 538-8000
(202) 538-8100 (fax)
williamburck@quinnemanuel.com
derekshaffer@quinnemanuel.com
heathermartin@quinnemanuel.com

Carey R. Ramos
Robert L. Raskopf
Andrew H. Schapiro
QUINN EMANUEL URQUHART &
SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, N.Y.  10010
(212) 849-7000
(212) 849-7100
careyramos@quinnemanuel.com
robertraskopf@quinnemanuel.com
andrewschapiro@quinnemanuel.com

*Counsel for Defendants Megaupload*
*Limited and Kim Dotcom*

_____ */s/ Craig C. Reilly* _____
Craig C. Reilly (VSB # 20942)
111 Oronoco Street
Alexandria, VA 22314
(703) 549-5354
(703) 549-2604 (fax)
craig.reilly@ccreillylaw.com

*Counsel for Defendants Mathias Ortmann,*
*Bram Van der Kolk & Finn Batato*

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| KIM DOTCOM, et al., | ) |
| | ) |
| Defendants | ) |
| | ) |

The Honorable Liam O'Grady

Criminal No. 1:12-CR-3

## [PROPOSED] ORDER

Defendants Megaupload Limited ("Megaupload"), Kim Dotcom, Mathias Ortmann, Bram Van der Kolk and Finn Batato specially appear to move the Court pursuant to Local Criminal Rule 47 and *United States v. Farmer*, 274 F.3d 800 (4th Cir. 2001), for the release of assets to fund their defense.   The COURT, having considered Megaupload's motion, the Government's response thereto, and Megaupload's reply in support of its motion, and being fully advised in the premises, finds by a preponderance of the evidence that, whereas the Government has seized all of the assets belonging to Defendants Megaupload, Dotcom, Ortmann, Van der Kolk and Batato, it in fact lacked probable cause to seize most if not all of the assets in question.   The COURT further finds that Defendants need access to those assets to pay for counsel of their choice.   Accordingly, it is hereby

ORDERED that said motion is GRANTED.

/ / /

/ / /

/ / /

The COURT hereby GRANTS Defendants leave to petition the Court at a later time for a specific release of assets to hire counsel of their choice.  The Government shall serve this Order on all foreign governments or other foreign entities where pretrial restraint has been obtained.


Date:  _____          _____
          Alexandria, Virginia                          The Honorable Liam O'Grady
                                     United States District Judge