# EXHIBIT 4

**IN THE DISTRICT COURT
AT NORTH SHORE**

UNDER THE EXTRADITION ACT 1999

**IN THE MATTER OF A REQUEST BY THE GOVERNMENT OF
THE UNITED STATES OF AMERICA
FOR THE SURRENDER OF PERSONS IN NEW ZEALAND**

**KIM DOTCOM,
MATHIAS ORTMANN,
BRAM VAN DER KOLK & FINN BATATO**
Applicants

v

**UNITED STATES OF AMERICA**
Respondent

| | |
|---|---|
| Hearing: | 18 May 2012 |
| Counsel: | Mr Davison QC with him Ms Woods for Kim Dotcom<br>Mr Foley for Ortmann, Van Der Kolk & Batato<br>Mr Ruffin with him Mr Walsh for the United States of America |
| Judgment: | 29 May 2012 |

**DECISION OF HIS HONOR JUDGE DAVID J HARVEY
[On application for Disclosure]**

## Contents

Introduction.................................................................................[1]

The Issue...................................................................................[5]

The Background.........................................................................[10]

What is Sought?.........................................................................[15]

The Submissions for the Applicant................................................[16]

Mr. Foley's Submissions.............................................................[71]

The Argument for the United States...............................................[77]

Discussion................................................................................[114]

    Extradition.......................................................................[114]

    The Record of the Case.......................................................[131]

    Criminal Proceedings and Extradition....................................[142]

    Powers of the Court...........................................................[151]

    Committal Proceedings.......................................................[154]

    Oral Evidence Applications in Extradition Proceedings..........[159]

    The Nature of the Decision to be Made in Extradition Cases..[164]

    Engaging the New Zealand Bill of Rights Act........................[192]

    Findings upon extradition proceedings and the
    applicability of the New Zealand Bill of Rights Act...............[213]

    The Issue of Disclosure......................................................[215]

    The Scope of Disclosure.....................................................[244]

Conclusion................................................................................[259]

Appendix – Documents to be Disclosed.

**Introduction**

[1]    In *R v Secretary of State for the Home Department Ex Parte Daly*[1] Lord
Steyn concluded his judgment as follows: "In Law context is everything." This case
deals with whether or not, within the context of extradition proceedings and the
record of the case evidence presentation process the applicants, Kim Dotcom and his
associates, are entitled to disclosure of information held by the prosecuting
authorities be it of a general or a restricted nature.

[2]    Mr Dotcom through Mr Davison and his associates through Mr Foley argue
that the context demands it. Mr Ruffin for the United States argues that the context
in this particular case, in the absence of any identified justiciable issue, means that
disclosure is not available.

[3]    My conclusion is that disclosure is available to a limited extent. That
disclosure is completely compatible with the context of extradition proceeding and
the utilisation of the record of the case procedure and in particular within the context
and factual circumstances of this case. My reasons follow and my decision is
structured in this way.

[4]    I commence by identifying the issue and give some of the background to this
case. I then identify what it is that is sought by the applicants and summarise the
arguments advanced by Mr Davison and Mr Foley, followed by a summary of the
arguments advanced by Mr Ruffin. I then move to a discussion of the matters argued
in the context of the law and the issues to be decided. I start with a consideration of
the extradition process, discuss the record of the case (ROC) process and consider
the powers of the Court, especially within the context of committal proceedings and
whether an oral evidence application needs to be made in extradition proceedings. I
then consider the nature of the decision to be made in extradition cases and whether
or not the provisions of the New Zealand Bill of Rights Act 1990 (NZBORA) are
engaged. I then moved to the principal issue – that of whether disclosure is available
as against the contextual background discussed, consider the scope of disclosure and
then identify the disclosure that should be made.

---

[1] [2001] UKHL 26; [2001] AC 532

**The Issue**

[5]    The major issue in this particular case are whether there is an obligation to make disclosure in ROC extradition proceedings and if so, whether or not this Court may in such circumstances order disclosure.

[6]    Initially the applicants' request for disclosure was framed in broad terms, seeking general disclosure akin to that available in criminal proceedings bought in New Zealand.  This approach was based upon the concept of general disclosure which was not specifically directed at the circumstances of this case.  However the applicant claims that it is entitled to disclosure in the particular circumstances of this case, irrespective of whether general disclosure is required in extradition cases more generally.

[7]    The applicant says that disclosure will fall to be considered in the context of those issues which are justiciable in the specific extradition context.

[8]    It is suggested that one of the justiciable issues before the Court is the existence of a prima facie case such as would be required to justify the applicant being committed to stand trial had the conduct which is said to constitute the offence occurred in New Zealand.  Disclosure is sought of documents and materials relating to this issue.

[9]    The application is opposed by the United States.

**Background**

[10]    The background to this case is becoming well known.  Mr Dotcom and his associates were involved with a group of companies which could be characterised as the Megaupload Group.  Megaupload provided internet based file storage facilities.  Associated with this service Megaupload provided its users with an opportunity to share files.  It is alleged that copyright material was stored on Megaupload servers by Megaupload customers and was widely shared in breach of copyright.  Music and movie files were among those so shared.

[11]   Mr Dotcom is resident in New Zealand as is one of his associates Mr Van Der Kolk.  Mr Batato and Mr Ortmann live overseas but all of the parties were gathered at Mr Dotcom's residence in Coatesville in anticipation of his birthday celebrations in January 2012.  They were arrested pursuant to provisional arrest warrants issued at the request of the United States.  It is alleged, and indictments have been presented against the applicants in the United States of America, that they were involved in criminal breach of copyright, money laundering, racketeering and wire fraud.  An extradition hearing has been set for the 6th August 2012.  A ROC has been filed by the United States Government and it is anticipated that a supplementary record is to be filed in due course.

[12]   In brief the United States contention is that there is no right of general discovery in extradition proceedings and discovery must be viewed in the particular extradition context of a request involving a record of the case summary.  A record of the case is deemed to be admissible and is presumed to be reliable.

[13]   The United States argues that the applicants would only be entitled to discovery if there was some evidential basis for a claim that the record of the case is not reliable in some particular respect or otherwise infringes some rights under the New Zealand Bill of Rights Act – for example that the presentation of the evidence has been tainted by bad faith and there must be an "air of reality" about such a complaint.

[14]   In such a situation discovery must be calibrated to the scope of the justiciable issues so raised but the United States argues that the applicants are not entitled to discovery for the purposes  merely of seeing whether evidence might exist to support a claim that the threshold has been reached.

**What is sought?**

[15]   In his memorandum of submissions dated 2nd May 2012 Mr Davison has set out a schedule of the documents and materials and an appendix which he seeks by way of disclosure.  He has broken the disclosure up into categories based upon the charges contained in the indictment.  The documents that he seeks are as follows:

1.   **Criminal breach of copyright**

   (a)   A copyright ownership element

      (i)   All documents either connected to, related to or evidencing legal ownership of the copyright interest allegedly infringed.[2]

   (b)   Infringement element

      (i)   All documents either connected to, related to or evidencing alleged infringement of the copyright interests, including but not limited to:

- all records obtained or created in connection with the covert operations undertaken by agents involved in the investigations related to these proceedings in transacting and uploading/downloading data and files on the Megaupload site;

- all records or information and/or material provided to or obtained by the investigating and/or prosecuting agencies in this case from holders and/or owners of copyright interests evidencing alleged infringement of their copyright and/or complaining of such alleged infringement;

- all records and materials related to communications between relevant copyright holders and Megaupload and/or its employees regarding their copyright interest, the direct delete access provided by Megaupload to any such copyright owners, and any communications between the copyright owners and Megaupload and/or its staff regarding take-down notices; and

- all and any investigative product relating to any investigation of third party internet sites providing links to files stored on Megaupload.com including all and any communications between Megaupload Ltd and/or its employees and such sites and the operators thereof.[3]

   (c)   Commercial element

---

[2] Mr Davison states that in his schedule reference to documents includes all documents howsoever created and whether obtained voluntarily or seized under warrant.
[3] Mr Davison states that in the schedule reference to investigative product includes all investigator records including but not limited to notebooks, file notes and records of communications by which investigators obtained, received or recorded material and information relevant to the investigation.

(i)     All/any records or materials or information relating to the operation of the Megaupload rewards scheme for premium users, including but not limited to:

- all documents containing communications between Megaupload Ltd and/or its employees and the said premium users, including communications regarding the payment of, entitlement to or qualification for rewards; and

- all documents relating to the payment of all/any rewards to "premium" users.

(d)     Knowledge/wilfulness element

(i)     All and any documents materials and/or records containing evidence relied upon by the respondent as evidencing or supporting the allegation that the applicant acted wilfully in relation to the infringement of copyright material;

(ii)     All documents evidencing communications between the applicant and all/any of the alleged co-conspirators demonstrating either knowledge or wilfulness on the part of the applicant, or the absence thereof in relation to the deliberate and unlawful infringement of copyright including but not limited to:

- all emails passing between, exchanged, forwarded, copied (either directly or indirectly) between the applicant and all or any of the alleged co-conspirators; and

- all telephone and other forms of electronic communication (including Skype) intercepted in the course of the investigation, including both transcripts and electronic recordings of such communications.

**2.**    **Money laundering**

(a)     All documents allegedly evidencing the transfer and/or handling of funds for the purpose of money laundering.

(b)     All documents containing descriptions of transactions or recording financial transactions undertaken by the applicant

(either directly or indirectly) for the purpose of money laundering.

3.   **Racketeering**

    (a)   All documents said to evidence the formation and/or existence of an enterprise involved in "racketeering activity".

    (b)   All documents said to evidence participation by the applicant in such an enterprise.

    (c)   All documents said to evidence the engagement in "racketeering activity" by the applicant and/or the said enterprise.

4.   **Wire fraud**

    (a)   All documents said to evidence that the applicant, by means of any of the specified mechanisms of transmission (see 18 U.S.C. § 1343) by which it is alleged that the applicant received a benefit or caused a loss as a result of false or fraudulent pretences.

    (b)   All documents said to evidence the fraudulence and/or falsity of the basis upon which the applicant is alleged to have received a benefit or caused a loss.

**The Submissions for the Applicant**

[16]   Mr Davison's submissions started by considering the statutory scheme provided by the Extradition Act, the provisions of s 22(1)(a) and the nature of the committal process incorporating Parts 5 and 5A of the Summary Proceedings Act.

[17]   He then went on to consider the provisions of s 24 of the Act setting out the elements relevant to the determination for eligibility for surrender and Article 4 of the Extradition Treaty arguing that all these provisions were consistent with a committal hearing process. The emphasis upon a committal hearing is important,

especially in light of amendments to the Summary Proceedings Act. Mr Davison conceded that because of the interaction of s 17 and 25 of the Extradition Act the ROC regime applies although Article 9 of the Extradition Treaty requires that the law of the country in which the extradition request is heard will apply to the determination request. Mr Davison submitted that the ROC is not mandatory. The requesting country may elect to present evidence in the usual manner but the ROC procedure is designed to expedite the process.

[18]    Essentially Mr Davison was arguing that the manner of adducing evidence does not detract from the need to consider whether the evidence would justify a trial if the conduct constituting the offence had occurred in New Zealand. The quality of the analysis required to reach an outcome does not change even although the manner of evidence production is different.

[19]    The distinction Mr Davison made about the nature of the committal hearing fell into sharp focus in respect of submissions that he made regarding whether or not it was necessary for there to be an application for an oral evidence order, should he elect to call evidence.

[20]    Mr Davison pointed out that s 22 of the Extradition Act refers to the applicability of Part 5 of Summary Proceedings Act with necessary modifications. The present provisions of the Summary Proceedings Act provide for two types of committal hearing:

    (a)    A standard committal which is done on the papers;

    (b)    A committal hearing as a consequence of s 180 and 181 and an oral evidence order.

[21]    However he submitted that the extradition hearing does not contemplate a standard committal process and therefore there is no need for a defendant to make application to a Judge for an oral evidence order. In his written submissions he argues that under the Summary Proceedings Act such an application or order is logically prior to the stage at which it becomes necessary to hold a committal hearing. In contrast, under the Extradition Act, a committal hearing is reached

directly and automatically, and is not predicated upon an oral evidence order being made by a Judge.  Thus the outcome of Mr Davison's argument is that an oral evidence application would only be applicable if there were an alternative process – a standard committal or a committal hearing – and that is not the case here.

[22]   The United States argues that not only should there be an oral evidence application but pursuant to s 176 of the Summary Proceedings Act,  briefs of evidence will have to be disclosed prior to the hearing.  Mr Davison argues that the pre-requisite for a s 176 is in fact the making of an oral evidence order and that does not apply in this case.   Section 176 applies in the context of a prosecutorial obligation to make disclosure and, in terms of a committal hearing, places a reverse obligation upon the defence.

[23]   Essentially Mr Davison is arguing that the applicability of the provisions of Part 5 of the Summary Proceedings Act in extradition hearings is limited. The anomaly, he argues, seems to have developed as a result of the 2008 amendments to the Summary Proceedings Act which provided consequential amendments to the Extradition Act substituting the reference to a preliminary hearing – which was the provision before 2008 – with a committal hearing.  The interrelationship between oral evidence orders, the disclosure of briefs and the difference between committal hearings and standard committal provided in the Summary Proceedings Act does not appear to have been addressed in the Extradition Act.

[24]   Therefore, argues Mr Davison it is anticipated that a full hearing would always take place in extradition procedures given that the distinction between the standard hearing and a committal hearing does not apply to extradition proceedings.

[25]   Following that he argues that it is the nature of the hearing – in person, contested and not on the papers – that infers that there should be pre-trial disclosure.

[26]   Mr Davison concedes that disclosure must be relevant to justiciable issues which require determination at extradition.

[27]    He also noted that whereas a committal hearing following an oral evidence order would be limited to the evidence, issues and witnesses identified as warranting or justifying the convening of an oral evidence hearing, there is no such constraint applicable in the extradition hearing under the Act.  He argues that that contrast and the wider scope of the issues arising at the type of committal hearing contemplated under the Act informs the requirement for appropriate disclosure relating to the justiciable issues arising.

[28]    Mr Davison then went on to develop his argument that disclosure was applicable under the Extradition Act.  He made reference to the point that the Act makes provision for regulations relating to disclosure but at present there is no specific process.  He argues that because of this it cannot be said that it was intended that there be no disclosure process or that such a process was inapplicable to Extradition Act proceedings.

[29]    He also argues that the absence of an expressed procedure provided by regulations does not prohibit court order disclosure and that is based upon:

    (a)    The purposes of the Extradition Act;

    (b)    The general nature of extradition;

    (c)    Other relevant legislation such as the Criminal Disclosure Act.

[30]    He also argues that an absence of disclosure is tantamount to a denial of certain NZBORA right and freedoms.

[31]    Mr Davison developed the purpose of extradition by referring first to the case of *Ferras v The United States of America*[4] the Supreme Court of Canada identified the purposes of extradition which were not only based upon issues of international relationships and a flexible non-technical approach but also the necessity to protect an individual from deportation in the absence of at least a prima facie case that he or she committed the offence alleged which must also be an offence in Canada. International comity does not require the extradition of a person on demand or surmise but neither do all the procedural safeguards of a trial apply provided the materials establishes a case sufficient to put the person on trial.

---

[4] [2006] 2 SCR 7

[32]    Mr Davison then went on to distinguish the various processes and procedures by which extradition purposes can be facilitated.  He referred to Australia and the United Kingdom where there is a high level of comity and where effectively there is extradition on request without evidence.  The next level includes exempt countries where the ROC regime applies.  In the ROC regime there is no need to provide source documents or testimony but Mr Davison argues that that should not be allowed to derogate from the second purpose stated in *Ferras* – to protect an individual from deportation in the absence of at least a prima facie case.  Therefore, argues Mr Davison, there must be a well founded allegation because extradition involves a serious and significant interference with the liberty of the individual.  Mr Davison went on to develop his argument of individual hardship as it applied to Mr Dotcom.

[33]    Mr Davison argued that there is a need for a properly and fully informed judicial determination on the available evidence of whether or not there is a prima facie case and, in referring to *Ferras*, he emphasised that the process must be more than a mere rubber stamp.   Expeditious evidence presentation should not compromise safeguards for the individual.

[34]    Mr Davison concedes that the scope of disclosure is not as wide as in criminal proceedings in New Zealand but a requirement for disclosure is necessary to ensure meaningful and robust assessment of the prima facie case – the principal justiciable issue.

[35]    Mr Davison argued that disclosure means that all relevant material would come before the Court.  This must be viewed in light of the nature of the process.  Extradition is not an inquisitorial process – it is adversarial.  The Court relies upon the contending parties to locate, evaluate and present the relevant evidence which includes evidence that may refute the requesting states position making it difficult to achieve the prima facie standard.

[36]    Mr Davison argues that the ROC could and may be selective in that it would provide the material that supports the request for surrender.  The ROC, he points out, contains a summary of the evidence plus supporting documents and photos.  It does

not require all source documents which would negate the expeditious nature of the ROC process.

[37]    The very nature of the ROC process, argues Mr Davison, makes refutation difficult.  This is complicated by virtue of the fact that Mr Dotcom has a lack of access to his own records as a result of search and seizure activities undertaken by the requesting State.  This provides a further obstruction in the way of the effective opportunity that Mr Dotcom and his associates may have to refute the requesting state's case.  By virtue of that absence of the ability to refute means that the Court becomes a rubber stamp.

[38]    Mr Davison is not challenging the *bona fides* of the ROC.  He repeats that the ROC is an evidence production method and is not in of itself infallible.  Mr Davison argues that it is necessary for there to be scrutiny of the supporting material which enables the ability to assist the Court in reaching a determination on the justiciable issue.  Disclosure, argues Mr Davison, does not challenge the evidence production systems of the ROC but provides a way by which relevant information may come before the Court.

[39]    Mr Davison draws an analogy with the criminal procedure (Mentally Impaired Persons) Act.  This process, he argues, is also robust but is not a rubber stamp.  He referred to the case of *R v Ankers*[5] and the duty upon defence counsel to test prosecution evidence at a s 9 hearing.  I should observe that the requirement and ability to test evidence at a s 9 hearing has been referred to by the Court of Appeal in *R v Ruka*.[6]

[40]    Mr Davison argues that disclosure may in fact be the only meaningful way by which the ROC can be challenged and provides an effective balance to the advantages inherent to the requesting State in the ROC process.

---

[5] DC Auckland CRI 0600-405-1209-9 Judge Joyce QC
[6] [2011] NZCA 404

[41]   Mr Davison then went on to develop his argument about the applicability of the New Zealand Bill of Rights Act referring to s 24(a)(c) and (d), s 25(a) and (c) and s 27.

[42]   Mr Davison concedes that there is conflicting authority as to whether the rights protected under s 24 and 25 (but not 27) of the New Zealand Bill of Rights Act are applicable in extradition proceedings.  Baragwanath J in *Poon v Commissioner of Police*[7] and *X v Refugee Status Appeals Authority*[8] made it abundantly clear that the New Zealand Bill of Rights Act principles were applicable.

[43]   On the other hand Temm J in *Callaghan v Superintendent of Mt Eden Prison*[9] and Potter J in *Schlaks v Superintendent of Mt Eden Prison*[10] relied on two decisions of the Supreme Court of Canada (*Schmidt v R*[11] and *The Republic of Argentina v Mellino*[12] holding that NZBORA was not applicable to extradition proceedings.

[44]   Mr Davison then went on to discuss *Schmidt* which dealt with the applicability of the Canadian double jeopardy prohibition which, if it applied, would give extra territorial effect to the Canadian charter.   That case also held that extradition was not an offence.  However Mr Davison argued the minority judgments of the Canadian Supreme Court should be preferred and referred to the decision of Giles J in *Schlaks v Gordon*[13] where it was accepted that s 24 required adequate information to be provided.  He pointed particularly to the comments made by Giles J where he stated:

> "Natural justice requires that a person accused of an offence be given adequate information to understand precisely what is alleged so that the defence can be prepared.  Section 24 of the New Zealand Bill of Rights Act 1990 requires that that information be provided promptly.
>
> I accept that the New Zealand Bill of Rights Act 1990 is addressing criminal prosecution in New Zealand.  An extradition request is not a prosecution but those principles, in my view, apply by way of analogy."

---

[7] [2006] NZAR 533
[8] [2000] NZAR 70
[9] HC Auckland M 648/91 22 July 1991
[10] HC Auckland M 1839/98 18 December 1998
[11] [1987] 1 SCR 500
[12] [1987] 1 SCR 536
[13] HC Auckland M 363/98 15 May 1998

[45]    Mr Davison also referred to s 28 of the New Zealand Bill of Rights Act arguing that the Bill of Rights Act was designed to ensure minimum standards were provided when an individual was faced with a punitive power of the State.  He argued that the fact that the prosecuting body – the requesting State – is other than in New Zealand does not diminish the need for such minimum standards and importantly, the extradition process is the exercise of State power by New Zealand over the individual and amounts to state interference with an individual's security and rights necessitating that minimum standards of procedure be adhered to.

[46]    Importantly Mr Davison argues that NZBORA is a shield against an intrusive state.  In his submissions he states extradition proceedings are a claim by another state to jurisdiction over the individual and must be considered in accordance with the rules and procedures of New Zealand to ensure by permitting the individuals extradition, the Government and judiciary are not party to breaches of fundamental standards which should, under the laws of this country, be afforded to all individuals about whom such decisions are made.  The function of extradition proceedings to protect the rights of the individual and to ensure that the request is not been made in the manner or for a purpose that is repugnant to our concepts of justice is evident from the express ability under the treaty to refuse extradition where the request is inappropriately politically motivated or is driven by impermissible discriminatory factors.

[47]    Mr Davison concedes that there are aspects of the ROC regime which are inconsistent with the rights guaranteed under the Bill of Rights Act but the fact that the Extradition Act limits the application of certain fair process rights expressly should not be implied to unduly limit other rights which are necessary to ensure that the appropriate level of procedural fairness is afforded to the individual sought.

[48]    In essence his submission is that partial interference with some fair process rights does not mean that they are all abrogated.

[49]    Mr Davison then went on to consider the applicability of the Criminal Disclosure Act (CDA).  His argument is that the general provisions of the CDA apply or, alternatively, that it forms a basis for a disclosure requirement.

[50]   He anticipates the United States argument that the CDA only applies to criminal proceedings and that extradition is an ancillary type of proceeding but, Mr Davison argues to the contrary suggesting that extradition in fact is a necessary step in the process of criminal charges.   To bring criminal proceedings against Mr Dotcom and his associates it is necessary for them to be present in the United States to face those charges and therefore the extradition process is inextricably bundled up with those criminal proceedings.

[51]   In addition Mr Davison cites authority which suggests that extradition proceedings and criminal proceedings albeit of a very special kind[14] and extradition hearings by their very nature involve the thread of the punitive powers of the State although it is of the requesting State.

[52]   Mr Davison also cites the case of *R v Governor of Brixton Prison Ex Parte Levin*[15] which considered the application of s 78 of the Police and Criminal Evidence Act 1984 to extradition hearings.   Section 78 applied to proceedings which were defined under s 82 of the Police and Criminal Evidence Act (PACE) as criminal proceedings.   Lord Hoffman stated: "If, as I think, extradition proceedings or criminal proceedings, then s 78 as originally enacted applied to them".   However since the committal, those proceedings were excluded from the application of s 78 as a result of legislation enacted in 1996.

[53]   That being so Mr Davison argues that the CDA ought to apply so as to create an entitlement to disclosure in the context of extradition hearings.

[54]   Having argued therefore that disclosure should be available as a part of overall fairness in the prosecution process, as a necessary adjunct to the engagement of rights under the NZBORA and as applicable under the CDA, Mr Davison went on to consider the scope of disclosure.

[55]   Having argued that the CDA provided a basis for the requirement of disclosure the scope would not be the same as would be available in New Zealand

---

[14] *R Government of United States of America v Senior District Judge Bow Street Magistrates Court* [2006] EWHC 2256 at [76]
[15] [2001] EWHC 178

and references made to the requirement that relevant material be disclosed.  In this context the relevant material which would be limited to the necessity to establish a prima facie case because effectively the scope of the inquiry is limited as well.

[56]    The availability of disclosure in relation to issues which are justiciable is supported by the Canadian decisions of the *United States of America v Kwok*[16], the *United States of America v Dynar*[17], and *Republic of Poland v Bujak*[18].

[57]    In some cases it may be necessary for there to be "an air of reality" to the justiciable issue – for example that there had been bad faith.  In this case however Mr Davison argues that the achievement of the prima facie threshold is the principle justiciable issue and therefore there is no need to provide an evidential foundation to give the issue the air of reality.

[58]    Mr Davison submits that an entitlement and corresponding obligation to make disclosure in relation to those issues which are justiciable at the extradition hearing, including the question of a prima facie case to answer, is both consistent with the Act, and necessary to give effect to its purpose of providing effective safeguards for the individual.  Further it is submitted that to deny disclosure would be inconsistent with the rights protected under the NZBORA.  The CDA provides a disclosure regime which can appropriately be applied to the extradition context, subject to the more limited scope which is justified by an assessment of those issues which will be relevant to the extradition hearing.

[59]    Mr Davison then goes on to consider the disclosure necessary in the present case and acknowledges that this case is complex primarily because of the allegation of criminal copyright infringement.  Normally the disclosure would be confined to issues of identity or impossibility or fundamental elements but in this particular case there are involved issues arising involving inferences from a wide range of material which makes matters even more complex.  The attempt to transfer civil copyright concepts into the criminal arena necessitates a consideration of principles such as the dual use of technology and other attendant complex legal and factual issues.

---

[16] [2001] SCC 18
[17] [1997] 2 SCR 462
[18] [2006] DCR 863

[60]   The charges of wire fraud, money laundering and racketeering all hang upon the establishment of criminal copyright infringement.  The copyright infringement charge is the keystone offence.  Absent a pattern of infringement all of the activities that are alleged by the requesting State could be part of legitimate business activities.

[61]   Mr Davison then went on to discuss the elements of a charge under 17 U.S.C § 506 as:

   (a)   The fact of copyright existing in relation to particular works (copyright ownership element);

   (b)   Infringement of that copyright (the infringement element);

   (c)   That the infringement was motivated by commercial gain (the commercial element);

   (d)   Knowledge of that infringement on a part of the applicant (the lawfulness element).

[62]   Mr Davison emphasised the importance of wilfulness and the necessity for a high standard and went on to consider the conspiracy requirement. Thus, he says, disclosure will relate to the issues surrounding those elements.

[63]   Mr Davison submits that disclosure must be tailored to reflect issues surrounding those elements.  The copyright ownership element will likely involve material held by the prosecution/respondent, demonstrating that ownership over certain works that can be established in a fairly formal position fashion. This is unlikely to require significant disclosure in terms of the volume of such documentation.

[64]   Relevant to the infringement element will be any material demonstrating the alleged infringements relied upon, and demonstrating all and any analysis undertaken by the prosecution to establish that the use to which the work has been put is an infringing use (i.e. information obtained as to the location of the user, the rights of the user, and any defences which might be available to the user).

[65]    As far as wilfulness is concerned Mr Davison considers that this will require the broadest scope of disclosure and will include all and any documents and materials which tend to support or refute the proposition that the applicant knew that the actions relied upon constituted infringements and these will be relevant to the issue. Mr Davison anticipates a wide range of communications and correspondence which will provide the basis upon which to assess the applicants intentions in relation to its business activities and this will be relevant because, based on the structure and contents of the indictment, it would appear that the requesting party is seeking to rely on a selection of communications extracted from a far wider array of correspondence and communications which would need to be assessed in their broader context. It may be that once viewed in context the communications cannot be said to provide a sufficient basis upon which a jury properly directed could reach a verdict of guilty on the relevant charges.

[66]    As far as the conspiracy element is concerned there will be a similar necessity to contextualise communications.

[67]    Mr Davison points out that the elements of wire fraud are co-extensive with the copyright charges and that, in the main, the greater disclosure will be necessary in relation to the fraud element because there is more scope for issue to be taken in relation to the existence of a prima facie basis upon which this element might be established particularly given the requisite intention relating to the element.

[68]    As far as money laundering is concerned, again the criminal copyright infringement is critical as the unlawful activity associated with wire fraud. Mr Davison details the elements for money laundering and pointed out that the knowledge element will be largely co-extensive but the wilfulness element in criminal copyright infringement charges. However disclosure in relation to the money laundering charges will relate to financial transactions entered into by the applicants in the course of conducting the Megaupload business and any communications correspondence or records relating thereto.

[69]   Finally in considering the racketeering charges Mr Davison considered the elements of those charges and suggests that there will be limited disclosure because much will depend on the disclosure made available in respect of the other charges.

[70]   In conclusion Mr Davison makes the following points:

(a)   The Act does not provide prescribed regime of disclosure but disclosure is not prohibited under the Act;

(b)   The purpose of the Act of safe guarding the interests of the person sought is enhanced by providing an entitlement to disclosure in relation to justiciable issues at the extradition hearing;

(c)   The other main purpose of the Act – international obligations – is not hindered or hampered by an entitlement to disclosure and, on the contrary, will enable the Court to make a properly informed decision;

(d)   To interpret the Act as prohibiting disclosure would unreasonably deny the individual natural justice and fair hearing rights protected under the New Zealand Bill of Rights Act and if such rights are to be excluded they should be done by express language or necessary implication.

(e)   If an alternative interpretation is available enabling the individual to obtain disclosure in relation to justiciable issues it should be preferred to a restrictive interpretation;

(f)   Establishment of a prima facie case is a justiciable issue and will automatically be an issue in every extradition hearing under the ROC regime;

(g)   The "air of reality test" that may be applicable to collateral issues including illegitimate motivation or bad faith but no such test needs to apply in relation to the factual basis of the allegations;

(h)   The requesting state having achieved seizure of the applicants own files and materials and withholding such from the applicant and denying the request for relevant disclosure and discovery is compounding and aggravating an injustice being caused to the applicant was unable to access information that may enable him to challenge and resist the allegations made in the ROC;

(i)     In most extradition cases the prima facie case issue will be fairly limited and disclosure in relation to these issues will be correspondingly constrained;

(j)     In this case the scope of disclosure is likely to be far greater due to the unusual nature of the charges and the novel approach to liability;

(k)     Disclosure should be no broader than is necessary in light of the justiciable issues before the Court.

**Mr Foley's Submissions**

[71]    Mr Foley filed no written memorandum of submissions but adopted those that had been advanced by Mr Davison. He argued that extradition proceedings were in fact in the nature of criminal proceedings and were part of the machinery of the criminal process in the same way that committal proceedings were. He acknowledged that there was no application for general disclosure in the nature of the Criminal Disclosure Act but that disclosure should be more limited.

[72]    He then discussed the ROC procedure which he submitted was not designed to truncate the committal hearing and did not eliminate the "hearing" aspect of that process but that was part of a statutory framework that by its very nature required disclosure. He argued that the general justiciable issue was that of the establishment of a prima facie case and as a matter of fairness disclosure was required both within the context of the ROC proceedings and within the context of the New Zealand Bill of Rights Act. He further submitted that the statutory framework itself provided an expectation of disclosure and emphasised in s 22(1)(a) of the Extradition Act the use of the words in the same manner as a committal hearing and thereby s 22(1)(a) was not overridden by the Treaty. Essentially the committal process was transplanted as part of the extradition procedure.

[73]    He emphasised that the power to make regulations that clearly anticipated that there was an expectation of disclosure and that the wording of a statute seem to suggest that any regulatory steps might be taken to limit disclosure rather than to provide for it. He argued that the statutory language suggested a pre-existing

entitlement to disclosure that may at some later stage be subject to some form of regulation.

[74]   He emphasised that the discussion about the Criminal Procedure Mentally Impaired Persons Act emphasised the importance of a hearing under that Act necessarily required disclosure so that a proper consideration could be made.

[75]   He also submitted that within the context of the Extradition Act the oral evidence procedures provided under the Summary Proceedings Act were untenable. He emphasised that the failure to comply with s 25(2)(b) of the mandatory requirement to provide documentary evidence made disclosure in this case inevitable.  The failure of the United States to provide any documentary evidence at all notwithstanding that they are required to do so meant that the disclosure should remedy this defect.

[76]   In essence Mr Foley's argument was that disclosure was necessary as a vital part of the proper assessment of a prima facie case in an honest meaningful and robust manner.

**The Argument for the United States**

[77]   In reply Mr Ruffin for the United States argues that there is no basis for the Court to make an order for disclosure nor is there any obligation to make such disclosure.  Broadly speaking, the argument relies upon the nature of the ROC procedure, the expeditious nature of extradition hearings, that extradition hearings are not determinative of liability, which is a matter for the Courts of the requesting State, and the role of extradition as an aspect of Treaty obligations and International comity.

[78]   Two sets of submissions have been filed, one dated the 30th March 2012 in anticipation of an earlier hearing, and a second dated 11th May 2012 in anticipation of the present hearing.  In summary the argument for the United States is that the ROC provides the context against which extradition proceedings are considered. The ROC is deemed to be admissible and presumed to be reliable.

[79] Beyond the ROC there is an entitlement to limited discovery only if there is some evidential basis for a claim that the ROC is not reliable in some particular respect or it otherwise infringes some rights under the NZBORA – for example the presentation of the evidence has been tainted by bad faith. There must be an "air of reality" about such a complaint. In such a situation discovery must be calibrated to the scope of the justiciable issues so raised.

[80] The argument is that the applicants are not entitled to discovery for the purpose of seeing whether evidence might exist to support a claim that the threshold is reached. In particular no evidential basis has been advanced that would justify an order for particular disclosure.

[81] In his first submission Mr Ruffin on behalf of the United States analyses the provisions of the Extradition Act, its background and structure addressing particularly the issue of exempted status under Part 3 of the Act and the relationship of close comity with the United States reflected in its status as an exempted country.

[82] In his second submission he develops an aspect of interpretation and the interlocking provisions of Extradition Treaty's the Extradition Act and the issue that eligibility must be determined according to the Law of New Zealand but subject to the Act.

[83] Emphasis is placed upon the fact that the Act provides for regulations relating to prehearing disclosure of information, but emphasises that no regulations have been made and there are no express statutory or regulatory obligations relating to disclosure under the Extradition Act or the Extradition Regulations of 1999.

[84] Mr Ruffin submits that extradition proceedings are not to be run along the lines of criminal trials with full rights of disclosure although I would observe that in fact the position is far more nuanced than that.

[85] Importantly the Crown argues that the objectives of the ROC regime would be embarrassed if the streamlined presentation of evidence were to be harnessed to a right to blanket disclosure. This was the position as advanced in March of 2012 and

Mr Davison's request for disclosure has been modified and reduced as his 2nd of May submissions pointed out.

[86]   The Crown argued that the issue of disclosure in extradition proceedings and especially in ROC cases it may be informed by the practice in Canada which also has a Charter Of Rights And Freedoms similar to the NZBORA.

[87]   The Crown argues that the Canadian authorities demonstrate the following propositions:

   (a)   The ROC procedure is compliant with the Canadian Charter;

   (b)   The certified record of the case is presumed to be reliable evidence;

   (c)   Because of the limited scope of an extradition hearing a person sought for extradition is not entitled to the same level of disclosure as a person charged with a domestic criminal offence in Canada[19].   In *Diab* it was noted that the Judge should prevent the hearing from taking on the characteristics of the criminal trial in that it is meant to be an expeditious process.   The Crown cites the following statement from Maranger J:

   > "The jurisprudence at the appellant level is replete with reminders that an extradition hearing in Canada is meant to be an expeditious, summary process, where the role of the Judge is confined to determining whether the requesting state is presented a prima facie case justifying the committal of the person sought".[20]

   (d)   There is no right to disclosure beyond the materials the requesting country relies upon.   There is a limited exception where there is a justiciable charter issue.

[88]   The Crown in this respect relies upon the case of the *United States v Kwok*[21] which held that a person sought is only entitled to limited disclosure of materials which were the requesting states seeks to rely to establish a prima facie case for

---

[19] *US v Costanzo*  (2011) ONSC 337; 236 CCR (2d) 248; *France v Diab*  (2011) ONSC 337;  (2009) 243 CCC 3d 342
[20] Ibid. *Diab* Paragraph [14]
[21] Above n. 16

committal and materials relevant to a charter issue that is properly justiciable before the extradition Judge and in respect of which there is an "air of reality".

[89]    The scope of disclosure as explained in *Kwok* was interpreted in *Costanzo* to mean in the absence of any indication of bad faith or improper motives on the part of prosecuting authorities, the person sought is not entitled to disclosure of materials that are not relied upon by the requesting State and support of committal.

[90]    The Crown concedes that there are exceptional cases where a Court may order disclosure and refer to the cases of *US v Hully*[22] and *US v Walker*[23].

[91]    Those cases make it clear that there must be an identifiable risk attaching to the reliability of the ROC, the necessity to avoid fishing expeditions not related to threshold reliability and that there should be an evidential foundation for and an air of reality in relation to an allegation justifying further disclosure.

[92]    Importantly in *US v Walker*[24] the Court rejected a "catch 22" argument that disclosure was needed to find material that would satisfy the threshold for disclosure. At paragraph 31 the Court stated:

> "This is not a fishing derby.  Before further disclosure may be permitted, there must be some evidentiary foundation for the request, or an air of reality to the allegation (in this instance) that the evidence of Mr Wako is manifestly unreliable as having been tainted by threats or inducements".

[93]    The Court then went on to state at paragraph [33]

> "the application (for disclosure) appears to be more like a fishing expedition related not to threshold reliability but to issues of ultimate reliability.  In the event that Mr Walker should ultimately be committed to stand trial, the concerns raised on his behalf would best be dealt with at that time.

[94]    Citing the *United States v Mach*[25] at [13] the Crown argues that unless the respondent adduces evidence that impugns the reliability of the record there will not be a basis for ordering disclosure.  Evidence that merely supports a competing inference, or does not affect the presumed reliability of the evidence in the ROC will

---

[22] [2007] BCSC 354
[23] [2008] BCSC 2214; [2009] 179 CCR 2d 360
[24] Ibid.
[25] [2006] OMSC 4832

not justify disclosure. It is for the party seeking to resist an order for extradition to establish a breach of duty by the requesting State.[26] Thus the assurance of good faith is reflected in the ROC procedure and the relationship of comity upon which it rests. Discovery is available only if there is an air of reality about complaints that the evidence in the ROC is unreliable.

[95]   As to the New Zealand Bill of Rights Act the Crown argues that although s. 27 may apply to extradition proceedings it is questionable that s 24 does but this does not enlarge the scope of disclosure in a ROC setting any more than the application of the Charter in Canadian extraditions.

[96]   Reference was made to the New Zealand case of *Flickinger v Morris*[27] where there was a judicial review of an application of a decision of a District Court Judge refusing application for an order of discovery of certain documents held by a prosecuting authority in Hong Kong. *Flickinger* was decided under the Fugitive Offenders Act 1881 which required the District Court to consider whether the evidence placed before it raised a strong or probably presumption that Mr Flickinger had committed the alleged offences in Hong Kong. This is similar to the evidential sufficiency test under s 24(2)(d)(i) of the Extradition Act 1999.

[97]   Williamson J made the following comment at page 381:

> "The District Court is not required to make any final decision on the charges or any final conclusion as to the guilt or innocence of a fugitive. It follows that in this case the District Court is not required to conclude whether the plaintive was or is guilty or innocent of the charges which had been laid in Hong Kong but rather to consider whether the evidence placed before the District Court raises a strong or probable presumption that he, the plaintiff, committed the offences".

[98]   The Court concluded there was no jurisdiction for the Court to order general discovery and *Flickinger* was cited with approval in *United States of America v Callaghan*[28] which also predates the current Extradition Act. This was a sufficiency of evidence inquiry and it was argued that Callaghan should not be extradited in respect of some of the offences referred to in the arrest warrant, as there had been

---

[26] *Knowles v Government of the United States of America* [2006] UKPC38
[27] [1993] NZLR 372
[28] HC Auckland M200/91 11 March 1991 Robertson J

material non-disclosure by the United States Government of relevant information including failure to disclose details of a plea bargain entered into in America involving a co-offender.

[99]     Robertson J in Callaghan[29] discussed Flickinger and made the following comment:

> "I do not in any way dissent from the second respondent's assessment that a foreign government "applying for extradition must be full, fair and frank in the evidence which is placed before the Court". There is in my view no evidence that what was not disclosed was in fact of sufficient relevance to justify the invocation of this extra ordinary jurisdiction which a trial court can resort to in appropriate circumstances".

[100]    The extraordinary jurisdiction was the power to dismiss an application for abusive process. Reference was also made to the case of Chvastek v Commonwealth of Australia[30] and Republic of Poland v Bujak[31]. In the former case there was an issue about third party disclosure which was not available together with the observation that materials held by a foreign government were not subject to the regime of the Official Information Act 1982. The latter case emphasised that discovery could be ordered where relevant to a justiciable issue – in that case the issue of delay and its consequences. In that case the Court of Appeal found that undue delay was in fact a justiciable issue in an extradition hearing in the District Court.

[101]    As to the applicability of the New Zealand Bill of Rights Act it is argued that that legislation would yield disclosure obligations in very limited circumstances available in an ROC proceeding. The applicability of the New Zealand Bill of Rights Act was highlighted by the conflicting cases referred to by Mr Davison.

[102]    The Crown argued strongly that the provisions of the CDA does not apply to extradition proceedings and although accepting that extradition proceedings are generally speaking and considered to be criminal rather than civil proceedings they do not fall within the specific definition of criminal proceedings in the CDA. In that legislation criminal proceedings are proceedings for an offence for which a

---

[29] Ibid.
[30] CA 281/01 9 May 2002
[31] Above n. 18

conviction may be entered or for an infringement offence.  It may be extended to three ancillary matters such as applications for bail and name suppression or an application under 344A of the Crimes Act but extradition proceedings, argues the Crown, do not fall within the specific definition of the criminal proceedings in the CDA.  Thus the comprehensive disclosure regime in the CDA does not apply to extradition proceedings which may be more comparable to ancillary matters, acknowledging for example that a conviction is not entered following a 344A application to determine admissibility of evidence at trial.  Nicholson J in *Warner v United Kingdom*[32]  observed that extradition proceedings are in the nature of administrative procedures which are facilitative of criminal justice and do not determine final rights and liability.

[103]  Once again the nature of extradition proceedings have to be considered, argues the Crown.  What is involved is an examination of evidence sufficiency provided by the ROC.  The determination does not involve a resolution of trial issues such as the proof of guilt or innocence and does not result in the consequence other than the fact that extradition may be ordered.

[104]  In further submissions of the 11th May 2012 many of the matters raised in the earlier submissions are repeated and the scope of extradition proceedings are emphasised.

[105]  The inter-relationship of the provisions of the Extradition Act and the construction of extradition treaties is covered, which is particularly relevant in terms of when legislation may trump a treaty or when a treaty may trump legislation. Nothing in the legislation nor in the treaty relate to disclosure and in essence eligibility for extradition must be determined according to the law of New Zealand but subject to the Extradition Act.  That section therefore argues the Crown is subject to s 25(3) which provides that the ROC is admissible as evidence provided that it has been authenticated properly.  The effect of s 25 is that the content of the record of the case is deemed to be admissible whether or not it would otherwise be so under New Zealand law.  Similarly in terms of jurisdictional powers given to the Court under s 22 (1) of the Extradition Act the grant of those powers is subject to the exception

---

[32] [2001] 1 NZLR 24

"except as expressly provided in this Act (the Extradition Act) or in regulations made under s 102. The application of the provision set out in s 22(1)(b) is qualified by the phrase "so far as applicable and with the necessary modifications".

[106]   The Crown acknowledges that when one considers those provisions together with the holding of the Court of Appeal in *Bujak v Republic of Poland*[33] the Court retains an inherent power to prevent an abusive process and the qualifying words in s 22 – except as expressly provided for in the Act – must have significance in the context of s 22.

[107]   The issue of necessary modifications is significant in interpreting s 22 which contains incorporated language and in this respect the Crown argues that because extradition proceedings are effectively a committal hearing the provisions of the Summary Proceedings Act as amended in 2008 make it necessary if evidence is to be given by Mr Dotcom or his associates that it be the subject of an application for an oral evidence order under s 178 and that under s 176 there must be disclosure of that evidence prior to the committal hearing.

[108]   This interpretation is vigorously rejected by Mr Davison but the Crown argues that in the context of an ROC proceeding it was clear that the provisions were intended to be applicable given the particular nature of extradition proceedings and the presumed reliability of the ROC.  The same sort of limitations applicable in a committal hearing as to the giving of evidence are applicable in ROC proceedings, argues the Crown.  Oral evidence applications, according to the Crown submission, are not usually granted for a chance to chip away at the prosecution evidence or test a credibility of prosecution witnesses rather than creditability – their capability of being believed.

[109]   The Crown rejected the argument based on the Criminal Procedure (Mentally Impaired Persons) Act and argues that the surrender is to be considered only in accordance with the record of the case.  The objectives of the regime would not be

---

[33] [2007] NZCA 392

met in the way that parliament intended if this streamline presentation of evidence were to be harnessed to a blanket right of disclosure[34].

[110]   Paragraphs 54 to 89 of the Crown submissions of 11 May 2012 essentially restate the arguments relating to the background to the ROC and the Canadian position relating to ROC and disclosure in extradition hearings.

[111]   Although noting the contesting views about the general applicability of the New Zealand Bill of Rights Act to extradition hearings, even if the more favourable view adopted by Baragwanath J is followed, the content of the disclosure duty will not change.  It will be tailored to the limited purposes of an extradition hearing subject to the air of reality exception and essentially, following the Canadian cases, the ROC procedure is essentially fair.

[112]   The Crown also argues that the common law has recognised that the principles of natural justice do not exist in a vacuum and that the scope and content of the right and degree of procedural protection that natural justice affords are dependent upon and vary with the statutory context in which the decision is being made, the nature of the power being exercised and the particular circumstances of the case.

[113]   Answers are provided to some of the submissions of Mr Davison but perhaps the most significant point that is made in those answers by the Crown is the approach the Court may take to the ROC.  The point, argues the Crown, is not whether the ROC statements are infallible.  The Crown concedes that they may not be but that is a matter that can be tested not at extradition hearings but at trial.  At extradition the Court may in fact think that a case is weak and that it is not likely to succeed but as long as it gets to the threshold the Court's evaluation of weakness or likelihood of success is not sufficient to decline to extradite.  The point of the exercise is to determine whether there is evidence, on each limb or element of the extradition offence which a reasonable jury properly instructed could accept.  Thus the relative strengths and weaknesses of the case are not evaluated at an extradition hearing.

---

[34] It should be noted that first there is no blanket disclosure sought and secondly disclosure does not in fact effect the presentation of evidence at the hearing

**Discussion**

**Extradition**

[114]  Extradition requests made to New Zealand are dealt with under Parts 3, 4, and 5 of the Extradition Act 1999.

[115]  Part 5 of that Act relates to countries with which New Zealand has no bi-lateral Extradition Treaty or where New Zealand does have a bi-lateral Extradition Treaty but where the extradition offence is not stipulated in the treaty.[35]   In such cases the Minister of Justice must determine whether the request should be dealt with by New Zealand under Part 3 of the Act and if so Part 3 operates in the usual way depending upon the designation of the country making the request.

[116]  Part 4 of the Act relates to Australia expressly and to the United Kingdom, Pitcairn and Cook Islands by order in counsel.  This prescribes the most stream lined procedures for extradition and reflects the highest relationship of comity.

[117]  Part 4 is intended to be a fast track simplified extradition procedure.  Part 4 establishes an endorsed warrants process[36] which includes an inquiry into the evidence.[37] The District Court makes the surrender order unless there are reasons to refer the case to the Minister of Justice.[38] Historically fugitives were moved between jurisdictions within the British Empire by an endorsed warrants process.

[118]  Part 3 of the Act regulates extradition proceedings between New Zealand and Commonwealth countries or countries with which New Zealand has a bi-lateral extradition treaty.  Extradition requests made to New Zealand under Part 3 can have 3 phases: provisional requests for arrests; the eligibility phase; the surrender process. Certain exempted countries have a special status under Part 3.  In the hierarchy of comity, these countries stand next to those covered by Part 4.  The close comity with the United States is reflected in its status as an exempted country under Part 3.[39]

---

[35] s 60 Extradition Act
[36] s 41 Extradition Act
[37] s 45(5) of the Extradition Act
[38] s 47 and 48 of the Extradition Act
[39] s 17 the Extradition (Exempted Country United States of America) Order 1999

Although the requests of exempted countries are subject to an evidential inquiry in s 24(2)(d) of the Extradition Act, those countries are entitled to provide evidence in summary form, as a ROC under s 25.

[119]   Section 24(2)(d) provides that eligibility must be determined according to the law of New Zealand but subject to the Act.   The section is therefore subject to s 25(3) which provides that the ROC is admissible as evidence provided that it has been authenticated in accordance with subsections (a) and (b).   The effect of s 25, therefore, is that the content of the ROC is deemed to be admissible and reliable whether or not it would otherwise be so under New Zealand law.   It is submitted correctly that the Extradition Act refers to disclosure only once in s 102(1)(e)(i) which confers the power to make regulations for among other things "pre-hearing disclosure of information".

[120]   In addition, as Mr Ruffin submitted, the proper construction of the interrelationship between the Extradition Act and the Extradition Treaties emphasises the importance of the extradition process and especially the particular methods by way of which evidence maybe adduced.

[121]   Section 11 of the Extradition Act provides as follows:

### 11   Construction of extradition treaties

(1) If there is an extradition treaty in force between New Zealand and an extradition country, the provisions of this Act must be construed to give effect to the treaty.

(2) Despite subsection (1), no treaty may be construed to override—

    (a)  section 7; or

    (b)  section 24(2)(d) or section 45(5); or

    (c)  subsection (2)(b) or subsection (3)(a) of section 30 (including where those provisions are applied under section 49); or

    (d)  any provision conferring a particular function or power on the Minister or a court.

(3) This section is subject to section 105.

[122]   I emphasise the words in subsection 1 "the provisions of this Act must be construed to give effect to the treaty".   Therefore the provisions of the Act have to be

interpreted in such a way as to make the treaty work.  However under subsection 2 no treaty may override s 7, s 24(2)(d) or s 45(5).  Section 7 deals with mandatory restrictions on surrender but importantly for our purposes s 24(2)(d) deals with the part of the process for the determination of the eligibility of surrender and s 45(5) deals with the part of the process for determination of the eligibility for surrender under Part 4 of the Act to Australia and designated countries.

[123]   The provisions of s 11 of the Act were considered in *Kwok Fung v The Hong Kong Special Administrative Region of the Peoples Republic of China.*[40]   Keith J observed[41]  that s 11(1) is a very strong direction and the construction that it directs is more than a mere interpretation of the Act.  He stated: "the process which s 11 of the New Zealand Act requires can perhaps be better thought of as reconstruction of the Act, to the extent it is inconsistent with the treaty, to make it consistent". [42] The strength of the direction recognises the basic principles of International Law that treaties must be complied with and that a State cannot invoke its internal law to justify its failure to perform a treaty.

[124]   He gave an example.[43] If a treaty had no discretionary ground New Zealand as the requesting State would be unable to refuse surrender on a discretionary ground.  If it did refuse surrender on a discretionary ground it would breach its basic obligation to surrender the accused person.

[125]   However, importantly, Keith J observed[44] that the direction in s 11(1) is not unqualified and contemplates the prospect that the Act may override a particular treaty he stated:

> "that apparent exception to the principle that treaties must be complied with maybe explained in three ways. First, the basic protection in s. 11 (a) to (c) are routinely included in bi-lateral extradition treaties or in one case (the torture exception) in a very widely accepted multi-lateral treaty; and so far as (d) is concerned, it is not in general the practice for extradition treaties to dictate whether the executive or the judiciary is to exercise a particular function.  Secondly subs (2) is in effect a direction to the executive that in negotiating extradition treaties it is to ensure that the listed protections are

[40] [2001] 3 NZLR 463
[41] Ibid. Paragraph [15]
[42] Ibid. Paragraph [16]
[43] Ibid. Paragraph [17]
[44] Ibid. Paragraph [18]

incorporated; such directions are expressly given by ss 100 and 101 of the Extradition Act 1999 and were given in a different way in the original Imperial Extradition Act 1870 section 4 which provided that an Order in Council applying the Act to a foreign state was not to be made unless it contain certain provisions. Thirdly the protection stated in subs (2) essentially looked at treaties concluded in the future. That arises from subs ( 3) which makes s 11 subject to s 105, a provision concerned with treaties in force when the 1999 Act came into force.

[126] Section 24 of the Extradition Act addresses the issue of determination for eligibility for surrender. That must be read in light of the objectives of the Extradition Act set in s 12. Section 12 reads as follows:

### 12 Object of this Act

The object of this Act is to provide for the surrender of an accused or convicted person from New Zealand to an extradition country or from an extradition country to New Zealand, and in particular—

(a) to enable New Zealand to carry out its obligations under extradition treaties; and

(b) to provide a means for New Zealand to give effect to requests for extradition from Commonwealth countries; and

(c) to provide a means for New Zealand to give effect to requests for extradition from non-Commonwealth countries with which New Zealand does not have an extradition treaty; and

(d) to provide a simplified procedure for New Zealand to give effect to requests for extradition from Australia and certain other countries; and

(e) to facilitate the making of requests for the extradition of persons to New Zealand.

[127] Section 24 reads as follows:

### 24 Determination of eligibility for surrender

(1) Subject to section 23(4), if a person is brought before a court under this Part, the court must determine whether the person is eligible for surrender in relation to the offence or offences for which surrender is sought.

(2) Subject to subsections (3) and (4), the person is eligible for surrender in relation to an extradition offence for which surrender is sought if—

(a) the supporting documents (as described in section 18(4)) in relation to the offence have been produced to the court; and

(b) if—

(i) this Act applies in relation to the extradition country subject to any limitations, conditions, exceptions, or qualifications that require the production to the court of any other documents; or

(ii) the terms of an extradition treaty in force between New Zealand and the extradition country require the production to the court of any other documents—

those documents have been produced to the court; and

(c) the court is satisfied that the offence is an extradition offence in relation to the extradition country; and

(d) the court is satisfied that the evidence produced or given at the hearing would, according to the law of New Zealand, but subject to this Act,—

(i) in the case of a person accused of an extradition offence, justify the person's trial if the conduct constituting the offence had occurred within the jurisdiction of New Zealand; or

(ii) in the case of a person alleged to have been convicted of an extradition offence, prove that the person was so convicted.

(3) The person is not eligible for surrender if the person satisfies the court—

(a) that a mandatory restriction on the surrender of the person applies under section 7; or

(b) [except in relation to a matter referred to in section 30(2)(ab),] that the person's surrender would not be in accordance with the provisions of the treaty (if any) between New Zealand and the extradition country.

(4) The court may determine that the person is not eligible for surrender if the person satisfies the court that a discretionary restriction on the surrender of the person applies under section 8.

(5) Subsections (3) and (4) are subject to section 105.

(6) Without limiting the circumstances in which the court may adjourn a hearing, if—

(a) a document or documents containing a deficiency or deficiencies of relevance to the proceedings are produced; and

(b) the court considers the deficiency or deficiencies to be minor in nature,—

the court may adjourn the hearing for such period as it considers reasonable to allow the deficiency or deficiencies to be remedied.

[128]   It is important to note the following:

(a)     There is nothing in the Extradition Treaty between New Zealand and the United States of America which relates to disclosure;

(b)     A disclosure regime under the Extradition Act is not presently in force apart from the passing reference in s. 102(1)(e)(i);

(c)     It will be argued at the extradition hearing that, pursuant to 101B of the Extradition Act, the alleged offending falls within the scope of the Transnational Organised Crime Convention of 2000 and by virtue of that section deems certain offences to be included in extradition treaties.

[129]   The other important thing about the examination of the legislative framework to this stage is that it inexorably leads to the conclusion that there can be no circumvention of the ROC procedure.  Section 24(2)(d) provides that eligibility for extradition must be determined according to the laws of New Zealand but subject to the Extradition Act.  That means that the section is subject to s 25(3) which provides that the record of the case is admissible as evidence as long as it has been properly authenticated.  Thus the content of the ROC is deemed to be admissible.

[130]   It should be noted however that the ROC procedure is at the option of the requesting State.  Section 24(2)(d)(i) states that a person is eligible for surrender in relation to an extradition offence for which surrender is sought if the Court is satisfied that the evidence produced or given at the hearing.  It is therefore part of the benefits that accrue to an exempted country under international comity that the ROC procedure may be adopted.

**The Record of the Case**

[131]   Section 25 of the Act provides:

**25   Record of case may be submitted by exempted country at hearing**

(1) For the purposes of any determination under section 24(2)(d)(i), a record of the case may be submitted by or on behalf of an exempted country.

(2) A record of the case must be prepared by an investigating authority or a prosecutor in an exempted country and must contain—

> (a) a summary of the evidence acquired to support the request for the surrender of the person; and

> (b) other relevant documents, including photographs and copies of documents.

(3) The record of the case is admissible as evidence if it is accompanied by—

> (a) an affidavit of an officer of the investigating authority, or of the prosecutor, as the case may be, stating that the record of the case was prepared by, or under the direction of, that officer or that prosecutor and that the evidence has been preserved for use in the person's trial; and

> (b) a certificate by a person described in subsection (3A) stating that, in his or her opinion, the record of the case discloses the existence of evidence that is sufficient under the law of the exempted country to justify a prosecution in that country.

(3A) A person referred to in subsection (3)(b) is—

> (a) the Attorney-General or principal law officer of the exempted country, or his or her deputy or delegate; or

> (b) any other person who has, under the law of the exempted country, control over the decision to prosecute.

(4) Nothing in this section—

> (a) prevents an exempted country from satisfying the test in section 24(2)(d)(i) in accordance with the provisions of this Act that are applicable to countries that are not exempted; or

> (b) limits the evidence that may be admitted at any hearing to determine whether a defendant is eligible for surrender.

(5) A court to which a certificate under subsection (3)(b) is produced must take judicial notice of the signature on it of a person described in subsection (3A).

[132] Thus for the purposes of the determination s 25 provides that a ROC may be submitted. The record must contain a summary of the evidence that has been acquired to support the request for the surrender of the person. It must also include other relevant documents including photographs and copies of documents. The important thing, from the point of view of the requesting State, is that the evidence doesn't have to be detailed. It only needs to be a summary.

[133] Another important thing as far as the evidential nature of the record is concerned is that it is automatically admissible if there has been compliance with s 25(3) that is that there is an affidavit of an officer of the investigating authority or the prosecutor stating that the ROC was prepared by or under the direction of that person and that the evidence supporting the summary was being preserved for use in the person's trial.

[134] Thus what would be referred to in academic circles as primary sources or raw data are not included in the record of the case but that information will be adduced at a later time at trial if there is extradition. However s. 25(2)(b) requires that the requesting state provide other relevant documents, including photographs and copies of documents which may allow for the use of primary source material.

[135] In addition to the affidavit there must be a certificate by that person stating that in his or her opinion the record discloses the existence of evidence that is sufficient under the law of the exempted country to justify a prosecution in that country. That effectively certifies as that:

    (a)    The evidence exists;

    (b)    That according to the law of the requesting state that evidence justifies bringing a prosecution.

[136] It is important to note that that is a far as the certificate goes. To go any further and to suggest that the evidence would be sufficient to amount to a *prima facie* case or something of that nature would of course be to usurp the judicial function.

[137] S 25(4) emphasises that the exempted country may adopt an alternative procedure to the ROC but importantly ss 4 also clearly states that nothing in s 25 limits the evidence that may be admitted at any hearing to determine whether a defendant is eligible for surrender. Thus it is perfectly legitimate from the reading of s 25(4)(b) that evidence in addition to the ROC is admissible and the purpose of that evidence (and implicitly the ROC) is "to determine whether a defendant is eligible for surrender".

[138]  That clearly engages the judicial function and it is also important to note that at s 25(4)(b) is not restricted to the requesting State, but suggests that *any* evidence may be admitted.  That necessarily includes evidence from the respondent which may have an effect upon the strength or weight that may be attributed to the ROC or to any other evidence that the requesting State may present.

[139]  There can be no doubt that the ROC process is an expeditious process that recognises levels of trust and comity between New Zealand and the exempted State. Behind the ROC procedure are certain presumptions about the fairness and rigour of the legal and investigative process within the requested State that justify the privilege of allowing it to adopt the ROC procedure.

[140]  What must be remembered is that the ROC becomes relevant at the extradition hearing.  It is a means of placing evidence that is deemed to be reliable before the Court.  It is not, in and of itself, the entire process.  It is part of the process.   It involves the provision of information upon which the tribunal determining surrender may come to a conclusion.  In my view it does not govern the overall process leading up to or associated with an extradition hearing.  Of necessity the evidence contained in the ROC cannot be tested by cross examination. The function of the Court at an extradition hearing is to determine whether or not a *prima facie* case exists.  It is not the function of the Court to determine whether or not the defendant is liable.  Other evidence that may be adduced orally, of course, would be subject to cross examination and testing but the ROC is not, and to that extent it is evidence of a nature peculiar to extradition proceedings.

[141]  The ROC procedure has a unique quality because of the nature of extradition proceedings.  Extradition proceedings necessarily involve the potential surrender of an individual living within a territory, who is entitled to the protection of the laws of that territory, to claim the benefits and privileges and also to accept the responsibilities of living within a territory; and among those benefits and privileges is the protection of the law including the New Zealand Bill of Rights Act (in respect of which there will be further discussion) and who is entitled to presume that he will not be removed from the jurisdiction to that of another against his will unless according to proper and rigorous legal process.  Extradition proceedings necessarily

involve a significant interference with the liberty of a subject within a particular territory.

**Criminal Proceedings and Extradition**

[142] Necessarily, extradition proceedings involve an allegation of criminal offending by the requesting State. There has been some debate as to whether or not extradition proceedings are of themselves criminal proceedings or something in between the criminal and civil jurisdiction of the Court. In Canada there has been some debate about the matter. In the case of *Schmidt v R*[45] the majority of the Supreme Court held that:

> "an extradition hearing is simply a hearing to determine whether there is sufficient evidence of an elleged extradition crime to warrant surrender of the person. It cannot be turned into a determination of whether the foreign trial would meet Canadian standards"[46]

[143] The majority of the Court concluded that the approach was supported by the words of s 11 of the Canadian Charter of Rights and Freedoms which applies to any person charged with an offence. The Supreme Court considered that a fugitive in an extradition proceeding was not charged with an offence in Canada and this had certain consequences as to the applicability of the Charter.

[144] The Supreme Court however was not unanimous. Lamer J stated[47]:

> "I am however of the view that a person under going extradition proceedings is a "person charged with an offence" as that term is used in s 11 of the Charter. Indeed I do not see why a person undergoing such an enquiry for the purpose of determining whether there is sufficient evidence to put that person on trial in a foreign country should be denied the protection that would be afforded that same person at his preliminary enquiry for a charge to be tried in the Canadian Court".

[145] Wilson J[48] considered that Charter Rights were engaged because an effect would be felt in Canada and that there was no extra territorial application of the Charter. She made the comment:

---

[45] Above n. 11.
[46] Ibid. Paragraphs [35] and [36].
[47] Ibid. Paragraph [62]
[48] Ibid. Paragraphs [68] – [69]

"if the participating of a Canadian Court or the Canadian Government is required in order to facilitate extradition so that suspected criminals may be brought to justice in other countries, it seems to me that we must face up to the question whether such persons have the benefit of the Charter or not in the Canadian proceedings emphasised in the Canadian proceedings. We must, in other words, decide whether Canada's treaty obligations override Charter Rights in respect of the Canadian proceedings or whether Charter Rights must be recognised in those proceedings whether or not similar rights are available to the person in the foreign proceedings for which he or she may be ordered extradited".

[146]  In the case of *Schlaks v Gordon*[49] Giles J made the following comment to which reference has earlier been made but which bears repeating:

"the extradition procedure is, of course, been conducted in a New Zealand Court under provisions of the New Zealand Bill of Rights Act 1990 apply. Section 27 preserves the right to the principles of natural justice. Natural justice requires that a person accused of an offence be given adequate information who understand precisely what is alleged so that a defence can be prepared. Section 24 of the New Zealand Bill of Rights Act 1990 requires that that information be provided promptly. I accept that the New Zealand Bill of Rights Act 1990 is addressing criminal prosecution in New Zealand. An extradition request is not a prosecution but those principles in my view apply by way of analogy and emphasise that particular statement."

[147]  The nature of extradition proceedings has also been examined in other jurisdictions. The case of *Cooke v Superintendant of Mt Eden Prison*[50] recognised extradition hearings as being in the nature of criminal proceedings. The High Court in England in *R (Government of the United States of America) v Senior District Judge Bow Street Magistrates Court*[51] said

"extradition proceedings are criminal proceedings albeit of a very special kind. The Judge should apply the normal rules of criminal evidence and procedure to the extent that these are appropriate having regard to the specifics of the statutory schemes in Part 1 and Part 2 of the UK Extradition Act". [52]

[148]  That observation clearly supports the contention therefore the conduct of the hearing as a "criminal proceeding" must be modified to take into account the special procedures contained in the Extradition Act such as the ROC which by necessity excludes the ability to cross examine.

---

[49] Above n. 13
[50] HC Auckland CP184/87 23 September 1987
[51] Above n. 14
[52] Ibid. paragraph 76

[149]   The case of *R v Governor of Brixton Prison Ex Parte Levine*[53] considered the application of s 78 of the Police and Criminal Evidence Act 1984 (PACE) to extradition hearings.  That section applied to proceedings which were defined under s 82 as criminal proceedings.  At page 747 it was stated "if as I think extradition proceedings are criminal proceedings then s 78 as originally enacted applied to them".As it turned out committal proceedings were expressly excluded from the application of s 78 by subsequent amendment.

[150]   Thus in my view it is clear that the nature of extradition proceedings are akin to criminal proceedings and although there is a view expressed by the Supreme Court of Canada to the contrary in *Schmidt*, the line of authority that follows both in New Zealand and in the United Kingdom, together with the nature of the consequences that may be suffered as a result of extradition proceedings together with their inevitable connection with the criminal proceedings in the requesting jurisdiction inevitably lead me to the view that the proceedings are of a criminal nature.

**Powers of the Court**

[151]   Section 22 of the Extradition Act provides for the powers of the Court. It states as follows:

### 22  Powers of court

(1) In proceedings under this Part, except as expressly provided in regulations made under section 102,—

(a) the court has the same jurisdiction and powers, and must conduct the proceedings in the same manner, as if the proceedings were a [committal] hearing of an information for an indictable offence alleged to have been committed within the jurisdiction of New Zealand; and

(b) the following provisions apply to the proceedings, so far as applicable and with the necessary modifications:

(i) Parts 5 and 5A and sections 203, 204, and 206 of the Summary Proceedings Act 1957:

(ii) Parts 1 (except sections 9 to 12), 2, and 4 of the Bail Act 2000:

---

[53] Above n. 15.

(iii) the Criminal Procedure (Mentally Impaired Persons) Act 2003.

(2) Despite section 5 of the Summary Proceedings Act 1957, a District Court presided over by Justices or 1 or more Community Magistrates does not have jurisdiction to conduct proceedings under this Part.

(3) Despite section 46(1) and (2) of the Summary Proceedings Act 1957 (as applied by [section 157] of that Act) and section 28(2) of the Bail Act 2000, a decision under this Part to remand a person in custody or on bail may be made only by a Judge.

(4) *Repealed.*

[152] Those powers are subject to the exception "except as expressly provided in this Act or in the regulations made under s 102". Furthermore the application of the provisions set out in s 22(1)(b) is qualified by the phrase "so far as applicable and with the necessary modifications". It is argued on behalf of the United States that a wide reading must be given to the applicability of Parts 5 and Part 5A of the Summary Proceedings Act 1957. In essence the extent of the modifications must be read against the interpretative structure that was discussed by the Court of Appeal in *Bujak v Republic of Poland*[54] and particularly at paragraph 31 and the Supreme Court in *Down v R*[55] where at paragraph 20 Elias CJ and McGrath J stated: "we accept that this is an available meaning of the legislative text but whether it is the true meaning requires consideration of the context and legislative purpose behind (s 343(C)(4)" and at 23:

> "the incorporation of provisions from one statute and another does not affect their separate identities".

> [24] as is common which this drafting method s 343(C)(4) requires that the incorporated provisions is subject to "necessary modifications" without specifying what they are. Where such modifications are an issue in litigation, the Court must decide what they are, in the course of interpreting the provision containing the incorporated language."

[153] What is important in this respect is whether or not the oral evidence order proceedings contained in the Summary Proceedings Act apply to extradition proceedings. It is important to consider the legislative framework. The Summary Proceedings Act was amended to provide a streamlined process for what where

---

[54] Above n. 33.
[55] [2012] NZSC 21.

formerly referred to as "preliminary hearings" to determine whether or not a person should be put on his trial. In turn preliminary hearings followed from the abandonment of the Grand Jury procedure which determined whether or not an indictment should be presented.

**Committal Proceedings**

[154] The committal proceedings for indictable offences came into effect in 2009 and effectively allowed for two tracks which could be followed by which a person may be committed for trial. These are set out diagrammatically at s 145 of the Summary Proceedings Act.



General overview of committal proceedings for offences to be tried on indictment

Note: This general overview of committal proceedings is by way of indication only. Detailed rules set out in the Act determine how those proceedings are conducted.

[155]  The two tracks are set out in s 146 of the Summary Proceedings Act which reads as follows:

### 146  Interpretation

In this Part and Part 5A,—

**committal hearing**
> means a hearing required under this Part as a consequence of an oral evidence order under section 180 or 181

**committal proceedings**
—

> (a)  means the proceedings comprising each and every occasion on which a defendant to whom this Part applies is required to appear in Court, or on which a Court considers his or her case under this Part or Part 5A, pending the committal of the defendant for trial or sentence; and

> (b)  includes a standard committal, a committal hearing, and any proceedings under section 160, 180 or 181

**prosecutor**
> has the same meaning as it has in section 6 of the Criminal Disclosure Act 2008

**standard committal**
> is a committal that takes place if no oral evidence order has been made under section 180 or 181 allowing the oral examination of a witness.

[156]  Committal proceedings may be by way of a standard committal which is effectively a committal "on the papers" or committal hearing which is a hearing which follows as a consequence of an oral evidence order under s 180 or 181. Section 178 contains the provisions for an application for an oral evidence order. Section 178 reads as follows.

### 178  Application for oral evidence order

> (1) Either party may apply to a District Court Judge for an order allowing the oral examination, at a committal hearing, of—

> (a)  any witness who has provided a formal written statement; or

> (b)  any person who has not provided a formal written statement, whether that person is proposed to be examined as a witness for that party or for the other party; or

> (c)  any person who is to give evidence for that party in relation to the exercise of any power or jurisdiction conferred by any of

sections 7 to 14 of the Criminal Procedure (Mentally Impaired Persons) Act 2003.

(2) An application under subsection (1) must be made no later than 14 days after the date on which the prosecutor is required to file written statements under section 168(1).

(3) Despite subsection (2), a District Court Judge may grant leave for an application under subsection (1) to be made later than the time specified in subsection (2) if the Judge is satisfied that it is necessary in the circumstances of the case.]

[157]   Once an application has been made there must be a determination and a determination of an application for an oral evidence order is set out in s 180:

**180   Determination of application for oral evidence order**

(1) Before a District Court Judge makes an oral evidence order on an application under section 178, the Judge must be satisfied,—

(a)  if the proposed order is for the oral examination of a witness who has provided a formal written statement, that—

(i)  it is necessary to hear the witness in order to determine whether there is sufficient evidence to commit the defendant for trial; or

(ii)  it is otherwise in the interests of justice to hear the witness; or

(b)  if the proposed order is for the oral examination of a person who has not provided a formal written statement,—

(i)  that the anticipated evidence of that person is relevant to the charge specified in the information; and

(ii)  either—

(A)  that the person has been requested to give evidence in the form of a formal written statement but has failed or refused to do so; or

(B)  that it is otherwise in the interests of justice to hear the witness; or

(c)  if the proposed order is for the oral examination of a person who is to give evidence in relation to the exercise of any power or jurisdiction conferred by any of sections 7 to 14 of the Criminal Procedure (Mentally Impaired Persons) Act 2003, that the anticipated evidence of that person is relevant to the exercise of such a power or jurisdiction.

(2) The Judge may refuse an application for an oral evidence order if he or she considers that the application was made—

(a)  for the purpose of delay; or

(b)  for any other improper purpose.

(3) The Judge must determine an application for an oral evidence order on the basis of—

(a)  the witness's formal written statement (if any); and

(b)  any other written evidence; and

(c)  any written submissions; and

(d)  any oral submissions made in accordance with subsection (4).

(4) A party who applies for an oral evidence order may make oral submissions to the Judge in support of that application.

(5) If a party makes oral submissions under subsection (4), the other party may also make oral submissions to the Judge on that application.]]

[158]  If a defendant is to give evidence at a committal hearing then pursuant to s 176 that evidence must be disclosed prior to the committal hearing.   Section 176 reads as follows:

### 176  Defendant must disclose evidence to be provided at committal hearing

(1) If an oral evidence order is made under section 180 or 181, the defendant must, no later than 14 days after the date on which that order is made, disclose to the prosecutor any evidence that the defendant intends to provide to the Court at the committal hearing.

(2) Sections 10 and 11 of the Criminal Disclosure Act 2008 apply to the disclosure of evidence under this section.

## Oral Evidence Applications in Extradition Proceedings

[159]  It is argued upon on behalf of the United States that because of the incorporation of s 5 of the Summary Proceedings Act and therefore the provisions relating to an application for an oral evidence order, it necessarily follows that if the respondent wishes to give or call evidence at the extradition hearings then there must be an application for an oral evidence order which must be considered and, if granted, that evidence must be disclosed to the applicant prior to the hearing.

[160] The argument advanced on behalf of the United States is that these proceedings were intended to be applicable. It is argued that in the context of an ROC proceeding, because of the threshold test and the failure by the respondents to apply for oral evidence orders, they are prohibited from giving evidence or calling evidence at the extradition hearing. With the greatest of respect this interpretation cannot be supported. Under the committal proceedings in the Summary Proceedings Act there are, as I have said, two types of hearing. There is a standard committal on the papers and then there is a committal hearing. A committal hearing under the Summary Proceedings Act is engaged as a consequence of an oral evidence order under s 180 or s 181. Without the necessary preliminary of an oral evidence application a committal hearing is not engaged under the Summary Proceedings Act and by default a standard committal takes place. In proceedings under the Extradition Act there is no application for an oral evidence order which engages a committal hearing. A committal hearing is engaged by the provisions of s 22(1)(a) which I shall repeat:

> **22   Powers of court**
> **(1)** In proceedings under this Part, except as expressly provided in this Act or in regulations made under section 102,—
>
> > (a) the court has the same jurisdiction and powers, *and must conduct the proceedings in the same manner, as if the proceedings were a [committal] hearing of an information for an indictable offence* alleged to have been committed within the jurisdiction of New Zealand; [56]

Thus the powers of the Court are as if the proceedings were a committal hearing of the information for an indictable offence. The engaging of the committal hearing process as opposed to a standard committal is therefore by virtue of statutory provision rather than the utilisation of an oral evidence application.

[161] It is important also to note that prior to 2009 the Extradition Act provided that the proceedings were conducted as if they were a preliminary hearing. Under that process a full preliminary hearing could take place with the calling of evidence which would be subject to cross examination or alternatively some evidence of witnesses could be admitted by consent or alternatively all of the evidence that

---

[56] The emphasis is mine.

would be called at a preliminary hearing could be admitted by consent and a prima facie case conceded.

[162]   The amendments to the Summary Proceedings Act of 2009 effectively streamlined the process but what appears to have happened is that by virtue of legislative oversight some of the processes set out in Part 5 of the Summary Proceedings Act which engage a committal hearing were not considered.  If they were then they are covered by the "with necessary modifications" language in the statute but what has to be remembered is the *purpose* of an oral evidence application. An oral evidence application *precedes* a committal hearing.  It is necessary to engage the committal hearing process.  As I have said the committal hearing in this case is provided by statute.  In my view the statutory engagement of the committal hearing is the way in which the proceedings that are to be conducted thereby leap frogs the oral evidence provisions of the Summary Proceedings Act.

[163]   Simply because the proceedings are to be conducted as a committal hearing does not, in my view, require a respondent in extradition proceedings to make an oral evidence application to call evidence.  The only purpose for an oral evidence application is to engage the committal hearing process. That has already been done by the Extradition Act.    Therefore, the necessity to make an oral evidence application, in my view, does not exist.

## The Nature of the Decision to be Made in Extradition Cases

[164]   An examination of extradition procedures including the ROC is assisted by reference to Canadian cases.  The Canadian framework for extradition is very similar to that of New Zealand with the exceptions that some of the statutory language is not precisely the same.  A helpful background to the ROC process and its purpose in Canada may be found in *US v Yang*[57] at paragraphs [24] – [30].

[165]   The decision in *Ferras v US*[58] identifies the purposes of extradition.

"The first purpose is to foster efficient extradition where such a case is made out, in accordance with Canada's international obligations.  This requires a

[57] [2001] 203DLR 4th 337
[58] Above n. 4

flexible, non technical approach. The second purpose is to protect an individual in Canada from deportation in the absence of at least a prime facie case that he or she committed the offence alleged which must also be an offence in Canada: *Schmidt*. The two purposes are complimentary. International comity does not require the extradition of a person on demand or surmise. Nor does basic fairness to the person sought for extradition require all the procedural safeguards of a trial, provided the material establishes a case sufficient to put the person on trial."[59]

[166]   The observations in *Ferras* received elaboration from the Court of Appeal for British Columbia in *US v Graham*.[60]   In that case the language in *Ferras* was described as "powerful and expressive"[61] The Court in *Ferras* was concerned that an earlier case,[62] effectively led to a rubber stamp process because the approach in that case did not bring a close enough scrutiny to the case for extradition.   The intervention of the Canadian Charter for Rights and Freedom had changed the landscape.

[167]   It was argued before the *Graham* Court that "if there remains reliable and available evidence on each element of the offence in question, then the Judge must commit on the presumption of sufficiency arising from the certification by the requesting State."[63]   The Court concluded the paragraph with the following words:

"That is, in my respectful opinion, a reductionist interpretation of *Ferras* and does not give full scope to the reasoning in that case". The Court went on to say that the reasoning in *Ferras* demanded more – a judicial appraisal of the case to ensure that there is a "plausible case" and that the subject is not committed on a case where "it would be dangerous or unsafe to convict, and the case should not go to a jury."[64]

[168]   The Court then went on to consider paragraph 46 in *Ferras* which demands that there should be a judicial assessment that goes beyond mere sufficiency.[65]

[169]   Paragraph 46 of *Ferras* reads as follows:

"Section 29(1) direction to an extradition Judge to determine whether there is admissible evidence that would "justify committal" requires a Judge to assess whether admissible evidence shows the justice or rightness in committing a

[59] Ibid. paragraph [21]
[60] [2007] BCCA 345
[61] Ibid. paragraph [19]
[62] *US v Shepherd* [1977] 2 SCR 1067
[63] *Graham* above n.60 Paragraph [22]
[64] Ibid. Paragraph [23].
[65] Ibid. Paragraph [28]

person for extradition. It is not enough for evidence to merely exist on each element of the crime. The evidence must be demonstrably able to be used by reasonable properly instructed jury to reach a verdict of guilty. If the evidence is incapable of demonstrating the sufficiency for committal, then it cannot "justify committal". The evidence need not convince an extradition Judge that a person sought is guilty of the alleged crimes. That assessment remains for the trial court in the foreign State. However it must establish a case that could go to trial in Canada. This may require the extradition Judge to engage in limited weighing of the evidence to determine, not ultimate guilt, but sufficiency of evidence for committal to trial".

[170] Then at paragraph 30 the court expressed disagreement with a statement in *Anderson* which suggested that there is no power to deny extradition cases that appear to the extradition Judge to be weak or unlikely to succeed at trial.[66] The court went on to state "My difficulty with that way of putting the limit of discretion is that there are degrees of weakness and extradition Judges should not be put off their task of assessing for sufficiency by a dictum that mere weakness is not enough. I agree that it is not enough."[67]

[171] The Court in *Graham* then summarised the position. The Judge said:

"In summary, *Ferras* stands for the proposition that extradition Judges now have the discretion to disregard evidence shown to be unreliable or unavailable and in respect of the evidence that remains, to determine by an assessment of the evidence, including a limited weighing of the evidence, whether it is sufficient for a properly instructed Judged acting reasonably to reach a verdict of guilty in Canada".[68]

[172] The case of *US v Gallacher and Brown*[69], a decision of the Supreme Court of British Columbia, affirmed the principles in *Graham*, recognising that it was the first time that the British Columbia Court of Appeal had considered the impact of *Ferras* on the test for committal. It recognised that *Graham* had been affirmed in subsequent British Columbia decisions and supported the approach.

[173] The case of the *Attorney General of Canada on behalf of the USA v Pavlicevic* is the subject of two decisions. One was in April of 2008[70] and the other

---

[66] Ibid. Paragraph [30]
[67] Ibid. Paragraph [31]
[68] Ibid. paragraph [32]
[69] [2008] BCSC 708
[70] [2008] BCSC 410

in August 2008[71]. In the later decision the *Ferras* approach was considered at paragraph 17 where the comments of Donald J at paragraph [23] were noted and affirmed. A caveat noted by Justice Hall in *Graham* was referred to in *Pavlicevic*. That caveat Court stated at paragraph [41] and [42] of *Graham*[72]:

> "I wish, however, to note that I would consider it an extremely rare situation when an extradition Judge could properly enter upon a consideration of the creditability of proposed witnesses. Creditability is pre-eminently a jury question to be left to be considered by the trier of facts. Unreliability of evidence could arise for instance from serious deficiencies in the body of circumstantial evidence or from the opportunity for a witness to know or observe factual matters. But the mere fact that a witness might be thought by an extradition Judge to be of less than stellar credibility would not normally suffice as a ground to refuse a committal order. That sort of issue, in my opinion, is best left to be decided by a trial court. Subject to this caveat I am in respectful agreement with the reasons of Donald JA."

[174] The conclusion that can be drawn from this line of authority is that extradition proceedings are not simply an administrative process based solely upon the record of the case. Although the scope may be modest or limited it is one which must be considered substantively, judicially and fairly. The steps by which the process is undertaken are outlined in paragraph 31 of *US v Prudenza*[73] where it was stated:

> "In deciding where the defects in the case proffered by the requesting State are sufficiently serious to justify disregarding some part of the evidence relied on by the requesting State when conducting the s 29(1)(a) assessment, an extradition Judge must begin from the premise that the material properly certified by the requesting State pursuant to s 33 is presumptively reliable for the purposes of the Extradition Act... The party resisting extradition may rebut the presumption of reliability flowing from certification either by reference to the requesting parties own material or by calling evidence to demonstrate fundamental inadequacies or frailties in the material relied on by the requesting State."

[175] Mr Ruffin argues that by virtue of this type of analysis there is no added discovery obligation upon the requesting state whereas on the other hand Mr Davison argues that to properly resist extradition and rebut the presumption of reliability disclosure is required.

---

[71] [2008] BCSC 1832
[72] Above n. 60.
[73] Ontario Court of Appeal 9 February 2007, 2007 Carswell ONT 638218

[176]   The case of *US v Yang*[74] contains some useful comments upon the way in which the extradition Judge may consider evidence and the evidence that is admissible under the Canadian scheme.   At paragraph [5] the issue of the double criminality requirement was considered.   It should be noted that in the case involving Mr Dotcom Mr Ruffin submitted that pursuant to the holding of the Court of Appeal in *USA v Cullinane*[75] the double criminality requirement does not apply but the comments that are made regarding the sufficiency of evidence are helpful.   The Court stated at in *Yang*:

> "The extradition Judge is therefore not concerned with foreign law.  He or she merely determines where there is evidence of conduct that will amount to the Canadian offence described in the authority to proceed.   The evidence must be sufficient as would justify an accused committal for trial if the offence were alleged to have been committed in Canada".[76]

[177]   The issue of admissibility was considered in the following way:

> "In summary s 32 contemplates that evidence that would not otherwise be admissible under Canadian law is admissible at the extradition hearing and can be used to make out the case for committal under s 29.  This evidence can fall into three categories.   If the evidence is adduced by the persons sought for extradition it can be admitted if it is relevant and the Judge considers it reliable even if it would not be admissible under Canadian law (1C).   The contents of documents submitted in accordance with an extradition agreement (treaty) are admissible (1B).  Finally the contents of documents contained in the s 33 record of the case are admissible although those contents would not otherwise be admissible under Canadian law (1A)."[77]

[178]   Then the nature of the record of the case is considered:

> "The record of the case need only contain a summary of the evidence.  A judicial or prosecuting authority must certify that evidence summarised or contained in the record of the case is available for the trial.  In addition, the judicial or prosecuting authority must certify either that the evidence is sufficient under the law of the extradition partner to justify prosecution or was gathered according to the law of the extradition partner".[78]

[179]   The Court went on to observe that notwithstanding the certification of the sufficiency of the evidence or the manner in which it was gathered whether the evidence is in fact sufficient to meet the test under s 29 of the Canadian legislation

---

[74] Above n. 57.
[75] [2003] 2 NZLR 1 (CA).
[76] Yang above n. 57 paragraph [5]
[77] Ibid. paragraph [7]
[78] Ibid. Paragraph [9]

must be determined by the extradition Judge[79]  and observed that the ROCprovisions determined admissibility only.  Then the Court went on to say:

> "It is for the Canadian Judge presiding at the extradition hearing to decide whether the evidence is sufficient to met the test under s 29.  Having said that, it is apparent that various types of evidence that would not be admissible at a Canadian trial are admissible at the extradition hearing.  In particular, hearsay is admissible although it would not meet a common law statutory exception that would not meet the necessity and reliability requirements set out by the Supreme Court ..." [80]

And then further at the  Court stated:

> "In the result the extradition hearing has moved very far from the typical Canadian trial or preliminary enquiry where the Judge, by applying the common law and statutory rules of evidence based on the paradigm of trial by the lay jury, performs a gatekeeper function to keep potentially unreliable and prejudicial evidence away from the trier of fact". [81]

Thus it is clear from *Yang* that the evidence contained in the record of the case and the supporting documents that must be filed pursuant to s 25 may be accepted uncritically but only insofar as reliability and evidence gathering processes are concerned.  However the evaluation of that evidence remains an aspect of the judicial function and that is emphasised by the following passage:

> It is possible to identify certain principles of fundamental justice in the extradition context.  The fugitive is entitled to a hearing before an unbiased decision maker and to be present.... the fugitive has the right to know the case against him or her including materials relied upon to establish the prima facie case... the fugitive also has the right to participate in the hearing free of coercion from the requesting State... however the fugitive is not, in my view, entitled to any particular form of evidence.  As Sopinka J said in Rodriguez at page 590 "A mere common law rule does not suffice to constitute a principle fundamental justice" rather,   principles of fundamental justice are ones "upon which there is some consensus that they are vital or fundamental to our societal notice of justice"  bearing in mind the need to respect differences in other jurisdictions, developments in extradition in other jurisdictions in the traditionally modest role of the extradition Judge I cannot find that the hearsay rules, opinion rules or the other common law rules of evidence are vital to our societal notion of justice in the extradition context".[82]

[79] Ibid. Paragraph [11]
[80] Ibid.
[81] Ibid. Paragraph [12]
[82] Ibid. Paragraph [46].

[180] Earlier in this section I made reference to the fact that the case of *Pavlicevic* is a subject of two decisions. The decision of April 7 2008 contains some important dicta as to the nature of the inquiry and the decision to be made.[83]

[181] Allen J in *Pavlicevic* referred to *Ferras* and stated:

> "There is no question that in *Ferras* the Supreme Court of Canada rejected the traditional "Shepherd test" whereby an extradition Judge had no discretion to reject evidence, even if it was so dubious to be dangerous, but was required to commit if there was any evidence on all of the necessary elements of the offence .... Under the new test articulated in *Ferras*, the extradition Judge must determine whether the evidence discloses a case which could properly go to a jury; a case that is too unreliable to go to a jury has not met the test for committal."[84]

[182] In so saying Allen J referred to comments made by Chief Justice McLachlin in *Ferras* at paragraphs [47] to [49] where the Chief Justice considered that a narrow approach to the judicial discretion should not be applied in extradition matters. Concern was expressed as to the decision to remove a trial Judge's discretion to refuse to extradite and that, in the Chief Justice's opinion, deprived the subject of any review of the reliability or sufficiency of the evidence. She was of the view that the limited judicial discretion to keep evidence from a Canadian jury did not have the same negative constitutional implications as the removal of an extradition Judge's discretion to decline to commit for extradition. In such latter case the removal of the discretion could deprive the subject of his or her constitutional right to a meaningful judicial determination before the subject was sent out of the country and loses his or her liberty.[85]

[183] The Court went on to consider the differences between extradition hearings and domestic preliminary inquiries. Both were described as pre-trial screening devices using the test of sufficiency of evidence for committal. But the new Extradition Act in granting the Judge the same powers as the preliminary inquiry Judge required that Judge to exercise those powers in a manner appropriate to the extradition context. The second difference arises in different rules for admitting evidence. The third difference arises from the ability of extradition Judges to grant

---

[83] Above n. 70.
[84] Ibid. Paragraph [19].
[85] Ibid. Paragraph [20].

Charter remedies which make it inappropriate to equate the task of extradition Judges with the task of a Judge on preliminary inquiry.

[184]   That being said what is import insofar as these comments are concerned is the necessity for a proper judicial hearing and determination.

[185]   On the other hand Mr Ruffin argues that a reading of the decision of *France (Republic) v Diab*[86] - a decision of the Ontario Superior Court of Justice - mandates a narrower approach.  His argument is primarily based upon the importance of the record of the case and its content.[87]

[186]   *Diab* was a somewhat unique case because it involved the calling of evidence particularly of expert handwriting evidence as a means of arguing that certain reports were manifestly unreliable thus recognising that manifest unreliability could be a ground for refusing extradition.  In the *Diab* case one of the matters referred to was an application to the Court to call expert evidence to argue that the reports were manifestly unreliable[88] which, according of Mr Ruffin, lent some weight to his suggestion, which I have rejected, that oral evidence applications need to be made for extradition hearings.

[187]   However it is at paragraph [99] that the nature of the extradition hearing was stated. After a lengthy discussion about expert evidence the Court said :

> "While the argument presented on behalf of the person sought was in many ways compelling, and forcefully argued, when the dust settled on the argument the fact remains that this is an extradition hearing.  The powers of the Court had arrived from the Statute.  The Act mandates that evidence contained in an ROC is presumptively reliable.  It is admissible evidence.  To rebut the presumption of reliability the person sought has to demonstrate that the evidence is manifestly unreliable.  To use standards of admissibility derived from the Canadian Criminal Law as a means of demonstrating manifest unreliability in my view runs foul of the governing statute.  The threshold reliability analysis in *Abbey* and referenced in the Gouge Report, are principles that are applicable to determining the issue of admissibility."[89]

---

[86] Above n. 19
[87] Ibid. Paragraphs [16] and [17].
[88] Ibid. Paragraphs [85]-[89]
[89] Ibid. Paragraph [99]. The *Abbey* case was about the admissibility of expert opinion evidence.

[188]   Thus in so holding the Court once again emphasised that the ROC is a means of producing evidence which is presumed to be reliable and in respect of which enquiries as to admissibility may not be mounted.   Nevertheless the issue of reliability can be challenged but not on admissibility basis.

[189]   Mr Ruffin made reference to the fact that the decision in *Graham* was discussed at page 29 *et seq.* in the decision in *Diab*.   The Judge observed that there seem to be a conflict of authority and after citing a lengthy passage from *Graham* found himself bound by decisions within the judicial hierarchy of a different province.   *Diab* doesn't necessarily mean that *Graham* is rejected but there was a contest in terms of precedential authority.

[190]   However the concluding paragraph in *Diab* properly, in my view, describes the extradition process in summary by saying:

> "The fact remains that this was never meant to be a trial, or a hearing regarding the guilt or innocence of Mr Diab.   Canada signed an extradition treaty with the Republic of France, who suspect that Mr Diab is responsible for a heinous crime.   They presented a prima facie case against him which justifies him having to face a trial in that country.   It is presupposed, based on our Treaty with France, that they will conduct a fair trial and that justice will be done.   This decision stands for that proposition, nothing more nothing less."[90]

[191]   Nevertheless what *Diab* does not suggest is that the approach in *Ferras* or the necessity for a proper judicial determination properly informed and fairly conducted is excluded. This discussion has been necessary in a consideration of how the Court must go against its determination and how that determination must be informed.   It may be informed by the ROC. It may also be informed by additional evidence adduced not only by the requesting party but by the respondents.   It is within the context of a fair contest that Mr Davison advances his argument that disclosure should be available.   It is acknowledged that in extradition cases there is no right to general disclosure.   In the April decision of Allen J in *US v Pavlicevic* reference is made at paragraph [15] to the cases of *US v Dynar*[91]  and *US v Kwok*[92]  which hold that the requirements of disclosure apply only to domestic criminal proceedings and

---

[90] Ibid.
[91] Above n. 17.
[92] Above n. 16.

not to extradition proceedings governed by Treaty and Statute. However it should be noted that those decisions relate to the concept of *general* disclosure rather than *limited* or *specific* disclosure.

### Engaging the New Zealand Bill of Rights Act

[192]  In its memorandum of submissions of the 30th March 2012 Counsel for the United States conceded that the NZBORA would yield disclosure obligations in the limited circumstances available in a ROC proceeding. It is accepted that the obligation falls on whichever branch of the Crown holds the relevant information. The NZBORA applies to "any person or body in the performance of any public function, power, or duty conferred or imposed on that person or body by or pursuant to law" (s 3) and therefore all branches of the Crown are subject to s 27 and must comply with it insofar as they hold the relevant information.

[193]  Section 27(1) states:

> "Every person has the right to the observance of the principles of natural justice by any tribunal or other public authority which has the power to make a determination in respect of that person's rights, obligations, or interests protected or recognised by law."

[194]  The applicability of s. 27 to extradition proceedings was considered in *Schlacks v Gordon & Ors*[93] where it was held:

> The extradition procedure is, of course, being conducted in a New Zealand Court and the provisions of the New Zealand Bill of Rights Act 1990 apply. Section 27 preserves the right to the principles of natural justice. Natural justice requires that a person accused of an offence be given adequate information to understand precisely what is being alleged so that a defence can be prepared. Section 24 of the New Zealand Bill of Rights Act 1990 requires that that information be provided promptly. I accept that the New Zealand Bill of Rights Act 1990 is addressing criminal prosecution in New Zealand. An extradition request is not a prosecution but those principles, in my view, apply by way of analogy.

[195]  The position relating to the applicability of s. 24 is more contestable. Section 24 states:

> Everyone who is charged with an offence—

---

[93] Above n. 13

(a) shall be informed promptly and in detail of the nature and cause of the charge; and

(b) shall be released on reasonable terms and conditions unless there is just cause for continued detention; and

(c) shall have the right to consult and instruct a lawyer; and

(d) *shall have the right to adequate time and facilities to prepare a defence;* and

(e) shall have the right, except in the case of an offence under military law tried before a military tribunal, to the benefit of a trial by jury when the penalty for the offence is or includes imprisonment for more than 3 months; and

(f) shall have the right to receive legal assistance without cost if the interests of justice so require and the person does not have sufficient means to provide for that assistance; and

(g) shall have the right to have the free assistance of an interpreter if the person cannot understand or speak the language used in court.

[196]   I have emphasised s. 24(d) because that is the right that the applicants argue engages the obligation to make disclosure. But for that to be available a person must be charged with an offence and it is argued that extradition proceedings do not fulfil that requirement for the rights to be engaged.

[197]   There are conflicting lines of authority. In *Callahan v Superintendent of Mt Eden Prison & Anor*[94] it was argued that Mr Callahan was entitled to cross-examine deponents who swore affidavits in support of the extradition application pursuant to s. 25(1)(f) NZBORA. Temm J held:

> "... I come to the conclusion that Mr Callahan is not charged with an offence in New Zealand. He is detained under a warrant issued pursuant to the Extradition Act and the question subject to examination is whether he should or should not be extradited."

[198]   Counsel for the United States argues that position is consistent with authority from the Canadian Supreme Court[95] and is supported by text writers.[96] As far as the

---

[94] Above n 9. Cited with approval in *Schlaks v The Superintendent of Mt Eden Prison* above n. 10
[95] *Schmidt v R* above n. 11; *The Republic of Argentina v Mellino* above n. 12.

latter suggestion is concerned I am not as confident that a critical reading of Rishworth et al supports that proposition. The discussion at pages 591-592 is about the consistency of New Zealand decisions with those of Canada and the occasions when policy considerations may diverge. In fact the passage from the text provided discusses the decision of Baragwanath J in *Poon v Commissioner of Police*[97] specifically as a departure from Canadian authority.[98]

[199]  In *Poon* Mr Poon was arrested and detained pursuant to an extradition warrant.  He argued he should be released on bail and relied on s 24(b) NZBORA. The Crown argued that s 24 did not apply in the extradition context and noted that s 24(e)-(h) cannot be applied to an extradition hearing. Baragwanath J agreed that some of the rights could not be engaged in the context of an extradition hearing. s24(e) of the New Zealand Bill of Rights promising trial by jury, plainly cannot apply to an extradition hearing. Likewise, s 25(f)-(h) cannot be applied to such a hearing.[99]

[200]  Baragwanath J held:

---

[96] Paul Rishworth et al *The New Zealand Bill of Rights*, pp 591 – 592; Butler & *Butler The New Zealand Bill of Rights Act: A Commentary*, pp 718 – 719.

[97] Above n. 7

[98] Rishworth above n. 96. In a footnote in the discussion on *Poon* the following appears:
" Of course, there is a growing body of jurisprudence in extradition cases that focuses on Charter sections that do not depend on the prerequisite that the person in question has been 'charged with an offence'. Thus, the Supreme Court decisions in United States v. Kwok [2001]1 SCR 532; United States v. Cobb [2001]1 SCR 587; and United States v. Shulman [2001] 1 SCR 616 recognise that a person who is the subject of extradition proceedings is entitled to disclosure. This right is based on s. 6(1) of the Charter (the right to "… remain in "…Canada)-the rough equivalent to s. 18 of the Bill of Rights. See United States v. Burns [2001]1 SCR 283"

[99] S. 25 of NZBORA provides:
Minimum standards of criminal procedure
Everyone who is charged with an offence has, in relation to the determination of the charge, the following minimum rights:
        (a) the right to a fair and public hearing by an independent and impartial court:
        (b) the right to be tried without undue delay:
        (c) the right to be presumed innocent until proved guilty according to law:
        (d) the right not to be compelled to be a witness or to confess guilt:
        (e) the right to be present at the trial and to present a defence:
        (f) the right to examine the witnesses for the prosecution and to obtain the attendance and examination of witnesses for the defence under the same conditions as the prosecution:
        (g) the right, if convicted of an offence in respect of which the penalty has been varied between the commission of the offence and sentencing, to the benefit of the lesser penalty:
        (h) the right, if convicted of the offence, to appeal according to law to a higher court against the conviction or against the sentence or against both:
        (i) the right, in the case of a child, to be dealt with in a manner that takes account of the child's age

"I... prefer the view that to the extent that the language of the Bill of Rights can reasonably be applied to public sector conduct affecting a person in New Zealand it should be applied, and that the language of s 24(b) can and must be applied to an alleged fugitive whose extradition is sought to be performed by the New Zealand Government."[100]

[201]   He then went on to note:

"There is nothing in the language of s 22 or s 24(b) to make it inapplicable to persons arrested for the purposes of extradition. There can be no doubt that Mr Poon has been "arrested" and continues to be "detained"; he asserts that his continued detention is no longer justifiable and is "arbitrary" .
Equally, he has been "charged with an offence"; namely the Hong Kong offences which give rise to the warrant on which he has beenarrested. In Schmidt Wilson J, at p 27, considered that to be the relevant "offence" for the purposes of s 11 of the Charter. "[101]

[202]   The applicability of NZBORA is emphasised in the following passage:

But the Bill of Rights Act states fundamental values, most of them already recognised by the common law, and is not to be construed narrowly. Those values include, in the present case, the prompt disposal of proceedings in New Zealand which precede a possible overseas trial: the greater expression "to be tried" includes the lesser - the preliminary hearing which is integral to the overall trial process."[102]

[203]   In strong language prior to that passage he stated:

"I do not accept the argument that because some provisions of ss 24 and 25 (namely' s 24(e) and s 25(f)-(h» can have no application to extradition cases, given the nature of the procedures under the Extradition Acts and their consequences, therefore the provisions which could apply are to be excluded. No policy reason for such conclusion was advanced, and none is available unless the open textured provisions of the Bill of Rights are to be construed narrowly and grudgingly. I am satisfied that the Bill of Rights, and here the rights under s 24(b), *are to be applied where possible* and do apply here."[103]

[204]   Baragwanath J adopted a similar position in *X v Refugee Status Appeal Authority.*[104] X appealed to the Refugee Status Appeals Authority against a refusal to recognise his status as a refugee from Rwanda. In July 2003, the Rwandan Public Prosecutor signed and sealed an international arrest warrant asserting that X was alleged to have committed the crime of genocide and crimes against humanity.

---

[100] Above n. 7  p.76.
[101] Ibid. p. 77.
[102] Ibid. p.77.
[103] Ibid. p. 77 – the emphasis in italics is mine.
[104] Above n. 8.

[205]   In that case Baragwanath J made specific references to the passages referred to in Rishworth and in Butler & Butler, together with the cases of *Schlaks, Schmidt v R* and *Mellino*. In language that strongly emphasises the importance of NZBORA as a recognition of the importance of an international rights based approach he stated:

> "The Bill of Rights is focused on the protection of persons subjected to public sector conduct. The rights are not confined to New Zealand citizens and residents. They are enforceable against the judiciary as well as the executive. I have recognised that certain of the provisions of ss 24 and 25 can have no application to extradition cases. But the s 25(a) right to a "fair hearing" in relation to "the determination of the charge", whether that hearing is in New Zealand or in Rwanda, could be adversely affected by how the New Zealand Courts (including both the Authority and this Court) deal with relevant issues.
> [64] It must follow that this Court is bound to ensure that such right at ultimate trial is not imperilled by events in New Zealand. To ensure such fair hearing, if there were real risk of leakage of information and corrupt advantage being taken to damage the defence case, it could well be necessary to hear the extradition application before the refugee claim.
> [65] As New Zealand's role in world affairs has constantly shown, we see ourselves as members of a global community. There can be no room for a crabbed construction of a statute expressed in such generous terms as the Bill of Rights. There is no reason to read down its language to exclude consequences at trial beyond our borders. On the contrary, to the extent that such language permits, New Zealand must play its part in promoting the rule of law by maintaining standards of public conduct in this country that bear upon the fairness of the treatment of accused persons wherever they may come to trial."[105]

[206]   He went on to say:

> "[66] I am not persuaded by the Crown's argument to depart from that approach in regard to s 25. The alternative would be, as I have put it at para [55], for this Court to close its eyes to conduct in New Zealand that offends its own standards of justice, simply because the trial will be held in another state. Rather this Court must ensure such standards of public sector conduct in New Zealand as will avoid creating unnecessary injustice on that other state."[106]

[207]   Despite the principled statement from *X* the language used by Baragwanath J in the passage cited from *Poon* does not suggest that the rights are absolute. There is a limitation contemplated – "to the extent that the language of the Bill of Rights can reasonably be applied to public sector conduct" thus suggesting that there may be

---

[105] Ibid paras [63] – [65]
[106] Ibid para [66]. The use of the word "on" may be a misprint and I wonder whether the word "in" was intended.

*limitations to the scope* of the rights articulated in s. 24. In my view this supports the suggestion that the availability of the rights must be viewed within the context of extradition proceedings. I am fortified in that view by the nuanced language in the final passage to which I have referred and in particular to the fact that the rights "are to be applied where possible" which recognises that, within the context of extradition proceedings, not all of the rights expressed in NZBORA will be available nor will they be engaged. In my view the discussion in Butler & Butler[107] which analyses the differences between *Callahan* and *Poon* must be modified to recognise the position that I have stated, for that discussion overlooks the nuanced language that Baragwanath J used.

[208]  A matter raised by Mr Ruffin in terms of the applicability of the NZBORA was whether or not there would be an extraterritorial implications. That was the position in *US v Yang*[108] where an insistence upon Canadian evidentiary procedures was tantamount to giving the Charter extra territorial affect.  That was dealt with by proper consideration of the nature of the ROCand that the utilisation of such a process prohibited going behind it to assess admissibility issues.  However in *US v Graham*[109]  a finding of a lack of extra territorial implication may allow Charter rights to be engaged.

[209]  The case of *Schmidt v R*[110] demonstrates how the extra territorial application of a Charter right ran head to head with extradition procedures and a consideration that such issue should be determined by the requesting State.  In *Schmidt* the issue was whether extradition should be allowed as offending against the double jeopardy

---

[107] Above n. 96  p. 719 para 25.5.19

> In our view the better approach is that set out *in Callahan* (accepted in *Schlaks*) and in the majority judgment in *Schmidt*. To force extradition proceedings into a section clearly directed to the regulation of criminal proceedings is to overshoot the purpose of ss 24 and 25. A broad and generous approach to BORA interpretation simply cannot justify overshooting the mark. The far more preferable approach is to secure fair procedures in extradition hearings through reliance on s 27(1) of BORA (right to natural justice) and to secure protection against prolonged detention pending the determination of an extradition hearing through reliance on s 22 of BORA (ought not to be arbitralily detained). Indeed, we note that in *Poon*, Baragwanath J did purport to rely on s 22 of BORA, at least to some extent, when discussing 'the desirability of avoiding prolonged proceedings where the respondent was in custody.'

[108] Above n. 57.
[109] Above n. 60
[110] Above n. 11

provisions of the Charter. It was held that the Charter could not be given extra territorial effect to govern how criminal proceedings in a foreign country could be conducted.   The nature of the extradition hearing as a hearing to determine sufficiency of evidence of an alleged extradition crime to warrant the Government to surrender a fugitive is different from a full trial.

[210]   These authorities lead me to conclude that if a right is to be engaged it should be engaged in the absence of an extra territorial effect.  If the effect of the right has some implication as far as the conduct of proceedings in the requesting State are concerned – such as the double jeopardy prohibition in the Canadian Charter – then such a right cannot be engaged.

[211]   Mr Ruffin argued that within the context of disclosure, were the right to be applicable that justified a limited disclosure it would have extraterritorial effect because it would be requiring the United States to undertake activities within its own jurisdiction such as the gathering of disclosure. Thus there was an extra territorial ingredient.

[212]   That argument suggests however if taken to its logical conclusion that the United States Government is not subject to procedural requirements preliminary to an extradition hearing.   Indeed American jurisprudence has a term known as "purposeful availment" of the advantages of a State which makes one amenable to the jurisdiction of the State.  Similarly in this case.  By availing themselves of extradition procedures in this country and particularly by invoking the very advantageous procedures associated with the ROC the United States makes it amenable to procedural requirements associated with the hearing.  In such a situation there is not an extra territorial implication.  Rather the obligations are grounded within New Zealand even although they may require performance off shore.  That is a different proposition to extending the reach of New Zealand law to bind a foreign jurisdiction in its determination of the case.

**Findings upon extradition proceedings and the applicability of the New Zealand Bill of Rights Act.**

1.  Extradition proceedings are criminal in nature but are of a special kind; see *R (on the application of the Government of the United States of America) v Senior District Judge Bow Street Magistrates Court & Ors*[111]; *Flickinger v Morris.*[112]

2.  The NZ BORA is applicable to extradition proceedings; see *Poon v Commissioner of Police*[113]; *X v Refugee Status Appeal Authority.*[114]

    I come to this conclusion notwithstanding that there are conflicting authorities. As to the academic texts I conclude that Rishworth et al does not support the proposition argued by the Crown and Butler & Butler does not recognise the nuance language in *Poon*. Furthermore the highly principled approached adopted by Baragwanath J in *X* recognises the important position of NZBORA and its applicability to public sector conduct and the way in which it should be tested. The Act should be applied where it can be applied although it is recognised that it will not be applicable across the entire extradition spectrum. In *X* Baragwanath J considered the competing authorities together with the observations of the text writers. The findings that he made are informed by those preceding authorities. Furthermore his decision is of a more recent nature and recognises the evolving recognition of a writes based jurisprudence.

3.  The applicability of NZ BORA provisions is not absolute but, in the context of extradition proceedings, may only be applicable within the context of the Extradition Act in the proceedings there under.

---

[111] Above n. 14.
[112] Above n. 27.
[113] Above n. 7.
[114] Above n. 8.

4.      Thus in considering issues of disclosure and discovery, the context of the particular proceedings and their nature must govern the approach that a Court takes to ancillary or procedural applications that are tried presently before the Court.

5.      Given the nature of the proceedings as criminal of a special type and the necessity for a proper judicial evaluation of the evidence presented rather than a mere administrative approval on the papers it appears to me that the NZBORA is engaged to the extent that it is possible within the context of extradition proceedings.  There is no doubt that Mr Dotcom and his associates have been charged with an offence, although in the United States. Extradition proceedings are a necessary part of placing Mr Dotcom and his associates before the Courts in the United States.  There can be no doubt that he has the right to consult and instruct a lawyer and have legal representation.  The right to adequate time and facilities to prepare a defence in my view is entirely consistent with the nature of extradition proceedings that has been described.  Some of the rights under s 25 of the New Zealand Bill of Rights would not be applicable such as the right to examine witnesses for the prosecution in the context of the ROC procedures.  Thus for example s 25(f) would not be engaged.

[213]  Once the time and facilities to prepare a defence right becomes available or is engaged it then becomes necessary to consider whether or not disclosure related to the justiciable issue, as an aspect of the preparation of defence right, is applicable within the context of extradition proceedings.

[214]  I now turn to the issue of disclosure.

**The Issue of Disclosure**

[215]  The question is one of whether or not an expedited means of giving evidence to a prima facie level by record of the case can exclude pre-hearing disclosure and,

as an ancillary matter, whether the ROC process is compromised in any way by a pre-trial or pre-hearing disclosure process.

[216]   The Canadian cases make it clear that within extradition proceedings there is no right to *general* disclosure.  Although the case of *Dynar*[115] was a pre-ROC case the following statement of principle was made:

> "Even though the extradition hearing must be conducted in accordance with the principles of fundamental justice, this does not *automatically* entitle the fugitive to *highest possible level of disclosure*.   The principles of fundamental justice guaranteed under s 7 of the Charter vary according to the context of the proceeding in which they are raised.  It is clear that there is no entitlement to the most favourable procedures imaginable. *"The context and purpose of the extradition hearing will shape the level of procedural protection that is available to a fugitive".*[116]

[217]   At a later stage in the judgment the following comment was made:

> "In the light of the purpose of the hearing, however, this would simply entitle and the disclosure of materials on which the requesting State is relying to establish its prima facie case". [117]

[218]   In this respect it should be noted that the case was decided prior to the ROC and Mr Ruffin argues that with the ROC procedure in place any entitlement to disclosure is satisfied by virtue of the existence of the ROC.

[219]   However one has to be mindful of the language that is used in *Dynar*.  The reference is to an absence of an *automatic* entitlement.  "The highest possible level of disclosure" is not available.  But *Dynar* is not authority for the proposition that any form of disclosure is absolutely prohibited in extradition proceedings.   It is important to note the use of the words the context and purpose of the hearing must be taken into account.

[220]   Mr Ruffin also relied on the case of *Kwok v USA*[118] which is authority for the proposition that extradition proceedings are not concerned with issues of guilt or innocence.  This, according to the Supreme Court, affects the scope of a fugitive's right to disclosure.  The extradition judge may only order the production of materials

---

[115] Above n. 17.
[116] Ibid. Paragraph [128] – [129] My emphasis.
[117] Ibid. Paragraph 134.
[118] Above n. 16.

relevant to the issues properly raised at the committal stage of the process, subject to a discussion to expand the scope of that hearing. In that case the requesting State was not relying on materials in the possession of Canadian authorities and in the absence of any indication of bad faith or improper motives on the part of the United States or Canada there was no obligation for the United States to provide further disclosure. Disclosure required would be considered only where a justiciable Charter issue could arise from the potential involvement of Canadian authorities in the gathering of evidence.

[221] Once again it must be noted that there is no *absolute prohibition* upon disclosure but that disclosure may take place within a limited context.

[222] If there are allegations of bad faith or similar alternative justiciable issues there must be an "air of reality" to those claims.[119]

[223] Mr Ruffin argued that there was nothing in the post *Ferras* cases dealing with disclosure to suggest that there had been any enlargement of the circumstances in which an extradition Court could order disclosure citing *US v Hulley*[120]  *US v Walker*[121], *Pavlicevic*[122], *US v Costanzo*[123] and *US v McAmmond*[124]

[224] These cases are authorities supporting the proposition of an absence of a right to general disclosure. The case of *US v Orphanou*[125]  the Ontario Superior Court of Justice treated *Dynar*[126] and *Kwok*[127] as authoritatively stating the limited right to disclosure in extradition proceedings.

[225] The issue therefore is whether or not the ROC process and the utilising of that process as a means of adducing evidence trumps all other considerations. In the case of *Flickinger*[128] the general right to disclosure in extradition cases was held

---

[119] See *US v Dynar* above n. 17 and *USA v Kwok*  above n. 16paragraph [100]
[120] Above n. 22.
[121] Above n. 24.
[122] Above n. 70 and 71.
[123] Above n. 19.
[124] [2005] Carswell ONT 7,192.
[125] [2010] Carswell ONT 2394.
[126] Above n. 17
[127] Above n. 16
[128] Above n. 27.

inapplicable.   That was a case under the Fugitive Offenders Act of 1881 but the important thing to remember is that the issue of disclosure must be considered within the context of extradition.   The extradition Judge must prevent the hearing from taking on the characteristics of a criminal trial.   It is meant to be an expeditious process.[129] The restrictions that are placed upon the extradition Judge in drawing factual inferences or credibility must be taken into account.   Under the Canadian Statute, defendant's evidence which is not relevant to the extradition test may be excluded but this is not explicit in the New Zealand Statute although it is argued that admission of such evidence is controlled by the Summary Proceedings Act.

[226]   References made by Mr Ruffin to the case of *Mailley v Police[130]* which was an "endorsed warrant" extradition under Part 4 of the Extradition 1999.   In that situation a warrant executed by a Court in a Part 4 country – in *Mailley's* case Australia – could simply be endorsed by the New Zealand Court and executed in New Zealand.   The observations were made at paragraphs 58 and 59 that a "cosmopolitan" approach to the interpretation and application of extradition statute should be adopted.   Although Courts should be vigilant to protect persons whose extradition was sought from the overreaching of their rights, such vigilance did not require the taking or upholding of unmeritorious claims or technical points that had no substantive effect upon the extradition process itself.

[227]   Mr Ruffin in his second written memorandum stated "However the right to call evidence as cast, it is clear that it does not entail a right to advance such evidence with the assistance of disclosure beyond the record of the case.   An exception will be made when there is evidential foundation for a claim that the ROC should not be presumed reliable."

[228]   That is a very sweeping submission in my view and one which construes the ROC procedure very narrowly.   It almost suggests if carried to its logical conclusion that the ROC is determinative of the outcome, thus making an extradition hearing and administrative process rather than a judicial one.   Mr Ruffin resiled from such a position when challenged but nevertheless the implications of such an argument

---

[129] *France v Diab* above n. 19.
[130] [2011] 3 NZLR 223

confine the ability of the Court to determine the matter within very narrow parameters indeed. That seems to fly in the face of the necessity for a judicial determination, properly informed, based on all of the evidence available both by way of the ROC and otherwise.

[229] In that respect I place considerable weight upon the second purpose of extradition proceedings cited in *Ferras* – to protect an individual from deportation in the absence of at least a prima facie case that he or she committed the offence alleged which must also be an offence in Canada. This involves a careful balance between the Court's obligations under the Extradition Act and associated treaties to recognise international comity and its position to, on occasion, act as a bulwark between the State and the citizen when the rights of the individual are at stake. In my view there must be fairness at the hearing and a balance must be struck, otherwise the ROC becomes dominant virtually to the exclusion of everything else and places the extradition process in danger of becoming an administrative one rather than judicial.

[230] In my view the authorities suggest that there may be justiciable issues other than whether or not there is evidence of such sufficiency to justify extradition. That in itself is a justiciable issue as Mr Davison rightly suggests. Other issues however require an "air of reality" as the authorities suggest. But in a consideration of this matter one must take into account the importance of a fair hearing, the application of the relevant provisions under s 24 of the New Zealand Bill of Rights Act the need not only for a fair hearing but a fair hearing properly informed. Furthermore the particular context of the case must be taken into account. There are levels of subtlety and nuance in the present case, particularly insofar as the criminal copyright infringement allegations are concerned that go beyond the normal elements of a straight forward criminal offence. Furthermore in this case actions by and on behalf of the requesting State have deprived Mr Dotcom and his associates of access to records and information. Although Mr Dotcom may not qualify as a "digital native" in the sense attributed to that term by Mark Prensky[131] and more latterly John

---

[131] Marc Prensky "Digital Natives, Digital Immigrants" (2001) 9 On the Horizon 1 http://www.emeraldinsight.com/journals.htm?issn=1074-&121&volume=9&issue=5&articleid=1532742&show=pdf; www.marcprensky.com/.../prensky%20-%20digital%20natives,%20digital%20immigrants%20-%20part1.pdf (last accessed 23 February

Palfrey[132] he nevertheless lives in the digital world. As I understand it all of his information and records were contained on computers or on servers which were removed from his premises or his control as the result of the actions of the New Zealand Police and the United States Authorities in other countries in January 2012. He simply does not have access to information which may assist him in preparation for trial. As I have said, this information is in the hands of prosecuting authorities and at the moment is denied him.

[231] A denial of the provision of information that could enable a proper adversarial hearing in my view would amount to a denial of the opportunity to contest and that would effectively mean that the process is one sided and in reality becomes more of an administrative one based on the limited information provided to the Court by virtue of the ROC. Effectively by its own actions the United States is saying that there can be no other evidence than the ROC that the Court can take into account, and it can say this with some confidence, given that all or any of the evidence upon which Mr Dotcom might wish to rely is in the hands of the United States or investigative authorities acting at their behest in New Zealand.

[232] In so saying I have considered the context of the ROC and as I understand Mr Davison's argument, the reliability of the ROC is not challenged but rather the weight to be attributed to it. Mr Davison also argues that there has been non-compliance insofar as the record of the case is concerned with s 25(2) of the Extradition Act. The language of that subsection is mandatory. It states what the ROC must contain. Sub clauses (a) and (b) are conjunctive. The ROC must contain both a summary of the evidence acquired to support the request for the surrender of the person and other relevant documents including photographs and copies of documents. Mr Davison did not go so far as to suggest that sub clause (a) only relates to witness statements without more but I must say that I share his concern that the ROC as it presently stands contains nothing that falls within sub clause (b). It would be a fair assumption that such information exists but making it available is not at the behest of the requesting State – as is the case in Canada in the Canadian

---

2012). For a brief introduction the the development of Presnsky's theory see Wikipedia "Digital Native" http://en.wikipedia.org/wiki/Digital_native (last accessed 23 February 2012)
[132] John Palfrey and Urs Gasser *Born Digital: Understanding the First Generation of Digital Natives* (Basic Books, Philadelphia 2008)

legislation – but is a mandatory requirement. The absence of this information lends colour to the context upon which Mr Davison relies for disclosure.

[233]  Furthermore within the context of the case, NZBORA considerations should come into focus especially emphasising if I understand the sub text of s 24, 25 and 27 correctly as an underlying fairness of process as a part of justice. By its very nature there is an inequality of arms in extradition proceedings. That is recognised. Nevertheless there are issues of individual's rights and interests as well that must be taken into account where they can work consistently within the extradition framework. The consequences for the individual are significant. At the request of a foreign power the New Zealand Government in accordance with its Treaty obligations and the requirements of international comity, are being asked to interfere with the liberty of the subject, his freedom of movement and his choice of residence (within the law) not only to take him into custody and hold him, as has been the case with Mr Dotcom, or impose restrictions upon his liberty (by virtue of bail requirements) but to remove him non-consensually to another State. There must in all this consideration be some weight placed upon the rights of the individual rather than allow them to be absolutely trumped by principles of international comity.

[234]  To be able to properly contest these actions and interferences with his liberty, the individual's pre-trial preparation right under s. 24(d) NZBORA in my view is implicated as an aspect of ensuring the fairness of process. The provision of information is a matter collateral to that pre-trial preparation. The concept of "defend" is not just restricted to contesting liability for alleged offences but may also include the contest of any part of an overall process.

[235]  Furthermore it should be recognised that the ROC process is one which allows an efficiency in the *introduction* of evidence and certain presumptions that are associated with it is part of the *hearing* rather than the pre-trial process. Whilst aspects of the extradition process may necessarily place restrictions upon the scope of disclosure it is quite clear from the Canadian authorities that disclosure is not prohibited. The ROC procedures place in the hands of the requesting State a significant advantage in the overall process. In my view that significant advantage

should be balanced by allowing the respondent the opportunity to have information that may assist him to contest those allegations.

[236] It is not as if the underlying reliability of the ROC is challenged by a requirement that the requesting party call evidence at the hearing. The ROC remains intact and its particular status does not change.

[237] Mr Davison also argued that the Criminal Disclosure Act should apply in extradition proceedings. He argued that the nature of extradition proceedings is criminal and I have already discussed that in this judgment. His submission is that the Criminal Disclosure Act ought to apply so as to create an entitlement to disclosure in the context of extradition hearings.

[238] Mr Ruffin on the other hand argues that the Criminal Disclosure Act does not apply because the proceedings are not properly described criminal in nature but are ancillary to criminal proceedings. It is the nature of the proceedings that engages the Criminal Disclosure Act.

[239] Disclosure in New Zealand developed within the context of the official Information Act and the case of *Commissioner of Police v Ombudsman* 1988[133]. Until the enactment of the Criminal Disclosure Act 2008, disclosure obligations were developed by the Courts. There are a number of reasons for disclosure. One is to obtain all the information in the hands of the prosecuting authority that is relevant to the individual facing a charge to assess the state of the evidence. In such a situation an advisor can develop a case strategy and determine how evidence would be challenged and whether or not evidence might be called in rebuttal. But disclosure goes beyond decisions about calling or challenging evidence. It has other functions. It enables an advisor to properly advise a client. It enables an accused person to consider and, with the help of a legal advisor, evaluate the case against him or her and such evaluation may inform further conduct of the case including whether or not a plea of guilty should be entered. Disclosure may also provide information as to the context of a case. So it can be confidently said that the function of disclosure is

---

[133] [1988] 1 NZLR 385

many facetted and goes beyond decisions about whether or not evidence could be rebutted, should be rebutted and how it should be rebutted.

[240]   Although I lean towards Mr Davison's argument, on a strict interpretation of the Criminal Disclosure Act measured against extradition proceedings it is my view that the Criminal Disclosure Act cannot apply.  The nature of the proceedings as I have indicated are sufficient to engage the applicable provisions of the New Zealand Bill of Rights Act where they are not inconsistent with extradition proceedings and although there are significant interferences with the liberty of the subject as I have already described, I find that it would be inconsistent with the structure and purpose of extradition proceedings to add on criminal disclosure proceedings which are designed for the domestic New Zealand criminal process.  One only has to look at s 3, which is an unusual section because it contains the flow chart, to understand the difficulty.  In this respect the flow chart is very helpful.  Disclosure under the Criminal Disclosure Act is a staged process.  It allows for initial disclosure and full disclosure together with additional information and further information.  The Act also makes provision for the process by which disclosure may be obtained from third parties.  It is clearly premised upon domestic criminal prosecutions and is part and parcel of what is being described as the criminal law simplification process evidence by the recently enacted Criminal Proceedings Act 2011.

[241]   To allow for the provisions of the Criminal Disclosure Act to apply would, in my view defeat the nature and purposes of extradition proceedings and their expeditious conduct.

[242]   Having said that, however, some guidance in an approach to disclosure can be obtained from that legislation.

[243]   In my view disclosure is available but only in so far as material relevant to the issues properly raised at the committal stage of the process is concerned.  As was held in the case of *Republic in Poland v Bujak*[134] 2006 DCR863 disclosure may be ordered for it is relevant to a justiciable issue and the justiciable issue in this case is the existence of a prima facie case to answer.

---

[134] Above n. 18

**The Scope of Disclosure**

[244]   As I have already observed this is a case that is more complex than many. There is a complex factual matrix and the justiciable issues are complicated by the fact that the United States is attempting to utilise concepts from the civil copyright context as a basis for the application of criminal copyright liability which necessitates a consideration of principles such as the dual use of technology or what they be described as significant non infringing uses.

[245]   The existence of criminal copyright charges is a keystone to providing the unlawful conduct element of the racketeering, money laundering and wire fraud charges.   For example as far as the money laundering charges are concerned the elements are as follows:

> (a)   That the applicant was involved in a transaction (the transaction) involving certain funds (the funds) (the transaction element);
>
> (b)   That the funds were the proceeds of unlawful activity (the unlawful proceeds element);
>
> (c)   That the applicant knew the funds to be the proceeds of unlawful activity (the knowledge element);
>
> (d)   That the transaction was conducted for one of the requisite purposes (the intention element).

[246]   The unlawful element activity requires the keystone criminal copyright infringement charge together with the wire fraud charges.   The elements of wire fraud are:

> (a)   That the applicant received a benefit or cause to loss (the benefits/loss element);
>
> (b)   That the benefit or loss was the result of false or fraudulent pretences (the fraud element);
>
> (c)   That the false or fraudulent pretences were transmitted by one or more of the means set out under the section (the transmission element).

[247] The fraud element is premised upon allegations of criminal copyright infringement. Similarly the racketeering charges involve:

    (a)    Criminal copyright infringement;

    (b)    Wire fraud; and

    (c)    Money laundering.

[248]   To prove the racketeering charges the United States would have to establish:

    (a)    That the applicant was a participant or was associated with an enterprise (the enterprise element); and

    (b)    The applicant conducted the affairs of the enterprise through a pattern of racketeering activity.

[249] Once again the racketeering activity requires as its keystone the criminal copyright infringements which in turn are tied to the wire fraud and money laundering aspects. Thus the apex of the United States case is the criminal copyright charge.

[250]   Significant disclosure is requested in respect of the criminal copyright charge and is related to the various elements of those allegations. The disclosure sought in respect of money laundering, racketeering and wire fraud is not as extensive because of the inter-relationship of all matters with the criminal copyright charges.

[251]   The disclosure that is sought is set out in paragraph [15] above. It must be remembered that the disclosure that may be ordered in such a situation must be limited. It is not the general type of disclosure that one may expect through the various stages set out in the Criminal Disclosure Act.

[252]   The type of disclosure that may be made under the Criminal Disclosure Act may include job sheets and associated investigative information that generated during the course of a criminal investigation. In this case Mr Davison is seeking all and any investigative product relating to any investigation of third party internet sites providing links to files stored on Megaupload.com including all and any

communications between Megaupload Limited and/or its employees and such sites and the operators thereof. Investigative product is defined by Mr Davison to include all investigative records including but not limited to notebooks, the notes and records of communications by which investigators obtained, received or recorded material and information relevant to the investigation. In my view this goes beyond the limited scope of disclosure anticipated for the purposes of conducting a proper and informative extradition hearing. However other documents sought relating to the infringement element have a direct connection to Mr Dotcom or the Megaupload enterprise and in my view are discoverable as are those documents related to the knowledge and wilfulness element.

[253] It is fundamental in any case involving copyright infringement that the element of the copyright and who is entitled to it be established. This, of course, is essential to the ROC process and in my view the requirements of documentation in that regard should be made.

[254] I am also of the view that disclosure as sought relating to money laundering; racketeering and wire fraud are sufficiently limited to warrant disclosure.

[255] The issue now arises as to whether or not disclosure should be further limited to material that is presently in New Zealand or material that is held by United States investigative authorities. Much of Mr Dotcom's material and that of his associates is contained on their computer equipment which was seized as a result of the activities of January 2012 and of course in that respect any relevant information may be disclosed.

[256] However I refer to my earlier comments about the utilisation of the New Zealand process by the United States and the fact that it brings itself within the ambit of New Zealand procedural requirements. In that respect I conclude that disclosure of material held by the United States should be made.

[257] During the course of arguments the issue was raised as to the difficulty of effecting disclosure given that so much material is in electronic format. During the course of argument I reminded counsel of recent amendments to the High Court

Rules relating to electronic disclosure and what is a widespread and growing practice of the use of computer equipment and specialised search techniques to swiftly recover relevant material, to eliminate irrelevant or repetitive material and to utilise a number of search techniques including keynote searching, concept searching, clustering technology, predictive coding or document prioritising technology, email threading and near duplicate identification.  It may not be necessary under the circumstances to engage, at this stage of the process, in native file review but there are procedures available and that are utilised within the civil arena that will enable the prompt disclosure of relevant information.

[258]  Lest it be thought that e-discovery is a matter that has relevance only within the civil jurisdiction it is clear that it does not, and as far back as April of 2009 the Chief Justice of the Supreme Court of New Jersey appointed a special committee on discovery in criminal matters to consider issues that had arisen as the result of increasing use of electronically store information in criminal cases.

**Conclusion**

[259]  I therefore order that there be disclosure of the documents set out in the appendix to this judgment.  Such disclosure is to be made within 21 days of the date hereof.  I expect counsel to liaise and discuss upon the way in which disclosure may be provided but I would imagine that given that most of the information should be in electronic form that a form of electronic disclosure will take place.

David J. Harvey
District Court Judge

**Appendix – Documents to be Disclosed.**

1. **Criminal breach of copyright**

    (a)   A copyright ownership element

        (i)   All documents either connected to, related to or evidencing legal ownership of the copyright interest allegedly infringed.

    (b)   Infringement element

        (i)   All documents either connected to, related to or evidencing alleged infringement of the copyright interests, including but not limited to:

        - all records obtained or created in connection with the covert operations undertaken by agents involved in the investigations related to these proceedings in transacting and uploading/downloading data and files on the Megaupload site;

        - all records or information and/or material provided to or obtained by the investigating and/or prosecuting agencies in this case from holders and/or owners of copyright interests evidencing alleged infringement of their copyright and/or complaining of such alleged infringement;

        - all records and materials related to communications between relevant copyright holders and Megaupload and/or its employees regarding their copyright interest, the direct delete access provided by Megaupload to any such copyright owners, and any communications between the copyright owners and Megaupload and/or its staff regarding take-down notices;

    (c)   Commercial element

        (i)   All/any records or materials or information relating to the operation of the Megaupload rewards scheme for premium users, including but not limited to:

        - all documents containing communications between Megaupload Ltd and/or its employees and the said premium users, including communications regarding the payment of, entitlement to or qualification for rewards; and

- all documents relating to the payment of all/any rewards to "premium" users.

(d)    Knowledge/wilfulness element

(i)    All and any documents materials and/or records containing evidence relied upon by the respondent as evidencing or supporting the allegation that the applicant acted wilfully in relation to the infringement of copyright material;

(ii)    All documents evidencing communications between the applicant and all/any of the alleged co-conspirators demonstrating either knowledge or wilfulness on the part of the applicant, or the absence thereof in relation to the deliberate and unlawful infringement of copyright including but not limited to:

- all emails passing between, exchanged, forwarded, copied (either directly or indirectly) between the applicant and all or any of the alleged co-conspirators; and

- all telephone and other forms of electronic communication (including Skype) intercepted in the course of the investigation, including both transcripts and electronic recordings of such communications.

## 2.    Money laundering

(a)    All documents allegedly evidencing the transfer and/or handling of funds for the purpose of money laundering.

(b)    All documents containing descriptions of transactions or recording financial transactions undertaken by the applicant (either directly or indirectly) for the purpose of money laundering.

## 3.    Racketeering

(a)    All documents said to evidence the formation and/or existence of an enterprise involved in "racketeering activity".

(b)    All documents said to evidence participation by the applicant in such an enterprise.

(c)    All documents said to evidence the engagement in "racketeering activity" by the applicant and/or the said enterprise.

4.    **Wire fraud**

(a)    All documents said to evidence that the applicant, by means of any of the specified mechanisms of transmission (see 18 U.S.C. § 1343) by which it is alleged that the applicant received a benefit or caused a loss as a result of false or fraudulent pretences.

(b)    All documents said to evidence the fraudulence and/or falsity of the basis upon which the applicant is alleged to have received a benefit or caused a loss.