# EXHIBIT 5

Court File No.

## SUPERIOR COURT OF JUSTICE
### (Toronto Region)

**IN THE MATTER OF** an application pursuant to Section 11(2) and 12(1) of the *Mutual Legal Assistance in Criminal Matters Act* for a search warrant

**B E T W E E N:**

### THE ATTORNEY GENERAL OF CANADA ON BEHALF OF
### THE UNITED STATES OF AMERICA

Applicant

and

### EQUINIX, INC.

Respondent
(*Ex parte*)

---

### AFFIDAVIT DANIEL RAYMOND

---

I, DANIEL RAYMOND, of the Royal Canadian Mounted Police, in the City of Milton, Province of Ontario, **MAKE OATH AND SAY AS FOLLOWS**:

## A.    QUALIFICATIONS

1.    I am a peace officer and have been a member of the Royal Canadian Mounted Police, ("RCMP") for the last twenty-seven years.  I currently am assigned to the Federal Enforcement Section, Milton detachment.  Among other duties, I am responsible for obtaining and executing search warrants issued pursuant to the *Criminal Code* and other federal legislation.

2.      The contents of this affidavit are based upon my review of materials forwarded by the United States ("U.S.") authorities to support their request for assistance in Canada as well as my own investigation, and information from other law enforcement officers and officials of the Department of Justice. The majority of the information contained herein is from the material provided by the U.S. authorities. Unless otherwise indicated, the information contained in this affidavit is taken from the materials forwarded by U.S. authorities. I believe all of the information in this affidavit to be true.

## B. OVERVIEW OF THE APPLICATION

3.      This affidavit is in support of an application for a search warrant under section 12 of the *Mutual Legal Assistance in Criminal Matters Act* (the"*Act*"). [1] This application is made to assist the U.S. in their ongoing investigation and prosecution involving the officers and employees of Megaupload and Megavideo (dubbed the "Mega Conspiracy"), for allegedly violating U.S. criminal laws by operating and administering several Internet websites that reproduce and distribute infringing copies of copyrighted television programs, music, and motion pictures, as well as conducting monetary transactions with the proceeds of those unlawful activities.

4.      The warrant being sought will authorize the R.C.M.P. to enter the business premises of Equinix, Inc. for the purpose seizing thirty two (32) computer servers. The servers are among approximately three hundred (300) servers allegedly used by

---

[1] Attached to this Affidavit as Exhibit "A" is a copy of the relevant portions of the *Act*

Megaupload Ltd. Megaupload Ltd. is alleged, through its websites, to be involved in committing various copyright related offences.

5. I am advised by counsel for the Attorney General that an order sealing the materials contained in this application will also be sought The United States has requested that confidentiality be maintained because this warrant is to be executed as part of a co-ordinated take down that will see searches and seizures of property and assets in multiple countries.

## C. RELEVANT STATUTORY PROVISIONS

6. I have familiarized myself with the relevant provisions of the *Act* and the *Treaty* that govern the issuance of search warrants and evidence gathering orders. Subsection 12(1) of the *Act* permits the issuance of search warrants. It reads as follows:

> *12. (1) A judge of a province to whom an application is made under subsection 11(2) may issue a search warrant authorizing a peace officer named therein to execute it anywhere in the province, where the judge is satisfied by statements under oath that there are reasonable grounds to believe that*
>
> *(a) an offence has been committed;*
>
> *(b) evidence of the commission of the offence or information that may reveal the whereabouts of a person who is suspected of having committed the offence will be found in a building, receptacle or place in the province; and*
>
> *(c) it would not, in the circumstances, be appropriate to make an order under subsection 18(1).*

7. Subsection 12(1) requires that a judge be satisfied that an offence has been committed. "Offence" is defined by section 2 of the *Act* to mean "an offence within the

meaning of the relevant agreement". The *Treaty* is the relevant agreement to this request. [2] Article I of the *Treaty* defines "offence" as follows:

> *"Offence" means*
>
> *(a) for Canada, an offence created by a law of Parliament that may be prosecuted upon indictment, or an offence created by the Legislature of a Province specified in the Annex;*
>
> *(b) for the United States, an offence for which the statutory penalty is a term of imprisonment of one year or more, or an offence specified in the Annex;*

## D. THE U.S. REQUEST FOR ASSISTANCE

### 1) Overview of the Request

8.      On December 15, 2011, the United States requested assistance[3] pursuant to the *Treaty*. The U.S. authorities forwarded further information on December 28, 2011 and January 4, 2012.[4] On January 5, 2012, counsel in the International Assistance Group ("IAG") of the Department of Justice, Ottawa, Canada, in accordance with the *Act*, approved the treaty request[5] authorizing the Attorney General to apply for a search warrant to obtain evidence located on these servers of Mega Conspiracy's unlawful activities. Subsequently, on January 17, 2012, the U.S. authorities provided further information changing the manner in which the search and seizure of the data was to be conducted.

9.      The U.S. authorities, specifically the United States Attorney's Office for the Eastern District of Virginia and the U.S. Department of Justice, Computer Crime and

---

[2] Attached to this Affidavit as Exhibit "B" is the copy of the Treaty between Canada and the U.S.

[3] Attached to this Affidavit as Exhibit "C" is the copy of the initial request for assistance dated December 15, 2011

[4] Attached to this Affidavit as Exhibit "D" is a copy of the Supplemental information dated December 28, 2011 and January 4, 2012

[5] Attached to this Affidavit as Exhibit "E" is a copy of the Minister's Approval dated January 5, 2012

Intellectual Property Section, along with the Federal Bureau of Investigation (the "FBI"),
are requesting assistance that will assist in the investigation and subsequent
prosecution of several individuals for the following American offences:[6]

### Title 18, United States Code, Section 2. Aiding and abetting.

(a) Whoever commits an offence against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

    * * *

### Title 18, United States Code, Section 371.  Conspiracy.

If two or more persons conspire…to commit an offence against the Unites States…and one or more of such persons do any act to effect the object of the conspiracy, each shall be…imprisoned not more than five years…

### Title 17, United States Code, Section 506.  Criminal Copyright Infringement.

(a) Criminal Infringement.

(1) In general – Any person who wilfully infringes a copyright shall be punished as provided under section 2319 of title 18, if the infringement was committed

    (A) for purposes of commercial advantage or private financial gain;

    (B) by the reproduction or distribution, including by electronic means, during any 180-day period, of 1 or more copies or phonorecords of 1 or more copyrighted works, which have a total retail value of more than 41,000; or

    (C) by the distribution of a work being prepared for commercial distribution, by making it available on a computer network accessible to members of the public, if such person knew or should have known that the work was intended for commercial distribution.

### Title 18, United States Code, Section 2319.  Criminal Infringement of a Copyright.

---

[6] Exhibit "A", request for assistance, dated December 15, 2011, pages #7 to 9

*(b) Any person who commits an offence under section 506(a)(1)(A) of title 17*

> *(1) Shall be imprisoned not more than 5 years, or fined in the amount set forth in this title, or both, if the offence consists of the reproduction or distribution, including by electronic means, during any 180-day period, of at least 10 copies of phonorecords, of 1 or more copyrighted works, which have a total retail value of more than $2,500…*

### Title 18, United States Code, Section 1956.  Laundering of Monetary Instruments

*(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity*

> *(A)(i) with the intent to promote the carrying on of specified unlawful activity…*

*shall be sentenced to…imprisonment for not more than twenty years,…*

*(2) Whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States*

> *(A) With the intent to promote the carrying on of specified unlawful activity;…*

*shall be sentenced to…imprisonment for not more than twenty years,…*

*(h) any person who conspires to commit any offence defined in this section or section 1957 shall be subject to the same penalties as those prescribed for the offence the commission of which was the object of the conspiracy.*

### Title 18, United States Code, section 1957, Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity.

*(a) Whoever…knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity, shall be punished as provided in subsection (b).*

*(b)(1) Except as provided in paragraph (2), the punishment for an offence under this section is…imprisonment for not more than ten years…*

*Title 18, United States Code, Section 1962. Prohibited Activities of
the Racketeer Influenced and Corrupt Organizations Act.*

*(c) It shall be unlawful for any person employed by or associated with any
enterprise engaged in, or the activities of which affect, interstate or
foreign commerce, to conduct or participate, directly or indirectly, in the
conduct of such enterprise's affairs through a pattern of racketeering
activity…*

*(d) It shall be unlawful for any person to conspire to violate any of the
provisions of subsection (a), (b), or (c) of this section.*

*Title 18, United States Code, Section 1963.  Criminal Penalties for the
Racketeer Influenced and Corrupt Organizations Act.*

*(a) Whoever violates any provision of section 1962 of this chapter shall
be…imprisoned not more than 20 years…*

## 2) GROUNDS TO BELIEVE AN OFFENCE HAS BEEN COMMITTED

10.   The following is a list of the persons involved and companies alleged to be part of

the "Mega Conspiracy."  The people and companies whose names appear in bold are

referred to in this affidavit:

- Kim Schmitz a.k.a. **Kim DOTCOM** a.k.a Kim Tim Jim Vestor
- Finn Batato
- Julius Bencko
- Sven Echternach
- **Mathias Ortmann**
- Andrus Nomm
- Bram Van Der Kolk
- **Megaupload Limited** (Hong Kong, China)
- **Carpathia Hosting Inc**. (Dulles, Virginia, U.S.)
- **Equinix, Inc**. (headquarters in California, data centre located in Toronto)

11.   In March, 2010, the FBI Intellectual Property Rights Unit initiated an investigation

of a worldwide criminal organization collectively dubbed the "Mega Conspiracy."  The

conspiracy involves the persons identified in the preceding paragraph, and a number of

associated companies under their direct control who are members of the Mega Conspiracy. It is alleged that the Mega Conspiracy has engaged in and facilitated criminal copyright infringement and money laundering on a massive scale around the world.

12.     According to documents obtained from the government of the Hong Kong Special Administrative Region Companies Registry, on or about September 7, 2005, DOTCOM registered the company Megaupload Limited in Hong Kong with company registry number 0835149.

13.     According to information publicly available through a domain name search over the Internet, Megaupload Limited is the registered owner of the website Megaupload.com.

14.     In addition, on or about May 20, 2006, DOTCOM registered the company Megavideo Limited in Hong Kong with company registry number 1046619. According to information publicly available through a domain name search over the Internet, Megavideo Limited is the registered owner of the website Megavideo.com.  DOTCOM is listed as the company director of Megaupload Limited and Megavideo Limited.

15.     The following information is publicly available on the website Megaupload.com:

> The website claims the following: "Megaupload is the leading online storage and file delivery service on the Internet. Megaupload is the biggest and the fastest service of its kind."

> The website offers both free and premium access to its services. Non-paying users may upload files with a maximum file size of 2 Gigabytes ("GB") of data on servers leased by the Mega Conspiracy. Download capabilities and speed also are restricted for free users.

> Premium users may upload files of an unlimited size and may provide access to their uploaded files to an unlimited number of persons simultaneously. Currently the premium account costs €9.99 for one month; €59.99 for one year; and €199.99 for a lifetime premium membership. The premium membership also provides premium access to Megavideo.com.

16.  ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████ after a user uploads a file, Megaupload.com provides the user with a unique URL that allows anyone with the specific URL link to view or download the file. When a user takes a copyright-infringing file and uploads it to Megaupload.com, the website will give the user a link to access the file. An example of a link is: www.megupload.com/?d=BY15XE3V. Users make the URLs publicly available. The company does not distribute the URLs itself, but it has knowledge of and facilitates infringing activity. It is common to have many links pointing to exactly the same copyright-infringing file. The vast majority of users do not have rights to files that are uploaded (although it is of course possible, in limited circumstances, that a user may have the right to distribute a particular copyrighted work). If the file is a video, for example a motion picture or television program, then the provided URL can redirect users to Megavideo.com. A copyright owner can notify the website and demand that the copyrighted work be removed. These notices are commonly referred to as "takedown notices".

17.    When Megaupload does receive a takedown notice, the company only disables whatever links are specified in the notice.  Even though the company knows which file the links are pointing to, the company does not remove the file, so the offending file remains publicly available through the remaining links.  The directors of the company designed the system this way, and the result is that copyright-infringing works commonly remain on the system for months and years.

18.    The following are examples of copyrighted works ██████████████████████
███████████████████████████████████████████████████ which were all publicly available over the Internet at Megaupload.com and Megavideo.com from these content servers located in Canada:

a) ██████████████████████████████████████████████████
the copyrighted motion picture "*Rio*" from these content servers.  That motion picture had been released in United States movie theatres on or about April 8, 2011, only nineteen days earlier.

b) ██████████████████████████████████████████████████
the copyrighted motion picture "*The Hangover*" from these content servers.

c) ██████████████████████████████████████████████████
the copyrighted television program "*Game of Thrones*" (Season 1, Episode 8) from these content servers.

d) ██████████████████████
the copyrighted motion picture "*Madagascar 2*" from these content servers.

e) ████████████████████████████████████████████████ the copyrighted musical recording "*E.T.*" by Katy Perry, featuring Kanye West, from these content servers.

f) ████████████████████████
the copyrighted television program "*Medium*" (Season 5, Episode 3) from these content servers.

g) ████████████████████████
the copyrighted motion picture "*Bad Teacher*" from these content servers.

h) ███████████████ the copyrighted television program "*Lost*" (Season 5, Episode 15) from these content servers.

i) ███████████████ the copyrighted motion picture "*Jay & Silent Bob Strike Back*" from these content servers.

j) ███████████████████ the copyrighted musical recording "*Love You Like a Love Song*" by Selena Gomez & The Scene from these content servers.

19.    Though the average suggested retail price of a motion picture or television series on disc exceeds $19.00, works that are not commercially available are difficult to price because there is not a legitimate market for them (i.e. copyrighted works that are not available on disc at the time of infringement, such as the motion picture "*Rio*" described in the previous paragraph).

20.    Generally, courts in the U.S. have accepted evidence that these pre-release works are worth at least as much as the legitimate copies at the time of release, or a minimum of $19.00 per copy for both pre-release and released works.  For musical works, courts in the U.S. generally accept valuations of at least $.99 per song or $9.99 per album, which are the most common prices in the online marketplace.  Software prices vary greatly, so courts in the U.S. attempt to use the actual suggested retail prices of specific titles.

21.    Using these estimates and the FBI investigation into the breadth of titles available on Megaupload.Com and Megavideo.com, together with information publicly available on Megaupload.com claiming that the website has at least fifty (50) million daily users, it is clear that the infringement caused by these websites over the years

exceeds many billions of dollars. To be overly conservative, the U.S. authorities have estimated the loss amount at $500,000,000.00, which would be the estimated infringement amount caused in less than two weeks, if each daily user only downloaded a single infringing copy of a musical song at $4.99.

22.    According to the Alexa.com, a subsidiary company of Amazon.com that analyzes Internet traffic, on December 1, 2011, Megaupload.com was ranked as the 74th most visited website on the entire Internet, and Megavideo.com was ranked as the 162nd most visited. In comparison, on that same dated, nytimes.com was ranked 89th and netflix.com was ranked 101st.

23.     since November 2006, Megaupload.com and Megavideo.com have received hundreds of thousands of copyrighted content takedown notices.

### 3) Evidence of the Offences will be Found in Ontario

24.    ████████████████████████ the Mega Conspiracy has leased approximately three-hundred (300) computer servers from Carpathia Hosting, Inc. According to Carpathia Hosting's website, Carpathia.com, the company is an Internet hosting provider with its corporate headquarters located in Dulles, Virginia, with

data centres located throughout the United States and in Toronto, Ontario. Carpathia has a global business alliance with Equinix, Inc. Equinix Inc. operates a data centre in Toronto and, as explained below, ███████████████████████████████ servers used by the Mega Conspiracy are located at Equinix's data centre in Toronto

25.    I have visited Equinix Inc.'s website at equinix.com. According to the website the company operates data centres throughout the world, including a facility located at 151 Front Street, Toronto. The website contains a video about the Toronto data centre and includes information on its location, as well as the fact that it is staffed twenty-four hours a day by security and its facilities are under video surveillance and are monitored by its security operations centre in Tampa, Florida. The video depicts a front entrance to the facility that opens outdoors. A security officer sitting next to several video monitors is depicted controlling access to the facility near the front entrance. The company also uses security card access as an additional security feature and the video depicts a person entering the front door after swiping a card on a card reader. The video also bills the facility as Canada's premier data hosting centre and says that the Toronto facility has over fifty-eight thousand square feet.

26.    I am advised by Constable Jann Saccaro, of the R.C.M.P. that she attended the address of 151 Front Street West on January, 18, 2012 and observed the premises from the outside. Constable Saccaro also viewed the video on Equinix's website and her observations of the outside of the building match what is depicted in the video. She confirmed that the entrance to the building requires a security access card and she

confirmed that there is a security guard inside the entrance as depicted in the video, described above.

27.   ████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████   Megaupload Limited ordered 135 servers, each containing twenty-four 1.5 terabyte ("TB") hard drives (a single terabyte is equivalent to more than one million megabytes).

28.   In addition, ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████ the computer web server with IP address 174.140.175/28 is labelled "mega-yyz-082". In total, ████████████████████████████ these 135 servers are physically labelled mega-yyz-001 through mega-yyz-135. According to information publicly available through domain name searches of these IP addresses over the Internet, these servers can be accessed from the Internet via www165.megaupload.com through www299.megaupload.com       (and       www165megavideo.com       through www299.megavideo.com.).

29. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Megaupload Limited

ordered an additional 100 servers, each containing twenty-four 2 TB hard drives. ▮▮

▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ these servers are "hosted at 151 Front Street, Toronto,

Canada."

30.    Based on information ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and from

information publicly available through domain name searches of the associated IP

addresses over the Internet, these 100 servers can be accessed from the Internet via

www1200.megaupload.com    through    www1299.megaupload.com    (and

www1200.megavideo.com through www1299.megavideo.com).

31.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮ Megaupload Limited ordered 10 additional servers, each containing two 146 GB

hard drives, and a further 22 servers, each containing a single 1 TB hard drive.

32.    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ the servers were "hosted in Toronto, Canada,

151 Front St." ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ these servers (32 in total) are

physically labelled mega-yyz-1001 through mega-yyz-1032. ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

████████████████████████████████████████████████ It is these database/numbercrunching servers that the U.S authorities would like seized through the search warrant.

33. ████████████████████████████████████████████████████
████████████████████████████████████████████████████████

Megaupload Limited ordered another 16 servers, each containing two 450 GB hard drives, and an additional 16 servers, each containing two 2 TB hard drives. ███████████
███████████████████ these servers are also "hosted in 151 Front Street, Toronto, Canada."

### 4) An Order Under Subsection 18(1) would not be Appropriate

34.    An order under subsection 18(1), commonly known as an evidence-gathering order, requires the subject of the order to compile and produce information in response to the order by a deadline prescribed in the order.  In other words, after the order is served on a party, it is up to the party to compile whatever information or records are required by the order.  For ease of reference, subsections 18(1) and 18(2) are set out below:[7]

> *Evidence-gathering order*
>
> *18(1) A judge to whom an application is made under subsection 17(2) may make an order for the gathering of evidence, where he is satisfied that there are reasonable grounds to believe that*
>
> *(a) an offence has been committed; and*

---

[7] The entirety of section 18 is set out with the other relevant statutory provisions in Exhibit "A" of this affidavit.

(b) evidence of the commission of the offence or information that may reveal the whereabouts of a person who is suspected of having committed the offence will be found in Canada.

(2) An order made under subsection (1) must provide for the manner in which the evidence is to be obtained in order to give effect to the request mentioned in subsection 17(1) and may

(a) order the examination, on oath or otherwise, of a person named therein, order the person to attend at the place fixed by the person designated under paragraph (c) for the examination and to remain in attendance until he is excused by the person so designated, order the person so named, where appropriate, to make a copy of a record or to make a record from data and to bring the copy or record with him, and order the person so named to bring with him any record or thing in his possession or control, in order to produce them to the person before whom the examination takes place;

(b) order a person named therein to make a copy of a record or to make a record from data and to produce the copy or record to the person designated under paragraph (c), order the person to produce any record or thing in his possession or control to the person so designated and provide, where appropriate, for any affidavit or certificate that, pursuant to the request, is to accompany any copy, record or thing so produced;

(c) designate a person before whom the examination referred to in paragraph (a) is to take place or to whom the copies, records, things, affidavits and certificates mentioned in paragraph (b) are to be produced; and

(d) order a person named in it to answer any question and to produce any record or thing to the person designated under paragraph (c) in accordance with the laws of evidence and procedure in the state or entity that presented the request.

35.     As described above, the target of the search, Equinix Inc. is in a business relationship with the Mega Conspiracy.  While I have no information that Equinix Inc. or Carpathia are knowingly complicit in the Mega Conspiracy's copyright infringement scheme, given the co-ordinated arrests and searches and seizures that will be taking

place on January 19, 2012, it is my belief that it would not be appropriate in the circumstances to obtain the information by way of an evidence gathering order.

### 5) Physical Seizure of the Servers

36.    The request from the U.S. asks that Canadian authorities create mirror images of the servers. However, as explained below, the U.S. has recently asked that the servers themselves be physically seized from Equinix.

37.    On Tuesday, January 17, 2012, I was advised by my colleague Cpl. Ian Lee of the R.C.M.P.'s Integrated Technological Crime Unit ("ITCU") in London, Ontario that the ITCU was concerned about the resources required to create mirror images of the servers that are the subject of this warrant. The amount of data on the servers would require the R.C.M.P. to remain on-site at Equinix for a very long period of time, given how much data is contained on the servers. I am advised by Cpl. Lee that, assuming there are twenty-five (25) terabytes of data on the servers to be imaged, the process would take approximate twelve (12) days.

38.    I am advised by Cpl. Lee that he spoke to a member of the F.B.I on Tuesday, January 17, 2012, who told Cpl. Lee that the F.B.I. would be satisfied with having the servers themselves seized and mirror images created at a later date by the R.C.M.P. at their own facilities.

39.    I have reviewed email correspondence between counsel for the Attorney General of Canada in Toronto and counsel with the Department of Justice International

Assistance Group in Ottawa (IAG). 

because of the amount of data on the servers, it would not be possible to image the servers on site and that is why they decided to ask for the physical seizure of the servers.

## E. ASSISTANCE BY EQUINIX, INC.

40.     Due to the complex nature of the execution of such a warrant, it will be necessary to have co-operation by employees at Equinix, Inc. to execute the warrant.   As mentioned above, Equinix Inc.'s Toronto data centre is a very large facility and its facilities service the needs of many businesses.  Without the assistance of Equinix Inc.'s employees, the execution of the warrant would likely be frustrated.

## F. TIME OF ENTRY

41.     I have been advised by Sgt. David Wright of the R.C.M.P. that he was advised by the R.C.M.P.'s ITCU in London (who were in communication with the F.B.I.), that the time of the co-ordinated takedown (i.e. searches and seizures and arrests taking place across multiple countries) is planned for **Thursday, January 19, 2012 at 1:00 p.m**. Eastern Standard Time.  I have also been advised of the same takedown time by counsel for the Attorney General, who learned of the time for the takedown from the IAG.

## G. CONFIDENTIALITY

42.     The U.S. authorities are requesting that the file be sealed as confidentiality is necessary to minimize the risk of the subjects becoming aware of the other arrests and fleeing.  The subjects pose a risk of flight because financial records show that the Mega Conspiracy holds significant financial assets, currently in excess of twenty million U.S. dollars, that would allow its directors and employees to relocate in a short time period. Disclosure of the request could cause a significant and detrimental setback to the investigation.


43.     I swear this affidavit in support of an *ex parte* application, pursuant to section 11(2) of the *Act,* by counsel for the Attorney General of Canada for a search warrant, and a related assistance order and sealing order.



SWORN before me at the City     )
                                )
of Toronto, in the Province     )
                                )
of Ontario, this     [signature]     day of     )
                                )
January, 2012.                  )
                                )
                                )
[signature]                     )
_____)
**A Commissioner, etc.**                              **Daniel Raymond**

Lynne Anne Axmith, a commissioner,
etc., City of Toronto, for the Government
of Canada, Department of Justice.
Expires January 11, 2014.