# EXHIBIT 6

IN THE DISTRICT COURT
AT NORTH SHORE

KIM DOTCOM
Applicant

v

UNITED STATES OF AMERICA
Respondent

Hearing: 16 February 2012

Appearances: Mr Davidson QC and Ms Woods for the Applicant
Ms Toohey and Mr Sinclair for the Respondent

Judgment: 22 February 2012

---

**RESERVED JUDGMENT OF JUDGE N R DAWSON**
[Opposed Second Bail Application]

---

[1] The applicant, Mr Dotcom, and some of his associates are facing extradition proceedings to face charges in the United States of America of:

- Conspiracy to commit racketeering.

- Conspiracy to commit copyright infringement.

- Conspiracy to commit money laundering.

- Criminal copyright infringement by distributing copyrighted work being prepared for commercial distribution on a computer network and aiding and abetting of copyright infringement.

- Criminal copyright infringement by electronic means and aiding and abetting of copyright infringement.

[2] This is the second application for bail by Mr Dotcom. His first application for bail was declined by Judge McNaughton in a judgment dated 25 January 2012 which was subsequently upheld on appeal by Asher J in the High Court on 3 February 2012. The background to this matter has been traversed in the decisions of Judge McNaughton and Asher J and are not repeated in this judgment.

[3] This application is made on the basis that since the first bail application was heard and determined, fresh and new information has been obtained and/or a change of circumstances has arisen. The fresh new circumstances upon which the applicant relies are as follows:

(a) An affidavit by Ms Bonnie Lam, the Hong Kong Chief Financial Officer of Megaupload, has been filed. It is submitted that her affidavit supports the applicant's contention that following the execution of restraining orders against him he has no funds or assets available to him that could potentially be used to facilitate his possible flight or departure from New Zealand.

(b) Information is now available to confirm that the United States of America does have extradition treaties with Germany and Finland, whereas the decisions of Judge McNaughton and Asher J were made upon the understanding that such treaties did not exist.

(c) That the applicant has only two current passports (one Finnish and one German) and not three as previously asserted.

(d) That evidence has now established that the New Zealand Police and the Crown knew of the applicant's Rabobank account prior to his first bail hearing and failed to advise Judge McNaughton and Asher J. The significance of this, it is submitted, is that it is not a previously undetected bank account identified after the first bail hearing.

(e) That no steps have been taken by the applicant or anybody on his behalf to re-establish Megaupload subsequent to the applicant's arrest.

(f) That no new evidence has been located or found by the police during its search and seizure operations. Also no further funds or assets in the name of the applicant or under his control have been located or identified that contradict the applicant's assertion that all his assets and financial resources have been restrained within the orders made by the Courts in New Zealand, Hong Kong and the United Kingdom.

(g) During the High Court appeal evidence was heard about a Mr Brooke William Bartlett, a person with a significant history of fraud including the use of fraudulent identities, attempting to contact the applicant during his remand in prison. The applicant is now able to produce another unsolicited communication from Mr Bartlett which confirms that he made his approach to the applicant without any request to do so by the applicant.

(h) That present indications are that an extradition hearing is likely to take four days and is unlikely to occur before the end of May 2012 and more likely not until July 2012. It is submitted that the period of remand is likely to be lengthy, is consequently onerous, and effectively punitive upon the applicant notwithstanding that no criminal conduct has been established.

(i) The applicant submits that the respondent has failed to prove to the requisite standard that there is just cause for the continued detention of the applicant in custody and has failed to establish any facts upon which an inference can reasonably, logically and properly be drawn that the applicant is a flight risk.

[4] The application is opposed by the respondent. It is submitted that the applicant must show that there has been a material change in circumstances: *B v Police (No. 2)*[1].

---

[1] [2000] 1 NZLR 31

It is submitted that none of the grounds set out in this new application for bail reflect new, fresh or changed circumstances that would justify a departure from the earlier decisions that declined bail. In addition, none of the grounds now raised displace the findings of Asher J that the applicant's previous convictions should have been taken into account when addressing flight risk.

[5] In *Manihear-Mako v Police*[2] Fogarty J said in paragraph 6:

> It is well established that under the Bail Act successive applications for bail can be made. As a matter of practice, it is improper for counsel for applicants to take advantage of this power under the Bail Act where they do not have new material or changes in circumstances which might justify a departure from the approach taken on the earlier occasion.

[6] In considering whether the applicant has established that there are new, fresh or changed circumstances, the affidavit of Ms Lam on its own would not justify a new consideration of bail, as her evidence is effectively just restating the assertions previously made by the applicant. However, the existence of extradition treaties between the United States of America with both Finland and Germany is a new circumstance. That the New Zealand Police and FBI of the United States of America do not appear to have come to light with any new evidence subsequent to the applicant's arrest notwithstanding the considerable investigative powers and resources at their disposal is also a new factor. The remaining submissions do not establish new or changed circumstances and they do not justify the hearing of a new bail application.

[7] Overall I am satisfied that sufficient new and changed circumstances exist as envisaged in *Manihear-Mako v Police* for this new bail application to be heard.

[8] It is accepted by counsel that s 8 Bail Act is relevant to this hearing. Although in a rehearing of a bail application it is proper for the Court to consider all the factors in s 8 in coming to a decision, it is accepted by counsel that the crux of this application is whether the application is a flight risk as per s 8(a)(i).

---

[2] CRI-2005-409-000081

[9] In considering this second application for bail, this Court must start its considerations by recognising the presumption of innocence in favour of the application and the onus that is on the respondents to show that there is just cause to have the applicant remanded in custody.

[10] Asher J in his decision noted in paragraph 70 that the conjunction of the factors of:

- Mr Dotcom's previous convictions
- His various identities
- His three different passports
- His numerous credit cards under different names
- The package by his bed
- The presence of pistol grip shotguns

can all be seen as indicative of risk. He said that:

> They must be considered against the reality that there is nothing to tie Mr Dotcom to New Zealand except the significant incentive of exoneration and freezing of funds.

There was also:

> The significant risk of him avoiding the whole ordeal by a flight to Germany and a new life.

Each of these factors needs to be considered in light of the evidence now before the Court.

[11] There is no new evidence or change of circumstances with respect to the applicant's historical convictions. In paragraph [44] of his decision, Asher J said:

> Accepting that the 1994 offending took place when Mr Dotcom was a teenager, he does stand convicted of three different offences which reflect on his probity and willingness to abide by the law. The offending for insider trading and breach of trust in 2003 is of particular significance...............
>
> They were relevant to the issue of whether Mr Dotcom might break the law and depart from New Zealand.

The strength of this factor against granting bail remains unchanged.

[12] The applicant has three passports. The first is from the country of his birth, Germany and is in the name of Kim Schmitz, his birth name. The applicant's mother was born in Finland, which confers dual nationality upon the applicant and he is entitled to hold a Finnish passport. He holds two Finnish passports, the first in the name of Kim Tim Jim Vestor with an expiry date in 2015 and the other in the name of Kim Dotcom. The applicant has legally changed his name on two occasions and each passport was obtained in his legal name at that time. It is the applicant's understanding that the first Finnish passport in the name of Vestor would have been cancelled when he applied for a new passport from Finland in the name of Dotcom. Surprisingly no enquiries have been made of the Finnish authorities to confirm this. The applicant says he does not have possession of the Vestor passport (but prior to his arrest held the other two passports) and assumes that it is no longer valid following the issue of the Dotcom Finnish passport.

[13] The applicant is entitled to hold both his German passport and his Dotcom Finnish passport. He says he travels using the Finnish Dotcom passport and only ever uses the German Schmitz passport if in Germany for identification purposes. As observed by Asher J, paragraph [45]:

> These different names were not used as aliases in the sense of them being false names.

No evidence has been produced to show that the applicant has ever used any passport illegally, wrongfully or to mislead anybody. The evidence of Ms Lam during this hearing is that the applicant is a disorganised person in his personal affairs and does not get around to updating things as quickly as he could. Considering all the information now before the Court I am of the view that the existence of two of the passports does not indicate any flight risk. The possible existence of the Finnish Vestor passport indicates there is still some possible flight risk.

[14] The decision of Asher J records that at the time of his arrest the applicant was found to have 59 credit or bank cards under 13 different names. Some of these were variations of the KimTim Jim Vestor name. 21 of the cards were still valid and were under the names of Kim Vestor, Kim Tim Jim Vestor and Kim Schmitz and Kim

Dotcom. Asher J concluded that the existence of various identities and numerous bank cards cannot be ignored when assessing flight risk and his willingness to change his name over the years to avoid unwelcome past associations indicated the possibility he would do so again.

[15] The only new information to this Court with respect to the applicant's bank cards is the evidence of Ms Lam that the applicant is not a well organised person, which is why she was involved in caring for much of his personal financial affairs as well as the finances of Megaupload. The applicant's possession of so many expired cards would bear that out and indicate a degree of muddlement in the applicant's financial affairs. Expired bank cards would be of no flight assistance to him. Nevertheless, the existence of 21 valid bank cards in four different names remains as a factor indicating flight risk.

[16] The presence of a black bag containing two passports and his bank cards found beside Mr Dotcom's bed at the time of his arrest and described as being within "grabbing distance" still remains as a flight risk factor. The obvious inference drawn by the respondent is that Mr Dotcom could grab that bag and leave at very short notice.

[17] Against that must be weighed the commonsense reason submitted by Mr Dotcom that he liked to keep them all in one place for ease of use. It is also significant that when the police entered his house to arrest him, Mr Dotcom left the bedroom and went into the safe room leaving that bag behind. If he had kept that bag containing the passports and bank cards to enable him to abscond without notice it might be expected that at the time of crisis such as this, he would have kept the bag with him if that were the purpose of having the bag. That he did not take the bag with him tends to support his explanation.

[18] Asher J in his decision at paragraph [54] concluded that:

> Possession of these firearms by Mr Dotcom knowing that he should get a licence, indicates an indifference to the law and a willingness to take steps to ensure self preservation that go far beyond those which an ordinary New Zealander would contemplate.

This remains as a factor to be considered when assessing flight risk.

[19] From new information available for this bail hearing it transpires that there are extradition treaties between the United States of America and Germany and also with Finland. Article 7(1) of the United States of America/German treaty says:

EXTRADITION OF NATIONALS

(1) Neither of the Contracting Parties shall be bound to extradite its own nationals. The competent executive authority of the Requested State, however, shall have the power to grant the extradition of its own nationals if, in its discretion, this is deemed proper to do and provided the law of the Requested State does not so preclude.

[20] Article 16(2) of the Basic Law for the Federal Republic of Germany (Grundgesetz) states:

No German may be extradited to a foreign country.

The United States of America/German Treaty goes on to say in article 7(3):

If the Requested State does not extradite its own national, it shall, at the request of the Requesting State, submit the case to its competent authorities in order that the proceedings may be taken if they are considered appropriate. If the Requested State requires additional documents or evidence, such documents or evidence shall be submitted without charge to that State. The Requesting State shall be informed of the result of this request.

[21] Similar provisions exist in the treaty between the United States of America and Finland. The situation as it now appears to be, is that if Mr Dotcom were to abscond to either Germany or Finland, he could not be extradited to the United States of America to face charges there, but he could be prosecuted within either of those countries. Absconding to either of those countries would not result in an immunity from prosecution. This weakens the respondent's opposition to granting bail, but it must be borne in mind that there are many other countries in the world that might be havens from prosecution.

[22] Mr Dotcom would require significant financial resources to abscond from this country and to live life on the run from the United States of America authorities. It is apparent that on any measure he is an extremely wealthy man. From the

affidavit of Glenn Alexander dated 13 February 2012 it is apparent that restraining orders have allowed the respondent to freeze bank accounts and seize assets of the applicant, his business associates and Megaupload in New Zealand, Hong Kong, United States of America, Australia, Germany, Netherlands and United Kingdom. It is Mr Dotcom's submission that he should be granted bail as he has disclosed his assets to the respondent and has no other financial resources at his disposal even if he wanted to abscond, which he denies.

[23] The position of the respondent is that it is highly likely that if Mr Dotcom does have other financial means available to him he therefore must have the means to abscond and also has a motive for avoiding prosecution.

[24] At the time of the first bail application (23 January 2012) Mr Dotcom was newly arrested (on 20 January 2012) and the respondent was actively engaged taking steps to locate all the assets of Mr Dotcom, his associates and Megaupload and to seize these assets and freeze their accounts. Mr Dotcom submits that he has co-operated with the authorities and has disclosed all his assets and bank accounts, and as at the date of this hearing (16 February 2012) no new assets or bank accounts have been discovered. He submits they would have been had they existed.

[25] In cross-examination, Ms Toohey put to Mr Dotcom and to Ms Lam, the existence of four bank accounts in the Philippines, two in the name of Kim Schmitz and two in the name of Megateam (a fully owned subsidiary of Megaupload) that have not been restrained. Mr Dotcom's explanation for these accounts was that they were set up by him to transfer funds to them for the maintenance and housing of his wife's family who live in the Philippines. His understanding is that there is not any money in these accounts at this time.

[26] The respondent has not conducted any examination of Mr Dotcom's likely income over recent years, which must have been high, compared it to the known assets and funds held in bank accounts for him, and estimated his likely expenditure to see if there is a significant unexplained differential that might lead to an inference that he does have other assets/bank accounts that had not so far been accounted for. The respondent's contention seems to be, that we know Mr Dotcom is extremely

wealthy and therefore there must be other assets/bank accounts we do not know about.

[27] Since Mr Dotcom's arrest on 20 January 2012 until the date of this hearing some 27 days later and notwithstanding the considerable investigative resources available to the respondent, no new evidence other than the four Philippine bank accounts, which appear to be empty, have been revealed. The respondent's submission, that there must be something more, effectively puts the applicant in the position of having to prove a negative. If as he says, he has no other assets or bank accounts, he cannot prove that to be so. The onus is on the respondent to show good cause why the applicant is a flight risk and should be granted bail. Other than the four Philippine bank accounts the respondent has produced no evidence of the applicant having financial resources available to him to assist any flight or evidence from which an inference of their existence can be drawn. A suspicion based only on the knowledge that the applicant is very wealthy is not enough, particularly now that the respondent has had much more time to investigate the applicant's financial affairs. This factor does not now weigh as heavily against granting bail as it did on 23 January 2012.

[28] Another change of circumstances is that since Mr Dotcom was refused bail, a number of his business associates facing the same charges have been granted bail. It is in the interests of justice that if some co-defendants are granted bail, so should the other unless a difference in circumstances exists that make a different outcome necessary.

[29] The respondent submits that such a difference in circumstances exists. It has submitted that:

    (a)    Mr Dotcom has prior convictions, his co-defendants do not.

    (b)    Mr Dotcom has far greater financial resources available to him. He is a 65% shareholder in Megaupload, Mr Ortmann is a 25% shareholder, Mr Van der Kolk is a 2.5% shareholder, and Mr Batato has no shareholding in Megaupload.

    (c)    Mr Dotcom was found with an illegal firearm on arrest, the others were not.

    (d)    Mr Dotcom had passports and bank cards in different names, the others did not.

The respondent submits that all these factors indicate that Mr Dotcom is a greater flight risk than his co-defendants.

[30]    In response, it is submitted for Mr Dotcom, that:

    (a)    Mr Dotcom's convictions are historical, some from when he was a teenager.

    (b)    Mr Ortmann would be at similar risk of flight. A 25% share in Megaupload is a very significant asset and in addition he has a bank account containing $20 million. Also Mr Dotcom has far more assets frozen by restraining orders than his co-defendants and therefore has more to stay and to fight for.

    (c)    There is an explanation for the illegal firearms that they were purchased by Mr Tempero under his firearms licence, and Mr Dotcom made no attempt to use a firearm that was in the same room with him at the time of his arrest.

[31]    That Mr Dotcom's co-defendants, who run the same prosecutorial risk as him, have bail is a factor in favour of granting him bail. However, the difference in circumstances raised by the respondent make Mr Dotcom's case for bail less strong than his co-defendants.

[32]    The anticipated length of time before extradition hearings can be heard is no different from that anticipated by Asher J in his judgment and therefore does not require consideration as a new or changed circumstance.

[33] The granting or refusal of bail is a discretion to be exercised after considering all the circumstances. The factors which indicate that Mr Dotcom is a flight risk include his name changes, a criminal record, multiple bank accounts in different names, the avoidance of lengthy prosecution, the risk of a lengthy sentence if found guilty, and loss of lifestyle. This is supported by the suspicion that he will still have significant unrevealed financial resources he can use to escape detection and live well.

[34] The factors against him being a flight risk include that he would live his life as a fugitive, he would be abandoning his expectant wife and three children and he would effectively lose all the considerable assets and bank accounts in a number of countries that have been seized or frozen by the respondent. It is submitted that he has a good defence to the charges and that he has every reason to stay and fight for his family's future and his seized assets.

[35] The most significant change since Mr Dotcom's first bail application on 23 January 2012 is the passing of time. The first bail hearing took place very soon after Mr Dotcom's dramatic arrest, high public interest and speculation and more importantly, large uncertainty as to the extent and location of Mr Dotcom's and Megaupload's resources and assets. Since that time, all known assets have been seized and are unavailable for Mr Dotcom's use or disposal. No new assets or accounts of any significance have been revealed since his arrest. Mr Dotcom's submission that he has not concealed any assets or bank accounts has largely been borne out.

[36] A suspicion that because Mr Dotcom is very wealthy means that he must have assets he has not revealed is not evidence of further assets and cannot now be used against him with the same force as before in his application for bail.

[37] In my view, after taking all matters now known to this Court into account, the factors relating to flight risk are not now of such concern that there remains just cause to continue to remand Mr Dotcom in custody once satisfactory bail conditions are imposed to alleviate the remaining concerns about his possible flight.

N R Dawson
District Court Judge