# EXHIBIT 7

**IN THE DISTRICT COURT**
**HELD AT NORTH SHORE**

| | |
|---|---|
| **UNDER** | The Extradition Act 1999 |
| **IN THE MATTER OF** | An application for bail |
| **BETWEEN** | **KIM DOTCOM** |
| | Applicant |
| **AND** | **THE UNITED STATES OF AMERICA** |
| | Respondent |

---

**AFFIDAVIT OF KIM DOTCOM**
**IN SUPPORT OF APPLICATION FOR BAIL**

---

Simpson Grierson
(William Akel)
Private Bag 92518
Auckland 1141

Telephone 0-9-358 2222
Facsimile 0-9-307 0331

**Counsel**
Paul Davison QC
PO Box 105513
Auckland 1143

Telephone 0-9-379 2227
Facsimile 0-9-308 9555
Email paul.davison@davison.co.nz

**Kim Dotcom, of Coatesville, Auckland, states:**

1.      That is my full name.  I am 38 years old.

2.      I was previously known as Kim Schmitz (the name given to me at birth) and later Kim Tim Jim Vestor.  I have legally changed my name to Kim Dotcom, and now conduct all of my affairs under that name.

3.      I am a founder and the principal shareholder of Megaupload Ltd (**Megaupload**).

4.      Megaupload is an internet file storage company.  Users of Megaupload are able to upload their digital files to the site and securely store them there.  This allows for the remote storage of large amounts of data and enables the person uploading the file to access the file from any location via the internet and also to be able to provide access to the file to any other person by means of the internet.

5.      Megaupload is one of a number of internet sites providing a file storage service, other such service providers include Rapidshare and  Dropbox.

**The current proceedings**

6.      On Friday 20 January 2012, I was arrested by the New Zealand Police, executing a provisional warrant for my arrest issued by the District Court at North Shore, following an application made by and on behalf of the United States of America seeking my extradition to the U.S. on charges of conspiracy to commit racketeering; conspiracy to commit copyright infringement, conspiracy to commit money laundering;  criminal copyright infringement by distributing a copyrighted work on a computer network and aiding and abetting of copyright infringement; copyright infringement by

electronic means and aiding and abetting of copyright infringement.

7.      When I made a first appearance before the District Court at North Shore on Friday 20 January 2012, I was remanded in custody by Judge McNaughton, as there was insufficient time available to the Court on Friday afternoon for it to hear and determine my application for bail.  Since that time I have been remanded in custody at the Auckland Central Remand Prison.

8.      I clearly and emphatically deny any criminal misconduct or wrongdoing such as is alleged against me in the indictment document issued by the United States District Court for the Eastern District of Virginia.  I absolutely deny the existence of any "Mega conspiracy" as is alleged by the United States government and deny that either I, or any of the other persons charged with me, were ever engaged in any criminal enterprise whatsoever relating to wilful reproduction and distribution of infringing copies of copyrighted works via the internet.

9.      The indictment document sets out under a heading "General Allegations" a particularised description of the alleged offending.

10.     This description and the particulars contained in it are in many instances incorrect and are certainly misleading.  In addition to containing inaccurate information the US government's "General Allegations" section omits to include highly relevant information pertaining to the business of Megaupload which is essential and necessary to any proper understanding of how the business operated.

11.     The business did not involve any reproduction or distribution of infringing copies of copyrighted works whatsoever. As noted above, Megaupload is essentially a file storage facility which is available to internet users to upload their own digital files to. Thereafter the user is provided with a link that the user can use or distribute so as to provide other users access to the file or files.

12.     Although not mentioned anywhere in the materials provided to this Court, or indeed to the US Court, each user is required to confirm their acceptance of terms and conditions of their access to the storage facility prior to each and every upload undertaken. Such terms and conditions stipulate a prohibition on any uploading of digital material or files in which the user is not the legal and authorised owner of the copyright or otherwise legally authorised to have and maintain a copy thereof.

13.     The information on the files uploaded by individual users is subject to privacy laws (such as the Electronic Communication Privacy Act, ECPA) and principles and is not searchable by Megaupload for that reason. Notwithstanding the extensive precautions taken by Megaupload, certain users would upload films, videos and other copyrighted and protected digital files with a view to then sharing access to those files with other internet users.

14.     Recognising the frequency of this practice, notwithstanding that it represented a breach of the terms and conditions of the site, Megaupload negotiated with major rights holders including the Recording Industry Association of America (RIAA), the Motion Picture Association of America (MPAA),

Disney, Warner Bros, Universal Pictures (in total approximately 180 principal and/or major rights holders) a facility that enabled such parties to take down and/or remove any offending breaches of their copyright materials directly, that is without prior reference to Megaupload. In addition to granting access to these principal and significant holders of entertainment related copyright, Megaupload also adhered to the provisions of the US Digital Millennium Copyright Act (DMCA), which while providing for a "safe haven" for internet operators whose sites are used by others for the transmission or storage of information in breach of the rights of the owners thereof provided they adhered to requirements to remove any offending items uploaded to the site within 24 hours of notice thereof from the relevant rights holder. Monitoring, complying and adhering to the requirement to take down and/or remove such offending material was and continued to be a significant part of the administration of the business aimed at maintaining the integrity of the Megaupload data storage base.

15.    The abovementioned provisions are those applicable within the United States of America. In other jurisdictions there is no such equivalent copyright restriction and in any instances parties who had a legitimate right to the use of or retention of copies of material which would be subject to copyright in the United States were found to upload such files onto the Megaupload database. Thus there were many instances of files being uploaded onto the database that would warrant removal or being taking down if parties within the United States which were not so susceptible by reason of the jurisdiction within which the relevant users resided. Further, while it might constitute an infringement to disseminate access to copyrighted materials held on Megaupload, some users legitimately use the service to store their own copies of

copyrighted material, for their own personal use. Such storage is not necessarily in contravention of the copyright interests of the rights holder. This presented an ongoing problem for Megaupload and the company was committed to ensuring that in every instance where there was a proper and legitimate basis to require a data file to be removed or taken down that it such was done so forthwith. The speed with which this was done was usually achieved within three hours of Megaupload being notified of the complaint and obviously well within the 24 hour period generally accepted as the maximum available time to respond. There have been somewhere in the order of 15 million take-downs, that figure being the sum of the take-downs conducted by the company pursuant to take-down notices and those files taken down directly by rights holders with direct access to effect take-downs.

16.   Recent estimates of the Megaupload.com site, indicates that it was being used to store something in the order of 12 billion files. Despite the enormous volume of files held via the Megaupload facility, the material located on the site found to be offending copyright interests is comparatively a very small proportion. The vast majority of Megaupload users use the file storage facility for entirely legitimate storage of personal and business related files.

17.   The US government summary alleges that US$175,000,000 has been derived by illegal activity. That figure is the total gross revenue of Megaupload.com over the last five years. That figure disregards the business costs and expenses incurred by the company, and it is certainly not the net profit figure. Business expenses were generally speaking in the order of 50% of gross revenue. The figure used by the US government also presupposes that all monies earnt by Megaupload are derived from the illegal use of the site.

18.    Megaupload has employed a number of sophisticated and very expensive mechanisms that preclude search engines (such as Google) from "crawling" over its database and thereby indexing its files.   While the US government contends that that measure would preclude the searching for files that breached copyright interests, in fact those measures and mechanisms preclude internet users of Google and similar search engines from deliberately searching for and locating files that breach copyright interests in order to take advantage of their availability.  This was Megaupload's means of both protecting the privacy of its users and preventing other internet users from utilising their data storage system for accessing such material.

19.    Although the US government's allegations place considerable emphasis on the existence of a user rewards programme, which it is alleged was created to generate interest in the usage of or access to files likely to be stored in breach of copyright, in fact the rewards programme was not at all directed at achieving such increased usage or attracting people to access files which were in breach of copyright such as films or music.   The rewards programme was initially established during the relatively early days of the company's operation and was modified progressively to the point where only paying members would be entitled to receive rewards and in every instance paying members were required to provide identification details which would enable Megaupload to know and identify the individual user.  This was seen as a disincentive to people to operate their usage in breach of copyright interests as they could be specifically identified and held accountable.   In 2008, Megaupload discontinued the usage of the rewards programme.  Following the withdrawal of the rewards scheme, usage of the site in fact increased and continued to increase thereafter, which I consider is a

fairly clear indication that the rewards programme was not aimed at increasing the number of users by promoting the use of the site to illegally disseminate copyrighted material.

20.   Notwithstanding the assertion made by the US Government to the effect that Megaupload "reproduces" the file uploaded by a user on one of its computer servers, such statement is incorrect.  It is the user of the facility who places a copy of the uploaded file onto the server.  Just as in any storage facility for tangible goods, it is a facility which is operated by Megaupload and it is not Megaupload itself reproducing the digital files or copying them.

21.   The above is a fairly brief outline of the principal matters of contest between the US government's complaint and me and my knowledge and understanding of how Megaupload in fact operates.  It is not intended to be exhaustive, but rather is intended to illustrate the fact that there are serious matters from the indictment which are in dispute.  As noted above, I am confident and firmly of the view that Megaupload has not at any time willingly or deliberately engaged in activities directed at reproducing or breaching material which is the subject of copyright.

22.   There is and was never any conspiracy;  there was no organised criminal activity such as could be described as racketeering;  there was no money laundering;  and there was no other activity aimed at aiding, abetting or assisting in any willing or knowing manner any breaches by others of copyright interests.

23.   In due course I will contest the US government's request for my extradition to the US, however at this stage I wish to provide the Court with a sufficient summary of the reasons for my contention that the US government's case against me

is weak, tenuous and unlikely to withstand close scrutiny in the Courts of either New Zealand or the United States.

**Crown's opposition to bail**

*Flight risk*

24. The Crown opposition to my application for bail emphasises the submission that I pose a "flight risk at the extreme end of the scale". I maintain that I present no flight risk whatsoever and the Court can be confident and reassured that if granted bail I will maintain and adhere to all and any conditions imposed and attend Court as and when required.

25. The basis upon which the Crown suggests that I am an extreme flight risk relies upon the following:

   a. *Significant financial incentive to continue offending*

   Due to the actions in the United States taken by the US government on Friday 20 January 2012, the entire operation of Megaupload and the operation of a number of its related and subsidiary corporations was effectively and emphatically terminated. There is no realistic prospect or possibility of restoring the business or recommencing the business having regard to both the seizure of the requisite servers and data storage equipment and to the seizure of all funds, monies and assets held both by Megaupload and by me personally. Further, it is likely that users would consider any new iteration of Megaupload as inherently unreliable as it could be subject to a further incident in which the US government takes action to close the site down and thereby prevents users from having legitimate access to their data.

   Until the merits of the US government's charges against me and my co-defendants, as well as the company, have

been determined there is no ability, let alone financial
incentive available to me, to try to continue to operate the
business as is alleged.  Indeed I have no financial ability
to conduct any business at all as all of my bank accounts
have been identified by the US government and have
been frozen due to the effect of the restraining order
issued by the Courts both here in New Zealand and in the
US.

b. *Resisting arrest*

The Crown maintains that I endeavoured to resist arrest
when the Police party arrived at my residence in
Coatesville to execute the arrest warrant and search
warrants.  I did not make any attempt whatsoever to
evade the police or avoid arrest.

At the time of the arrival of the Police party I was in my
bedroom and the first I heard of anything unusual
happening was when, without any announcement as to
who was responsible, the secure door of my bedroom was
pounded upon.  My bedroom is large and the door at
which the attempt to enter was being made is well away
from the bed in which I was lying at the time.

Because of concerns I have for my own personal safety, I
had put in place security protocols for both myself and my
wife and family with particular emphasis on the safety of
my wife and children because of my belief that they might
attract the attention of criminals.

Acting in accordance with these security protocols, on
hearing the door of my room being pounded upon I
immediately retreated to a lockable panic room which is
accessed from the main master bedroom.  This room was
a feature of the house that had been included by the

previous owner. I went to the panic room because, at that time, I was in a state of fear and panic at the prospect of some person or persons, at that time unknown to me, forcibly attempting to gain entry to my bedroom.

Upon arrival in that panic room, which itself is quite large (about 20m long) I sat down on the floor. I was anxious and afraid and was unsure of what was happening. It was at that time that I first heard a voice, or voices, coming from my bedroom area stating that they were the Police. I was worried and frightened at the prospect of opening the door for them in case they should misunderstand my actions and shoot me. I therefore remained where I was.

Although there was a gun safe in the secure room in which I was seated it was located at the far end of the room from where I was seated. There was little or no furniture in the room apart from the gun safe. Inside the gun safe was a 12 gauge shotgun and stock. The stock was disconnected from the shotgun, but the stock could be readily reconnected. The shotgun had some rubber or plastic rounds of ammunition in the magazine. In our discussions about security I had always insisted to my security advisor that I did not wish to have any weapon and ammunition that might cause serious injury or worse. It was agreed that the firearm would have rubber bullets, which although they would cause injury were unlikely to have any more serious effect. While the firearm was not licensed to me I was intending to apply for a firearms licence. It was the same form of firearm as was located in my security advisor's own gun safe in his accommodation wing on the property.

I never thought to uplift the shotgun in the gun safe in my room even though I walked past the gun safe when

entering the panic room. The gun safe was closed and the firearm had no relevance whatsoever to any suggestion that I might have been minded to resist arrest or evade the Police.

Once the police had gained access to the panic room, I made no attempt to resist arrest or do other than cooperate fully. The police accosted me during which I was punched in the face, pushed into a prone position, handcuffed with some plastic arm restraints and physically held down. I suffered grazes and some minor lacerations as a result of this "treatment". I made it clear to the Police that I had no intention of doing anything other than fully cooperating with them. I was subsequently taken outside where other members of my family and staff were seated on the ground and were similarly restrained and were being detained by the Police party.

After a period I was allowed to return inside my house and some clothing was obtained for me suitable for me to wear to the Police station ( I had been in night attire at the time of the Police arrival).

So far as I am concerned there was no absolutely basis whatsoever for the Police to anticipate any resistance or lack of full cooperation by me to any request by them for cooperation either in the execution of a search warrant or an arrest warrant. The arrival of a heavily armed assault party at my residence early on Friday 20 January 2012 resulted in wholly unnecessary anxiety and distress being caused to my family and staff. My wife, Mona, is in an advanced state of pregnancy, carrying twins. In that state she was particularly susceptible to any anxiety and distress or shock such as must have been anticipated to have been the result of the strategy and tactics employed

by the authorities.  I am frankly appalled at the failure of those responsible for planning this operation to have regard to the safety, welfare and wellbeing of my wife and children, not to mention other members of my household.

I note that amongst the Crown discovery is a Police job sheet of Senior Constable Jason Homan.  Constable Homan had visited our residence the day before I was arrested, on 19 January, for the purpose of speaking with one of my security staff, regarding arrangements to ensure the Police were properly briefed and informed to respond to any breach of our security at home.  I note that in the course of discussions with my security officer, Senior Constable Homan was told that my wife was pregnant.  Senior Constable Homan subsequently reported fully to his supervisors before the operation was conducted and apparently produced a covertly obtained videotape showing aspects of our property and its layout. The authorities could not have been unaware of the vulnerability of my wife in the state she was in having regard to her pregnancy.

c.  *Prior use of private transport (chartering of private jets etc)*

The Crown suggest that I am a flight risk as I have previously used international means of transport such as chartered private jets.  That is true.  I have previously chartered a private jet for international travel, however the fact that I have done so does not in any way make me likely to be a flight risk and to be in a position to leave the New Zealand jurisdiction.

When chartering a jet all customs formalities for international travel need to be adhered to and charter companies and pilots in command ensure that such

formalities are scrupulously met.   There is no way that anyone chartering a jet can bypass customs formalities.  I respectfully suggest that such knowledge as I have of alternative means of transport provides no indication whatsoever and is entirely irrelevant to any issue of flight risk.

Further I note that as all of my bank accounts have been frozen, I would not have the financial means with which to charter and pay for private transportation.

### d. Disregard for authority

The Crown have also presented the Court with the Police opposition to bail document in which it is stated that the FBI believe that my history of having been involved in speeding during the Gumball rally indicated a disregard for public safety and an unwillingness to obey officials. My involvement in the Gumball rally took place many years ago when I was a single man.   The speeding referred to and filmed, and which I presume is the source of the FBI concern, was in fact driving undertaken in Morocco on a closed section of road in circumstances where entrants in the rally had official approval to exceed the local speed limit and there was no speed limit applicable at all.  Whilst it was foolhardy and dangerous to drive in that fashion, and I see it in that light with hindsight, there is absolutely no connection between my involvement in that Gumball rally and any notion that I am either reckless or unwilling to obey officials.   I believe that my response to the police attendance at my home last Friday clearly demonstrates my willingness and cooperation with officials acting in the execution of their duty.

*e. Allegation that I have previously fled the jurisdiction to evade prosecution*

The Crown submit that I have shown a propensity to evade prosecution previously by having fled a jurisdiction. That is entirely incorrect.

Whilst a resident of Germany I became involved in a proposal to invest 1.4 million euro in shares in an internet based company that I had purchased shares in previously for a price equivalent to 360,000 euro.   I was also proposing to use a venture capital vehicle, Kim Vestor Gmbh to assemble further funds from a number of investors to acquire further shares in the internet company.

While on holiday in Thailand I learnt via the internet that charges had been laid against me in Germany, and that my conduct was being treated as "insider trading".   As a reaction and in response to finding out that charges had been laid I gave an interview to a television channel in which I rather foolishly commented that if young business entrepreneurs like me in Germany were being treated in this fashion, I would consider living elsewhere.   I was commenting on the manner in which I had been treated, and was certainly not indicating any unwillingness to return to Germany to face the charges.

The German authorities proceeded to obtain a warrant for my arrest.  There followed an unusual sequence of events by which the German embassy in Thailand required me to surrender my German passport to them, following which I was informed by the Thai authorities that as I had no current travel papers and document, I was required to leave Thailand.   At that stage I agreed to return to

Germany and I was accompanied by two German Police detectives. I was not deported. More importantly, at the time I left Germany no charges had been laid against me and I certainly did not leave the German jurisdiction to evade prosecution. I was away from Germany on a fortnight's holiday with the full intention of returning at the end of the holiday in any event.

f.   *Previous convictions*

Under German law, convictions are subject to an effective "clean slate" provision. Attached hereto, marked "**A**", is a copy of a German Federal Office of Justice "certificate of good conduct", together with an English translation thereof. This Certificate of Good Conduct in the name of Kim Schmitz (my former name) confirms that on a formal basis I have no prior convictions in Germany. Notwithstanding this certificate I confirm that when I was a teenager in Germany I became involved in hacking computers as a result of which I faced charges and was placed on probation. Following the publicity associated with that matter, I was approached by a number of companies that were concerned about their computer systems being hacked and I started a business to assist them with securing their computer networks and protecting them from hackers.

At the same time as the insider trading charges for which I was convicted, I also received a conviction in relation to alleged misuse of business funds. I was involved in a business with an investor who held 5% of shares and I held the balance. I used some company funds to settle legal fees and failed to have regard to my fellow investor's interest in the company's funds. After he had made a complaint to the Police, I took steps to pay him the

equivalent sum as was used from his share of the company monies. I received a suspended sentence and was placed on probation.

That offending took place during my youth and early twenties.

Subsequently, I was also convicted of a regulatory offence in Hong Kong as a result of the purchase of shares in a company which exceeded a threshold of 5% and required notification of my interest. I failed to notify authorities that my share acquisitions totalled approximately 5.1% of the shareholding of the company. I was fined a sum of approximately US$1,200. This was treated and regarded as a minor regulatory breach. It was certainly unintentional and I respectfully suggest is no indication of any lack of respect for lawful restrictions. In this instance it was an oversight and was treated as such by the authorities and the Court in imposing the penalty.

I respectfully suggest that that offending, which has now been expunged by means of the clean slate legislation, is irrelevant to the present circumstances and charges and gives no indication of any propensity for unlawful conduct on my part.

g. *The use of aliases*

The Crown also point to the use of aliases, suggesting that as I have had a number of different names that in some way might enable me to effectively facilitate flight and travelling beyond the New Zealand jurisdiction.

Whilst I do have a history of having several names, it is not because of any intention to mislead people in a criminal or any other fashion. I was given the name Kim

Schmitz at birth.  Following the events surrounding my offending in Germany during my youth, I decided to change my name to avoid the negative associations of my given name with my hacking and minor criminal conduct. At that time I had a company called Kim Vestor and I decided to change my name to Kim Tim Jim Vestor.

My German passport was in the name of Kim Schmitz. When I changed my name to Kim Vestor I did so as a Finnish national and was issued a Finnish passport. I subsequently changed my name again from Kim Tim Jim Vestor to Kim Dotcom.  I customarily travel on the Kim Dotcom passport and my earlier Finnish passport I believe to be cancelled.  I still have my original German passport in the name of Kim Schmitz.  There is no way that this history of name changing is in fact properly described as using aliases because I do not use the names interchangeably or in different circumstances. I consistently use the name Kim Dotcom and the prior names are the result of the history summarised above.

*Domicile*

26.    Although I have been travelling to New Zealand regularly over the past several years, I did not move to New Zealand for residential purposes until September 2011.

27.    I had previously been granted permanent residency for myself and my wife and family in or around December 2009. We then decided that we wished to purchase a property here in New Zealand however due to the Overseas Investment Office declining our application to purchase the house in which we have been living, we decided that we would become ordinarily resident in New Zealand so as to be able to purchase the property.

28.     I have three children aged 4,3 and 1 and my wife is also the legal guardian of her two younger brothers aged 14 and 11. Prior to moving to New Zealand we resided in Hong Kong. We still maintain an apartment in Hong Kong although the lease on that apartment is shortly to expire.

29.     My wife and I have an option to purchase the large property in Coatesville where we have been residing and having relocated to New Zealand we have established a significant household of support staff.   It has been our intention to reside in New Zealand permanently and to bring up our children here.   To this end, we have enrolled my wife's brothers at a local school, where they are expected to begin attending at the end of this month.   We see New Zealand being advantageous to us and our family both in terms of its environmental benefits and personal security.

30.     Since residing in New Zealand I have endeavoured to demonstrate my commitment to this country and have made a number of charitable donations to causes and humanitarian projects.  In addition to myself, my wife and the children there are 42 New Zealand staff members engaged at our property in Coatesville as well as a further 8 Filipino staff members. These staff include nannies involved in the care of our children and the support of my wife, chefs and kitchen staff, household staff, gardeners and security staff, etc. I confirm that as a result of these charges and the restraining order seizing and freezing my business and personal funds, the employment of these 42 New Zealanders will inevitably be terminated.

31.     I note that in the opposition to bail form prepared by the Police, reference is made to an indication given by one of my security staff that my wife and I intended to travel back to Hong Kong for a couple of months.   That is true, but is no

indication of our intention of quitting New Zealand.  As my wife has confidence in a Hong Kong based Obstetrician who has attended her for the birth of our other children, she wished to return to Hong Kong and remain under his care during the period prior to the birth of the twins that she is now carrying.  Once the twins were born, we intended to return to New Zealand.

32.  Having regard to international safety criteria and conditions imposed for air travel, we understood that we needed to make arrangements for my wife to travel before she reached the later stages of her pregnancy.  Our intention to remain away from New Zealand for that period was purely and simply related to that matter and following the birth of our twins, we were planning to return to New Zealand and resume our permanent residency here.  There is nothing associated with the plans for travel to Hong Kong that would indicate any intention to quit New Zealand or to evade the authorities.

33.  I have developed strong ties to New Zealand and have no intention of leaving the jurisdiction.

**Risk of reoffending**

34.  The Crown has alleged that there is a significant risk of my offending whilst on bail, such that I should not be granted bail.

35.  As noted above, there is no ability for me to reinstate Megaupload either as it was prior to the police operation or as some new iteration of the site.  The seizing of the company's servers and the freezing of any resources would prevent me from attempting to do so.

**Destruction of evidence**

36.   The Crown have suggested that it was necessary to employ the armed offenders squad in an assault type raid on my property because of concerns that I would in some way attempt to destroy evidence by tampering with the company's computer system.

37.   In support of this the Crown refer to the Police computer experts being able to observe that some person was attempting to access the server located at the house while they were examining the computers located there.

38.   There is no ability for me to delete or destroy the company's data from my residence and I did not make any attempt to access my computers or the company's servers on Friday morning.   Further, I note that the server located at my residence is not related to Megaupload, but is, rather, the server used for the internal systems at the house.

**Summary/Conclusion**

39.   I respectfully suggest that the US government's case against me is not only misconceived but in its description by the US authorities as reproduced and presented to this Court by the Crown, the gravity of the alleged offending has been amplified well beyond anything that is either realistic or reasonable in relation to a description of the alleged misconduct.   Moreover the manner in which the New Zealand authorities have acted upon the request for my apprehension and arrest by deploying a large number of armed offenders squad members to execute a surprise assault operation on my residential property is remarkable in its inappropriateness given that such was entirely unnecessary.   At its worst, the US government's charges against me allege breaches of copyright which is generally a

matter dealt with by way of civil law remedies.   My legal advisors in the US and New Zealand have advised that there are good defences to any civil allegations of copyright breach by Megaupload and the whole issue arising from the US government's complaint is strongly contested.   I seek bail to enable me to remain in the community while awaiting developments and the anticipated receipt of a request by the US government for my surrender for extradition.   I can indicate that I will contest extradition.

40.   I assure the Court that I have no intention whatsoever of attempting to depart New Zealand or to in any other way do other than fully cooperate with the authorities pending determination of the US government's application. Furthermore, I wish to be at liberty so that I can fully and effectively brief counsel and my legal advisers both here in New Zealand and  in the US regarding the charges and proceedings, as well as the many other legal issues arising from the abrupt termination of the business.

41.   Finally I refer to my health.   I am aged 38 years and suffer from diabetes and hypertension.   I take medication for these conditions.   In addition, I have a slipped disk in my back and as a result have treatment to address back pain which is debilitating and can result in me being immobilised.   I currently follow a health regime that has involved me swimming each day and receiving a special electro based treatment to release muscle spasm in my back and thereby alleviate pain.   Without these treatments, I anticipate that I will be immobilised by the severe pain and discomfort of my back condition.

42.   I am advised that the US government have 45 days from the date of my arrest to present a request that I be surrendered by the New Zealand authorities for extradition.   As I intending

to challenge the extradition, I expect that the proceeding will be further delayed and that a decision on extradition may not be made for a period of months, possibly a delay of four to six months or even more if legal processes involve appeals. Such a period of time in custody would be significant, lengthy and present a very real hardship to me both physically and in terms of the effect that it will have upon my family. In particular I refer to the impending arrival of the twins and the ages of our other children. Finally I refer to the effect of a custodial remand on my ability to prepare for trial and the process of dealing with the many business consequences resulting from the recent legal developments initiated by the US government.

43.    I will faithfully attend to and comply with all conditions of bail if granted bail.


**SWORN** at Auckland the 23rd day          ]
of January 2012 before me:                    ]




**A Barrister and Solicitor of the High Court of New Zealand**