UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | |
| ) | |
| KIM DOTCOM *et al.*, ) | |
| ) | The Honorable Liam O'Grady |
| Defendants. ) | Case No. 1:12-cr-00003-LO |
| _____) | |

**RESPONSE BY DEMAND PROGRESS IN SUPPORT OF KYLE GOODWIN'S MOTION FOR RETURN OF PROPERTY AND IN REPLY TO MPAA MEMBER STUDIOS RESPONSE TO THAT MOTION**

As an interested non-party in the pending motion by Carpathia Hosting for a protective order regarding data on servers leased by Megaupload ("Mega Servers"), Demand Progress[1] supports Kyle Goodwin's motion for return of property and replies to MPAA Members ("MPAA") response to Mr. Goodwin's motion.

In the current motion, Mr. Goodwin asks the Court to exercise its equitable jurisdiction to ensure retrieval of property he lawfully stored on Mega Servers. Demand Progress urges the Court grant Mr. Goodwin's motion and, in kind, order the parties to facilitate all non-party Megaupload users in retrieval of all files (or copies of files) they stored on Mega Servers. Such an order would preserve the presumption of innocence, protect the rights of non-parties, and stop an end-run around recent congressional rejections of these types of broad Internet seizure actions. The MPAA has no legal basis

---

[1] Demand Progress is an online community dedicated to Internet freedom with more than one million members, many of whom make use of online data storage at a variety of sites including Megaupload. Member names are available at: http://theinternetvshollywood.com.

to urge this Court to do the opposite and allow owners to retrieve only that property which MPAA deems "non-infringing."[2] Demand Progress herein explains why the Court should deny this request and instead encourage MPAA to use customary remedies to pursue with specificity the infringement claims they allege against unspecified, unnamed non-parties.

**I. MPAA Members Are Urging the Court to Violate the Presumption of Innocence**

Demand Progress asks the Court to reject the MPAA Members' arguments and, in turn, observe the fundamental principle that Americans are presumed innocent until proven guilty. Counts 2, 4 and 5 of the indictment, alleging criminal copyright infringement, are still unproven.[3] This is particularly the case since the allegation rest on novel and questionable legal theories[4] about the application of 18 U.S.C. §§ 2319(b)(1) & 2319(d)(2); 17 U.S.C. §§ 506(a)(1)(A) & 506(a)(1)(C). Indeed, questions surrounding proper service of documents on the defendant may cause this case to be dismissed.[5]

Given that no criminal infringement has yet been found by the Court, the MPAA has no legal basis to ask the Court to pre-judge the outcome of the infringement claims by only returning "non-infringing" files to non-party Megaupload users like Kyle Goodwin. Should the United States' charges not bear fruit or the Defendants later be found not

---

[2] Response of Interested Non-Party MPAA Member Studios to Interested Party Kyle Goodwin's Motion for Return of Property (June 5, 2012) (Doc. No. 98) (hereinafter, "MPAA Brief").
[3] Indictment of *United States v. Kim Dotcom, et al* (Jan. 5, 2012) (Doc. No. 1).
[4] *See, e.g.*, Jennifer Grannick, *Megaupload: A lot less guilty than you think*, Stanford Law School Center for Internet & Society Blog, Jan. 26, 2012 *at* http://cyberlaw.stanford.edu/node/6795 (discussing the novel nature of the prosecution's belief that secondary copyright liability can form the basis for criminal liability).
[5] *See id*; David Fisher, *Dotcom trial may not occur - Judge*, New Zealand Herald, Apr. 21, 2012 *at* http://nzherald.co.nz/business/news/article.cfm?c_id=3&objectid=10800409.

guilty, the seizure of the Mega Servers in the first place will be suspect. To even entertain the MPAA's suggestion, the Court would have to assume the truth of the prosecution's most controversial allegations: namely that copyright infringement has occurred. On its face, the MPAA's request is suspect and asks the Court to bootstrap the guilt of parties onto a collateral motion, prior to a judgment.

Inquiries into infringing property should be made, instead, through existing channels, not a new criminal shortcut. The MPAA argues otherwise, asserting, without support, that "MPAA members and other rights holders are certain to own the copyrights in many of the files stored on the servers."[6] Therefore, the MPAA reasons, property owners should prove their property non-infringing before the Court permits them access to it. This is akin to arguing that when a thief rents a hotel room and is caught, the contents of all of the guests' luggage should be presumed contraband until proven otherwise. This result would be absurd and unreasonable. While, the presumption of a file's infringing status might fairly attach to an indicted Defendant's property, it is a brave new claim indeed to extend that presumption to innocent third parties whose property is seized in an unrelated criminal investigation. In the digital world, private persons who lose their vacation photos, graduation videos, or garage band recordings will be left without their property and without a practical remedy.

**II. Selectively Returning Files is Impracticable and Outside This Court's Purview**

Return of only "non-infringing" files, as MPAA requests this Court to do, is impractical given the scale of stored files involved and outside the scope of this criminal

---

[6] MPAA Brief at 1-2.

proceeding that does not name all Megaupload users. The MPAA essentially asks this Court to repeatedly replicate on a massive scale the very judicial determination of whether infringement has occurred or not. As evidenced by the complicated and controversial nature of the legal questions involved in this case, it is facially impracticable to ask the Court to issue an order complying with MPAA's request. Moreover, MPAA's request would improperly use Court powers to aid in MPAA's unrelated, extra-judicial business goals and unduly prejudice the Defendants.

The United States has even recognized the impractical nature of such a determination. In the United States' own statements to foreign Courts, it has complained of the time-consuming nature of retrieving data on Mega Servers.[7] Yet, in this case, the United States, and the MPAA, propose that Kyle Goodwin, and any other non-party, undertake such an effort by themselves. In proceedings substantially related to this case, Judge Winkelmann of the High Court of New Zealand restated the United States' difficulties accessing data on the Mega Servers:

> The investigation has included analysis of computer servers rented in United States by the respondents' business, the contents of which are very large.... In an affidavit filed in the related judicial review proceedings, Special Agent Michael Postin of the Federal Bureau of Investigation stated that the New Zealand items alone are estimated to contain more than 150 terabytes of data, and it has previously taken 10 days of full time work to image certain items representing 29 terabytes. The process of providing forensic images of the New Zealand items not already copied will take a minimum of two and a half months…. The United States is not able to provide readable copies of the items it has imaged while much of the content remains encrypted.[8]

Though Judge Winkelmann acknowledged the extraordinary labor involved in

---

[7] See *In the Matter of App. for Jud. Review Between the U.S. and Kim Dotcom, Finn Batato, Mathias Ortmann & Bram van der Kolk*, Res. Judg. of Winkelmann J ¶ 19-20 (High Ct. of New Zealand June 15, 2012).
[8] *Id.*

4

accessing data on Mega Servers, he concluded that the United States has the resources to achieve the task.[9] However, it is patently unreasonable to expect ordinary Megaupload users like Kyle Goodwin and Demand Progress's members to expend comparable time and resources that burden even the United States Government. In reality, forcing ordinary individuals to shoulder the costs of data-mining for these files would result in an outright deprivation of their own property. This would create an extreme inequity, especially since the property may have been unreasonably seized in the first place, and there has never been an actual finding of infringement.

Granting MPAA's request to further restrict Megaupload users' access to seized property goes beyond the proper scope of this case and would greatly widen the inequities in this case. Screening for content that MPAA unilaterally deems non-infringing would add an arbitrary and nonjusticiable element to the return of the seized files. MPAA's response brief does not propose any mechanism or means by which the Court could possibly assist MPAA in achieving these business goals. Moreover, MPAA does not cite to any legal authority whatsoever to support their request. In short, MPAA urges the Court to add additional expense and onerous requirements for the retrieval of property by innocent Megaupload users.

Notably, MPAA can file its own lawsuits, under the Copyright Act, to protect its member's interests. It has already announced its contemplation of civil litigation[10] through which it could find adequate remedies for its allegations of copyright infringement within Mega Servers. But in the case at hand, no infringement has yet been

---

[9] *Id.* at ¶ 24.
[10] January 31, 2012 Letter from S. Fabrizio to P. Weber at Memorandum of Law in Support of Emergency Motion for Protective Order by Non-Party Carpathia Hosting, Inc, Exhibit F, (Mar. 20, 2012) (Doc. No. 39).

established, so the costs of enforcing such hypothetical claims against unnamed parties are MPAA's future burden and not within the scope of these Court proceedings.

**III. MPAA and the United States Seek to Achieve Results Congress Declined to Approve**

Legislation[11] that sought to achieve the very results the MPAA now seeks to obtain de facto through mere seizure of Mega Servers -- *with or without a conviction* – was rejected by Congress. Specifically, the failed legislation tried to render inaccessible data on websites that host user-uploaded files, and to do so at the request of private parties like MPAA, without due process for targeted business owners and users.[12] This legislation, embodied most recently in two bills, called the Stop Online Piracy Act[13] in the United States House of Representatives and the Protect IP Act[14] in the Senate, was defeated after numerous website operators shut down or otherwise protested the pending legislation on January 18, 2012.[15]

But the MPAA and the United States appear to be trying to enforce the spirit of the same secondary liability scheme that Congress had specifically failed to pass. In

---

[11] *See, e.g.*, Mark Lemley, David S. Levine & David G. Post, *Don't Break the Internet*, 64 STAN. L. REV. ONLINE 34 (Dec. 19, 2011) *at* http://www.stanfordlawreview.org/online/dont-break-internet.
[12] *Id.*
[13] H.R. 3261, 112th Cong. (2011).
[14] S. 968, 112th Cong. (2011).
[15] Ned Potter, *SOPA Blackout: Wikipedia, Google, Wired Protest 'Internet Censorship'*, ABC News (Jan. 18, 2012) at http://abcnews.go.com/blogs/technology/2012/01/sopa-blackout-wikipedia-google-wired-join-protest-against-internet-censorship/. The next day, January 19, 2012, the United States executed the search warrants against the Defendants in this case. *See* Corrected [Proposed] Response of Defendant Megaupload Limited to Emergency Motion for Protective Order by Non-Party Carpathia Hosting, Inc., at 5 (Apr. 6, 2012) (Doc No. 67-1).

discussing whether judge-made secondary liability for infringement can form the basis for novel and new criminal copyright violations, Stanford Law lecturer Jennifer Grannick clarified: "Congress considered and rejected statutes that would have created such liability, in COICA and PROTECT IP. In sum, due process doesn't allow incarceration under a civil legal theory that the Supreme Court dreamed up in 2005."[16]

In contrast, Congress *did* approve a means to address MPAA's allegations of infringement, namely the Digital Millennium Copyright Act (DMCA) of 1998, Pub. L. 105-304, 112 Stat. 2860 (1998). Title II of the DMCA created a safe harbor provision that places no burden upon any Defendant for "monitoring its service or affirmatively seeking facts indicating infringing activity."[17] Additionally, as a previous United States District Court observed, the DMCA's safe harbor "represents a legislative determination that copyright owners must themselves bear the burden of policing for infringing activity — service providers are under no such duty."[18] The MPAA is presently asking the Court to place on itself the burden of policing for infringing activity, when that burden falls squarely on the MPAA.[19]

Applying the DMCA to the present case, Grannick also noted that the DMCA questions go to the heart of the charges in this matter: "the important question is did Defendants BELIEVE they were covered by the Safe Harbor? This is because criminal infringement requires a showing of willfulness. The view of the majority of Federal Courts is that 'willfulness' means a desire to violate a known legal duty, not merely the

---

[16] Grannick, at http://cyberlaw.stanford.edu/node/6795.
[17] 17 U.S.C. §512(m)(1).
[18] *In re Aimster Copyright Litigation*, 252 F.Supp.2d 634, 657 (N.D. Ill. 2002), *aff'd*, 334 F.3d 643 (7th Cir. 2003).
[19] *Id.*

will to make copies. In other words, for criminal liability, it doesn't really matter whether the service qualifies, so long as Defendants believed it qualified. If so, they were not intentionally violating a known legal duty, and so their conduct would not satisfy the willfulness element of the offense."[20] Either way, the rule of lenity clearly applies to the novel charges presented before the Court. That Megaupload had many legitimate users like Kyle Goodwin was obvious based on their sheer number of users.

### IV. Broader Implications

Perhaps most importantly, Demand Progress asks this Court to consider the broader implications it's ruling on Mr. Goodwin's motion will have and the need to protect the rights of non-parties such as Mr. Goodwin.  Accordingly, Demand Progress urges the Court to prioritize the strong and abiding public interest in protecting and vindicating the property interests of innocent others situated similarly to Kyle Goodwin but who lack the resources to petition this Court for relief.  We strongly urge the Court to use its equitable powers to order returned all property unrelated to the criminal prosecution—not merely that the government disclaim possession, but that it actually see innocent users' access to their property effectuated.

As an online community dedicated to Internet freedom with more than one million members, many of whom make use of online data storage at a variety of sites including Megaupload, Demand Progress is keenly interested in the novel issues presented in this case.  Our concern runs both to the disposition of legitimate property currently unavailable because of the government's seizure and to the example that this Court will

---

[20] Grannick, *at* http://cyberlaw.stanford.edu/node/6795.

set for others in creating some limits to the United States' increasing data seizures. In both the instant case and possible precedent, we seek procedural and substantive due process for third parties not implicated in criminal wrongdoing.

Internet server seizures of Mr. Goodwin's intellectual property are, unfortunately, but the tip of a troubling iceberg of potential property seizures that will be committed against innocent non-parties if the seizures are not cabined in some way to the alleged criminals the United States claims as targets and to specific property it alleges was involved. The scope of innocent users and property at risk is staggering. The indictment of the United States noted that "Megaupload.com was at one point in its history estimated to be the 13th most frequently visited website on the entire Internet. The site claims to have had more than one billion visitors in its history, more than 180,000,000 registered users to date, an average of 50 million daily visits, and to account for approximately four percent of the total traffic on the Internet."[21]

If even a small fraction of Megaupload users were engaged in legitimate uses of Defendants' services, the potential harm from the United States' actions could impact hundreds of thousands of businesses and individuals. If the entire case turns out to be faulty, the damage done to a large percentage of the Internet's traffic might already be irreversible. The Court might set a dangerous precedent by not working to limit the scope of damage caused by the United States and to force restraint in future cases. Popular websites and services ranging from your email provider to specific storage sites like DropBox, GoogleDocs, Flickr, Tumblr, Picasa, Facebook, DepositFiles, and dozens of others host millions of non-infringing files for hundreds of thousands of users. Each site

---

[21] Indictment of *United States v. Kim Dotcom, et al*, at 2-3 (Jan. 5, 2012) (Doc. No. 1).

undoubtedly has some technically infringing material along with the legitimate property its users store. But this is precisely why the DMCA exists and creates predictability for both consumers and business owners. Even an unsuccessful criminal prosecution of any of these sites would throw a wrench into a substantial part of the modern economy and jeopardize the legitimate property of a huge class of Americans—if the seizure is allowed to operate as it has so far here or as the MPAA Members urge. No restraint is apparent that would prevent seizure or deletion of even personal email inboxes.

And there is no interest from other involved parties to protect these non-parties' property. The MPAA strongly supports website seizures, including those websites that are linking to - *rather than hosting* - allegedly infringing content and that are subject only to secondary liability.[22] And these seizures have a chilling effect on the server and website operators, prompting the seizures to result in closure in most cases. As the MPAA explained these facts to Congress:

> The combined efforts of the Department of Justice, ICE and the IPR Center have not only put rogue sites out of business but have raised awareness with the public, deterred bad actors, and resulted in many websites voluntarily ceasing criminal activity or going legal… Of the top 304 infringing websites that were monitored during the 2010 calendar year, including both sites that compile links to stolen content and sites that allow unauthorized streaming, nine were seized during both phases of "Operation in Our Sites". An additional 81 websites, over one quarter of the landscape (26%) voluntarily stopped offering illegal content or completely shut down, and of the 81 sites, 12 transitioned to legal movies or TV, or became promotional websites that do not offer illegal content.[23]

The server and website operators are simply not in a position to aid their users. And the United States is not stepping in to help preserve these files of non-parties. The

---

[22] Motion Picture Association of America, *Statement of Motion Picture Association of America, Inc Before the Senate Judiciary Committee* (Feb. 26, 2011), at 4 *at* http://www.mpaa.org//Resources/94af6e2e-8dfd-48b8-9994-4aa2d11e709e.pdf.
[23] *Id.*

10

United States denies its direct responsibility for Kyle Goodwin's deprivation and therefore for any role in returning his property.[24] In contrast, Defendants' counsel notes that the United States is without a doubt, the proximate cause of Kyle Goodwin's property deprivation: "Indeed, not only is the Government unwilling to pay for continued preservation out of its own pocket, but it will not even permit Megaupload to pay for preservation (out of tens of millions of dollars in Megaupload's assets the United States has frozen) ... nor will it permit 'any transfer of Mega Servers from Carpathia to the defendants….'"[25] This Court should not close its eyes to the incurable scenario that no actor initiating the seizure, such as the United States and or the supporting MPAA, is protecting the property of the Kyle Goodwin's of the internet.  Not creating an avenue for users like Kyle Goodwin to retrieve their property under circumstances such as these leaves such prior restraint unchecked.

We urge the Court to consider the impact this ruling will have on other prosecutors and sister courts regarding the return to innocent users access to their property.  Our sincere hope is for the immediate return of all property not related to Mr. Dotcom's indictment and a clear pronouncement that the seizure of the private property of innocent third parties is not countenanced by our Constitution.

---

[24] *See id*: Response of the United States to Non-Party Kyle Goodwin's Motion for the Return of Property Pursuant to U.S.C. § 1963 or Federal Rule of Criminal Procedure 41(g), at 7 (June 8, 2012) (Doc. No. 99) (purporting that the United States "does not have possession, custody, or control of any property belonging to the defendant.")

[25] Corrected [Proposed] Response of Defendant Megaupload Limited to Emergency Motion for Protective Order by Non-Party Carpathia Hosting, Inc., at 2 (Apr. 6, 2012) (Doc. No. 67-1).

Dated: June 27, 2012						By:	/s/ Christopher A. Cotropia
							Christopher A. Cotropia
							Virginia Bar No. 81726
							*Attorney for Interested Non-Party Demand Progress*
							University of Richmond School of Law
							28 Westhampton Way
							Richmond, VA  23173
							Phone:  804-484-1574
							Fax: 804-289-8683
							ccotropi@richmond.edu

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of June, 2012, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send notification of such filing (NEF) to all registered users, including:

Jay V. Prabhu
Chief, Cybercrime Unit
Assistant United States Attorney
Eastern District of Virginia
2100 Jamieson Avenue
Alexandria, VA 22314
Tele: (703) 299-3700

Craig C. Reilly, Esq.
111 Oronoco Street
Alexandria, VA 22314
Tele: (703) 549-5354

Paul F. Brinkman, Esq.
Quinn Emanuel Urquhart & Sullivan LLP
1299 Pennsylvania Avenue, NW, Suite 825
Washington, DC 20004
Tele: (202) 538-8000

John S. Davis, V, Esq.
Williams Mullen
200 South 10th Street, 16th Floor
Richmond, VA 23219
Tele: (804) 420-6296

Christopher L. Harlow, Esq.
SNR Denton US LLP
1301 K Street, NW, Suite 600, East Tower
Washington, DC 20005
Tele: (202) 408-6816

Ira P. Rothken, Esq.
The Rothken Law Firm
3 Hamilton Landing, Suite 280
Novato, CA 94949
Tele: (415) 924-4250

Julie Moore Carpenter, Esq.
Jenner & Block LLP
1099 New York Ave, NW, Suite 900
Washington, DC 20001-4412
Tele: (202) 639-6000

Griffith Lowell Green
Sidley Austin LLP
1501 K Street, NW
Washington, DC 20005
Tele:  (202) 736-8000

Dated: June 27, 2012						By:   /s/ Christopher A. Cotropia
								Christopher A. Cotropia
								Virginia Bar No. 81726
								*Attorney for Interested Non-Party Demand Progress*
								University of Richmond School of Law
								28 Westhampton Way
								Richmond, VA  23173
								Phone:  804-484-1574
								Fax: 804-289-8683
								ccotropi@richmond.edu