# Exhibit A

1

1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF VIRGINIA
2               RICHMOND DIVISION

3    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
                                  :
4    UNITED STATES OF AMERICA     :
                                  :
5    v.                        : Criminal No.
                                  : 3:12CR00137-01
6    KOLON INDUSTRIES, INC.,      :
                                  : February 8, 2013
7               Defendant       :
    _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _
8

9

      COMPLETE TRANSCRIPT OF MOTION TO QUASH SERVICE
10       BEFORE THE HONORABLE ROBERT E. PAYNE
           UNITED STATES DISTRICT JUDGE
11

12    APPEARANCES:

13    Kosta S. Stojilkovic, Assistant U.S. Attorney
    U.S. Attorney's Office
14    2100 Jamieson Avenue
    Alexandria, VA   22314
15
    John W. Borchert, Esq.
16    U.S. Department of Justice
    1400 New York Ave., NW
17    Bond Building
    Washington, DC   20530
18
    Michael S. Dry, Assistant U.S. Attorney
19    U.S. Attorney's Office
    600 E. Main Street, 18th Floor
20    Richmond, Virginia   23219

21        Counsel for the United States

22

23

24          DIANE J. DAFFRON, RPR
         OFFICIAL COURT REPORTER
25         UNITED STATES DISTRICT

```
 1     APPEARANCES:   (Continuing)

 2     Rhodes B. Ritenour, Esq.
       LeClairRyan
 3     951 E. Bryd Street, Eighth Floor
       Richmond, VA    23219
 4
       Jeffrey G. Randall, Esq.
 5     Paul Hastings
       875 15th Street, N.W.
 6     Washington, DC    20005

 7     Stephen C. Neal, Esq.
       Cooley LLP
 8     3175 Hanover Street
       Palo Alto, CA    94304-1130
 9
               Counsel for Kolon Industries, Inc.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (The proceedings in this matter commenced

2    at 9:30 AM.)

3              THE CLERK:  Criminal No. 3:12CR00137-01, the

4    United States of America vs. Kolon Industries,

5    Incorporated.  Mr. Michael Dry, Mr. Kosta Stojilkovic,

6    and Mr. John Borchert represent the United States.

7              Mr. Rhodes B. Ritenour, Mr. Jeff G. Randall

8    and Mr. Stephen C. Neal represent the defendant.

9              Are counsel ready to proceed?

10             MR. STOJILKOVIC:  The United States is ready,

11   Your Honor.

12             MR. RITENOUR:  Kolon is ready, Your Honor.

13             THE COURT:  All right.  It's your motion,

14   isn't it?

15             MR. NEAL:  Yes, Your Honor.

16             May it please the Court:

17             My name is Stephen Neal and I am one of the

18   attorneys specially appearing on behalf of Kolon

19   Industries in support of our motion to quash the

20   summons.

21             The issue, obviously, has been extensively

22   briefed before Your Honor, and so I'll just touch on

23   some highlights, and then am obviously prepared to

24   address any more issues Your Honor would like

25   addressed in more detail.

1          I start by saying, and I think it's now clear

2    really beyond any dispute, that Rule 4 of the Criminal

3    Rules of Procedure have a territorial restriction in

4    them.

5          THE COURT:  Under your view, nobody, no

6    foreign corporation, can be prosecuted criminally in

7    the United States because they can't be served; is

8    that right?

9          MR. RANDALL:  Yes, if they cannot be served

10   with a summons pursuant to both the delivery and the

11   mailing requirement of 4(c)(3), they cannot be brought

12   before --

13         THE COURT:  Has any court actually ever held

14   what you just said as opposed to making

15   interpretations on the rules that might lead one to

16   that conclusion?

17         MR. NEAL:  The government obviously has the

18   burden of proving --

19         THE COURT:  I didn't ask that.  I asked you

20   has any court ever held that you just simply can't

21   serve a defendant, you can't get a defendant, a

22   foreign defendant, who has committed a crime in this

23   country into the United States unless you do both the

24   things that you said as opposed to making statements

25   in their opinions which might lead one to that

1  conclusion, but did not, in fact, lead to that result?

2  I found no such cases and I'm curious whether you

3  found them.

4       MR. NEAL:  Well, the *Dotcom* case and the

5  *Johnson* case out of Utah are the two that come --

6       THE COURT:  But *Dotcom* didn't do that.  What

7  I asked you is did it do it.  And the answer is, it

8  didn't do it.

9       MR. RANDALL:  *Dotcom* didn't quash the

10 summons.  So I agree with Your Honor on that.  Did not

11 quash the summons, but *Dotcom* did say that the mailing

12 requirement had to be satisfied by an actual mailing

13 on the defendant within the district or within the

14 United States.

15      THE COURT:  Well, Mr. Neal, you-all are

16 arguing about a phrase in a rule and what was said in

17 that opinion is not binding here.  And I don't think

18 it's right.  There's a split of authority on what the

19 rule says.  And what I'm trying to get at is whether

20 any court has ever actually done what you say needs to

21 be done.  And I think the answer is no, but I know

22 you-all are more up to speed on it than I am.

23      MR. RANDALL:  The Utah case, the Utah court

24 in the *Johnson* case held that the mailing requirement

25 has to be satisfied by actual mailing to a last known

1  place of business within the district or on a present

2  principal place of business should one exist.  And in

3  the Utah *Johnson* opinion, they concluded that that

4  could not be met.

5         THE COURT:  That was a magistrate judge,

6  wasn't it?

7         MR. RANDALL:  Yes, but the summons was

8  quashed and there was no further action in the case.

9         THE COURT:  Well, have you ever looked at

10  when that sentence of Rule 4(b) was added to the rule?

11         MR. NEAL:  1946 it became effective, Your

12  Honor.

13         THE COURT:  No, not in 4(b) it didn't.

14         In 4(c), the sentence you're relying on was

15  part of 9(b) at one time.  In 2002, it came over from

16  the nines into the fours.  Neither one of you have

17  addressed any of the history of that.  You're arguing

18  over the language.  You've got a textural argument.

19  Nobody has gotten to the bottom line of it all.

20         The whole Justice Department of the United

21  States can't bestir itself to research the law in the

22  way it needs to be researched.  One of the largest law

23  firms in the country can't bestir itself to research

24  the law in the way it needs to be researched.  I am

25  troubled by what I' seeing here.

1          MR. NEAL:  I would say the most recent and in

2    some sense the clearest statement about the history of

3    this is contained in a letter that we provided to the

4    Court last night and this morning.  A letter that

5    should have been brought to the Court's attention, I

6    submit, before the briefing on this whole issue ever

7    began.

8          THE COURT:  What obligation do they have to

9    bring a letter?

10          MR. NEAL:  Because they were writing a letter

11    to the Rules Committee in which they said to the Rules

12    Committee that Rule 4(c)(3)(C) has a territorial

13    restriction that makes it impossible for us to perfect

14    a summons on a foreign corporation if they're not

15    presently domiciled somewhere in the United States or

16    never were domiciled within the district.

17          And they unequivocally acknowledged that when

18    they went to the Rules Committee and they acknowledge

19    that in contrast --

20          THE COURT:  Is that an admission binding on

21    the United States of America?

22          MR. NEAL:  Pardon?

23          THE COURT:  Is that an admission, an

24    ill-articulated theory by somebody in the Justice

25    Department, is that an admission that binds the

1  government?

2          MR. NEAL:  I think it is, Your Honor.

3          THE COURT:  On what authority do I make that

4  conclusion?

5          MR. NEAL:  It's the Assistant Attorney

6  General of the United States.  It's not just somebody

7  sitting multiple levels down in the Department of

8  Justice.  It's the Assistant Attorney General of the

9  United States.  And they go through the history of

10  this rule in great detail in here.  And they

11  acknowledge repeatedly in this letter that, in fact,

12  Rule 4(c)(3) doesn't have a territorial restriction,

13  and that absent an amendment to the rule, they cannot

14  perfect a summons on a company in a situation like the

15  one we're in here.

16          We didn't write the rule.  They didn't write

17  the rule.  Your Honor didn't write the rule.  There is

18  a historical rationale for the rule that they set

19  forth in their letter, but in their letter, they

20  repeatedly state, Your Honor, that they cannot perfect

21  summons under these circumstances.

22          THE COURT:  What if they're wrong, Mr. Neal?

23  Let's assume it says that, and I'm not quite sure it

24  does, but, you know, I'm asking you are they bound by

25  the statement they made here?

1           MR. NEAL:  I don't think it's a question

2     whether they are legally bound by it.  No, I don't

3     think they're legally bound by it, but I think the

4     analysis and the history that they set forth in it,

5     Your Honor, are compelling.  And the analysis and the

6     history that the Department of Justice --

7           THE COURT:  Well, it's always good to get the

8     other side briefing your side of the issue.

9           MR. NEAL:  Pardon?

10          THE COURT:  I said, it's always good to get

11    the other side briefing your side of the issue.

12          MR. NEAL:  It is, Your Honor.

13          I do think this letter should have been

14    brought to everybody's attention at the beginning

15    because the defect is blatant on the face of the rule.

16          THE COURT:  Well, if they really -- if the

17    government really believes the letter, and the letter

18    says what you said, it's kind of hard for the

19    government to be writing papers in this case and

20    satisfy their obligation under the ethical constraints

21    that are applicable.

22          MR. NEAL:  I totally agree with Your Honor.

23    And that's why, Your Honor, what should have happened

24    here, this letter was written a month or two after the

25    indictment in this case was returned.  They had made

1  multiple requests on Mr. Randall to voluntarily accept
2  service of this summons.  That had been declined.  And
3  they realized that they had a problem.  And it's a
4  problem that four other courts have looked at around
5  this country.
6        The rulings on this are sparse, to be sure,
7  but no court looking at it has said that the
8  territorial restriction doesn't mean exactly what it
9  says.  No court looking at it has said that, Your
10 Honor.
11       And they wrote a long letter to the Rules
12 Committee saying, We need to change the rule.  We need
13 to bring it into the modern era.  And we need to bring
14 it into conformance with the civil rule, which
15 contains no territorial restriction.
16       What they should have done, Your Honor, is
17 said, We do have a problem here.  We have a problem.
18 The plain language is very, very clear.  No court has
19 gone contrary to the plain language of the rule in the
20 very limited times when courts have addressed it.
21       THE COURT:  This rule has been around for a
22 long time and there have been foreign corporations
23 prosecuted in this country for years.
24       MR. NEAL:  But there's no indication in
25 anything that's been brought to our attention or to

1   Your Honor's attention that any foreign corporation

2   has ever been prosecuted where they didn't have either

3   an existing principal place of business in the United

4   States or had a last known place of business within

5   the district.

6           There may be instances which have not come to

7   light in the briefing where foreign corporations

8   elected to voluntarily appear, but there's no instance

9   that's addressed in any case that we've seen where a

10  foreign corporation was brought to court here in the

11  United States in a situation where they didn't have

12  either a principal place of business here or a prior

13  place of business within the district.  They have

14  never had a place of business within this district

15  and, therefore, the last provision of Rule 4(c)(3)(C)

16  kicks in, which requires it be mailed to their

17  principal place of business.  And there's no case that

18  we've seen, Your Honor --

19          THE COURT:  That assumes you have one.  What

20  if you don't have one?

21          MR. NEAL:  That's exactly why the Justice

22  Department has now gone to the Rules Committee and

23  said, We need to change the rule to make it read in

24  parallel with the civil rule because the civil rules

25  were changed to eliminate territorial restrictions.

1   They didn't do that in the federal case.  And the --

2          THE COURT:  Where is territorial restriction?

3          MR. NEAL:  In Rule 4(c)(2), Your Honor.

4          THE COURT:  What's the language?

5          MR. NEAL:  Well, in Rule 4(c), the language

6   specifically says that the execution of service and

7   return.  And it says, "By whom?"

8          "Only a marshal or other authorized officer

9   may execute a warrant.  Any person authorized to serve

10  a summons in a federal civil action may serve a

11  summons."

12          "Location:  A warrant may be executed or a

13  summons served within the jurisdiction of the United

14  States or anywhere else a federal statute authorizes

15  an arrest."

16          THE COURT:  But it does not say that it

17  cannot be served anywhere else.

18          You want me to rewrite that rule and say that

19  the rule -- you want the rule to be the only factor

20  that is to be considered in service.  And you don't

21  want them to be able to serve under MLAT at all,

22  right?

23          MR. NEAL:  They cannot meet the mailing

24  requirement under MLAT for sure.

25          THE COURT:  Let's first settle this:  Insofar

1    as I'm concerned, I've read all of what you said, the

2    mailing requirement is simply not the controlling

3    requirement.   It just doesn't work the way you say it

4    does.

5         It, in my view, means that if you have one of

6    these things, then you have to send it to them.   But

7    if you don't have one of the things that are there, a

8    principal place of business in the United States or a

9    last known place of business in the district, then it

10   simply doesn't apply.   It doesn't graft a whole new

11   provision that would stand as a bar to the prosecution

12   of those abroad who would violate the laws of the

13   United States in the United States.   That just doesn't

14   do that.   I'm prepared to hold that and I think that's

15   right.

16        I don't think either one of you have

17   adequately explained how and why that sentence ever

18   came into what was Rule 9(b) to begin with in your

19   papers.   You may know, but nobody has addressed it.

20        If this case were in front of the Supreme

21   Court of the United States, don't you think that

22   everybody would be scurrying to go find out what on

23   earth it was that was the history to this rule?   Of

24   course they would.   And nobody has done it here at

25   all.   They are leaving it for us to do.   I'm doing it.

1   I haven't found the answer yet.

2           MR. NEAL: So with all due respect --

3           THE COURT: But anyway, you can leave that

4   part alone. Leave the mailing requirement out because

5   I don't agree with you on what it means.

6           MR. NEAL: Okay.

7           THE COURT: And you've preserved your point

8   and you've made your point very effectively, and there

9   are courts that agree with you, I understand that. I

10   just don't think that's the --

11           MR. NEAL: There is no other court that

12   disagrees, Your Honor, other than Your Honor, and --

13           THE COURT: That's not right. *Dotcom*

14   disagrees.

15           MR. NEAL: No, *Dotcom* --

16           THE COURT: No, it disagrees.

17           MR. NEAL: *Dotcom* specifically noted that the

18   mailing requirement has to be met. What *Dotcom* said

19   is the way to meet the mailing requirement is to do

20   two things. To extradite a senior --

21           THE COURT: *Dotcom* said that the mailing

22   requirement is not a juridictional requirement. It's

23   a notice requirement.

24           MR. NEAL: But *Dotcom* specifically said you

25   have to comply with the mailing requirement by mailing

1  to a place in the United States or in the district.

2      THE COURT:  I understand your view on that,

3  Mr. Neal.  I'm just trying to save us some time.  I'm

4  firmly of the view that that's not right.  I've read

5  carefully all of what you-all have read.

6      I'm trying to address the questions in

7  perspective of the assumption that my view or

8  interpretation of the law is correct with respect to

9  the mailing requirement and I'd ask you to help me

10  work through that analysis.

11      MR. NEAL:  So then, Your Honor, you have two

12  other pieces that you have to deal with, I think.  The

13  first piece is the delivery requirement.  And that

14  is the first part of 4(c)(3)(C) where there has to be

15  delivery on the entity or an authorized agent.  And

16  the government's position on how they have met that

17  delivery requirement has, with all due respect,

18  bounced all over the place, but fundamentally they

19  claim they have met the delivery requirement by

20  hand-delivering a copy of the summons on a defunct

21  corporation in the state of New Jersey that has not

22  been in existence since prior to the time any of the

23  events charged in the indictment occurred in 2006, and

24  by serving it on an individual who at one time was an

25  agent for that defunct corporation.

1          They have the burden of proving that that is

2     adequate service or delivery, Your Honor, and they

3     have totally failed to do that.  There is no authority

4     suggesting that you can comply with the delivery

5     requirement by serving the paper on a defunct

6     corporation or on somebody at one time who might have

7     been an agent for the entity, the defunct entity, and

8     no longer is.

9          And then the other problem they have, Your

10    Honor, is the problem of time.  In every effort that

11    they have made to comply with 4(c)(3)(C), they are too

12    late in time because every effort they made, whether

13    it was through the New Jersey service or through the

14    MLAT service, came after the return date on the

15    summons.  And there is no authority that they have

16    cited that suggests that you can either resuscitate

17    the return date or continue the return date after it

18    has expired.

19         Your Honor continued -- Your Honor continued

20    the date on the 13th of December, but it was two

21    days after the summons was returnable.  Prior to that

22    time they had never perfected service either through

23    MLAT, even if you assume MLAT was a viable way to do

24    it, or by service on this defunct corporation.

25         So they have two problems with respect to the

1  delivery element, Your Honor.  One is that they served
2  it on this defunct entity and on an agent who was
3  never authorized to accept service, and, two, that
4  they did it too late in time.
5      THE COURT:  In the first sentence of Rule
6  4(c), what is the meaning of "general agent"?
7      MR. NEAL:  I'm sorry, Your Honor.  What
8  sentence?
9      THE COURT:  The sentence that provides you
10  can serve it on a general agent.
11      MR. NEAL:  It means you can serve it on a
12  general agent.
13      THE COURT:  What is the meaning of "general
14  agent"?
15      MR. NEAL:  I think a general agent is
16  somebody who is appointed to serve as an agent for the
17  company.  I think a general agent of the company could
18  theoretically be a senior executive of the company,
19  somebody who, in effect, could be the alter ego of the
20  company.
21      THE COURT:  No, you're conflating two things.
22  You're saying that a general agent can only be an
23  alter ego.  Is that your position?
24      MR. NEAL:  No, no, I'm not saying that.  I'm
25  saying somebody who is an alter ego might be a general

1    agent, but I'm saying a general agent is somebody

2    who's been specifically and duly authorized to accept

3    delivery or accept service and they haven't done it.

4            THE COURT:   That cannot be what that means.

5    And the reason it cannot be what that means is because

6    the rule says, "A summons is served on an organization

7    by delivering a copy to an officer, to a managing or

8    general agent, or to another agent appointed or

9    legally authorized to receive service of process."

10           So, clearly, a general agent is not someone

11   who has been appointed or authorized to receive

12   service of process.  Do I measure the meaning of the

13   term "general agent" with reference to the general law

14   on agency?

15           MR. NEAL:   I think you would measure it with

16   respect to the -- probably with respect to the general

17   law of the place of incorporation of the company that

18   you're looking at, which is Kolon Industries, Korea,

19   and nobody on the government's side has attempted to

20   address what that law requires.

21           THE COURT:   I understand that, but that's a

22   somewhat different question, Mr. Neal.

23           How do I look at the term and define it,

24   "general agent," in a federal rule?  You're not

25   telling me that I go look at Korean law to determine

1   what the Congress and the Rules Committees meant when

2   they passed the rule using the term "general agent,"

3   are you?

4           MR. NEAL:  I think you have to look -- I

5   don't think there is a federal common law that defines

6   what a general agent is for purposes of this rule.

7           THE COURT:  Well, when you and I were in law

8   school, Mr. Neal, and I know when I was, you learned

9   agency, didn't you?

10          MR. NEAL:  Correct.

11          THE COURT:  And we had to take a course in

12  agency, didn't we?

13          MR. NEAL:  Correct.

14          THE COURT:  And there was a general agent?

15          MR. NEAL:  Correct.

16          THE COURT:  And a special agent?

17          MR. NEAL:  Correct.

18          THE COURT:  And that law has been in the

19  common law for hundreds of years.  And I'm asking you,

20  I guess -- let me try it this way:  Do I look at the

21  common law meaning of the term "general agent" to

22  ascertain what "general agent" means?

23          MR. NEAL:  I think you can look at that, Your

24  Honor, because I think whatever law you look at with

25  respect to general agents they have not established

1   that they have served or attempted to serve on any

2   general agent or specially authorized agent or on an

3   officer or managing director.

4           THE COURT:  Let's just look at "general

5   agent" right now.  That's all I'm asking you about.

6           All right.  I think I understand.  You're not

7   saying I go to Korean law to see what the Korean law

8   of agency is?

9           MR. NEAL:  I think there's an argument that

10  you could go to Korean law.  We clearly believe that's

11  the case when you get to the alter ego issue.  If you

12  are looking at the alter ego issue --

13          THE COURT:  You look to the place of

14  incorporation.

15          MR. NEAL:  Yes.

16          THE COURT:  I'm not talking about that.  I'm

17  talking about the --

18          MR. NEAL:  The agency.

19          THE COURT:  But you do agree that the general

20  agent and alter ego are two different things?

21          MR. NEAL:  I do agree with that.  My point,

22  Your Honor, was that you could serve it on a general

23  agent if they had done that.  And they didn't under

24  any definition of that.  Or you could conceivably

25  serve it on an alter ego, but they didn't do that

1 either.

2          So however you define it and however you look

3 at it, they failed to perfect the service as required

4 in the first portion of 4(c)(3)(C)), period.

5          And then we do have the additional issue that

6 they did whatever it, whatever they did, even if it

7 had otherwise been good, they did it too late in time.

8          THE COURT:  What authority do you have for

9 the proposition that service could not be obtained

10 under an MLAT if, in fact, let's assume it had been

11 effectuated in what you consider a timely manner?

12          MR. NEAL:  I think excepting Your Honor's

13 ruling with respect to the territorial issue that I

14 addressed in 4(c)(2) and 4(c)(3), excepting that, I

15 think that if they had used MLAT --

16          THE COURT:  I didn't make a ruling on the

17 territorial issue.  I was talking about my view of

18 what the sentence means, A copy must be mailed to the

19 organization's last known address within the district

20 or to its principal place of business elsewhere in the

21 United States under 4(c)(3)(C).  That's what I was

22 talking about.

23          MR. NEAL:  But if you look at 4(c) --

24          THE COURT:  And I have said, yes, I'd asked

25 you to please believe that we don't need to revisit

1   that issue in your argument.

2        MR. NEAL:   I'm assuming Your Honor is making

3   the same ruling with respect to Rule 4(c)(2), that

4   that language does not impose a territorial

5   restriction on the service of summons.   That is that

6   that language is not saying in Your Honor's view that

7   service has to occur within the United States.

8        If that is correct, and if they had used the

9   MLAT procedure in a timely fashion, then I think they

10  would have complied with the delivery requirement

11  through MLAT.

12       THE COURT:   Let's try it this way, though.

13  What's your authority for saying that they can't use

14  the MLAT?

15       MR. NEAL:   What I'm saying, Your Honor, is --

16       THE COURT:   Other than the text of Rule

17  4(c)(2)?

18       MR. NEAL:   Other than the text of Rule

19  4(c)(2), I think they could use it if they did it in a

20  timely fashion, they could use it to meet the delivery

21  requirement.

22       Although I will also note, Your Honor, that

23  in the letter that they have sent to the Rules

24  Committee asking Rule 4 to be modified --

25       THE COURT:   Mr. Neal, I haven't read that.

1    You all slung that at me at a time --

2         MR. NEAL:  We didn't find it until yesterday,

3    Your Honor.

4         THE COURT:  How did you find it?

5         MR. NEAL:  We found it in continuing research

6    on the legislative history point that Your Honor

7    started your comments --

8         THE COURT:  That's what I want to know is

9    what tool were you using to find the legislative

10   history that I can't find?

11        MR. RANDALL:  We found remarkably little

12   legislative history and we found this letter online as

13   we searched --

14        THE COURT:  Legislative history of what?

15   What were you looking for?

16        MR. NEAL:  For the rule, Rule 9 and Rule 4.

17   There's no question it's remarkably little on it.  But

18   it is interesting that in the letter, and the letter

19   is really worth reading, Your Honor, but in the letter

20   they specifically ask that Rule 4 be amended to permit

21   service through international agreements.  So they

22   specifically in the rule are asking that the rule be

23   amended to permit MLAT service.

24        Having said that, Your Honor, I think --

25        THE COURT:  Do you want to get a glass of

1   water?

2            MR. NEAL:  Pardon?

3            THE COURT:  Do you want to get a glass of

4   water?

5            MR. NEAL:  No, I'm fine.  Thank you.  What

6   I'm saying is that if you assume 4(c)(2) does not

7   impose a territorial restriction, then if they had

8   complied with MLAT in a timely fashion, I think that

9   would have met the delivery requirement of 4(c)(3)(C),

10  again, given the ruling Your Honor has made about

11  territorial restriction, but they didn't do it.

12           THE COURT:  What's the meaning of "summons"?

13           MR. NEAL:  I think the meaning of "summons"

14  is the document that they attempted to serve on us.

15  It's the indictment with the summons attached

16  commanding us to appear or commanding our client to

17  appear on a date certain in a court.

18           THE COURT:  Well, what part of "summons" says

19  it has to be on a date certain as opposed to

20  commanding you to appear?  Blacks Law Dictionary

21  doesn't have that requirement in it.

22           MR. NEAL:  But "summons" --

23           THE COURT:  The summons form that's used

24  actually does have a date and time.

25           MR. NEAL:  Yes.

1            THE COURT:   Is there a provision of the rule

2   that defines a summons to include a date and time?

3            MR. NEAL:   No, I think there are cases.

4            THE COURT:   (b)(2) a summons must be in the

5   same form as a warrant except that it must require the

6   defendant to appear before a magistrate judge at a

7   stated time and place.

8            MR. NEAL:   Correct.

9            THE COURT:   All right.

10            MR. NEAL:   And this is an issue Your Honor,

11   by the way, raised with the prosecution the first

12   time, and I wasn't here that day, but the first time

13   everybody appeared here, Your Honor raised this

14   question whether they shouldn't go back and get a

15   newly issued summons with a future date, and then go

16   back and do MLAT.

17            THE COURT:   Did they?

18            MR. NEAL:   And they did not do that.

19            THE COURT:   They did not?

20            MR. NEAL:   They did not.   Your Honor

21   encouraged them to do it, suggested it was the

22   appropriate route, and they don't do it.

23            THE COURT:   Well, Judge O'Grady's opinion in

24   *Dotcom* suggests that you can't use an MLAT to serve a

25   summons; that you can use the MLAT to serve a criminal

1   information.

2          MR. NEAL:  Correct.

3          THE COURT:  What's the difference between a

4   criminal information and a criminal complaint in

5   respect of whether it can be served by way of a

6   summons?

7          MR. NEAL:  Other than what the rules

8   themselves talk about, Your Honor, I don't know the

9   answer to that question.

10         THE COURT:  Why can a summons be used to

11  serve a criminal complaint?

12         MR. NEAL:  That is one of the forms that is

13  specifically called out in the rules is to serve a

14  criminal complaint by means of a summons.  And absent

15  an arrest to compel a party to appear on a date

16  certain and a place certain to answer the summons,

17  it's an alternative to an arrest warrant.

18         THE COURT:  Excuse me.  Go ahead.

19         MR. NEAL:  So Your Honor has other

20  questions -- I mean, your ruling on the mailing

21  requirement --

22         THE COURT:  I haven't ruled on anything yet.

23  I've asked you to assume that's how I feel.  I don't

24  need any more argument on it, and I think you-all are

25  wrong, but I haven't ruled on anything yet.

1    MR. NEAL:  So then, Your Honor, let me then

2 spend just a couple of minutes on the alter ego theory

3 because if we were right on the mailing, and if the

4 government were right in what it has said in the

5 October letter to the Rules Committee, which

6 unequivocally says they need this amendment or they

7 can't do it absent the ego theory, if we are right on

8 that, then the only way they could meet the mailing

9 requirement absent a change in the rules, which they

10 are trying to get, absent a change in the rules is to

11 prevail on the alter ego theory and to prove that

12 Kolon USA is, in fact, the alter ego of Kolon

13 Industries.

14    THE COURT:  How do they do that?

15    MR. NEAL:  It's their burden, of course.

16    THE COURT:  I know, but how does one go about

17 doing that?

18    MR. NEAL:  They have to prove two things.

19 One, they have to prove that Kolon USA is, in a sense,

20 sort of overwhelmingly controlled by --

21    THE COURT:  Oh, I know the test.  I'm sorry.

22 Mechanically, how do we go about that?  Do I have a

23 hearing and take evidence on it?  Do they get

24 discovery on the issue?

25    You talk about discovery.  They talk about

1   discovery.  I wasn't aware that you did it that way

2   and I'm just curious how it is that one goes about

3   doing this proof of alter ego, which is always a

4   factually intensive inquiry.  How does a court go

5   about that in your view?

6           MR. NEAL:  Well, the prosecution has the

7   burden of proof on that.  We all agree on that.  The

8   prosecution has the burden of proof.  They have to

9   come forward with admissible evidence meeting the

10  standards.  And Your Honor is familiar with the

11  standards.

12          THE COURT:  Can they have discovery on the

13  issue?

14          MR. NEAL:  I don't think at this point.

15          THE COURT:  Can they use discovery from other

16  cases?

17          MR. NEAL:  If they can intervene in other

18  cases and want to intervene, they can use anything

19  that they can properly bring before this court that

20  complies with the Federal Rules of Evidence.  They can

21  do anything they want.  But I don't think they can ask

22  Your Honor -- and they sort of dance around the edges

23  in their papers.  They sort of say, "What do you

24  think, Your Honor?  Do we have enough?  And if we

25  don't have enough, maybe you ought to let us have

1   discovery."

2        THE COURT:  It's sort of like throwing out a

3   little June bug and seeing if the bass is going to

4   come to the surface.

5        MR. NEAL:  Yeah.  And they shouldn't be

6   putting that burden on Your Honor.

7        THE COURT:  Well, I share that view.  Thank

8   you.

9        MR. NEAL:  So they need to come forward with

10  evidence, and it has to be admissible evidence, and

11  they haven't done it.  They could have tried to take

12  discovery on this while the grand jury was sitting and

13  while they were taking the case before the grand jury.

14       Maybe they can intervene in other

15  proceedings, although I'm not sure they can intervene

16  in other proceedings at this point.

17       THE COURT:  They seem to suggest than I can

18  issue an order requiring the production in this case

19  of evidence taken in another case.

20       MR. NEAL:  I think they're wrong about that,

21  Your Honor.  I don't know by what authority Your Honor

22  could enter such an order.  The grand jury is the

23  province by which they gather evidence in a criminal

24  proceeding.

25       They have the ability to compel trial kinds

1  of evidence in anticipation of a trial, but there's no

2  rule and no case that we've seen that suggests that

3  Your Honor could accede to a request by them to let

4  them have some kind of interim discovery not in front

5  of the grand jury and not in the context of some civil

6  case.

7          THE COURT:  Your point is they'd have to go

8  wherever that court was, ask that court for permission

9  to have the documents, or evidence, or whatever it is,

10  removed from the scope of the protective order, and

11  then it can be tendered here, but that this court

12  doesn't have the authority to say, Oh, go do

13  discovery, or even to say, I want you to have that

14  material in the other court.  Even so far, I suppose,

15  as to issue a notice to the other court saying it will

16  be helpful to have that information, but it's within

17  your province.  The United States is going to

18  intervene.  Go do it.

19          MR. NEAL:  I think that is all correct, Your

20  Honor.

21          THE COURT:  I do, too.

22          MR. NEAL:  I think that is all correct.

23          And they have attempted on a very sparse

24  record to try and argue in the papers that Kolon USA

25  is an alter ego.  I don't think they've come close to

1    that.  I'm prepared to address that evidence if --

2          THE COURT:  No, you go ahead.  I cut you off

3    by asking something else.

4          MR. NEAL:  And Your Honor is familiar with

5    the standard.  So we've obviously made an argument

6    that we think is right, that the actual alter ego

7    issue with respect to Kolon Industries has to be

8    determined under the law of South Korea.

9          THE COURT:  And that is in that law review

10   article?

11         MR. NEAL:  Yes.

12         THE COURT:  Is that your view of what the

13   Korean law is?

14         MR. NEAL:  Yes.

15         THE COURT:  I mean, you cite that, but you

16   cite that has the proposition for what the Korean law

17   is?

18         MR. NEAL:  Yes.  But having said that, Your

19   Honor, I actually don't think, given the record that's

20   before Your Honor, I don't think it makes any

21   difference.  Whether it's under New Jersey law, which

22   the prosecution concedes is the same as Virginia law,

23   they need to prove, they need to prove to Your Honor,

24   that the parent so dominated the subsidiary that the

25   subsidiary had no separate existence but was merely a

1    conduit for the parent.  And that comes from the
2    *Department of Environmental Protection v. Ventron*
3    case, which is cited in our most recent brief, Your
4    Honor, or they have to show that the corporation has
5    abused the privilege of incorporation by using the
6    subsidiary to perpetuate a fraud.  They haven't come
7    close to proving either of those here.
8              The uncontroverted evidence that's before
9    Your Honor through proper affidavits that do comport
10   with the Federal Rules of Evidence establishes that
11   Kolon USA is a separate subsidiary.
12             THE COURT:  What do you think is the state of
13   the record on the observance of corporate formalities?
14             MR. NEAL:  I'm sorry, Your Honor.  I didn't
15   hear you.
16             THE COURT:  I'm sorry.  What do you think is
17   the state of the record here on the observance of
18   corporate formalities?
19             MR. NEAL:  I think the state of the record is
20   that Kolon USA conforms to and maintains a separate
21   corporate identity.  Kolon USA is not authorized to
22   enter contracts on behalf of Kolon Industries.  Kolon
23   USA manages its own operating expenses.
24             THE COURT:  Your man said that, but I heard
25   evidence in the trade secrets case and in your own

1    antitrust case about how it was that your people,

2    Kolon USA, went out and got contracts for the sale of

3    Heracron® and the purchase of Heracron®.  And that's

4    hard for me to reconcile.  I don't know that they have

5    gone into the record and ferreted that out, but I know

6    it.

7           MR. NEAL:  So, Your Honor, Kolon USA has its

8    own customer relationships, manages its own customer

9    relationships, is responsible for its own marketing

10   and selling operations.  It retains 100 percent of its

11   own profits.  It prepares its own audited financial

12   statements.  And my belief on the state of the record,

13   and Your Honor knows the record better than I do --

14          THE COURT:  I also have records that showed

15   that they had consolidated financial statements.

16          MR. NEAL:  I don't believe that that's the

17   case, Your Honor.

18          THE COURT:  I think it is in the enforcement

19   part of the case I saw some records that indicated

20   there were consolidated financial statements at least

21   at one point in time.  Now, what I can't recall is

22   whether they were of Kolon USA and all of the other

23   Kolon entities under the Kolon chaebol umbrella.

24          MR. NEAL:  In a roll up of their numbers,

25   maybe, but what I am certain of is that Kolon USA does

1  prepare its own financials, its own separate

2  financials, prepares and files its own taxes.  And

3  Your Honor said something which I'm not familiar with

4  and I actually thought the case was different.  Your

5  Honor suggested that the record in the civil

6  litigation suggests that Kolon USA actually sold

7  Heracron®.  My understanding --

8          THE COURT:  I think they tried to sell

9  Heracron®.  I don't know how much they sold.  I think

10  the record is they never did end up qualifying to sell

11  anything or if they did, they didn't sell much.  But,

12  basically, what I recall it did, they had a big

13  dispute over whether or not some young lady was a

14  managing agent or not for purposes of taking her

15  deposition, and I think we found that she was a

16  managing agent of Kolon USA, I mean of Kolon, and she

17  was allowed to be deposed.  And then she was moved

18  over to be in Kolon USA.  And one of the things that

19  was a common responsibility was that she had the whole

20  responsibility for all the sales.  She ran from Korea

21  and then she moved to the United States.  I can't

22  think of her name.

23          MR. NEAL:  So again, Your Honor, Your Honor

24  knows that portion of the record far better than I do.

25          THE COURT:  Well, I tell you, it's a distant

1   memory.  I'm not asserting it.  I'm asking it.  But

2   that's not in the record here at all.

3        MR. NEAL:  That's not in the record here.

4   What is in the record here is that they haven't sold

5   Heracron®.  They do sell a whole host of non-Heracron®

6   kinds of products.  That's fundamentally what their

7   business is.  It is in the record that they maintain

8   separate books and records.  It is in the record that

9   they file and prepare their own financial statements.

10  It is in the record that they prepare and file their

11  own independent tax returns.  So that all of the key

12  indicia that courts tend to look to to establish the

13  presence or absence of an alter ego cuts against there

14  being any alter ego relationship here.

15       THE COURT:  Their theory is that the alter

16  ego is shown because of the change in the payment

17  method from one method to another so as to evade the

18  collection efforts of DuPont in the civil litigation.

19  Isn't that one of their theories?

20       MR. NEAL:  They make that argument, Your

21  Honor, but they don't do anything that establishes

22  that there's any impropriety with respect to the

23  renegotiation of those contracts.  And the fact Kolon

24  USA and Kolon Industries have contracts, they have

25  contractual relationships, which is consistent with

1   there being separate entities, Your Honor, not one the

2   shell of the other, and there is no law that prohibits

3   their renegotiating contracts.  And the fact that they

4   may have renegotiated --

5           THE COURT:  Well, it doesn't have to be

6   illegal to be proof of alter ego status.

7           MR. NEAL:  I agree with that.  But the

8   fact --

9           THE COURT:  They're just saying it's proof

10  that Kolon calls the tunes.  And let's assume that's

11  right.

12          MR. NEAL:  They haven't put any evidence

13  before Your Honor to suggest that those new contracts

14  were in some sense imposed unwillingly on Kolon USA.

15  They haven't done anything to suggest that Kolon USA

16  didn't get benefits of various sorts from those new

17  contracts.

18          THE COURT:  How can they do that?  They can't

19  get discovery.

20          MR. NEAL:  With all due respect, Your Honor,

21  it's not your fault they don't have it and it's not

22  our fault.

23          THE COURT:  But it's a matter of what the

24  showing is.  And the issue is what is the showing

25  that's required.  Do you have to show it by clear and

1    convincing evidence, by preponderance of the evidence,

2    by reasonable doubt, beyond a reasonable doubt, or do

3    they have to make a prima facie case and then you have

4    to come forward and call the tune from that point?

5            How structurally would we look at measuring

6    whether or not they have shown the alter ego is the

7    question I was asking rather inarticulately?

8            MR. NEAL:  They clearly have the burden of

9    proof.  The burden of proof never shifts to us and

10   they haven't come close to meeting it.

11           THE COURT:  But I asked you how they would do

12   it.  What's the standard of proof?  What do we have to

13   do there?

14           MR. NEAL:  Your Honor, I don't know whether

15   the standard is preponderance or clear and convincing,

16   but it's their burden to do it.  In the civil context,

17   obviously it would be a preponderance, and I don't

18   think we've seen a single case in the criminal context

19   dealing with alter ego that suggests what the burden

20   of proof is other than clear recognition that it falls

21   on the prosecution.

22           So separate entities, separate books,

23   separate financials.  The other thing, Your Honor,

24   that they do point to is that there is some overlap in

25   the boards of directors of the two entities.

1            THE COURT:  And there are.

2            MR. NEAL:  But that has never been held to

3    make the subsidiary the alter ego of the parent.

4            THE COURT:  Standing alone it isn't.

5            MR. NEAL:  Pardon?

6            THE COURT:  Standing alone it isn't.

7            MR. NEAL:  Correct.

8            THE COURT:  It can be considered, right?

9            MR. NEAL:  Correct.

10            THE COURT:  The degree of overlap and

11    officers and directors can be considered as evidence,

12    but it's not dispositive is your point?

13            MR. NEAL:  Correct.

14            THE COURT:  Yes, I agree.

15            MR. NEAL:  I just wanted to point out that

16    there is that overlap and they have pointed to that

17    overlap.  But, Your Honor, there is no answer that

18    they come forward to, and they don't dispute the fact

19    that with respect to all of the corporate formalities,

20    the preparation of books and records, the running of

21    the businesses, the keeping of the profits, that they

22    are totally separate entities other than the

23    ownership.  And ownership obviously is not any basis

24    for finding an alter ego.

25            The cases that have found alter ego are

1    cases -- it's the *Chitron* case out of Massachusetts is

2    the one government likes the best, but in that case,

3    based on the record before it, the Court made a

4    finding that the U.S. entity was a mere front, a mere

5    front operation.

6              THE COURT:  It was pretty clearly

7    established, too, wasn't it?

8              MR. NEAL:  Yes.

9              So, again, they were too late in time with

10   respect to delivery.  They haven't come close to

11   proving the alter ego point, Your Honor.  In order to

12   prove the alter ego point, they need admissible

13   evidence.  They haven't come forward with any

14   admissible evidence.  They haven't tried to comb the

15   record of the civil case to establish any of the

16   points Your Honor was asking about.  It was their

17   burden to do that.  And we do not believe, Your Honor,

18   that Your Honor has the authority to enter or compel

19   discovery.  They can go try and get discovery through

20   intervening in other cases or they can make the

21   decision to go back to the grand jury.

22             They can't go back to the grand jury simply

23   to take discovery on this.  They'd have to have a bona

24   fide reason to consider a superseding indictment or so

25   forth, but that's the way they should have gotten this

1   evidence.

2          The last thing is, and I'm not going to

3   reargue it, I hear Your Honor's thinking on the

4   mailing point, and I think on that all I would do is

5   urge -- and I concede we got that letter to Your Honor

6   late last night and --

7          THE COURT:  There are other courts that share

8   your view about what the significance of that

9   requirement is.  I understand the argument.  I just

10  wanted to have the discussion free of being encumbered

11  with discussing that point at this juncture because I

12  think that the right rule is to regard that section of

13  4(c)(3)(C) the way I said.  But I admit I have to do

14  some more studying, and I want to do it in perspective

15  of the history of the rule, which I have found very

16  difficult to find.

17         I have underway an inquiry with the Rules

18  Committee which keeps the history of how each of the

19  rules got the way they are to find that material, and

20  if I find that material, if in fact they still have it

21  going all the way back to the formation of 4 and 9,

22  I'll share it with you-all, or at least tell you how

23  to get to it, and you-all will have equal access to

24  it.  I'm not going to do it on my own.

25         I don't know that that information is

1    generally available to you all.  It may be online.

2    Everything is available online, but whatever I come up

3    with in that area, I'll share with you.

4              MR. NEAL:  All right.  Well, thank you, Your

5    Honor.  And I will say they don't have a lot of it,

6    but the October 2012 letter from Lanny Breuer to the

7    Rules Committee actually has a little bit of the

8    history in it, and it's worth reading --

9              THE COURT:  Yeah, I'm going to read it, but

10   you-all delivered it at a time -- I don't work the

11   hours that you-all work.

12             MR. NEAL:  I wish I were you, Your Honor.

13             So it's worth reading.  And, again, I

14   apologize we got it to you late, but it really is sort

15   of a clear -- it's a very clear, very candid

16   discussion of the dilemma that sort of brings us here.

17   And whatever happens in this case, they have clearly

18   made a decision at the top levels of the Justice

19   Department that they need to get a change in the rule.

20   And whether they will get that easily or not easily, I

21   don't know.  There are a lot of policy reasons why one

22   could imagine people not wanting --

23             THE COURT:  Well, I can tell you that the

24   changes in the rules are not going to occur in time

25   for me to make any decisions in this case.

1          MR. NEAL:  I think that's right.  I don't
2     know what the duration is.
3          THE COURT:  The process is very long.  And
4     rightfully so because there are a lot of views that
5     need to be taken into account in deciding whose ox is
6     going to be gored by what provision that's changed.  I
7     understand that.
8          MR. NEAL:  And the thing that is interesting
9     about this is that Rule 4 for civil purposes is
10     different than Rule 4 for criminal purposes.  And I
11     think now the government, you'll see in the letter, in
12     the October letter, sort of suggests that we just
13     haven't brought criminal Rule 4 up to the modern day
14     era.
15          Maybe that's right, but you can also imagine
16     a whole bunch of other reasons why people might say,
17     You know, we don't want criminal Rule 4 to have the
18     same broad reach that the civil rule does because
19     what's sauce for the goose is sauce for the gander.
20          THE COURT:  Well, as is illustrated in one of
21     the Second Circuit cases that I think you cited, I'm
22     not sure who cited it, just in interpreting the rules
23     we have to be mindful of the world in which they
24     function.  And just as one interprets home or place of
25     abode in the service rule in perspective of today's

1   world where people live all over the world, we also

2   maybe have to interpret the criminal Rule 4 with the

3   same realities in mind.

4        That said, one cannot use an interpretation

5   as a vehicle for the judicial alteration of a rule.

6   There's a reason why the rules are structured the way

7   they are and are built the way they are.

8        MR. NEAL:  Yes, that's right.  That's exactly

9   right.  They, in some sense, the prosecution in some

10  sense is saying we would like you, Your Honor, to

11  rewrite the rules the way we have asked the Rules

12  Committee to rewrite the rules.  And the Rules

13  Committee is the right way for them to go.

14       And as I say, I think we don't have a lot of

15  insight into why they fashioned it the way they do,

16  but we could all speculate that they actually had good

17  and sound reasons why they actually didn't want to set

18  a precedent for being able to reach overseas with

19  criminal process because if we can do it to somebody

20  in Korea, the Iranians or somebody else can do it to

21  us.

22       So if we're going to go down that path from a

23  rules standpoint, we at least have to be mindful of

24  the pushmepullyou part of it.  And, as I say, the fact

25  that they changed the civil rules or that the civil

1   rule contains no territorial references at all and the

2   criminal one does, these rules don't come, as Your

3   Honor said a moment ago, they don't come

4   inadvertently.  They're not arrived at in a sloppy way

5   or a cavalier way.  And everybody who has looked at

6   the language, including the Justice Department in

7   their letter, says the language is really clear.

8           They don't make any argument in their letter

9   suggesting that there's ambiguity or that it says X

10  but really means Y.  They say explicitly in their

11  letter there are two elements, and as the rules are

12  presently drafted, they say the second element cannot

13  be met.  Cannot be met with respect to an entity that

14  never had a place of business within the district and

15  doesn't have a place of business within the U.S., and

16  we need to fix that.  And while we're fixing it, we

17  ought to make it clear that treaties, like as MLAT,

18  can also be used to effect the delivery part of it.

19          And it's a very thoughtful letter.  I wish we

20  had all seen it at the beginning.  It really lays it

21  out, and it discusses the cases, and it discusses the

22  difficulty of trying to move on an alter ego theory,

23  and that's why they're doing what they should be

24  doing.

25          If, as a matter of policy, the United States

45

1   wants to be able to reach companies with criminal

2   indictments where those companies aren't here, we

3   ought to make that as a clear, conscious policy

4   decision, and we ought to make it recognizing that

5   what we do in that direction is going to come back to

6   us or has the potential to come back to us.

7           THE COURT:  That's precisely one of the

8   considerations that has to be taken into account in

9   making any rule.

10          All right.  Well, it seems to me that since

11  I'm the only one who really hasn't read this letter,

12  that maybe we can be better informed if we took a

13  little recess and I read the letter, and then I'll

14  hear from the government on the matter.

15          Thank you, Mr. Neal.

16          MR. NEAL:  Thank you, Your Honor.

17          THE COURT:  If you have other things to say,

18  I'll be glad to give you, and you have rebuttal, but I

19  just would like to read the letter since I have it.

20          Thank you.

21          MR. NEAL:  No, I'm fine, Your Honor.  Thank

22  you.

23          THE COURT:  Thank you very much.  We'll be in

24  recess.

25          (Brief recess taken.)

```
 1              THE COURT:  All right.  Who is going to argue
 2    for the United States?
 3              MR. STOJILKOVIC:  I am, Your Honor.
 4              May it please the Court:
 5              My name is Kosta Stojilkovic.  I'm an
 6    assistant United States attorney in the Alexandria
 7    office.
 8              THE COURT:  Did you know about this letter?
 9              MR. STOJILKOVIC:  I had not seen this letter
10    prior to this morning.
11              THE COURT:  So one arm doesn't know what the
12    other is doing.
13              MR. STOJILKOVIC:  Your Honor, I was aware
14    that there was some discussion within the Department
15    of Justice about proposing an amendment to the rule.
16    I was not aware that that proposal had been, in fact,
17    made.
18              In any event, Your Honor, this letter is
19    nowhere -- this letter does not say what Kolon said it
20    does, and the Court has just taken the time to read
21    it, but I want to highlight a couple of things.
22              On the first page of the letter, the Justice
23    Department clearly acknowledges that people located
24    abroad may be held criminally liable within the United
25    States, and that organizations, such as foreign
```

1    corporations, are not exempt from this principle.

2          And then the Court recounts a couple of

3    district court cases, *Johnson*, *Matthey* and *Pangang*

4    *Group*, that the Department of Justice is clearly

5    concerned about.  And the critical analysis, which is

6    on page 5 of 9 of Kolon's filing, the government

7    indicates in this letter that we are concerned that

8    other courts will adopt the reasoning of *Johnson*,

9    *Matthey*, *Pangang Group*, and similar cases, reasoning

10   we believe is contrary to sound public policy and the

11   purpose of the rules.

12         And at the end of that paragraph,

13   accordingly, the United States may be faced, if this

14   scenario comes to fruition, the United States may be

15   faced with the anomalous result that a private civil

16   litigant will be able to pursue an action against an

17   organization while the government remains helpless to

18   vindicate the laws of the United States through a

19   corresponding criminal proceeding.

20         It's clear on the face of this letter that

21   the government's concerned about confusion in the

22   district courts.  The government is concerned about

23   language in the *Matthey* opinion and the *Pangang*

24   opinion, and we certainly share that concern, but,

25   Your Honor, this is not by any stretch of the

1  imagination a concession that those cases are rightly

2  decided.

3          Further, after the letter recounts the

4  proposal, and I'm turning to the final page of Kolon's

5  filing, the penultimate paragraph states, These

6  amendments, the proposed amendments to Rule 4, are

7  designed to ensure that the foreign organizations do

8  not avoid criminal prosecution in the United States

9  merely because they don't have an agent or a mailing

10 address here.  They are designed to ensure that

11 outcome.  They are not designed to for the first time

12 create a mechanism to serve such a foreign defendant.

13         It's clear in light of the case law that

14 district courts have been confused about Rule 4.  The

15 different cases all have differences in the analysis,

16 and what this amendment --

17         THE COURT:  Have you been back to look at the

18 history of the rules?

19         MR. STOJILKOVIC:  Your Honor, we've tried.

20 We have looked for the history both under Rule 9 and

21 under Rule 4, and, unfortunately, we have not had any

22 more luck than Kolon has had.  Other than what's in

23 the advisory committee notes, which are silent on the

24 critical questions here, we have not been able to find

25 anything.

1          THE COURT:  The Administrative Office of the

2   U.S. Courts has a whole office that deals with the

3   rules.  And those rules, you can go online and you can

4   check and get the advisory -- there are two

5   committees.  There's the committee on rules and

6   practice and procedure, that's the advisory committee,

7   and the other one is a standing committee.  And they

8   go first to the advisory committee and then to the

9   standing committee.

10         They all maintain minutes.  I write letters

11  about them.  You write letters about them.  People

12  talk about them.  Law professors comment on them.  All

13  that stuff is here.  That's where you go to find out

14  what happened.

15         But beyond that, beginning back with the

16  commencement of the Federal Rules, what's the

17  significance, vel non, of a summons on an

18  organization, and why did it come to pass that the

19  rules were adopted in their original form?  And this

20  provision that we're talking about, 4(c)(3)(C),

21  originally was in Rule 9(c), and it didn't read the

22  way it reads now.

23         MR. STOJILKOVIC:  Yes, Your Honor.

24         THE COURT:  It was changed in 2002.  And at

25  the time in 2001, it read, "A summons to a corporation

1   shall be served by delivering a copy to an officer or

2   to a managing or general agent or to any other agent

3   authorized by appointment or by law to receive service

4   of process, and if the agent is one authorized by

5   statute to receive service and the statute so

6   requires, by also mailing a copy to the corporation's

7   last known address within the district or its

8   principal place of business."

9           So it didn't have any two requirements in

10  there.

11          MR. STOJILKOVIC:  That's correct, Your Honor.

12          THE COURT:  But why did all this happen, is

13  the question.  There's a reason for these things.  And

14  part of this, I think, was the effort of I think I'm

15  able to trace it into an effort to clean up the text

16  of the rules a little bit, but it's arguable that

17  (c)(1) of 9 means the same thing as does the current

18  Rule 4(c)(3)(C).

19          MR. STOJILKOVIC:  Your Honor, we do think as

20  a matter of legislative history --

21          THE COURT:  I want you to go back and look at

22  this stuff.

23          MR. STOJILKOVIC:  Your Honor, we will be

24  happy to submit a supplemental brief.

25          THE COURT:  The other thing is, let me ask

51

1   you this question:  Why haven't you, or have you --

2   excuse me.  I've got a really squeaky voice this

3   morning.  I don't mean to be hard to hear or sound

4   harsh, but I do.

5           Have you not gone back and done the MLAT over

6   again as was suggested when Mr. Belevetz was first

7   here?  Have you done that or not?

8           MR. STOJILKOVIC:  Yes, we have.

9           THE COURT:  Did you start all over again with

10  the MLAT?

11          MR. STOJILKOVIC:  We did not start all over

12  again.

13          THE COURT:  Why didn't you?

14          MR. STOJILKOVIC:  Because the Court did not

15  issue a new summons.

16          THE COURT:  As I understand it, it is the

17  lawyer who gets the summons and gets it issued.  You

18  want a new summons?  I'll give you a new summons.

19  That's not much of a reason.

20          You got the first summons, didn't you?

21          MR. STOJILKOVIC:  This was our understanding.

22  We came here on December the 11th, and we said, We

23  believe we've served them, but the MLAT hasn't

24  arrived.  So we asked for a new summons.

25          The Court expressed concern, and Mr. Belevetz

1   indicated that if the old summons was rescinded, the

2   Court expressed concern, Well, what happens then about

3   this method of service that has already happened?  And

4   I think that was a valid concern.

5           THE COURT:  That wasn't a concern.  That was

6   a question.

7           MR. STOJILKOVIC:  A question, yes.

8           THE COURT:  And then there's also a concept,

9   which at common law was known as an alias summons,

10  which simply was the second summons if there was a

11  problem with the first.

12          Now, somebody needs to get down into

13  nitty-gritty here and get this researched and get it

14  developed in the way that makes sense.  You-all have

15  placed so much emphasis on how important it is.  I

16  would think we'd spend the time going to do it and

17  doing it right.

18          MR. STOJILKOVIC:  Your Honor, we will submit

19  additional briefing on the legislative history.  I do

20  want to, to the best of my ability, address all of the

21  Court's concerns both about the MLAT process and about

22  the way --

23          THE COURT:  Let's take each one of your

24  theories.  First, tell me which ones you've dropped.

25  They have pretty well blown you out of the water on a

1  lot of them.  It looks to me like you might as well

2  turn Mother's picture to the wall on the ones that

3  don't make any sense, and let's decide the ones that

4  do.

5          MR. STOJILKOVIC:  Your Honor, one point of

6  clarification.  Not everything we did we believe was

7  something that resulted in service.

8          THE COURT:  You're trying to press them on us

9  and me and them as if they resulted in service.  You

10  assert that you did them, and these are the things

11  that were done, and then they have to address those

12  things, and they have to go get affidavits, and then

13  you go get affidavits, and you put in evidence, and

14  they say, Well, it's not good evidence.

15          There's a lot of what they say in their

16  papers that makes a lot of sense to me.  I think

17  there's sort of a mishmash of approaches here and this

18  is not a situation in which a leaner counts.  You

19  don't get close in this.  Close doesn't get you a

20  cigar.

21          MR. STOJILKOVIC:  We absolutely agree with

22  that, Your Honor.  So let me turn to the question you

23  asked.

24          THE COURT:  Which one do you want to answer

25  first?  There are all those multiple questions and

1   statements that you should have objected to.   Take

2   each one at a time and tell me, A, I've dropped it, B,

3   why I'm right on it, C, why they're wrong on it.

4          MR. STOJILKOVIC:  Yes, Your Honor.

5          Beginning with service in New Jersey, we no

6   longer contend that service on Sung Gu Hong creates

7   jurisdiction in this case.  And the reason is that

8   Kolon produced in their reply brief a certificate of

9   withdrawal from the state of New Jersey, and by

10  operation of New Jersey law that certificate of

11  withdrawal takes the authority away from Mr. Sung Gu

12  Hong.

13         THE COURT:  What's his last name?

14         MR. STOJILKOVIC:  Hong, H-O-N-G.

15         THE COURT:  Okay.  So you dropped that one.

16         MR. STOJILKOVIC:  Yes, Your Honor.

17         We do believe that the same statute that

18  takes authority away from him grants it to the New

19  Jersey Secretary of State, and so we continue to

20  maintain that service on the New Jersey Secretary of

21  State creates jurisdiction in this case.

22         THE COURT:  But you didn't serve that until

23  after the return date I think Mr. Neal said in his

24  papers.  Isn't he right?

25         MR. STOJILKOVIC:  He is right.

1          THE COURT:  You know, I'm going to go to

2     court, and I get a paper, and it says, Payne, show up

3     in court.  And you've got to be there on X date, and Y

4     date.  And, being a fairly smart fellow, I know to go

5     call my lawyer.  I call my lawyer and say, "What does

6     this mean?"

7          He says, "It means you've got to show up

8     there."

9          "What happens if I don't show up there?"

10          "You can be held in contempt of court.

11     Actually, under the rules here, the government can go

12     get an arrest warrant on you."

13          And I say, "Lord, have mercy.  How can all

14     that happen when they didn't even give me notice to

15     get here on time?"

16          Doesn't that strike you as sort of funny that

17     a summons served after the fact can have effect?

18          MR. STOJILKOVIC:  Your Honor, we believe it

19     can, and if it was just that summons alone served with

20     no other information, we wouldn't be taking that

21     position.  However, we served on the Secretary of

22     State at the same time the original summons and the

23     order continuing the arraignment.  So we served two

24     pieces of paper, which together provide all the

25     information that a summons with a new arraignment date

56

1   would provide.

2          Now, I concede that's not the same procedure.

3          THE COURT:   What were you required to serve

4   under the law?

5          MR. STOJILKOVIC:   We are required to serve a

6   summons.

7          THE COURT:   What is a summons?

8          MR. STOJILKOVIC:   A summons is an order, and

9   in the criminal context, ordering the defendant to

10  appear.

11         THE COURT:   A little bit more than that.

12  Under Rule 4(b)(2), a summons must be in the same form

13  as a warrant.   And that's under 4(b)(1)(A)(B)(C).

14  Contain the defendant's name, description.   (B)

15  Describe the offense.   (C) Command the defendant be

16  arrested and brought without unnecessary delay before

17  a magistrate, etc., to be signed by a judge.   (2) a

18  summons must be in the same form as a warrant except

19  that it must require the defendant to appear before a

20  magistrate judge at a stated time and place.

21         So, clearly, under the rules, an important

22  component of the summons is the date and place of

23  appearance, the time and place of appearance.

24         MR. STOJILKOVIC:   That is true, Your Honor.

25         THE COURT:   Do you take the view that the

57

1   order amended the summons?

2           MR. STOJILKOVIC:  I think the order is

3   effectively the same thing as an amendment to the

4   summons, but I also believe that the provision you

5   just read does not mean that if a summons is served

6   after the fact, that that alone strips the Court of

7   jurisdiction.  And we --

8           THE COURT:  I don't think it strips the Court

9   of jurisdiction.  The question is:  Is it effective?

10           MR. STOJILKOVIC:  We believe it is.

11           THE COURT:  What case says that, that

12   something served after the fact can be effective?

13           MR. STOJILKOVIC:  The closest case that

14   either party has cited, I think by far, is the

15   *Sanderford* case out of the 11th Circuit, which we

16   cited in our latest round of briefing, and if I may

17   explain the circumstances there.

18           *Sanderford* was a civil case, but the

19   situation was exactly analogous.  In a civil case, a

20   summons doesn't order a defendant to appear; it orders

21   them to respond.  And under the civil rules, that

22   summons must tell the defendant what time period they

23   have to respond.  That is a requirement under the

24   civil rules.

25           And the summons in *Sanderfort* left that field

1  blank.   It was a defect in the summons.   Plain and

2  simple.

3         Nonetheless, the Court of Appeals held that

4  the Court had jurisdiction over the case because this

5  wasn't the kind of defect that materially prejudiced

6  the defendant.   The defendant was still served with a

7  summons and the Court of Appeals said that was

8  sufficient for jurisdiction.

9         And the analysis of the Court of Appeals is

10  particularly telling.   Now, in *Sanderford*, the

11  defendant didn't object timely to this issue, and

12  Kolon is right to point that.   But the Court of

13  Appeals didn't decide the case on that basis.   Instead

14  what the Court of Appeals said is that had the

15  defendant timely objected, this matter could have been

16  easily resolved, and it would not have either affected

17  jurisdiction or required a reservice because if the

18  defendant said, Well, this summons doesn't tell me --

19  came into court specially appearing and said, This

20  summons does not tell me when I need to appear, the

21  Court could say, Okay.   When do I need to respond?

22  The Court could say, You can respond by such and such

23  a date.   Problem cured.

24         That's exactly what we have here.   And we

25  attach the Court's order.

1          THE COURT:  But you didn't send that to Korea
2    to serve with the MLAT.
3          MR. STOJILKOVIC:  Yes.
4          THE COURT:  With the MLAT?  Did you use the
5    MLAT to serve that order?
6          MR. STOJILKOVIC:  We submitted it under the
7    MLAT.  And our experience with the MLAT, again, is
8    that it has not gotten there despite our timely
9    submission.
10         THE COURT:  Well, let me ask you something.
11   Do you have anybody in the Justice Department that can
12   follow through on things and talk to people in the
13   State Department and in Korea and say, Get this done
14   and here's why?  Did you do any of that?
15         MR. STOJILKOVIC:  Yes, we did, Your Honor.
16   And I think -- I want to try to best describe where
17   the breakdown occurred.  And it's not going to satisfy
18   the issue, but I think at least the Court deserves to
19   know.
20         Both for the original summons and for the
21   Court's order, we got them out as soon as we could.
22   We translated them into Korean.  We got them out in a
23   timely fashion to the Office of International Affairs.
24   They got them to their Korean counterparts in the
25   Ministry of Justice in a timely fashion.  That is,

1    more than 30 days ahead of the appearance date.

2          THE COURT:  Why would it take very long for

3    somebody in your office up there in Washington if they

4    had to spend the weekend the day after it got to them

5    doing it, and then hand-walking it, where do you take

6    it next?

7          MR. STOJILKOVIC:  No, no, Your Honor.  We did

8    not take 30 days.  We took it -- as soon as we had it,

9    we turned it over.  Or I turned it over as soon as we

10   had it to the Korean authorities.  The 30-day rule I

11   mention because it's in the MLAT, and what the MLAT

12   says is that the Koreans have to get it at least 30

13   days ahead of when the defendant has to appear.

14         THE COURT:  So, now, that's the problem.  You

15   didn't get it there.  You could have gotten it there

16   earlier.  My question is:  From the time that you got

17   the summons in this case, how long did it take to get

18   it to the Korean authorities?

19         MR. STOJILKOVIC:  From the time that we got

20   the summons in the case, it took a couple of months to

21   get it to the Korean authorities.  And the reason --

22         THE COURT:  Now, why did it take a couple of

23   months to get an order of the Court to the Korean

24   authorities?

25         MR. STOJILKOVIC:  Because under the process,

61

```
 1   the Korean authorities were not just going to serve
 2   the summons, they are going to serve the indictment.
 3   And that is how long it took OIA to translate the
 4   indictment.
 5           THE COURT:  Who is OIA?
 6           MR. DRY:  The Office of International
 7   Affairs.
 8           THE COURT:  In the Justice Department?
 9           MR. STOJILKOVIC:  Yes.
10           THE COURT:  So it's all the fault of the
11   Justice Department?  You couldn't have had that thing
12   translated in less time than two months and delivered
13   over there?  I mean, I just find that appalling.  But
14   once you got here and realized that your efforts had
15   been bad or ineffective, you already had it
16   translated, didn't you?
17           MR. STOJILKOVIC:  Yes.
18           THE COURT:  So why didn't you just go do it
19   again with a new summons?  The summons was even
20   translated.  All you had to do was put in a new date.
21   Why didn't you do that?
22           MR. STOJILKOVIC:  We understood that this
23   Court did not wish to issue a new summons.
24           THE COURT:  Where did you get that
25   impression?
```

1      MR. STOJILKOVIC:  From the December 11th
2  hearing.
3      THE COURT:  Well, boy, did I foul you up.
4  Now I know it's my fault.  I mean, I got the
5  impression you-all were being just wooden-headed and
6  not thinking about what needs to be done here.  And
7  maybe the MLAT isn't sufficient.  Maybe that won't get
8  the job done.  They take the view that it won't get it
9  done.  I think probably it will, but I don't know.
10 But it certainly seems to me that I would have gotten
11 a new date, and gone on, and then I would have moved
12 heaven and earth to have figured out a way to get it
13 done.  And I wouldn't send a thing through the
14 bureaucratic mail.  I would walk it along the halls of
15 justice.
16     Where does it go from Justice?
17     MR. STOJILKOVIC:  To Korea.
18     THE COURT:  And I would have flown it to
19 Korea.  And I would have gotten myself a Korean
20 designate, somebody who helps out and knows what's
21 going on, and walked it down the hall, and said, Look,
22 this has happened.  We screwed this up.  We wish we
23 hadn't.  Will you help us?  Get it done.  And then you
24 wouldn't have anything to decide but whether the MLAT
25 is good enough to get the job done.

1    MR. STOJILKOVIC:  Yes, Your Honor.

2         If I may just make one point just to complete

3    the record and I understand the Court's frustration

4    and I take responsibility.

5         THE COURT:  Do you know how much paper there

6    has been?

7         MR. STOJILKOVIC:  I've written half of it,

8    Your Honor.  I do.

9         THE COURT:  Okay.

10        MR. STOJILKOVIC:  We were told repeatedly by

11   the Korean authorities that if we submitted the

12   summons when we did that it would be served easily

13   within the time frame that was necessary.  We had

14   assurances that we received repeatedly that this would

15   not be a problem.

16        And where the problem occurred ultimately,

17   why this service within the 30 days was not enough,

18   Your Honor, as soon as the Korean Ministry of Justice

19   got it, they passed it on.  But in Korea, unlike in

20   most countries pursuant to MLATs, it's not the

21   executive branch that serves; it's the judicial

22   branch.

23        So the summons went over to the Korean

24   Supreme Court and it sat there without any action for

25   about a month.

1      THE COURT:  Did you call the Supreme Court of

2 Korea every day and ask what's going on?

3      MR. STOJILKOVIC:  We contacted our Korean

4 counterparts, who in turn contacted them, at least a

5 dozen times, but for whatever reason, once it got to

6 the Korean court system, it moved a lot more slowly.

7      THE COURT:  Is it possible to put a date on a

8 summons, do you think, that says, Show up on X date,

9 so you have a specific date, or on the Tuesday, three

10 weeks after the date this was served on you, at 10 AM,

11 whichever first occurs?

12      MR. STOJILKOVIC:  I don't see any reason why

13 that would not be appropriate under the rules.

14      THE COURT:  I don't either because it's a

15 date and a time certain.

16      MR. STOJILKOVIC:  I wish we had thought of

17 that, Your Honor.  But the inquiry --

18      THE COURT:  What they're raising is

19 important.  It is clear there's a split of authority

20 in the courts about it.  You're concerned about it

21 sufficiently that you all sent this letter.  They are

22 concerned about it because they're entitled to the

23 benefit of the laws before they are hailed into court

24 to answer up.  That's just the way we do things.

25      And so this is really a matter, I would

1    think, if it's as important as Mr. Breuer says, I

2    would think somebody has to take this on as a project

3    and handle it to a conclusion and see that it gets

4    done right.  It may still be that they object to it.

5    I gather they will if you use the MLAT.  That's their

6    privilege and right.  But at least you'll have the

7    issue cleaned.

8          And what's happened here is there's a lot of

9    different approaches and there's not much that has

10   actually hit the bull's eye.  So I think we need to

11   get this straight.

12         You've abandoned the service in New Jersey to

13   the extent it's based on service of Mr. Hong.

14         MR. STOJILKOVIC:  That's correct, but we do

15   believe the Secretary is properly served.

16         THE COURT:  Yes, but you don't have any case

17   that says late is okay other than the Eleventh Circuit

18   case, right?

19         MR. STOJILKOVIC:  Your Honor, I do have two

20   other cases that bear on that issue and I do want to

21   address the one authority based item on that issue.

22         THE COURT:  All right.

23         MR. STOJILKOVIC:  The two other cases are

24   from the Fourth Circuit.  It's not same defect, but

25   it's a defect that equally goes to whether you have on

1    the face a summons that fully meets the requirements

2    of the rules.  And those are the decisions in --

3    pardon me, Your Honor.  *A. H. Fischer Lumber Company*

4    and *Morrel* are the two cases also cited in our most

5    recent brief.  And there the defendant's name was not

6    correctly entered on the summons.

7            But nonetheless, the Court said, You don't

8    even have to resort to amendment.  The Court said in

9    the strongest possible terms this is, in essence, not

10   a game.  And there's a difference between whether a

11   defendant has been served with process and whether

12   there's some defect in that process.  And the latter

13   does not necessarily go to jurisdiction where there's

14   no harm to the defendant.

15           And that is our argument with respect to

16   timing.  Not everything in Rule 4 goes to whether

17   jurisdiction can attach.

18           THE COURT:  All right.  There's another

19   problem they raise in connection with service on the

20   Secretary of State, isn't there?

21           MR. STOJILKOVIC:  Yes.  The other issue they

22   raise is the New Jersey statute 14A:13-8, which

23   creates this mechanism under which Kolon has

24   irrevocably consented to service.  Talks about

25   liability incurred within New Jersey.  And Kolon

1   argues that this is not liability incurred within New

2   Jersey.

3           We have cited what we believe is the most

4   relevant case on point under New Jersey law, and that

5   is the *Corporate Development Specialist* decision that

6   is discussed on pages 5 and 6 of our Sur-reply.

7           THE COURT:   That case was prosecuted in New

8   Jersey, wasn't it?

9           MR. STOJILKOVIC:   That was a New Jersey case.

10          THE COURT:   Here you don't have that.   Here

11  you have a case being prosecuted in another venue.

12          MR. STOJILKOVIC:   Yes, Your Honor, but the

13  standard is not that we have to bring this case in New

14  Jersey.   The standard is, is this liability in some

15  way a liability that Kolon incurred in New Jersey as

16  well as other places?   And that's the relevant

17  question for the analysis in our view.

18          THE COURT:   So how do we measure that?

19          MR. STOJILKOVIC:   Well, *Corporate Development

20  Specialist* says very clearly that the defendant --

21  liability can occur in New Jersey not only through

22  conduct in New Jersey that causes the liability, but

23  because the defendant has ample contact with New

24  Jersey.

25          And, in fact, in *Corporate Development*

1   *Specialist*, it was the latter rubric that got it done.

2   The defendant wasn't even registered in New Jersey

3   ever to our knowledge.  Yet the Court still said,

4   well, in light of your contacts, the issue in the suit

5   there could be one that could be heard by the New

6   Jersey courts.

7           That's the only case that either party has

8   cited --

9           THE COURT:  What evidence do we have about

10  Kolon's contact with New Jersey?

11          MR. DRY:  They were registered as doing

12  business in New Jersey from 2002 to 2007.  We think

13  that pretty clearly shows their contacts with New

14  Jersey.

15          In *Corporate Development Specialist*, the

16  company was not registered.  So there had to be a

17  finding of fact on what they actually did in New

18  Jersey.  But Kolon directly, unequivocally conducted

19  business in New Jersey from 2002 to 2007 as reflected

20  by the fact that they were a registered company in New

21  Jersey, registered as a foreign company doing business

22  in New Jersey.

23          THE COURT:  Well, but why does that show that

24  the liability was incurred within New Jersey?

25          MR. STOJILKOVIC:  Well, Your Honor --

1          THE COURT:   What predicate do you have to

2    establish liability occurring within New Jersey?

3          MR. STOJILKOVIC:   Your Honor --

4          THE COURT:   And I would assume there has to

5    be liability for the case you're bringing.   Don't you

6    think that's what the statute means?

7          MR. STOJILKOVIC:   It has to be in some way

8    related to the case.   We do describe, Your Honor, in

9    our briefs the way that context did occur in New

10   Jersey relative to this case.

11         THE COURT:   That's one meeting with

12   Mr. Moore.

13         MR. STOJILKOVIC:   Mr. Mitchell.

14         THE COURT:   Mr. Mitchell.   And let's assume

15   that this conspiracy had been formed.   And let's

16   assume that's an overt act in furtherance of the

17   conspiracy.   Is that sufficient in your view?

18         MR. STOJILKOVIC:   Yes, it is, in our view.

19         THE COURT:   How do you measure the liability

20   that's referred to in that statement?   Does that

21   envision criminal liability, that statute, or does it

22   envision civil liability?   Usually, those kinds of

23   statutes relate to civil liability.

24         And liability that's incurred in New Jersey

25   means that they either did something outside of New

1    Jersey to hurt somebody in New Jersey or they hurt

2    somebody in New Jersey.  And, therefore, the liability

3    was incurred in New Jersey because of conduct that

4    occurred there.  But I don't know of any case that --

5    you apply a civil case.  There's no case cited that

6    says that that would apply to authorize service on the

7    Secretary of State in a criminal matter.

8              MR. STOJILKOVIC:  The reason we believe it

9    works that way is that Rule 4(c)(3)(C) talks, among

10   other things, about service of any legally authorized

11   agent.  And we think for that rubric any legally

12   authorized agent clearly would also include authorized

13   under state law.

14             So our argument is if there's a basis under

15   which a civil suit could be brought against Kolon

16   stemming from the same nucleus of facts even if it's

17   just because of the Mitchell meeting that started

18   things up, if there's any basis from which a civil

19   suit could be brought against Kolon and service could

20   be done under the New York Secretary of State, that

21   makes him a legally authorized agent.  The rule says

22   "any legally authorized agent."  And so we think we

23   can look to that in serving a criminal summons.

24             THE COURT:  Is there a case that says that?

25             MR. STOJILKOVIC:  Your Honor, I can submit

1    briefing on this.

2         THE COURT:  Is that sort of like the case I

3    witnessed one time in the Supreme Court of the United

4    States where Justice Marshall asked the lawyer, "Can

5    you cite any authority for that that's not in your

6    head because I can't rely on that which is in your

7    head?"

8         Have you got any authority other than your

9    thought process that gets you to where you want to go

10   on that point?

11        MR. STOJILKOVIC:  Yes, Your Honor.  I believe

12   we can cite dozens of cases.

13        THE COURT:  But did you?

14        MR. STOJILKOVIC:  I don't know that we did on

15   this particular point, but, Your Honor, if what I'm

16   saying is wrong, then the government could never serve

17   a registered agent in another state of a corporation

18   in a criminal case.

19        THE COURT:  Well, can you?

20        MR. STOJILKOVIC:  We think we can.

21        THE COURT:  What case says you can?  I

22   haven't seen a single case that says you can serve a

23   registered agent in New Jersey and use that as a

24   predicate for hailing somebody into court in Virginia.

25        MR. STOJILKOVIC:  Your Honor --

72

1          THE COURT:  I'm sure there must be cases or
2   you wouldn't have made the argument, but I didn't see
3   it in your briefs.
4          MR. STOJILKOVIC:  One point of clarification.
5   There's, admittedly, and I think if the briefing has
6   established anything, it's that there's a limited
7   number of cases on service of corporations in a
8   criminal context.
9          THE COURT:  Okay, but is there one that says
10  what you said?  If I missed it, I want to go back and
11  read it.
12         MR. STOJILKOVIC:  No.  I apologize.  Standing
13  here I cannot think of a case that says that
14  specifically.  And I apologize if I misled the Court.
15         THE COURT:  I didn't suggest you misled me.
16  I wasn't talking about that.  You made a statement
17  about a brief and I didn't find it in the brief.
18         MR. STOJILKOVIC:  Yes, Your Honor.
19         The point I want to make on this is when
20  we're talking about any legally authorized agent, just
21  like when we're talking about in the other part of the
22  analysis about general agent or managing agent, those
23  terms are not only in the criminal rules, they're in
24  the civil rules.
25         And so in a civil case, and on this I'm sure

1   there are plenty of cases and I'll be happy to cite

2   them, there are plenty of cases where you have a

3   federal question case, so it's not a state law case,

4   and, nonetheless, the defendant, a corporation, is

5   served on a registered agent that's located outside of

6   the state of where the Court is sitting.  And that I

7   am confident I can get cases to the Court.

8           And if that's true in a civil context, the

9   question is:  Why should the interpretation of the

10  exact same rules in the service provision in the

11  criminal context be read differently?

12          THE COURT:  But there's no case law

13  developing that point in your papers.

14          MR. STOJILKOVIC:  That is true, Your Honor.

15          THE COURT:  Well, then it's kind of hard for

16  me to use it.

17          MR. STOJILKOVIC:  The difficulty in this

18  case, frankly, Your Honor, I would submit is that

19  there is a limited number of cases where corporations

20  contest service on criminal summons.

21          THE COURT:  Okay.  But they do.  These people

22  do.  And they have a right to.

23          MR. STOJILKOVIC:  They absolutely do, Your

24  Honor.

25          THE COURT:  It has to be done right.  I don't

1    want to put -- I don't think it's right to put -- what

2    you want me to do, according to your papers, at the

3    end of the day is if they don't show up on March the

4    6th, is to start the clock running on their bank

5    account and fine them $10,000 a day or $1 million a

6    day or something for contempt of court.  Is that what

7    you want me to do?  That's pretty serious business

8    where I come from.

9              MR. STOJILKOVIC:  It is absolutely serious

10   business.  The question in this case is whether they

11   have been served and that's what we're arguing.  If

12   you think they have, then I think the Court has to

13   take some action.  It can't just say, You've been

14   served.  Now, if you feel like it, come to court.

15             THE COURT:  So how am I going to enforce

16   that, collect that million dollars or whatever it

17   turns out to be?

18             MR. STOJILKOVIC:  Your Honor, let me just

19   switch to that.

20             THE COURT:  No, you don't have to.  We'll get

21   back to that later.

22             Let's deal with your other modes of service.

23   Let's, for instance, take the theory that they are the

24   alter ego.

25             MR. STOJILKOVIC:  Yes, Your Honor.  I do want

1  to turn to that.

2          May I make one final point on New Jersey just

3  because it's something I wanted to address?

4          THE COURT:  Sure.

5          MR. STOJILKOVIC:  Kolon cited in this latest

6  round of briefs a treatise, Brinkman & Weissenberger,

7  for the proposition that the summons expired.  And I

8  do want to address that because the treatise does say

9  that.  The points I want to make are the following.  I

10  have a copy of it and I'll be happy to give it to the

11  Court because I think it merits an inspection.

12          The treatise does not cite any authority.  It

13  does not cite to any case law for this proposition.

14          THE COURT:  No, it doesn't.

15          MR. STOJILKOVIC:  And also according to our

16  research --

17          THE COURT:  Who is Brinkman?

18          MR. STOJILKOVIC:  I believe it's Kathleen

19  Brinkman.

20          THE COURT:  A practitioner writing the

21  treatise?

22          MR. STOJILKOVIC:  I believe so, Your Honor,

23  and the key is the Court should at least be aware

24  that, according to our research, no federal court has

25  ever cited this treatise for any proposition.  That's

1    not to say it's worthless, but it is not --

2              THE COURT:  Not highly cited.

3              MR. STOJILKOVIC:  It is not an authoritative

4    statement we would submit.

5              Turning to service on Kolon USA, we have two

6    theories.  One is the managing agent.  One is the

7    alter ego.

8              THE COURT:  Let's take the alter ego.

9              MR. STOJILKOVIC:  Yes, Your Honor.

10             THE COURT:  Why are they an alter ego?

11             MR. STOJILKOVIC:  Your Honor --

12             THE COURT:  You're saying Kolon USA is the

13   alter ego for --

14             MR. STOJILKOVIC:  Kolon Industries.

15             THE COURT:  Kolon Industries, right?

16             MR. STOJILKOVIC:  Yes.

17             THE COURT:  Why?

18             MR. STOJILKOVIC:  They are an alter ego for

19   the following reasons:

20             (1)  There's a near totality of ownership.

21   That's not sufficient on its own, but it's a factor.

22             (2) --

23             THE COURT:  How much stock does Kolon

24   Industries own?

25             MR. STOJILKOVIC:  Approximately, 98 percent.

1              (2)   The majority of the board of directors

2    of Kolon USA are Kolon Industries executives.

3              (3)   And this part of the analysis will also

4    affect the managing agent analysis, but we submit that

5    Kolon USA acts as, in effect, a mere branch for Kolon

6    Industries.

7              And the facts that support that are that they

8    sell exclusively Kolon products.  They market even

9    those Kolon products that Kolon USA does not sell in

10   the United States.  So they, in essence, provide free

11   marketing to the parent.

12             In 2011, after Kolon was already involved in

13   the civil litigation and looking at a potential

14   criminal case, Kolon USA after consulting with Kolon

15   opened an office in Atlanta for the purpose of

16   marketing Kolon products in the United States that

17   Kolon, the parent, used to market directly.

18             THE COURT:  They did what now?

19             MR. STOJILKOVIC:  In 2011 -- I'm taking this

20   from the Yang deposition, which I don't believe has

21   been objected to on evidentiary grounds.

22             In 2011, Kolon USA opened an office in

23   Atlanta.  And they did so after consultation with

24   Kolon.  According to Mr. Yang, the reason they opened

25   that office is to market additional Kolon products in

1   the United States.  Products that I don't believe

2   Kolon USA was currently selling.

3           And Mr. Yang conceded that prior to that --

4           THE COURT:  Kolon USA doesn't make anything?

5           MR. STOJILKOVIC:  No, they are a reseller,

6   but they don't sell every Kolon product.  They sell

7   some of them and some of them they at least have not

8   sold to date to anyone in the United States.

9           Mr. Yang indicated that prior to this office,

10  Kolon, the parent, directly marketed those products

11  that are now being marketed out of Kolon USA in

12  Atlanta.  And we do think that's relevant because we

13  think it's proper for the Court to look at how Kolon

14  is positioning itself here.

15          At the end of the day what Kolon hopes to

16  gain if it wins this motion is to both continue to

17  practice in the United States and make money through

18  Kolon USA and yet be beyond the reach of the criminal

19  process.

20          Kolon USA also, according to Mr. Yang's

21  deposition, keeps track of Kolon's customers in the

22  United States.  That is the parent's customers, not

23  the subsidiaries.

24          THE COURT:  What do you mean keeps track of

25  them?

1        MR. STOJILKOVIC:  This was an issue that's

2  important for juridictional discovery in the New York

3  action.  So Mr. Yang was asked:  Where are the

4  parent's customers in the United States?  Does the

5  parent have any customers?

6        Mr. Yang said, "We do keep track of that

7  information in our Atlanta office.  Even if they're

8  not our customers, we do keep track of it."

9        Also, in another instance in the deposition,

10 Mr. Yang was asked about content on the Kolon website,

11 and I believe it's content related to U.S. customers

12 and he could not verify the content, nor could anyone

13 at Kolon USA because they had been taken directly from

14 the parent company.

15        So those are some facts that go to Kolon USA

16 functionally serving as a branch rather than as a

17 separate entity.

18        The additional facts which, we believe, are

19 critical, and particularly under the state law

20 analysis, are, No. 1, the fact that Kolon and Kolon

21 USA changed their payment arrangement after DuPont

22 started successfully garnishing monies.  That happened

23 in September of last year approximately.

24        And the point here, Your Honor, is that under

25 Virginia, and it's also under New Jersey law because

1    it's the same standard, I think the parties agree on
2    that, avoiding a personal obligation is an indicator
3    of alter ego.  And the point is not that Kolon can't
4    contract with Kolon USA.  The point is that prior to
5    September of 2004, Kolon gave Kolon USA 150 days after
6    receipt of goods before they had to start making
7    payments.  That's in the Yang deposition.  And so
8    Kolon USA could get goods, find a customer, get paid,
9    and then in turn pay Kolon.
10          The change that's made after DuPont starts
11   garnishing is to a prepayment, which is in no way
12   advantageous to Kolon USA.  Kolon USA now has to pay
13   for goods before they can sell them down the line.
14   And the timing of the change and the fact that --
15          THE COURT:  What evidence is there about why
16   the change was made or who approved it, who required
17   it?
18          MR. STOJILKOVIC:  Your Honor, there isn't
19   evidence before the Court of why the change was made
20   other than the following:
21          Kolon, Kolon's own attorneys, indicated to
22   their counterparts in the New York action that in
23   light of this change, they didn't believe that DuPont
24   was going to collect any more money.  And we think
25   that given that, and given the timing of the change,

1    DuPont only starts garnishing in the middle of 2012,

2    garnishing these monies owed by USA to the parent.

3    And within a matter of months there's this change.

4    And the terms of the change, without any additional

5    evidence, suggests that Kolon is structuring this to

6    benefit them.

7              I don't see any reason why a prepayment

8    method on its face would benefit Kolon USA because

9    they have to operate now -- they have to, essentially,

10   pay for stuff, and then hope to get the money back,

11   and in the meanwhile they're operating in the red.

12             We do also think that the Mitchell contact in

13   New Jersey has something to do with the alter ego

14   analysis.  And I don't want to overrepresent this, and

15   it is just a meeting and an email that followed the

16   meeting in a relatively short period of time, but

17   there are two critical facts.

18             One is Mitchell met -- and according to

19   Michael Mitchell, according to his deposition, another

20   bit of evidence we submitted that has not been

21   objected to, Mitchell met with both Kolon USA and

22   Kolon employees, parent and subsidiary, and he

23   understood these meetings to be about, in part, him

24   wanting to work and help with the Heracron® product.

25             He came away from those meetings and within a

1    matter of weeks submitted an application to work for
2    the parent to help with Heracron®.  This is on an
3    email that we submitted as an attachment to our
4    response brief.  And he sent that email to an employee
5    of Kolon USA.

6          In addition, at this time Mr. Yang, who was
7    deposed, and who was the president of Kolon USA, had
8    email contact with Mr. Mitchell, but he contacted him
9    not from his Kolon USA email account, but from a Kolon
10   email account.

11         There was nothing about that transaction that
12   would put Mr. Mitchell or anybody else involved in it
13   on notice that these are two separate entities who are
14   evaluating him for separate purposes.  They were very
15   much working symbiotically, and the result of that
16   work in the end is Mr. Mitchell working as a
17   consultant, and that consultantship resulted in Mr.
18   Mitchell's guilty plea to the trade secrets theft.

19         Your Honor --

20         THE COURT:  What does the record show on
21   corporate formalism?  They say you don't dispute that
22   the formalities were maintained.  In their brief, they
23   say that you don't dispute that.  Do you or do you not
24   dispute it?  If you do dispute it, why do you dispute
25   it?

1          MR. STOJILKOVIC:  Your Honor, we don't

2     dispute that they had separate books and records.  We

3     don't dispute that, in general, a number of the

4     formalities were maintained.  There's some instances,

5     like this Mitchell conduct, where you look at the

6     conduct and they're kind of acting interchangeably,

7     but this is not a case based on the evidence we've

8     been able to get our hands on where there's

9     intermingled books or intermingled assets, and that is

10    not our argument here today.  We do concede that.

11         Part of the question of alter ego, and I

12    think the briefs have been over it in some detail, now

13    is what law to apply.  And I submit I think it's

14    pretty clear the courts are all over the place.

15         THE COURT:  But the Supreme Court, which is

16    sort of the one you've got to pay most attention to,

17    says that generally you look at the law in the place

18    of incorporation to measure the legitimacy, vel non,

19    of the corporate structure, doesn't it?

20         And, really, isn't that the general rule, is

21    that you look at the law in the place of incorporation

22    and say, What does the law of the place of

23    incorporation say about piercing the corporate veil?

24         MR. STOJILKOVIC:  Well, Your Honor, I believe

25    the Supreme Court has actually said multiple different

1  pronouncements, and I just want to make sure I have

2  the cases for the Court.

3          In our most recent brief, we did cite a

4  number of Supreme Court cases.  And I'm looking now.

5          THE COURT:  Which brief?

6          MR. STOJILKOVIC:  This is the final briefs or

7  the supplemental brief filed this Tuesday.  And I'm at

8  page 6 of that brief, the second paragraph.

9          There we deal -- we discuss a Seventh Circuit

10  case, which is what Kolon cited initially for the

11  proposition that it's state law, but we contrast

12  that -- there's a Supreme Court case, *United States v.*

13  *Best Food*, declined to decide the issue of state or

14  federal law governs alter ego issues under federal

15  environmental statute.

16          In the *First National Citibank* case, there

17  the Court surveyed principles of corporate law.  The

18  issue was ultimately jurisdiction over foreign bank,

19  and it wasn't strictly an alter ego analysis, but it

20  was a related analysis, but the Court looked both to

21  general principles of corporate law in the United

22  States as well as international principles of

23  corporate law.

24          The last case we cite here, *Taylor*, talks

25  about -- asserts what just appears to be either a

1   summary or a standard about not recognizing corporate

2   form where it would work a fraud or injustice.   None

3   of those cases were decided and adopted a specific

4   state law standard.

5           Neither did the criminal cases in *Chitron* and

6   *Public Warehousing*, which are the two examples we have

7   of alter ego in criminal service disputes.

8           At the end of the day, under the analysis, if

9   you look at the federal -- the analysis that *Chitron*

10  take and *Public Warehousing* take, and the cases

11  decided therein, it's a laundry list of factors.   It's

12  a totality of the circumstances.   The Court can

13  consider anything it feels relevant to the issue.

14          And we do think, as a matter of policy,

15  that's the best approach because in federal question

16  cases, in criminal cases we believe that like facts

17  should lead to like results and defendants should be

18  or shouldn't be dragged into court based on the facts.

19          But if you apply the law of other

20  jurisdictions, if it's New Jersey or Virginia, and

21  Kolon has now argued a lot about Korean law in its

22  final brief as well, there are additional

23  requirements.   And we think out of an abundance of

24  caution the Court should analyze it under both the

25  federal approach and the state law approach because I

1    can't tell you with certainly that one has been deemed

2    superior to the other.

3         The additional aspects of the analysis under

4    the state law approach are this idea, in particular,

5    that the alter ego is used in some way to perpetrate a

6    fraud, commit a crime, or to avoid a personal

7    obligation.

8         Under the rubric of personal obligation,

9    that's where we think that restructuring of the

10   payment terms is very relevant.  And in terms of

11   perpetrating a crime, I think the best evidence here

12   we have are those Mitchell meetings, which are in the

13   period of time that he is starting to engage in

14   discussions with Kolon.

15        Your Honor, if I also may briefly address our

16   discussion of potential discovery related to the alter

17   ego issue, I understand the Court has some questions

18   and Kolon has raised some questions --

19             THE COURT:  How can I do that?

20             MR. STOJILKOVIC:  Your Honor --

21             THE COURT:  And what would I do if I had the

22   authority to do it?

23             MR. STOJILKOVIC:  I think there are a number

24   of options.  First of all, the reason we mention this

25   other evidence, which we haven't been able to see yet,

1   is we want the Court to know there are, we believe,

2   other materials out there.  If the Court is not

3   satisfied with our holding today, we would ask that

4   that not preclude us if we have to go back and get

5   this stuff through other means.

6                THE COURT:  What do you mean?  Help me with

7   what you're saying.  You want me to tell you today

8   whether I think you've gone the necessary mileage and

9   then give you an opportunity to go get some more if

10  you don't?  Is that what you're asking to do?  Do you

11  want me to write an opinion and do that?  I'm lost.

12               MR. STOJILKOVIC:  We understand, and we

13  expect, and we think the Court should rule on whether

14  service has been properly effected based on what's

15  been put before it.  What I would simply ask is that

16  if the Court were to reject our arguments, that that

17  rejection not preclude us if we six months from now

18  serve Kolon USA again, and in the intervening period

19  of time get more evidence of alter ego, not say, Well,

20  you can't argue alter ego again with that additional

21  evidence.  So I do think that's something that we can

22  preserve.

23               If we were to serve Kolon USA again, and

24  after some more passage of time, and develop more

25  evidence of alter ego, I would hope that we would be

1    allowed to present that to the Court, that the Court

2    would be willing to hear it.

3            In terms of what the Court can do now, I

4    think the core things we're asking for are really not

5    to go out and engage in, either for us or even in

6    camera, in some kind of fishing expedition, but we put

7    this statement, and we supported it in a variety of

8    ways about Kolon's representations with the

9    prepayment.  I gather they're not really contesting

10   that that didn't happen.

11           THE COURT:  They're not contesting it or they

12   now are contesting it?

13           MR. STOJILKOVIC:  No.  I have not heard Kolon

14   or read in any of the briefs them say that that

15   prepayment did not occur.

16           THE COURT:  They just say it's legal.

17           MR. STOJILKOVIC:  And that's argument, but

18   that's not something we need to order discovery on.

19   Discovery is on whether or not it happened.  So if

20   they agree it happened, we don't think there's any

21   discovery that needs to be had on that.

22           THE COURT:  What discovery could I order if

23   they don't agree?

24           MR. STOJILKOVIC:  Your Honor, we believe

25   there are materials that have been discovered both in

1   New York, and actually also we have reason to believe

2   submitted in the civil case in this case in civil

3   docket, I believe, 2277, that we have reason to

4   believe substantiate that change in payment occurred.

5   And so I certainly think it's appropriate to --

6          THE COURT:  You haven't moved the Court to do

7   that, though.  You want me to just sua sponte do it?

8   Do you want me to go back out and root through the

9   docket and see what it is that I think may be helpful

10  to your cause?

11         MR. STOJILKOVIC:  No, Your Honor.

12         THE COURT:  And order production of that?

13  What do you want me to do and how do you do it at this

14  juncture?  Or can you do it at this juncture?  And if

15  you want to do it, don't you have to file a motion and

16  give them an opportunity to be heard and deal with it

17  that way?

18         MR. STOJILKOVIC:  Your Honor, I think in

19  light of where we are, I think in light of the facts

20  we have put forward, I would ask the Court to rule on

21  the facts we have before the Court.

22         If the Court rules against us on this and is

23  not persuaded by our other arguments, we do think that

24  for future efforts at service we can go into -- and we

25  can appear here to seek to get evidence.  We can

1  appear in other cases to seek to get evidence.

2          The one point we wanted to raise, Your Honor,

3  is that the Court and the government share a desire to

4  get this case on the Court's calendar and get a

5  defendant before the Court.

6          THE COURT:  Only if it's done in the right

7  way.

8          MR. STOJILKOVIC:  Absolutely, Your Honor.

9          THE COURT:  I don't want you and them and

10  myself and the jury to spend all this time trying a

11  case to have the Fourth Circuit say, "Well, King's X.

12  You didn't get it started right."  I don't think that

13  behooves you or anybody.  And the amount of money it

14  costs them, that's pretty steep, unless Mr. Randall

15  has cut back on his rates or something.

16          MR. STOJILKOVIC:  Understood, Your Honor.

17          May I also be heard on the managing agent in

18  Korea?

19          THE COURT:  Sure.  I want you to take each

20  one of them and tell me about them.

21          MR. STOJILKOVIC:  Yes.

22          THE COURT:  And I want you to -- you know,

23  there's a phrase that's indigenous to this area.  It

24  came over.  It's an Appalachian phrase.  It's called

25  "That dog won't hunt."  If you've got any dogs that

1   won't hunt, put them up, and tell me you put them up

2   so I don't have to spend any time feeding them.

3            MR. STOJILKOVIC:  Absolutely, Your Honor.

4            I only have two hunting dogs left.

5            THE COURT:  You have a lot of them that you

6   have identified.  I haven't heard you drop them yet.

7            MR. STOJILKOVIC:  I do want to get to those.

8            THE COURT:  Go ahead.  Take the next hunting

9   dog and get it out.

10            MR. STOJILKOVIC:  So managing or general

11   agent is our next basis that we are still pursuing.

12            THE COURT:  Well, now, do you believe that

13   there's a difference between a managing agent and a

14   general agent?

15            MR. STOJILKOVIC:  I have not seen one in the

16   case law.  The terms seem to be used interchangeably.

17            THE COURT:  Well, that's true, but also some

18   of these cases conflate alter ego and other theories.

19            MR. STOJILKOVIC:  That's true.

20            THE COURT:  Such as general agent.  And a

21   general agent does not necessarily -- the old law of

22   general agency doesn't necessarily mean that I'm the

23   alter ego of the entity.  I may act in such a way as

24   to subject the company for which I am the agent to

25   liability by virtue of my conduct, but general agency

1  connotes a principal.  And it also suggests that it

2  can be somebody who is not related to the principal in

3  terms of corporate structure.

4        And if that's the case, then the analysis of

5  corporate piercing the veil and general agency are

6  quite different.  Also, managing agent is a concept

7  that is related to the operation of a company.  And it

8  has meaning in context of what your obligations are

9  with respect to the company in terms of certain kinds

10  of functions.

11        And I don't know that it's right to equate

12  managing agent and general agent, but are you saying

13  insofar as you're concerned you think it is?

14        MR. STOJILKOVIC:  Your Honor, the cases that

15  we have reviewed tend to use those terms rather

16  interchangeably.  I agree with the Court's point, and

17  general agent or managing agent have some differences

18  in terms of the law, but in terms of citing cases to

19  this court, the cases tend -- if they are going to

20  call -- if they have gone to this rubric, they tend to

21  invoke both terms, even though maybe it's just one or

22  the other that's applicable.

23        The courts tend to think of it as that's sort

24  of -- managing a general agent is one part of the

25  test.  Other legal agent is another part of the case.

1   Officer and director is another part of the test.

2           THE COURT:   It may be another part of the

3   test, but one part of the test encompasses two

4   different kinds of agent.

5           MR. STOJILKOVIC:   Yes, Your Honor.

6           I wish I could cite --

7           THE COURT:   Do you know of any cases that

8   turn on the fact that the record shows that service

9   has been made on what is called a general agent and

10  what it takes to be a general agent for purposes of

11  Rule 4(c)(3)(C)?

12          MR. STOJILKOVIC:   Your Honor, just a moment.

13  I'm looking at the cases we cited.   And I do think,

14  actually, in the cases we cited to you typically use

15  the term "managing agent" rather than "general agent."

16          THE COURT:   Yes, I think they do.

17          MR. STOJILKOVIC:   So I think you've pointed

18  to perhaps a deficiency in our briefing.

19          If it please the Court, we are happy to

20  gather up cases and look specifically at the issue of

21  general agent.   The treatment we saw often complained

22  of them and we did not analyze --

23          THE COURT:   Let's suppose they get treated

24  the same.   The question is:   What is the general

25  agent?   What are the indicia?   What would I have to

1   find in order to say Kolon USA is not the alter ego of

2   Kolon Industries, but it serves as the general agent

3   of Kolon Industries in the United States or for

4   selling or whatever?

5          MR. STOJILKOVIC:  Your Honor, I believe there

6   are two parts to the inquiry.  And I acknowledge that

7   this issue perhaps has been insufficiently briefed.

8          I think one question with respect to a

9   general agent is that -- is a general agent somebody

10  whose relationship with the defendant is such that we

11  are confident that that person will inform the

12  defendant of the summons that's been served?  They are

13  not some specific agent authorized only for some

14  restricted point such as service on them does not

15  create an obligation on them in turn to notify the

16  defendant.

17         A general agent by virtue of their standing

18  would have, in light of their relationship to the

19  defendant, an obligation to turn around and say,

20  Kolon, I'm your general agent.  I've just been served

21  with this.  Here you go.  You need to know about this

22  service.  So we think that's part of the analysis.

23         The other part of the analysis that we looked

24  at in our briefs, and perhaps this is more, frankly,

25  towards the idea of a managing agent is the courts

1  talk about whether the agent essentially does the

2  business which the defendant could do directly in the

3  jurisdiction.  Whether the agent is, in effect, a

4  branch of the parent is another way it's been called.

5  And we think when we're talking about all the business

6  that Kolon could do here through Kolon USA, the

7  factors that I recounted a few moments ago, selling

8  exclusively Kolon products, marketing even those

9  products that they don't sell, in other words giving

10  free marketing to the parent, opening the Atlanta

11  office and the reasons for that, keeping track of the

12  parent's customers, and featuring content on their

13  website taken directly --

14          THE COURT:  You said something about selling

15  products that they don't sell, and I'm having a little

16  trouble understanding what that means with the

17  indefinite pronoun.  Could you explain that to me?

18          MR. STOJILKOVIC:  Absolutely, Your Honor.

19          I may have misspoken.  Kolon USA markets

20  Kolon's products in the United States.  And they don't

21  market just those Kolon products that Kolon USA sells

22  in the United States.  They also market other Kolon

23  products which the subsidiary does not sell in the

24  United States.  They nonetheless engage in marketing

25  of those products, which is something that clearly

96

1   Kolon could and likely should just do directly in the

2   United States.  They have chosen instead to do it

3   through Kolon USA.  That to us is an indicator of an

4   agency relationship.

5           THE COURT:  They are a sales agent.  They are

6   the marketing arm in the United States for Kolon

7   Industries?

8           MR. STOJILKOVIC:  Yes.

9           THE COURT:  Let's assume that you have

10  established that.  All right?

11          MR. STOJILKOVIC:  Yes.

12          THE COURT:  Why does that make them a general

13  agent for purposes of the rule?

14          MR. STOJILKOVIC:  Your Honor, I think

15  given --

16          THE COURT:  Why doesn't that make them a

17  limited agent?

18          MR. STOJILKOVIC:  Your Honor, if it was just

19  the marking standing alone, I think that may not be

20  enough, but if you look at not only do they market

21  them, they sell their goods.

22          THE COURT:  I don't mean marketing in the

23  limited sense of advertising.  I mean advertising and

24  selling.  They conduct the sales transactions.

25          MR. STOJILKOVIC:  They also helped recruit --

1          THE COURT:  Is there in this record the

2     evidence about what Kolon USA did to try to get

3     Heracron® qualified, etc.?  Is it in this record?

4          MR. STOJILKOVIC:  Your Honor, I don't believe

5     it is in terms of the role in getting Heracron®

6     qualified.

7          THE COURT:  I know about what the record is

8     in the civil case.  Can that be considered?

9          MR. STOJILKOVIC:  We absolutely believe it

10    can be considered.

11         THE COURT:  Do you have an authority that

12    says I can do that?

13         The Fourth Circuit kind of likes me to

14    justify what I do so they can review it and see

15    whether or not I kept my foot on base or not.  I know

16    you think I can, but can I?

17         MR. STOJILKOVIC:  The issue is, in most

18    cases, this case -- the posture of this case is

19    different than most cases.  In the other criminal

20    cases we're discussing there's not a previous civil

21    proceeding.  So the only facts before the Court are

22    the facts that are either alleged in the indictment or

23    supported by affidavit.

24         But, Your Honor, if there is a record that's

25    already before this Court in a civil proceeding

1    stemming from the same nucleus of fact, and I

2    apologize for not having a more specific cite, but the

3    question of whether Kolon has been served and the

4    underlying factual questions of whether service is

5    proper is not a question of whether Kolon is guilty or

6    innocent.  It's not a question in which the government

7    bears the burden of proof beyond a reasonable doubt.

8    It's not a question -- and I would like to get to this

9    because we don't believe the rules of evidence

10   strictly apply in this proceeding.  If --

11          THE COURT:  Are you suggesting that the Court

12   can take judicial notice of the record in the civil

13   case?  Is that what you're saying?

14          MR. STOJILKOVIC:  I think the Court can.

15          THE COURT:  But that's not briefed either.

16          MR. STOJILKOVIC:  Your Honor, we suggest that

17   the Court can do that, but I don't have, and I don't

18   think either side has cited, an authority for the

19   proposition of whether it can or whether it can't.

20          THE COURT:  What am I supposed to do?  The

21   other case lasted seven weeks or something like that.

22   What am I supposed to do?  Go through and identify the

23   things I can take judicial notice of?

24          MR. STOJILKOVIC:  No, Your Honor.

25          THE COURT:  It seems to me that you-all would

1  have to do that and they have a right to say whether

2  or not it was something of which I could take judicial

3  notice or not, on where it falls in the spectrum of

4  judicial notice law.

5          MR. STOJILKOVIC:  Your Honor, we've tried to

6  put before the Court all the materials that we have

7  access to that we believe are most directly on point.

8          THE COURT:  You didn't put all that stuff in

9  front of the grand jury, did you?  The civil case.

10         MR. STOJILKOVIC:  No, Your Honor.  And with

11 respect to that, I think there's a bit of a

12 misunderstanding about the timing.  A lot of the

13 evidence we have about Kolon's relationship with Kolon

14 USA has been developed since we indicted this case.

15 It's been developed as the collection actions have

16 heated up on the civil side.

17         After we indicted this case, we stopped

18 issuing grand jury subpoenas because we don't want to

19 be accused of abusing the grand jury process.  There

20 are certain things that we could not have subpoenaed.

21 We could not have subpoenaed Kolon's change in payment

22 strategy that postdated our date of indictment, for

23 instance.  And we could not have subpoenaed or tried

24 to get out from under using grand jury subpoenas out

25 from under protective order any materials submitted to

1   either this court or to other courts after the date of

2   our indictment.  Or we chose not to the do that

3   because we think that Kolon would argue that that was

4   a violation of the use of grand jury subpoenas.

5            THE COURT:  Okay.  Go ahead.

6            MR. STOJILKOVIC:  Your Honor, on the issue of

7   managing and general agency, one thing we do think is

8   clear, and that is Wright and Miller recounts it and

9   cites after a review of case law, it cites that "A

10  federal standard controls the question of whether a

11  particular person is a managing or a general agent."

12  That's Wright and Miller, Federal Practice and

13  Procedure at Section 1103.

14            We do think in this area we at least have

15  some pretty clear indications of the choice of law.

16  And the cases we cite on page 8 of our final brief,

17  the supplemental brief, are the cases we believe are

18  most directly on point and the cases that analyze the

19  issue carefully.  They don't submerge it with alter

20  ego.  They look at and they understand that one can

21  respect corporate formalities and still very much be a

22  managing agent or a general agent.

23            Your Honor, the final method of service that

24  we are relying on for jurisdiction in this case is

25  service through the MLAT.  And that is the service

1    that occurred two days after the original arraignment

2    date.

3            The MLAT indicates that the parties shall

4    use -- the party receiving the request shall use its

5    best efforts to effectuate service.  It does not

6    contain any time restrictions other than the

7    government in this case get it to the Korean

8    government at least 30 days in advance.

9            As I told the Court, we were repeatedly

10   assured that this was plenty of time.  It turned out

11   not to be the case.  As we have argued, and unless the

12   Court wants me to argue the issue here, we state in

13   our briefs why we don't think the mailing requirement

14   is a strict jurisdictional requirement.

15           THE COURT:  Can the MLAT be used to serve a

16   summons?  If so, what's the authority for that

17   proposition?

18           MR. STOJILKOVIC:  Yes, Your Honor.

19           THE COURT:  Do you realize that MLATs began

20   as ways to sort of seek the assistance of getting

21   evidence?

22           MR. STOJILKOVIC:  Yes, Your Honor.

23           THE COURT:  They evolved from that point to

24   other purposes depending upon the particular MLAT

25   that's was involved.  At least that was my experience

1    when I was in private practice.

2          Now, does this MLAT that we're talking about

3    allow service of process documents?  Korea apparently

4    did it and didn't take umbrage at doing it.  But does

5    the treaty allow it?  And if so, how do I know that?

6          MR. STOJILKOVIC:  It does, Your Honor, and if

7    I may just take a moment.  We have the MLAT.  I

8    believe there are two provisions that are relevant to

9    the issue.

10          The Court's indulgence.

11          Your Honor, Article 14, paragraph 2, of the

12   U.S. Korean MLAT provides that "any request for the

13   service of a document inviting the appearance of a

14   person before an authority in the requesting state,"

15   which here would be the United States, "must be

16   received by the central authority of the requested

17   state," here Korea, "no later than 30 days before the

18   date set for any appearance."  And the MLAT also

19   provides in Article 14, paragraph 3 --

20          THE COURT:  Today is the 8th of February.

21          MR. STOJILKOVIC:  Yes, Your Honor.

22          THE COURT:  So you can't, if you started

23   today, you couldn't get it done in time to get it to

24   Korea by courier tonight and get it there in 30 days

25   because the hearing is March the 6th, right?

1    MR. STOJILKOVIC:  That's correct, Your Honor.

2    And based on our experience, I seriously doubt we

3    could effect service within the MLAT between now and

4    March 6.

5            THE COURT:  Not using the approach you used

6    the last time you couldn't.

7            MR. STOJILKOVIC:  Yes, Your Honor.

8            THE COURT:  Go ahead.

9            MR. STOJILKOVIC:  Your Honor, as soon as we

10   had -- with respect -- I do want to address the

11   territorial limitation that was raised by counsel for

12   Kolon.  That's in Rule 4(c)(2).  And it says both with

13   respect to a summons and with respect to an arrest

14   warrant, they shall be only served within the United

15   States.  And it does create also -- they can also be

16   served anywhere else pursuant to federal statute.  And

17   if you look to the advisory committee notes, that's

18   really a limited set primarily for arrests of U.S.

19   military personnel located abroad.

20           That provision is not properly read as

21   preempting or invalidating, in essence, service under

22   the MLAT or service under an extradition treaty of an

23   individual.

24           In both cases, the government within the

25   United States obtains a document, whether it's an

1    arrest warrant or whether it's a summons, but the

2    government does not directly seek to serve those

3    outside the United States.  And that is the key, in

4    our view.  The government can't go -- we can't go to

5    Korea directly and the United States agents arrest one

6    of the individuals charged in this case without

7    causing a significant diplomatic issue.

8            And under the MLAT, we don't go and serve,

9    and under Rule 4, we don't ourselves go into Korea,

10   find Kolon Industries or find their executives and

11   serve them with summons.  But the rules are silent on

12   what our foreign partners can do.  And we think it's

13   completely consistent with the rules to say that

14   foreign parties may take other steps, and that those

15   steps are governed not by the federal criminal rules,

16   but by treaties between the United States and those

17   foreign parties.

18           In fact, while there's limited case law in

19   corporations, there's a lot of case law, Your Honor,

20   on extradition of individuals.  We get about 600

21   extraditions a year in the United States.  And they

22   all happen because an arrest warrant is issued in the

23   United States, and then the United States notifies a

24   partner country pursuant to one of our many, many

25   extradition treaties, and then those people -- their

1    liberty is restrained abroad and they are brought to

2    the United States.

3         If that doesn't violate the territorial

4    limits in 4(c)(2), then neither does the fact that

5    here we asked the Korean authorities to help serve,

6    help notify Kolon.

7         As with all the methods of service, we

8    submitted a proof of service on this as soon as we had

9    it.  That is a form attached as Exhibit A of our

10   response brief, and that form is fully translated.

11        Just a couple days ago we received another

12   form, a certificate, from a court in Korea.  And we

13   attached that to our most recent filing.  The form

14   itself is translated.  There are a couple of entries

15   there that are not translated, and we'll be happy to

16   provide a certified translation as soon as possible.

17   We got this and immediately turned around and filed

18   it, but --

19        THE COURT:  How long is that document?

20        MR. STOJILKOVIC:  It's one page, Your Honor.

21        THE COURT:  How long does it take to get that

22   translated?  Certified?

23        MR. STOJILKOVIC:  Certified, maybe a couple

24   days.

25        THE COURT:  I wouldn't think very long.

1          MR. STOJILKOVIC:  It's not, Your Honor.  We

2    have an understanding of the two words that are

3    untranslated in there.  I can give the Court my

4    understanding, but I'd rather give the Court --

5          THE COURT:  I think you need to get a

6    certified translation that they have legitimately

7    complained about what you've done.

8          MR. STOJILKOVIC:  Your Honor, the proof of

9    service we submitted was translated, and it said that

10   the delivery occurred, and it described the manner in

11   which the delivery occurred.  And we believe that the

12   Court will see once we have submitted a certified

13   translation of the certificate that it essentially

14   just attests to the very same facts in the proof of

15   service.

16          We also indicated to the Court and attached

17   an email chain, and I just want to briefly comment on

18   that.  Kolon has accused us in the past, and we don't

19   explain the nature of our interaction with Korean

20   authorities, that we haven't supported them, and so

21   this is an email chain reflecting our efforts to find

22   out more information about this certificate that we

23   just received.  And the parties are identified in the

24   email.

25          It's a conversation between Timothy Hammer of

1    the Office of International Affairs of the Department

2    of Justice, and his Korean counterpart, whose full

3    name is reflected in the emails, who is a prosecutor,

4    deputy director, in the Korean Ministry of Justice.

5           We submit that simply because I can tell the

6    Court here, I can stand up here and tell you that the

7    Korean Ministry of Justice says this attests to the

8    fact that the Korean courts find service appropriate.

9    You can see that from the certificate itself because

10   it says in translation, this is the part that is

11   translated, that service was effected.  But in case

12   there's any doubt about whether we're getting other

13   information from the Koreans, we attach it for

14   whatever value it has.

15          THE COURT:  The motion of the defendants asks

16   for dismissal of the indictment if the subpoena is

17   quashed.  What is your view on that?

18          MR. STOJILKOVIC:  That is not an appropriate

19   remedy.  Our view on that, there's two reasons, two

20   principal reasons.

21          First is if the Court finds that we have not

22   served successfully to date, there are additional

23   steps the government can and will try to take.  Some

24   of those steps may be relatively easy.  Others are,

25   frankly, more time consuming.  But as long as there is

1   a route for us to effect service, and as long as the

2   government is trying, and I think our efforts however

3   they may be characterized, I'm pretty sure the

4   government has tried in dozens of ways to effect

5   service in this case, we should be permitted to

6   continue doing so.

7           I would note, for instances, that even if --

8   if the timing issue is of a concern to the Court, and

9   this is a point I do want to make, we can seek to

10  rectify that.  With respect to the service in the New

11  Jersey, the Secretary of State, now understanding the

12  Court's position on an amended summons, we can get an

13  amended summons or a new summons.  We can ask for one

14  on Monday and re-serve the Secretary of State and get

15  that proof of service to the Court before the end of

16  next week.  That's easy for us to do, and if the Court

17  doesn't have a problem with us doing that, we will do

18  that right away.

19          THE COURT:  Don't you think that it might be

20  difficult for the defendant to be served that way with

21  one date and then under the MLAT told another date --

22          MR. STOJILKOVIC:  Well --

23          THE COURT:  -- when you go back and do the

24  MLAT right using an expedited and sensible procedure

25  to follow through and do it right?

1          MR. STOJILKOVIC:  Well, Your Honor, what I'm

2     suggesting is that if the only thing the Court wanted

3     us to do or felt needed to be done to perfect the

4     record by March 6, we can re-serve the New Jersey

5     Secretary of State.

6          THE COURT:  What is the status of the

7     extradition?  It would not be a good thing to try this

8     case twice, I don't think, assuming that it ever gets

9     to trial on the case of Kolon Industries.  What's the

10    status?  You told me you were extraditing or seeking

11    extradition of the individuals.  Where do you stand?

12         MR. STOJILKOVIC:  We are seeking extradition

13    of the individuals.  Where that currently stands is

14    that the Department of Justice is working with the

15    Korean authorities to get them in translation and into

16    forms they want as much evidence as they need to have

17    a successful extradition proceeding.

18         THE COURT:  I don't understand what that

19    means.

20         MR. STOJILKOVIC:  Yes, Your Honor.

21         THE COURT:  Being unfamiliar with the details

22    of what is required.

23         MR. STOJILKOVIC:  An extradition, it's not

24    just a matter of finding the individual and serving

25    them with the indictment and with an arrest warrant.

1    There is a proceeding in Korea I think not unlike what

2    would happen if somebody in the United States got

3    indicted where they have process before a Court.  And

4    as part of that process, the government has drafted

5    and has shared with the Korean counterparts affidavits

6    because it's not just the indictment isn't sufficient,

7    affidavits both from prosecutors and from agents

8    explaining the individual's role, recounting evidence

9    against the individual.

10            The government also is getting to the Korean

11    authorities and this is where things currently stand.

12    What we don't want to have happen is getting an

13    extradition proceeding and then lose it in Korea

14    because of insufficient evidence.

15            So we want, even if it takes some more time

16    on the front end, we want to get them all the evidence

17    they have so the courts in Korea have the best case

18    possible to order extradition here.  And that has been

19    a back and forth process because we are gathering lots

20    of evidence.  We have the evidence, but we have to

21    determine what's going to be necessary to the courts

22    there.  We have to translate evidence when it's

23    depositions in English, and things of that nature, and

24    that is the process that is ongoing.

25            I will be frank with the Court.  We think

1    it's likely going to be a matter of years before these

2    individuals show up.

3              THE COURT:  Years?

4              MR. STOJILKOVIC:  Years.  And with respect to

5    that, it is not about how much diplomatic pressure we

6    put on, it's about how long the court proceedings take

7    in Korea.

8              And for that reason -- and just to contrast

9    the *Dotcom* case, the *Dotcom* case, Judge O'Grady

10   basically said, Well, who knows if this will ever

11   happen, but I'm not going to dismiss your indictment

12   because it might some day and some day this guy might

13   come here and you might have a case.

14             We're doing everything in our power not to

15   have to put this case in that posture, and we are

16   prepared, Your Honor, and willing and ready and able

17   to go to trial against the corporate defendant.  We

18   think trials against the individual defendants will be

19   a lot shorter.  Each individual's role is relatively

20   limited.  I don't think it's going to be a lengthy

21   proceeding with respect to them once we get them here.

22   But we want to do everything in our power to serve the

23   corporate defendant and not have years go by before we

24   have a trial because we simply cannot control how

25   quickly those extraditions will happen from Korea.

1          THE COURT:  I see.  Anything else?

2          MR. STOJILKOVIC:  Your Honor, briefly on the

3    evidentiary objections.  As we said, the government's

4    view is that we are not in a proceeding where the

5    rules of evidence apply.  And the critical issue is

6    that the Court has not asserted jurisdiction.  We do

7    not have a defendant.  We have a specially-appearing

8    defendant, but we do not have a full-blown criminal

9    proceeding.

10          So we think this proceeding is very much like

11    the non-exhaustive list of miscellaneous proceedings

12    exempted from the rules of evidence, which includes

13    proceedings related to the issuance of a summons in a

14    criminal case or extradition proceedings.

15          THE COURT:  Isn't this proceeding related to

16    the issuance of a summons?

17          MR. STOJILKOVIC:  It's certainly related to

18    that, Your Honor.

19          THE COURT:  What does that mean?  That's

20    rule --

21          MR. STOJILKOVIC:  It's Federal Rule of

22    Evidence 1101, I believe, Your Honor.  Yes, 1101(d)

23    lists exceptions.  It says that these rules, except

24    for those on privilege, do not apply.  And then in sub

25    3, to miscellaneous proceedings such as -- so this is

1   not an exhaustive list, but that list does include

2   issuing an arrest warrant, criminal summons or a

3   search warrant.

4            THE COURT:  My question is, it says, The

5   rules, except for those on privilege, do not apply to

6   the following:  Sub 3, miscellaneous proceedings such

7   as issuing an arrest warrant, criminal summons or a

8   search warrant.

9            Now, aren't we here talking about the

10  issuance of a summons?

11           MR. STOJILKOVIC:  Yes, we are.

12           THE COURT:  Isn't your position that's where

13  it falls?

14           MR. STOJILKOVIC:  Our argument is that's

15  where it falls.  And, Your Honor, if there's any

16  question about that, I think what Kolon is going to

17  argue in opposition is they're going to say, Well,

18  you're not issuing a criminal summons.  You're

19  deciding whether it's been served.

20           We think even on Kolon's reading as a back-up

21  position, these are miscellaneous proceedings such as,

22  and our proceeding is, at the very least, closely

23  related to the issuance of a criminal summons.

24           THE COURT:  Another leaner, huh?

25           MR. STOJILKOVIC:  Your Honor, we're trying to

1   make all the arguments we can, and I think, if nothing

2   else, the way the district courts have struggled with

3   this issue in the prior cases suggests that there are

4   some unclarities in the law.

5          THE COURT:  All right.  Thank you.

6          MR. STOJILKOVIC:  I don't know if the Court

7   wants to hear anything on contempt or appointing

8   counsel now or to save that for March 6.

9          THE COURT:  I think I need to get the cart

10  before the horse before I move forward.

11         MR. STOJILKOVIC:  Yes, Your Honor.

12         THE COURT:  All right.

13         MR. STOJILKOVIC:  Thank you.

14         THE COURT:  Thank you.

15         Is there anything else, Mr. Neal?

16         MR. NEAL:  Thank you, Your Honor.

17         With respect to the problems with the date of

18  the summons, counsel said that *Sanderford* is their

19  best opinion in support of the position that it's no

20  big deal.  *Sanderford* actually stands for the reverse.

21         In *Sanderford*, the Court of Appeals

22  specifically said that where process is defective in

23  omitting a date, the summons requires an amendment.

24  They didn't insist on it there because they found that

25  the defendant had sat by idly and never raised the

1   issue until after final judgment had been entered.  So

2   it was a waiver issue, not a substantive issue.

3           Counsel says that service on the New Jersey

4   Secretary of State on the defunct corporation is good.

5   It is not, Your Honor.  The New Jersey statute

6   specifically says that service is for the purpose of

7   wrongs or issues arising in New Jersey under the laws

8   of New Jersey.  There's nothing in the indictment that

9   suggests that anything in this case arose in New

10  Jersey or involved New Jersey.

11          THE COURT:  Well, it doesn't have to be in

12  the indictment if there's evidence of it, does it?

13          MR. NEAL:  Correct.  The only evidence with

14  respect to Mitchell is that he was interviewed for a

15  job with Kolon USA one year before the conduct

16  involving Mitchell in the indictment begins to run,

17  and it was for a job that they concluded he wasn't

18  suited for.  That doesn't establish anything.

19          Counsel on the alter ego I think now concedes

20  that the corporate formalities have been met as we

21  said.  Further arguments on the alter ego are a

22  combination, Your Honor, I think of things that aren't

23  actually in the evidence are all or things that don't

24  amount to any establishment of alter ego.

25          The best example of those are these

1   discussions about changes in the contractual

2   relationships between Kolon Industries and Kolon USA.

3   The record is almost devoid of any real evidence about

4   what those are, Your Honor, where they occurred, why

5   they occurred, or what the consequences are.  So those

6   are almost naked assertions.

7            The other cases that counsel cites with

8   respect to the summons issue and whether they are just

9   too late are cases, Your Honor, that involve slight

10  misstatements in the name on the summons, the absence

11  of the word "Inc." or referring to it as "a

12  partnership" versus "a corporation."  That's not what

13  we have here.

14           What we have here is a failure to make any

15  service, good or bad, before the date that was called

16  for in the summons.

17           Your Honor asked about MLAT and whether MLAT

18  facilitates service of process.  An interesting thing,

19  at least as I've read it, there's only one place in

20  the MLAT where it even talks about service of process,

21  and that is not in Article 14, Your Honor.  It is in

22  Article 12.  And as Your Honor said, MLAT arose for

23  the purpose of facilitating the obtaining of evidence,

24  not for the purpose of obtaining custody over people

25  or service of process.

1          Article 12 specifically provides that if

2    somebody is brought to the USA pursuant to MLAT for

3    purposes of giving evidence, they cannot be subject to

4    process as a result of having been brought here.  It

5    creates a safe harbor.

6          THE COURT:  Article 14, according to the

7    Senate report, page 24, says, This article creates an

8    obligation for the requested state to employ its best

9    efforts to effect the service of summonses,

10   complaints, subpoenas, and other legal documents on

11   behalf of the requesting state.

12         I think that's pretty well settled.  But if

13   you think that's wrong, tell me why that's wrong.

14   That's what the legislative history says in the report

15   of the Senate, July 30, 1996.

16         MR. NEAL:  As I said this morning, Your

17   Honor, I think if we put aside the whole territorial

18   issue that we put aside, that if you put that aside

19   and there's not a territorial restriction arising out

20   of 4, our position has been that the delivery half of

21   4(c)(3) can be met by MLAT if it's done properly.

22         THE COURT:  The mailing requirement can't be?

23         MR. NEAL:  Yes, that the mailing requirement

24   cannot be.

25         THE COURT:  If the delivery requirement can

1    be, why can't the mailing requirement be accomplished

2    by way of MLAT as well?

3              MR. NEAL:  Because the rule, the clear face

4    of the rule, for whatever reason, and we can go back

5    and talk about the history, but the clear face of the

6    rule says the mailing has to be to a last known

7    address in the district or a place of business in the

8    U.S.

9              THE COURT:  Well, I think that you're going

10   to go back and find what that really means is it

11   contemplates a corporation that's within the United

12   States.  I think that's what we're going to find.  It

13   just didn't contemplate foreign corporations in its

14   reach when it was implemented.

15             MR. NEAL:  That's sort of what the --

16             THE COURT:  The question then becomes, Okay,

17   so what?  The language is still there.  What do you do

18   with the language according to your theory?

19             MR. NEAL:  Yes.  I totally agree.  It's what

20   do we do about it?  And that's sort of what Breuer's

21   letter says.  Breuer's letter says it is because

22   historically when we got into the business of

23   indicting corporations, we were indicting domestic

24   corporations, and we hadn't confronted the phenomenon

25   that this indictment presents back at that time

1   period, and that's why they are saying, Let's fix the

2   rules.  What the prosecution is saying is you ought to

3   fix the rules, and what Breuer is saying is that the

4   Rules Committee ought to fix the rules.

5          THE COURT:  Do you think we're ill-suited to

6   fix the rules, people in black robes?

7          MR. NEAL:  I think --

8          THE COURT:  I think the answer to that is

9   yes.

10          MR. NEAL:  I think you may be better suited

11  than most to know what the rules ought to say.

12  Unfortunately, we have a system.

13          And Your Honor said a number of times, if

14  we're going to be -- obviously, we're going to be

15  hauled in here on this indictment.  It's got serious

16  major consequences potentially of all sorts.  And if

17  it's going to be done, it ought to be done right.  And

18  we've had sort of a changing series of targets as to

19  what the theory is.  We've had missed dates.  We've

20  had references to evidence that we don't think is

21  actually before the Court, putting aside the whole

22  1101 issue.

23          Then under 1101, it's not true that the

24  evidentiary issues here are about the service of

25  process.  The evidentiary issues here are about the

1  alter ego.   The evidentiary issues here are about the

2  relationship between Kolon Industries and Kolon USA,

3  issues on which they have the evidentiary burden.

4  Mere argument doesn't meet it.   And those are issues

5  on which on the key elements they've conceded they

6  don't have the case.   The corporate formalities are

7  met.

8          And the mere fact that Kolon USA sells some

9  products for us has never in any case been held to be

10 sufficient to find an alter ego.   And they talk about

11 the *Chitron* case and the PWC case, and I invite Your

12 Honor to judge that issue by the standards in those

13 cases.

14         We cite *Wolff* and *Pangang*.   And those two

15 cases are very much like this one is.   *Chitron* and PWC

16 are not, and they don't come close to meeting the

17 burdens as articulated in *Pangang* or PWC.

18         And we thank very much for your time, Your

19 Honor.

20         THE COURT:   All right.   Thank you.   We're

21 going to recess.

22         But, Mr. Randall, I need to see you up here.

23 And you can come up, Mr. Dry.   It has nothing to do

24 with this case, but so you'll know that, I need to

25 talk with you.   We're off the record.

1          (Off the record discussion.)

2          THE COURT:  All right.  We'll be in recess.

3

4          (The proceedings were adjourned at 12:31 PM.)

5

6          I, Diane J. Daffron, certify that the

7 foregoing is a correct transcript from the record of

8 proceedings in the above-entitled matter.

9

                   /s/
10      _____      _____
         DIANE J. DAFFRON, RPR, CCR         DATE
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25